**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| RICHARD L. WILLIAMS and MICHAEL E. PETERS, | : | |
| Plaintiffs, | : | |
| v. | : | Civil Action No.: 05-0435 (GMS) |
| DOVER DOWNS, INC., | : | |
| Defendant. | : | |

**APPENDIX TO DEFENDANT'S**
**OPENING BRIEF IN SUPPORT OF**
**ITS MOTION FOR SUMMARY JUDGMENT**

Date: May 17, 2006

Noel C. Burnham (DE Bar No. 3483)
Richard M. Donaldson (DE Bar No. 4367)
Montgomery, McCracken, Walker & Rhoads, LLP
300 Delaware Avenue, Suite 750
Wilmington, DE 19801
(302) 504-7840

*Counsel for Defendant Dover Downs, Inc.*

# TABLE OF CONTENTS


| Document | Appendix Page |
|---|---|
| Deposition (Excerpts) of Michael Peters, dated February 14, 2006 | A0001-A0011 |
| Deposition (Excerpts) of Richard Williams, dated February 14, 2006 | A0012-A0032 |
| Deposition (Excerpts) of Ernest Carlisle, dated March 10, 2006 | A0033-A0036 |
| Deposition (Excerpts) of Thomas Curtis, Jr., dated February 9, 2006 | A0037-A0038 |
| Deposition (Excerpts) of Joe McNair, dated February 9, 2006 | A0039-A0041 |
| Deposition (Excerpts) of William Robert Morrison, dated February 9, 2006 | A0042-A0047 |
| Deposition (Excerpts) of Robin Roberts, dated February 13, 2006 | A0048-A0049 |
| Deposition (Excerpts) of Edward J. Sutor, dated February 9, 2006 | A0050-A0059 |
| Deposition (Excerpts) of Brian D. Williams, dated February 13, 2006 | A0060-A0063 |
| Job Description for Maintenance Mechanic I | A0064-A0065 |
| Excerpts of Dover Downs' Employee Handbook | A0066-A0071 |
| Disciplinary Warning Notice - Written Warning re: Michael Peters | A0072-A0073 |
| Disciplinary Warning Notice - Written Warning re: Richard Williams | A0074-A0075 |
| Accident Report, Race Track 12/23/03 | A0076-A0129 |
| Disciplinary Warning Notice - Termination re: Michael Peters | A0130-A0132 |
| Disciplinary Warning Notice - Termination re: Richard Williams | A0133-A0134 |
| Declaration of Robin Roberts, dated May 16, 2006 | A0135-A0136 |
| Declaration of Edward Sutor, dated May 16, 2006 | A0137 |
| Peace v. Shellhorn & Hill, Inc., C.A. No. 03-1007 (GMS), 2005 U.S. Dist. LEXIS 2533 (D. Del. Feb. 18, 2005) | A0138-A0149 |

1

IN THE UNITED STATES DISTRICT COURT
IN FOR THE DISTRICT OF DELAWARE

RICHARD L. WILLIAMS and )
MICHAEL E. PETERS, )
Plaintiffs, )
)
v. ) C.A. No.
) 05-0435 (GMS)
DOVER DOWNS, INC., )
a Delaware corporation, )
Defendant. )

Deposition of **MICHAEL PETERS,** taken before Cheryl A. Anthony, Court Reporter, in the law offices of Parkowski, Guerke & Swayze, 116 West Water Street, Dover, Delaware, on Tuesday, February 14, 2006, beginning at 9:00 a.m.

APPEARANCES:

PARKOWSKI, GUERKE & SWAYZE
BY: JEREMY W. HOMER, ESQUIRE
116 West Water Street
Dover, Delaware 19901
Attorney for Plaintiffs.

MONTGOMERY, McCRACKEN, WALKER & RHOADS
BY: EDWARD T. ELLIS, ESQUIRE
123 South Broad Street
Philadelphia, Pennsylvania 19109
Attorney for Defendant.

ALSO PRESENT:

MR. RICHARD L. WILLIAMS
MS. ROBIN M. ROBERTS

ORIGINAL RETAINED BY EDWARD T. ELLIS, ESQUIRE

ANTHONY REPORTING
PO Box 234
Dover, Delaware 19903
(302)674-8884

2

MICHAEL EARL PETERS,
the witness herein, having first been duly sworn on oath, was examined and testified as follows:

BY MR. ELLIS:

Q. Mr. Peters, my name is Ed Ellis. I am a lawyer, and I represent Dover Downs in the lawsuit you brought against Dover Downs. What I'm going to do today is conduct a deposition, and you are the witness. So I'm just going to give you a few instructions as to how we go about doing this.

The first question to you is: Have you ever been deposed before?

A. No, I have not.

Q. Well, the rules are really pretty simple. I am going to ask the questions, and you answer the questions. If you don't understand a question, please tell me and I will try to make it clear, because sometimes lawyers ask questions that are less than clear.

At the end of all this, the court reporter is going to prepare a transcript. She will give it to you so that you can read and make any changes that you have in your transcript. Other than that, it's really

3

pretty simple. If you have any trouble with the question, say so and that sort of thing.

MR. HOMER: I hate to interrupt you already, but just to make it clear, you can't change the transcript. You can't change your answers. All you can do is check the transcript to see if she has taken it down right. Maybe she misspelled a name or something like that. But you can't modify your prior response.

MR. ELLIS: Sure, you can. The rule says you can make a change to form or substance. I don't want to get into a rules argument with you on the record.

MR. HOMER: That is not the typical practice, I don't believe. But that is fine, if that is what you anticipate. That is fine.

MR. ELLIS: I'm just reciting what the rule says. That is all. I am not anticipating anything.

MR. HOMER: All right.

BY MR. ELLIS:

Q. Mr. Peters, are you currently employed?

A. Yes, I am.

Q. Where do you work?

A. Kent Construction.

Q. Kent, K-E-N-T?

4

A. Yes.

Q. How long have you worked there?

A. About three and a half months.

Q. Do you remember what month you started?

A. The beginning of November.

Q. Of 2005?

A. Yes.

Q. And what is your job?

A. Truck driver.

Q. What kind of a truck do you drive?

A. Six-wheel dump truck with a trailer; I move a lot of equipment and move a lot of material.

Q. What is your rate of pay?

A. It's $18 an hour -- excuse me, $17 an hour.

Q. And is that the pay rate that you started at?

A. Yes.

Q. Is this a 40-hour a week job?

A. Most weeks, no; usually, it's less.

Q. Is that because of the weather?

A. Yes.

Q. Would you expect when the weather turns better, it will be a 40-hour a week job?

A. Probably.

13

the question, because the otherwise, the court reporter has an awful time trying to keep it all straight.
A. Okay.
Q. Are you married?
A. Yes.
Q. Do you have children?
A. Yes.
Q. How long have you been married?
A. 28 years.
Q. How many kids do you have?
A. One.
Q. How old?
A. 26.
Q. Boy or girl?
A. Boy.
Q. And what is his name?
A. Michael E. Peters, Jr.
Q. How long have you known Rich Williams?
A. The whole time I worked at the track.
Q. Do you remember what year you started at the track?
A. '84.
Q. And do you consider yourself to be a friend of Rich Williams'?

14

A. Yes.
Q. A good friend?
A. Yes.
Q. Do you socialize with him outside of work?
A. Not very often.
Q. Have you socialized with him at all outside of work?
A. We went to dinner or lunch.
Q. Dinner with your wives?
A. Yes.
Q. Have you ever been to his house?
A. Yes.
Q. Has he been to your house?
A. Yes.
Q. Do you consider him a good friend?
A. Yes.
Q. You held a position at Dover Downs, as I understand it, called mechanic I. Do you remember that?
A. Yes.
Q. Were you ever a mechanic II or a mechanic III?
A. I don't remember.
Q. Did you ever see a job description for a mechanic I?

15

A. Yes.
Q. I'm going to show you what we have marked in another deposition as Exhibit P-1. I would like you to take a look at that.
A. I don't remember any of this, my job description.
Q. Do you ever remember seeing a job description?
A. Yes. I saw it one time.
Q. Who did you get it from?
A. Bob Morrison.
Q. Were you ever involved in submitting suggestions as to what should have been in the job description for maintenance mechanic I?
A. I believe we did do something along those lines.
Q. Do you remember when that was?
A. (The witness nodded head from side to side.)
Q. Do you remember who your supervisor was at the time that occurred?
A. I believe it was Rich.
Q. Did Rich communicate to you that the company wanted you to make suggestions as to what should be in the job description?

16

A. That was a long time ago.
Q. Can you give me an approximate when it occurred?
A. Several years before, I would say around 2000, maybe even before that. I'm just guessing here. I don't know.
Q. I understand. Do you remember how many years you worked under Rich Williams?
A. The whole time he was the manager, and that was ten years or something.
Q. Okay. So he did your performance appraisals?
A. Yes.
Q. Do you recall making any suggestions to him as to what should go in the maintenance mechanic I job description?
A. No.
Q. Do you recall that you didn't make any suggestions?
A. Not to Rich.
Q. Did you make them to anybody?
A. They requested -- I don't think it came through Rich. They requested that we write our own job descriptions at one point. Don't ask me when that was.

Q. When you say they, who was the they?
A. I don't know who requested that. It may have been Robin. I'm not sure.
Q. Robin Roberts?
A. Yes.
Q. Did you write your own job description?
A. I believe I did.
Q. And who did you submit it to?
A. I don't remember.
Q. Prior to when Bob Morrison gave you the job description, had you ever seen a job description for maintenance mechanic I?
A. No.
Q. So whatever you submitted to somebody at the point they asked you to describe your job, you never saw anything back?
A. No.
Q. In the job description I put in front of you, P-1, if you look at the essential functions section and look down to the fourth bullet point on that, do you see that --
A. Uh-huh.
Q. -- where it describes various, different specialties?



A. Uh-huh.
Q. Did you, as a maintenance mechanic I, have a specialty in one of the areas identified in Exhibit P-1?
A. Yes.
Q. What was that?
A. A carpenter.
Q. Okay. Now, I want to ask you some questions about the last year or so of your employment. First of all, what did you call the group of people that you worked with? Was it called the outside maintenance crew?
A. At some points it was.
Q. Okay. Was it called other things, too?
A. Yeah. It went through some names, I'll say. And I don't remember them all.
Q. At the point that you left the company, did you consider that group that you worked in outside maintenance?
A. I think at the time, we were -- no, I won't say. I don't remember what we were calling it at that time.
Q. Okay. Who were the people that you worked with in your unit? Do you remember the names of the people?



A. I remember some of them.
Q. Why don't you tell me the names of the people you remember?
A. Obviously, Rich was there, and Don Sylvester, Mike Monohan, and I remember Steve Maher. And there was Bill -- I don't remember his last name right offhand -- and Dave Pelly, Larry Barner, Tom Curtis.
Q. Curtis was your supervisor at that point, right?
A. Yes.
Q. Barner was one of your coworkers?
A. Yes.
Q. Was Pelly a supervisor at that point?
A. He was over the landscaping crew.
Q. Do you remember any of the other people that worked in your group?
A. Not right offhand.
Q. Okay. Could you describe to me what type of work your group was responsible for? What did you do?
A. We took care of the motor sports complex, the whole -- everything from the racetrack to the camping grounds, grandstands.
Q. When you say you took care of it, does that mean you mowed the lawn?



A. That's what Dave Pelly's crew did. He took care of landscaping, and we did all the mechanic work that needed to be done.
Q. What type of work needed to be done?
A. There was always something. We did crack filling on the concrete racetrack, you know, fix grandstands, put signs up.
Q. Did you do any painting?
A. Oh, sure.
Q. Did you do roofing?
A. No.
Q. Did you do roofing on the command center?
A. Yes. It seems to me I remember that -- I think a couple of the guys did do that, I believe.
Q. That wasn't something that you ever did?
A. Not there.
Q. Did you do roofing anywhere else in the complex?
A. No.
Q. Did you do electrical work?
A. Helped.
Q. Who did you help? Sylvester?
A. Don Sylvester.

Q. Go up two lines, to the fourth line down of that comment. It says: He needs to realize that newer employees look to him for guidance and knowledge, areas that he chooses not to share.

Did you discuss that with Mr. Clifton?

A. I don't remember.

Q. Do you have any idea what he is referring to?

A. I guess he wanted me to train the newer employees to do my job.

Q. And is that something that he had asked you to do over the course of the time that he supervised you?

A. No.

Q. He says here that these are areas that, quote, he chooses not to share, end quote.

Had you refused to give guidance and knowledge to newer employees?

A. No.

Q. Do you have any idea what he is referring to here?

A. No. I'm sorry.

Q. Okay. Did Mr. Clifton ever talk to you about changing your attitude towards your job?



A. Not that I remember.

Q. Did you attempt to address pay issues with more senior personnel?

A. Yes.

Q. Who?

A. Terry Harbeson.

Q. Who is Terry Harbeson?

A. He was a -- He worked for Jerry Dunning as an assistant of some type. I don't remember his title. I also discussed it with Rich Wertz.

Q. Did you discuss it with anyone else in upper management?

A. I don't remember. I don't think so.

Q. Were you unhappy about this salary cut, as you called it?

A. Yes.

Q. Did you talk to your coworkers about it?

A. Yes.

Q. Did you attach a large screw to the front of your vehicle?

A. Yes, I did. I forgot about that.

Q. And exactly what was it you attached to the front of your truck? Was it a --

A. Yeah. It was a large grandstand bolt. I



remember it was probably 12 or 14 inches long. And I painted it gold, so it was a big golden screw.

Q. And did you wire it to the front of your car?

A. I don't remember how I attached it.

Q. Is that the truck that you drove to work every day?

A. That was a company vehicle.

Q. Oh, you put that on a company vehicle?

A. Yes.

Q. How long was it on there?

A. I don't know.

Q. Was it still on there the day you got fired?

A. I don't know.

Q. Do you remember when you put it on?

A. Not right offhand.

Q. Do you remember how long it was on there?

A. No.

Q. Were there any other employees in the maintenance group that were capped the way you were?

A. The only other person I know was Rich.

Q. Rich Williams?

A. Rich Williams.

Q. Were you ever told what the cap number was?



In other words, what the top rate of pay Dover Downs would pay?

A. Yes.

Q. What was it?

A. $19.50 an hour.

Q. So for somebody to be capped, they would have to be at that rate?

A. Yes.

(Following a discussion off the record:)

MR. ELLIS: I'm going to ask the court reporter to mark this as Number 4.

(Exhibit Number D-4 was marked for identification and attached to the record.)

MR. HOMER: I think this is also -- maybe not.

MR. ELLIS: I think this has some additional things on it.

BY MR. ELLIS:

Q. What I have shown you, Mr. Peters, is three pages that I found in your personnel file. And I would ask you, first of all, to take a look at the top page on Exhibit D-4 and tell me if that is your signature dated August 5, 2002.

A. Yes.

57

A. Yes, sir. I'm -- I'm sure I did.
Q. Did Mr. Morrison use profanity?
A. I don't remember.
Q. Why were you angry?
A. Because this is bullshit.
Q. Any other reason?
A. No, sir.
Q. And why is it that you think that this was bullshit?
A. Because we had a long conversation; we had a 40-minute conversation. We talked about a lot of things.
Q. Who did?
A. Me and Mr. Morrison.
Q. Okay.
A. And one of the things we talked about was he asked me twice -- he said something about me being a supervisor while Tom Curtis was on vacation, twice. And it was in the middle of about a 40-minute conversation.
Q. Now, are you referring to a conversation that occurred on December 1, 2003?
A. Yes.
Q. Okay. And how did that conversation come about?

58

A. I don't know how I ended up in his office. I don't know.
Q. Do you remember -- I guess you are telling me it did take place in his office?
A. Yes.
Q. And was anybody present other than you and Mr. Morrison?
A. No.
Q. And you don't remember how you got there?
A. No.
Q. Well, what was the 40-minute conversation about?
A. We talked about all the things that I did for the track, you know, what I did for the track, the jobs I was doing, you know, and we had a fairly intelligent conversation about how he was going to run the maintenance department and those kinds of things. We talked about a lot of things.
Q. Okay. Did he ask you to keep an eye on the work that was being done that day?
A. I don't remember him saying that.
Q. Okay. Are you saying that he definitely didn't say it, or you just don't remember it?
A. I don't remember it.

59

Q. At any point did he ask you to supervise the work that was being done in Tom Curtis's absence --
A. Yes.
Q. -- during that conversation?
A. Yes.
Q. And what did you say to that?
A. I told him I didn't want to.
Q. Did you tell him you didn't want to be in charge of anybody?
A. I told him I didn't want to do that supervisor's job.
Q. Okay. And what did he say to that?
A. I remember him saying -- the only thing I really remember of that conversation is that he said something about, I need somebody to step up to the plate, or something along those lines. That's all he said.
Q. Okay. Did he tell you that it was in your job description?
A. No, not that I remember.
Q. Again, are you saying that it didn't happen or are you saying that you didn't remember whether it happened or not?
A. I don't remember whether that happened or

60

not.
Q. Okay. In that discussion with him, did you tell him why you didn't want to supervise the group?
A. I think I did give him two reasons why.
Q. And what were they?
A. One was the salary cap.
Q. Okay.
A. And I don't --
Q. I'm sorry. Was there a second reason?
A. Yes, there was. But I don't remember what it was offhand.
Q. Okay. Did you have any discussion with Mr. Morrison about the salary cap, other than to give that as a reason why you didn't want to supervise anybody?
A. No.
Q. By December 1, 2003, had you received --
A. By when?
Q. By that date, December 1, 2003, had you received your lump sum bonus yet from 2002?
A. I had just received a lump sum in October, I think.
Q. And do you know why it was delayed from your anniversary date until October?

A. Because I was trying to get it changed.
Q. Okay. And those are the discussions you said you had with Mr. Harbeson and with Rich Wertz?
A. Yes.
Q. Do you remember any of the discussion you had with Rich Wertz?
A. No.
Q. Do you remember any of the discussion you had with Mr. Harbeson?
A. I remember some of that conversation.
Q. What did you say to him, and what did he say to you?
A. I asked him what he thought a salary cap would do to a person's attitude and if there was anything that could be done about the salary cap. We had a discussion, a long conversation, also.
Q. Do you remember any more than that?
A. No.
Q. Would you say that the salary cap had a bad effect on your attitude?
A. Yes.
Q. Did the salary cap make you mad at management?
A. No.



Q. Did it make you mad at all?
A. It wasn't the salary cap. It was the lump sum -- well, both. Don't forget the lump sum.
Q. I understand.
A. Go ahead. Ask your question again. I am sorry.
Q. The lump sum is caused by your salary cap, right? Otherwise, you would just keep getting a five percent raise every year; is that right?
A. Yes.
Q. So I guess what I am saying is did the salary cap make you sort of angry at management? I'm really talking about the salary cap and the lump sum, because it is all part of one.
A. Okay.
Q. Did that combination of things make you upset with management?
A. Unhappy.
Q. Did it cause you to have a bad attitude?
A. Perhaps.
Q. What do you mean by perhaps? What do you mean by perhaps? I don't --
A. Well, when you are the only one that is taking a salary cap and other people are getting 50



cents or a dollar an hour -- a dollar an hour is $2,000 more a year. And I'm taking a pay cut.
Q. Okay. That is not good for your attitude?
A. No.
Q. Look at Exhibit 13, Sutor Exhibit 13. It is in front of you.
A. This says Morrison.
Q. I'm sorry.
A. It says Morrison 13. Am I --
Q. No. You are probably right. I have Sutor 13 on mine.
A. What do you have?
Q. I hope I have the same document.
A. Yes, it looks like it, yes.
MR. HOMER: That would have been Morrison 13.
MR. ELLIS: That is my mistake.
BY MR. ELLIS:
Q. Look at the second page of the document, please, and just read that to yourself.
Have you had a chance to read that?
A. Yes.
Q. Is there anything in that statement that you believe to be untrue?



A. This is part of the mechanic I job description. It was not part of the job description, was it?
Q. Okay. Anything else?
A. I don't remember saying I would not or I don't want to be in charge of anybody. I don't remember saying that.
Q. Well, what I'm asking you is not about things you don't remember. I'm asking --
A. I know.
Q. I am asking you if you believe there is anything that he made up that isn't true?
MR. HOMER: That is a tough distinction for a witness to make, I think. Maybe you need to clarify that a little. I'm not sure what you are saying there.
MR. ELLIS: Well, I'm asking him if there is anything in there that makes it incorrect as opposed to something he doesn't remember that could have happened that might not have happened?
MR. HOMER: I'm still not following that. If he doesn't remember what happened, you want him to say that he believes it is incorrect because he doesn't remember it? Or if he doesn't remember? What does that mean? By asking whether he believed it happened, and if

that there was going to be a Christmas party?

A. I don't know. I would say perhaps a week.

Q. And who was supposed to be present at the Christmas party?

A. Usually, it was the maintenance crew and the landscapers, perhaps the harness track, and I think even perhaps -- I think motor sports was also supposed to be there. I don't know.

Q. But it was more than just the outside maintenance crew?

A. Yes.

Q. Okay. Did you ever get to the party that day?

A. No, sir.

Q. Okay. Why not?

A. I didn't want to go.

Q. Oh. Why didn't you want to go?

A. Bob Morrison had just written me up for something I didn't do, and I was not happy with him.

Q. Would it be accurate to say that you didn't like Mr. Morrison?

A. Yes.

Q. Why not? Aside from writing you up, was there any reason besides writing you up that you didn't



like him?

A. No, sir.

Q. So what were you going to do as an alternative to going to the maintenance Christmas party?

A. Some of us ordered pizza. And we were going to have our own little -- not party, but eat lunch together.

Q. And who was it that was going to eat pizza together that day?

A. Me and Rich Williams -- I don't remember who all.

Q. Do you remember anybody other than you and Rich Williams?

A. No.

Q. Do you remember where you were going to eat it?

A. I don't remember there being a plan to eat the pizza anywhere.

Q. Who was going to get the pizza?

A. I know who went to get the pizza.

Q. Who went to get the pizza?

A. I believe it was Brian Williams. But I don't know how that came about.

Q. How do you know he went to get the pizza?



A. It seems to me I heard somebody say he went to get the pizza.

Q. But you don't remember who it was that said that?

A. No. I wasn't there when the pizza was delivered.

Q. Do you remember seeing the pizza?

A. Yes.

Q. Where was it?

A. It was in the landscaping office.

Q. Okay. Let's see. Show me where the landscaping office is. Why don't you put a --

A. (The witness indicated.)

Q. On the north end of the property, there is a building.

A. Yes.

Q. Just for the record, we are back to Exhibit D-1. Is the maintenance shop somewhere around there?

A. Right across the parking space.

Q. Why don't you draw that building, too?

A. (The witness indicated.)

Q. What did you just draw there that attaches to the landscaping building? Horse barns. Okay.

(Following a discussion off the record:)



BY MR. ELLIS:

Q. So when you finally saw the pizza, it was in the landscaping shop?

A. Yes.

Q. Do you know how long it had been there?

A. No.

Q. What time of day was it that you saw it?

A. It was -- I didn't look at my watch, but it was after the drag race.

Q. Okay. The Christmas party was to be in the chalet, right?

A. Yes.

Q. Why don't you show us on D-1 where that is? Now, you are drawing a building that is actually underneath the grandstand, correct?

A. Yes. I assume it's still there.

Q. I suspect it hasn't moved nor have the grandstands. Now, you don't remember anyone other than you and Rich Williams who were going to eat pizza instead of going to the Christmas party?

A. No, I don't.

Q. Okay. Obviously, there was Brian Williams, because he was the one that supposedly got the pizza?

A. I think so, yes. There were several, but I

don't remember who they were.

Q. How many pizzas were there?

A. There was more -- There was at least two, and there were probably more than two. There were two different kinds. I remember that.

Q. Were they big ones?

A. I remember mushroom and pepperoni.

Q. And they were big ones?

A. They were quite a good size.

Q. Now, when did you find out there was going to be a drag race that day?

A. Right at lunchtime.

Q. And when you say right at lunchtime, what do you mean by that?

A. I had stopped work out to where I was and headed for the infield.

Q. And what was your job that day?

A. I was just topsoiling some low spots out in the camper fields. I was in lot two, in particular. I was out in lot two.

Q. Why don't you give me some indication on Exhibit D-1 where lot two is.

A. (The witness indicated.)

Q. Is that on the same side of Route 1 as the



track, or is it on the far side?

A. Yes.

Q. On the same side?

A. Yes.

Q. It must be close to Route 1?

A. Pretty close.

Q. How far is it from lot two to the structure here that has all the grandstands?

A. The northwest corner is probably a quarter of a mile away or something.

Q. Okay. By the northwest corner, you mean the corner that is closest to the grandstands?

A. Yes.

Q. Were you working a piece of machinery out there?

A. I had a dump truck and a backhoe out there.

Q. Was anybody working with you?

A. Nobody was working with me.

Q. So you are out there with a backhoe and a dump truck?

A. Yes.

Q. And you are moving dirt around?

A. Yes.

Q. At what point in the day did you learn that



there was going to be pizza in the landscaping shed or shop?

A. I knew early in the day that there was going to be pizza, but I didn't know where it was going to be.

Q. Okay. And how did you find out where it was going to be?

A. After the drag race we were still -- Well, this happened during lunch. We were still hungry and hadn't had anything to eat. And I went looking for it and asked people, you know, where was it, because I was hungry.

Q. When did you stop working out in lot two during the morning, at the end of the morning? What time was it?

A. Probably right at the end of the morning, probably right at 12:00.

Q. What did you do next?

A. I headed up to the track.

Q. In what vehicle?

A. In the van, the company van.

Q. Okay. So you had a van and a dump truck and --

A. Yes.

Q. -- and a backhoe out in the field?



A. Yes.

Q. Was this the van with the screw in the front?

A. Well, it was that van. Whether the screw was still on it, I couldn't tell you at that point.

Q. And where did you go?

A. I headed for the Busch Garage, actually.

Q. Why were you headed for the Busch Garage?

A. Because Ernie -- I had seen Ernie's Camaro down there, and I wanted to go talk to him about it.

Q. About what?

A. About the car.

Q. Why?

A. He had been bragging on it, bragging about his car. It was a nice car.

Q. How long had he been bragging on the car?

A. A couple of weeks.

Q. What was he bragging about his car?

A. That it was fast.

Q. First of all, how did you know the car was in the Busch Garage?

A. I went down there to get a piece of equipment and saw it sitting there.

Q. What piece of equipment?

85

A. I don't remember.
Q. When did you go down there?
A. It was very early in the morning.
Q. Would that be a normal place for Ernie to park his car?
A. Yes.
Q. Why is that?
A. Because he works in the track shack, which is right across the parking lot.
Q. Okay. So you were headed for the Busch Garage?
A. Yes.
Q. And did you get there?
A. No.
Q. Why not?
A. Because as I approach the Busch Garage, I saw the Camaro coming out and the Mustang coming out and a group following them.
Q. Okay. Now, where were you when you saw all of this?
A. I was approaching the Busch Garage.
Q. Okay. So you had come in through gate one?
A. Yes.
Q. And you were driving your van?

86

A. Yes.
Q. And when you got in through gate one, what direction did you take?
A. Turned left, south.
Q. On the NASCAR track?
A. I don't remember. I don't remember.
Q. Okay. You don't remember whether you went on the NASCAR track or you went through the gate onto Pit Road?
A. Right.
Q. So how far did you get before you saw these cars?
A. Right at the end of Pit Road.
Q. Okay. And that is the end where the tires are? Is that where the tires are? The tires at the end of the barrier, the Pit Road barrier?
A. Oh, yes, yes. I know what you are talking about.
Q. If I have the nomenclature wrong, I'm sorry.
A. No, that is fine.
Q. So what happened at the point that you got to the tires? What did you see?
A. I saw them coming out, like I say. And I went and turned around and went up onto the auto track,

87

out the auto track, and out gate on.
Q. So what you saw were two cars, right?
A. Yes.
Q. One was a Camaro?
A. Yes.
Q. And the other was a Mustang?
A. Yes.
Q. Did you see who was driving the Camaro?
A. No.
Q. Did you know see was driving the Mustang?
A. No.
Q. Did you know whose Camaro it was?
A. Yes.
Q. It was Ernie's?
A. Yes.
Q. Did you know whose Mustang it was?
A. Yes.
Q. So when you say you didn't see who was driving, why is it that you couldn't tell who was driving?
A. Sometimes it's hard to see in the windows. I just saw the cars coming out, and I knew what they were going to do.
Q. How did you know what they were going to do?

88

A. Because it had been done before.
Q. What is it that had been done before?
A. The drag racing.
Q. So you knew that they were going to drag race when they came out of the shed?
A. Yes.
Q. Did you think that was a very smart thing to do?
A. What is that?
Q. Drag race down Pit Road?
A. It happened all the time.
Q. That kind of wasn't my question. Do you think it was a very safe thing to do?

MR. HOMER: I will object to the form of the question.

BY MR. ELLIS:
Q. Go ahead. You can answer.
A. It always had been before that.
Q. I am sorry. My question is: Did you think that it was safe to drag race cars down Pit Road?
A. No.
Q. I take it you turned your van around?
A. Yes.
Q. And did you do it on the NASCAR track?

A. No.
Q. Where did you turn it around?
A. I went out through gate one.
Q. I'm sorry. You are getting ahead of me. When --
A. Oh, I know what you are asking me. I'm sorry.
Q. You come down gate one, and you are headed for the Busch Garage, right?
A. Yes.
Q. And so you get to the end of Pit Road, near where the tires are, and you see the two cars coming out of Busch Garage, right?
A. Yes.
Q. Again, please slow down so that the court reporter gets it all.
A. I'm sorry.
Q. I take it you turned around and went back to gate one?
A. Yes.
Q. Did you turn around on the auto track?
A. Pit Road is very wide right there, and I turned around there.
Q. Okay. But you were outside the area where



the tires were? In other words, outside the barrier from Pit Road?
A. Yes.
Q. Okay. So you turned around and then drove out gate one?
A. Yes.
Q. What did you do through gate one?
A. I drove out gate one, and I did a U-turn and drove back in.
Q. When you say you drove back in, did you stop at some place?
A. Yes.
Q. Where?
A. Right by the outside retaining wall.
Q. Okay. So that is the gates that actually open to form gate one, right?
A. Yes, yes.
Q. And you parked your van there?
A. Yes.
Q. Why?
A. A good place to watch.
Q. Okay. How was the van positioned? Was it across the gate?
A. No.



Q. What direction was it facing?
A. I was facing west.
Q. Facing west. Okay. And you decided to watch?
A. Yes.
Q. And what is it you saw?
A. I saw the cars drag race.
Q. When they pulled out of Busch Garage, where did the two cars go?
A. To the south end of Pit Road.
Q. Okay. And that is the end that is closest to the Busch Garage, right?
A. Yes, yes.
Q. And what did they do next?
A. They proceeded to have a race.
Q. And where did they start the race?
A. On Pit Road.
Q. North or south?
A. South, from the south end.
Q. From the south end to the north end?
A. Yes, yes.
Q. So the first race went from south to north?
A. Yes.
Q. Who else was around at the point the races



started?
A. Russell Hands, Patterson, I don't remember his first name right offhand, Mike Monahan, and Bill was with him. I don't remember his last name.
Q. Bill Warner?
A. Perhaps, yes. Perhaps that is his name, yeah. And that is all I remember right offhand.
Q. Where was Patterson?
A. On the track.
Q. He was on the south end of Pit Road.
A. No, I can't say that. I don't know who that was right there.
Q. There was somebody on the south end of Pit Road?
A. Yes, with Russell Hands.
Q. So there were two people on the south end?
A. Yes.
Q. Inside the barrier, right on Pit Road?
A. Yes.
Q. And then where was Monohan?
A. Victory Lane.
Q. Okay. And what was he doing?
A. Watching.
Q. Just watching?

A. No.
Q. Okay. Did you expect that management might think it was unsafe to watch cars run down Pit Road?
A. Never thought about it.
Q. You never thought about it. When did Rich Williams arrive at gate one?
A. After I had parked my van.
Q. How long after you had parked your van?
A. Within a minute or two, I suppose.
Q. All right. When Rich Williams got there, was he driving a vehicle?
A. Yes.
Q. A company vehicle?
A. Yes.
Q. What kind of a vehicle?
A. A pickup truck.
Q. And where did he park?
A. He parked at the gate.
Q. The same as you?
A. He was facing -- I believe he was facing south.
Q. And you were facing west?
A. Yes.
Q. So he was across the gate?



A. Yes.
Q. Did you have a conversation with him?
A. No, sir.
Q. Did you remain in your car the whole time?
A. Yes.
Q. And he remained in his, I guess, until the accident occurred?
A. I don't remember him getting out of the truck.
Q. Okay. So you had no conversation with him?
A. No.
Q. Okay. Could you tell what he was doing?
A. Yes.
Q. What was he doing?
A. Watching the race.
Q. Did you have a radio?
A. Yes.
Q. Is that like a walkie-talkie?
A. Yes.
Q. Who did it connect to?
A. The whole maintenance department was on the same frequency.
Q. So, for example, Monahan, who is in Victory Lane or whatever you call it, would he have the



walkie-talkie, too?
A. I don't know if he had it on his person, but he should have a radio.
Q. And you could, for example, have talked to him from your car during the race?
A. Yes.
Q. And how about Ernie Carlisle and the younger Williams? Would they have walkie-talkies, also?
A. I don't think Ernie carried a radio, and I don't know about Brian.
Q. Okay. How about Russell Hands? Would he have a radio?
A. I don't think so.
Q. Did the landscape people have radios?
A. Some did, some didn't, and I don't know who.
Q. Okay. But all the maintenance people would have radios?
A. Yes.
Q. How about the harness people? Do you know?
A. I don't think they all had radios.
Q. Okay. You are not sure?
A. No.
Q. Okay. Describe the accident.
A. Brian failed to negotiate the curve at the



end of Pit Road and hit the inside of the ad wall with the left front of his car.
Q. The inside of the what wall?
A. The ad wall, and that is the wall you are talking about that separates the road from Pit Road.
Q. Why is it called the ad wall?
A. Because it has advertising on it on the spectators' side.
Q. Okay. Now I got you. I understand. So what happened next? Where did the two cars end up?
A. Brian's ended up on the auto track, and I don't remember where Ernie ended up. But he --
Q. Did you --
A. Go ahead.
Q. Go ahead. What were you saying?
A. I remember him driving away.
Q. Did you know that Ernie had a flat?
A. Not at that time.
Q. Okay. After Brian's car spun onto the speedway, what happened next?
A. Everybody ran that way.
Q. Including you?
A. No.
Q. Who was the everybody then?

IN THE UNITED STATES DISTRICT COURT
IN FOR THE DISTRICT OF DELAWARE

RICHARD L. WILLIAMS and )
MICHAEL E. PETERS, )
Plaintiffs, )
)
v. ) C.A. No.
) 05-0435 (GMS)
DOVER DOWNS, INC., )
a Delaware corporation, )
Defendant. )

Deposition of RICHARD L. WILLIAM, taken before Cheryl A. Anthony, Court Reporter, in the law offices of Parkowski, Guerke & Swayze, 116 West Water Street, Dover, Delaware, on Friday, February 14, 2006, beginning at 1:30 p.m.

APPEARANCES:

PARKOWSKI, GUERKE & SWAYZE
BY: JEREMY W. HOMER, ESQUIRE
116 West Water Street
Dover, Delaware 19901
Attorney for Plaintiffs.

MONTGOMERY, McCRACKEN, WALKER & RHOADS
BY: EDWARD T. ELLIS, ESQUIRE
123 South Broad Street
Philadelphia, Pennsylvania 19109
Attorney for Defendant.

ALSO PRESENT:

MR. MICHAEL PETERS
MS. ROBIN M. ROBERTS

ORIGINAL RETAINED BY EDWARD T. ELLIS, ESQUIRE

ANTHONY REPORTING
PO Box 234
Dover, Delaware 19903
(302)674-8884



RICHARD LEE WILLIAMS,
the witness herein, having first been duly sworn on oath, was examined and testified as follows:
BY MR. ELLIS:
Q. Mr. Williams, as you may remember from this morning, my name is Ed Ellis. I represent Dover Downs in the lawsuit that you have brought against Dover Downs. What we are going to do here today is called a deposition. And I know you have watched a number of depositions; am I correct?
A. Yes.
Q. So you have some idea of what the procedure is?
A. Yes.
Q. I'm going to ask you questions, and I will ask you to give me answers. And all of it will have to do with one aspect or another of your lawsuit. If you don't understand the question, please tell me that you don't understand. I am not trying to trick you, but sometimes lawyers ask bad questions. If you tell me you don't understand the question, I will try to rephrase it and try to get you a better question.
Do you have any questions about the



procedure?
A. No, sir.
Q. Okay. Are you currently employed?
A. No.
Q. When is the last time you were employed?
A. Full-time would have been December 31, 2003.
Q. Was that at Dover Downs?
A. Yes.
Q. Have you been employed at all since December 31, 2003?
A. I have done part-time jobs for a neighbor, mowing grass, taking care of animals. She has a horse farm.
Q. Who is that name?
A. Heather Lloynd, L-L-O-Y-N-D.
Q. Heather, that is her first name?
A. Yes.
Q. What have you been paid for the work you did at Heather Lloynd's property?
A. Possibly $150 a week.
Q. Have you sought any other employment since December 31, 2003?
A. Yes. I have applied at a number of places and inquired about jobs, mainly while I was on



unemployment.
Q. How long were you on unemployment?
A. Six months.
Q. Have you applied for any jobs since you went off of unemployment?
A. No, sir. I've always had a part-time job as a musician since I was a teenager.
Q. What instrument do you play?
A. Bass guitar.
Q. Do you play in a band?
A. Yes.
Q. What is the name of the band?
A. Glass Onion Band.
Q. What type of music do you play?
A. Mostly rock, classic rock.
Q. Do you work every week?
A. Not every week, but most weekends.
Q. Do you ever work during the week?
A. Very seldom, but yes.
Q. Are you working more in the band now than you did when you were employed at Dover Downs?
A. Yes, somewhat more.
Q. How much money do you make in a year with the band?

13

other sources of income currently?
A. I loaned my son some money to purchase a house, and he is currently paying me $500 a month.
Q. Okay. Prior to when you sold the farm, did you work the farm?
A. No.
Q. Did somebody else work the farm?
A. Yes. It was rented out.
Q. And did you live on that property, the farm property?
A. The acre I lived on was sold with the farm, but it was a separately deeded acre.
Q. Okay. So you lived on an acre property that adjoined the farm property?
A. Yes, sir.
Q. And when it came time to sell it, you put it all together and sold it as one?
A. Yes.
Q. What is your current address?
A. 5786 Westville Road, Hartly, Delaware 19953.
Q. That is not the address that you lived at when you worked at Dover Downs, right?
A. Correct. I have since moved.
Q. Where is Hartly?

14

A. It is on the west side of Dover.
Q. Approximately how much do you make in a year in interest off of your investments?
A. I hate to say I don't know. It just started rolling in, and it's different.
Q. It's different every month?
A. It's added to my checking account. And so far, I've only made $7,000.
Q. Okay. When you say it is added to your checking account, I take it you have placed it with some sort of money manager that also gives you checking privileges?
A. Yes.
Q. So that when the interest comes in, it just goes right into your checking account?
A. Yes.
Q. And is February 2006 the first month in which you received a payment?
A. No. I believe it was December 2006.
Q. Of '05?
A. I'm sorry, of '05. I got some money.
Q. Okay. What is your educational background?
A. High school education, 1966, Milford High School, Delaware, and a graduate of Delaware

15

Technical & Community College, a two-year degree. That is in Dover.
Q. What year did you get your two-year degree from Del Tech?
A. 2002.
Q. Okay. And what is that degree in?
A. Marketing management.
Q. What is your date of birth?
A. February 20, 1948.
Q. After graduating from high school, I would like you to go through the jobs that you held up until the point you became an employee of Dover Downs.
A. I left high school in '66, and I worked part-time at a cannery in Milford, Draper Cannery. And then I went to work for Dover Electric Supply in Dover until March 4th of 1969. I got drafted into the US Army. I was in there six months, got out on medical discharge, went back to Dover Electric Supply for approximately another year. I worked a short time at a gas station. And then around 1971 or '72, I went to work for the Henry D. Gilpin Company in Dover.
Q. What type of company is that?
A. It's a drug wholesaler. Then they went out of business around 1976, and I went to work for K Mart,

16

which had just opened that year.
Q. I'm sorry?
A. K Mart. My next job that I recall would have been at Dover Downs, '78, December 22nd.
Q. How long were you in the Army all together?
A. Six months.
Q. And what was the nature of your medical problem?
A. I had a rare blood type, is what I was told by the Army doctors. Now, I have never gone to any civilian doctors to get that explained. The way it was explained to me, were I wounded on the battlefield, they would have a hard time matching up the blood. That's all I really know, and it really hasn't affected me all these years. That was during Vietnam. It didn't break my heart.
Q. I am sorry?
A. It didn't break my heart to leave the Army at that time.
Q. No, I wouldn't expect that it would. How did you come to own the farm?
A. It belonged to my wife's parents and farmed by my wife's father and his brother. Then my wife's father died, and it was left to his wife and his

17

brother, who co-owned it. Each one of those had children. This is the overall farm, which was more than the 82 acres.

Q. Oh, okay.

A. It was rented at the time. Then my mother-in-law didn't want to have anything more to do from the farm other than receive the rent, and she signed it over to myself and my wife.

I'm sorry. Let me back up. Just before my father-in-law's brother died, the farm was split in two. His kids got his half. And that's about the time that my mother-in-law signed the farm over to the other half of the 106-some acres to my wife and me.

Q. Was your wife the only heir of your mother-in-law?

A. She has a sister, but the sister disowned everybody some years ago.

Q. Okay. Approximately when was it that your mother-in-law signed the property over to you and your wife?

A. Maybe eight or nine years ago.

Q. Okay. And when did your mother-in-law die?

A. My mother-in-law lives with us now.

Q. She still lives with you.

18

A. My father-in-law died around 1995.

Q. What was your first job at Dover Downs?

A. I think at that time we were just called maintenance.

Q. How many maintenance workers were there?

A. It ranged from about eight to 17, depending on the time of the year.

Q. Okay. And at the point that you started in 19 -- What did you say it was? '78?

A. 1978.

Q. -- '78, was the NASCAR track there?

A. Yes, sir.

Q. Was the harness track there?

A. Yes.

Q. And was the casino or any of the gaming there?

A. No.

Q. Do you know how many total employees worked at Dover Downs in 1978?

A. Yes, I do; 32 full-time employees. It went into the hundreds during a NASCAR event.

Q. Right. At the point that you left Dover Downs in 2003, do you know how many employees worked there?

19

A. It was just under a thousand.

Q. How long did you work as a maintenance employee, a non supervisory maintenance employee at Dover Downs?

A. 11 years.

Q. So that would take us to 1989?

A. Yes.

Q. What happened in 1989?

A. I was promoted to maintenance manager.

Q. And how long did you remain the maintenance manager?

A. Just about an additional -- Well, 11 years.

Q. Now, as the maintenance manager, what were you responsible for?

A. In the early days I was responsible for -- There were no separations of harness people, landscape, and outside maintenance. At the time I was responsible for everyone, with no supervisors under me. And it ranged anywhere -- up to maybe being responsible for 17 people.

Q. Okay. What pieces of the facility did you take care of?

A. In the beginning we took care of everything, inside the building, inside the grandstand, the harness,

20

mowing the grass, the grounds, the campgrounds. We took care of all the track, which was asphalt, which required a lot of maintenance in the summer. We did plumbing, changing light bulbs of every building, every square inch of the place pretty much.

Q. Did that change at some point during the period you were maintenance manager?

A. Yes. Maintenance separated into two sections, inside maintenance and outside maintenance. And we were given our own building a way from the main grandstand.

Q. When you say went with, who are you referring to?

A. Most of the original maintenance people; and then at that time, when the casino people came in, approximately at that time, they hired a lot of new people. So I don't know how the separation of the operation came about, who stayed in, who stayed out. I'm not sure at the time.

Q. When you say the casino came in, do you know what year that was?

A. It seems to me it was 1995.

Q. And that caused an increase in the number of employees, right?

terms of the employees that worked under you?
A. Some were belligerent. Most of those are gone by now. What from what I understand, it's an all new maintenance department.
Q. Who was belligerent towards you?
A. At times, Mr. Larry Barner.
Q. Anybody else?
A. I can't recall.
Q. During the time that you were the maintenance manager, was Jerry Dunning your boss the whole time?
A. Yes, sir.
Q. Your son Brian, did he work under you?
A. For a period of time, yes.
Q. What period of time did he work under you?
A. When I first became maintenance manager, he worked some part-time summers there for me directly. Later on he worked on the harness track under me, but indirectly under me. There were different supervisors.
Q. So you were the manager, and then there would be a harness supervisor?
A. Yes.
Q. And then the harness supervisor supervised Brian?



A. Yes.
Q. Okay. Do you have children other than Brian?
A. Yes, Chad Williams.
Q. How old is Chad?
A. 28.
Q. Anybody else?
A. No.
Q. Two boys then?
A. Yes, sir.
Q. During the time that you were the maintenance manager, did the company set up job descriptions?
A. Yes.
Q. Were you part of setting up the job descriptions?
A. Yes.
Q. Who was in charge of setting up job descriptions for people in the maintenance department?
A. I believe it was human resources. It came from them and directed me to get everyone to write up their own job description. And that was a starting point to make it official with input from other people.
Q. And who was the person in the human



resources department that was running the job description program?
A. I don't remember.
Q. Do you remember what you were asked to do as part of getting job descriptions written for your people?
A. That everyone would get a piece of paper and write down everything that they did.
Q. And did you go to each one of your employees and ask them to do that?
A. Yes.
Q. And did each of your employees write down on a piece of paper the things that they did as part of your job function?
A. Yes.
Q. And what did they do with those pieces of paper?
A. They gave them to me and I turned them in at one of the weekly meetings, as I recall.
Q. And you don't remember who you turned it in to?
A. No.
Q. Okay. Did you have further discussions with the human resources department about how to define



certain jobs that were in the maintenance department?
A. I don't understand.
Q. Well, did somebody from the human resources department sit down with you and get some explanation from you as to what each of these people did? In other words, did you talk about what the people that worked for you did?
A. Yes, I believe I did.
Q. Okay. And out of those discussions, was there a job description created?
A. Yes.
Q. Well, did you actually see the job descriptions when you were the maintenance manager?
A. Yes, yes, yes, I did.
Q. And did you give them to the employees that were working for you?
A. I don't recall.
Q. Do you remember there being three levels of maintenance mechanic? A I, II, and a III?
A. Yes, I do.
Q. And they all have Roman numerals? That is, I, II, and III?
A. Yes.
Q. And do you remember that the Is got paid

more than the IIs, and the IIs got paid more than the IIIs?

A. Yes.

Q. So it would be important that people got placed I, II, and III?

A. Yes.

Q. And that is because the Is made more money than the IIs, and the IIs made more money than the IIIs?

A. Yes.

Q. Did you sit with your employees and discuss with them where they would be placed?

A. Yes.

Q. And did you show them the job descriptions when you did that?

A. I don't remember if I did at that time.

Q. Did you show them the job descriptions at some other time?

A. Yes. Everyone would have seen a job description at some point.

Q. Okay. Now, did the job descriptions change over the course of the time that you were the maintenance manager?

A. I don't believe so.

Q. Okay. Well, let me show you what we have



marked as Sutor 1, which is the job description for maintenance mechanic I. Now, do you see where it says last revision -- I think it is sometime in 2002 -- up at the top?

A. Yes.

Q. Now, that is after you came on, after you left the position of maintenance manager, correct?

A. Correct.

Q. Do you recall there being any changes between the time the job description was set up and the time you left?

MR. HOMER: Do you need more time to read it?

MR. ELLIS: Yes. Please take all the time you want to read it.

MR. HOMER: It takes longer than that to read it.

MR. ELLIS: I'm sorry. I shouldn't have been going so fast; when you left the position of maintenance manager.

MR. HOMER: Any changes between this and something else?

MR. ELLIS: No, this document is after that time period.



MR. HOMER: Okay. I wonder if the witness remembers the connection. When you refer to changes, what are you talking about?

MR. ELLIS: I'm talking about changes in the job description between the time it came out and the time he stopped being the maintenance manager.

THE WITNESS: I'm not aware of any.

MR. HOMER: I remember him saying that.

MR. ELLIS: That is what I thought.

BY MR. ELLIS:

Q. By the way, let me ask you to take a look at Exhibit 3. Is that a performance appraisal you did on Mr. Peters?

A. Yes.

Q. Was that done in February of 2001?

A. Yes.

Q. So you would have still had to have been the maintenance manager, at least as of February of 2001; is that right?

A. Not necessarily, because in the same instance that my evaluation was done by Mr. Clifton, it was after someone else had already taken over the department. This is possible. I honestly don't know the date.



Q. Okay. That is fine. I am sure we can find that in the records someplace.

Do you remember any changes that were made to the job description of maintenance mechanic I after you became a maintenance mechanic I, whenever that occurred?

MR. HOMER: I'm going to object to the question. I don't think you really have a foundation for that yet.

You can answer it or you can try to answer it, if you can.

You haven't really established what the last job description said.

MR. ELLIS: Well, he said that he remembers that job descriptions were created.

BY MR. ELLIS:

Q. Is that right?

A. Yes.

Q. And you don't remember there being any changes to the job description between the time it came out and the time you left the manager's job, right?

A. I don't remember any.

Q. Okay. Do you remember any taking place between the time you left the manager's job and the time

A0016

33

you were fired?
A. I have never seen any changes. In fact, this looks unfamiliar to me.
Q. Okay. And are you saying that that doesn't look like the job description for maintenance mechanic I?
A. It doesn't look like the original ones that the group of us wrote up at the time that they were first created.
Q. And what is the difference? Can you tell?
A. It seems to be a lot more items on here than we all agreed upon at the time. And the format is totally different.
Q. When you say the format is different, what do you mean?
A. The writing is a lot smaller.
Q. Do you mean the print size is smaller?
A. The print is small, yes. And we didn't have salary grades that I recall at the time.
Q. At the time, meaning that the first time that you saw it?
A. The first time that we originally drew up the job descriptions.
Q. Okay. When you became a mechanic I,

34

whatever year that turned out to be, who replaced you as the maintenance manager?
A. Jerry Clifton.
Q. Okay. And was there a supervisor that was between you and Jerry Clifton?
A. Not right away.
Q. Was there eventually a supervisor between you and Jerry Clifton?
A. Yes.
Q. And who was that?
A. That would have been Tom Curtis.
Q. Okay. And Tom Curtis was somebody that you had supervised before, right?
A. Yes.
Q. Before the company set up the job descriptions, in whatever year that was before you were manager, was there any job description for the maintenance employees?
A. No.
MR. ELLIS: Let's call this D-6.
(Exhibit Number D-6 was marked for identification and attached to the record.)
BY MR. ELLIS:
Q. Can you tell me what this is?

35

A. Yes. It looks like my first evaluation under Jerry Clifton.
Q. Okay. Did Jerry only do two for you?
A. I don't recall. Actually, this may have been the second, according to the date.
Q. Okay. On the third page, there is a signature line at the bottom for employee. Is that yours?
A. Yes.
Q. The employee comments contains the statement, quote, don't like salary cap, end quote. What does that mean?
A. It means I was dissatisfied with the fact of knowing that I would never make any more money, no matter how hard I worked or how good my evaluations were.
Q. And why did you think that you would never make any more money?
A. That's the ideas that were expressed to all of us.
Q. Who was it that explained the salary cut to you?
A. No one explained it.
Q. Okay. Then who expressed it to you? I mean

36

how did you find out there was such a thing as a salary cut?
A. I believe through Mr. Jerry Dunning.
Q. And when did he explain it to you?
A. I don't recall.
Q. Do you remember where?
A. No.
Q. Do you remember who was there?
A. Probably just Mr. Dunning and myself in the office, in his office.
Q. Do you remember what you were doing in his office that you ended up in that conversation?
A. No, I don't.
Q. Do you remember what it was he said to you?
A. That the company couldn't afford to continue to give five percent indefinitely to each employee, because there were too many employees now to consider.
Q. With?
A. Now, with the casino opening up, there were way too many to give five percent to each person.
Q. Okay. And so did he say what the company was going to do?
A. That everyone that reached that mechanic I, that reached that salary, would stop there and not make

any more.

Q. Did he tell you that the cap would be adjusted periodically for things like inflation?

A. No, I don't recall that.

Q. Did he tell you it would be adjusted for competitive factors?

A. No, he did not.

Q. So all he said to you was that was the highest your hourly rate could ever be?

A. Yes.

Q. And was there a lump sum payment that you were supposed to receive at the end of every year?

A. Yes.

Q. And do you know how the lump sum payment was to be calculated?

A. It would have been a percentage of your annual earnings. That would also include your general salary, plus any overtime.

Q. Okay. And how was the percentage determined that would be multiplied by the total amount of income you earned?

A. Yeah. The percentage would be based upon your annual evaluation.

Q. Okay. Now, in the evaluation I showed you



here, Number D-6, I don't see any indication as to what your lump sum percentage would be. Do you recall whether there was -- First of all, just take a look at it and confirm that I am right, that there is nothing there that gives you a percentage.

A. Correct.

Q. Do you know how the company arrived at a percentage based on this type of evaluation?

A. No.

Q. Do you remember what percentage lump sum payment you received at the end of 2003 which would have been in response to this or after this D-6 was issued?

A. I'm not sure. I believe I got five percent that particular year.

Q. Okay. That is just based on your recollection?

A. Yes, because I believe that for quite a number of years, I consistently got five percent, up to and including this. The salary cap wouldn't actually effect me until later on.

Q. I don't understand. You mean you weren't capped yet?

A. Not at this point.

Q. Oh. When did you become capped?



A. It would have been the following year. I would have to work another year.

MR. ELLIS: Why don't we just take a break for a minute or two?

MR. HOMER: Okay.

(A recess was taken from 2:22 p.m. until 2:32 p.m.)

BY MR. ELLIS:

Q. All right. Could you look at D-7, please, Mr. Williams?

A. Yes.

(Exhibits Number D-7 and D-8 were marked for identification and attached to the record.)

BY MR. ELLIS:

Q. Is that a document that you have ever seen before?

A. No.

Q. Do you know what it is?

A. Yes, sir.

Q. How do you know what it is? Because you were a manager at one point?

A. I filled many of these out, yes.

Q. Okay. This document, if you look in the middle, it says that your rate is moving from $19.20 an



hour to $19.50. Do you see that?

A. Yes.

Q. Do you recall $19.50 was the cap?

A. Yes.

Q. So you recall in year -- this would have been the end of 2001, the beginning of 2002 -- that is when you hit the cap?

A. Yes.

Q. Okay. And then the following year, if you take another look at Exhibit D-8, is the next one, the one for 2002, at the end of 2002. Do you see that?

A. Yes.

Q. And this reflects that you are at the cap, because in other words, if you are capped, you are red-lined, correct?

A. Yes.

Q. And this shows you getting a five percent lump sum payment, because you red-lined?

A. Yeah.

Q. Okay. So five percent would be the number that arises out of your performance appraisal, right?

A. Correct.

Q. Aside from what you wrote on the performance appraisal from 2002, did you express your