**41**

1  dissatisfaction with the salary cap in other ways?
2      A.   Very little, actually; grumbling here and
3  there.
4      Q.   What do you mean by grumbling here and
5  there?
6      A.   When someone else would bring it up, I would
7  certainly agree.
8      Q.   And how many people in the maintenance group
9  were capped?
10     A.   At that time, I don't know.
11     Q.   How many maintenance mechanic Is were there?
12         MR. HOMER:  Do you mean as of December of
13 2003 or --
14         MR. ELLIS:  As of December of 2002, December
15 of 2003, anywhere in that time period; it's all the
16 same.
17         THE WITNESS:  I'm not sure of the exact
18 number.  I would say four or five.
19 BY MR. ELLIS:
20     Q.   That would be Monahan?
21     A.   Yes.
22     Q.   Sylvester?
23     A.   Yes.
24     Q.   And yourself?

**42**

1      A.   Yes.
2      Q.   And Mr. Peters?
3      A.   Yes.
4      Q.   Can you think of any others?
5      A.   Possibly Mr. Curtis.
6      Q.   Mr. Who?
7      A.   Tom Curtis.
8      Q.   Oh, Curtis, but he was a supervisor, wasn't
9  he?
10     A.   Yes, at the time, yes, he was.
11     Q.   When you were a manager, did the crew that
12 you supervised all report to the maintenance shed in the
13 morning?
14     A.   Yes.
15     Q.   Do you call it the shop or the shed?
16     A.   Shop.
17     Q.   Okay.  And is that where the time clock was?
18     A.   Yes.
19     Q.   After you became a maintenance mechanic and
20 sort of stepped down from the position of manager, did
21 people still report to the same place?
22     A.   Yes.
23     Q.   So that was constant during the whole time
24 that you worked there, after the shed was moved out of

**43**

1  the main building?
2      A.   Yes.
3      Q.   And what would you do when you got to the
4  maintenance shop in the morning?  Would you have coffee?
5      A.   Yes.
6      Q.   And did people just sort of sit around and
7  talk for a few minutes while they were waiting to get
8  their assignments?
9      A.   Yes.
10     Q.   Turning now to the end of the time you
11 worked there, to 2003, did you receive assignments at
12 the maintenance shop in the morning?
13     A.   No.  I personally didn't.
14     Q.   How did you know what you were going to do?
15     A.   I can honestly count on one hand the number
16 of times Mr. Clifton told me something specific to do.
17 He understood that I had been there so many years, I
18 knew what had to be done.  He trusted me.
19     Q.   Okay.  And what is it that had to be done,
20 say, in December of 2003?  How is it that you knew what
21 had to be done?
22     A.   That particular period of time, Mr. Frank
23 Outten and myself had an ongoing long project of
24 remodeling the command center, which is located on Old

**44**

1  Leipsic Road.
2      Q.   Okay.  Did somebody assign you that job?
3      A.   Yes.
4      Q.   Who?
5      A.   I believe it was Mr. Jerry Dunning.
6      Q.   Okay.  So you don't make the decision that
7  the command center has to be remodeled.  Somebody makes
8  that decision and then you do it, right?
9      A.   In that instance, yes, somebody else made
10 the decision.
11     Q.   Are there things that are done seasonally
12 that you, having been there for 25 years, are going to
13 know they have to be done?
14     A.   Yes, absolutely.
15     Q.   Like what types of things get done in the
16 winter that you know have to be done?
17     A.   In the winter?
18     Q.   Yes.  We are in the winter now.  It seems
19 like a good place to start.
20     A.   Mostly, it is repairs that you don't have
21 time to do just before harness season and just before an
22 auto race.  Those have specific duties.  Specific things
23 have to be accomplished.
24     Q.   Okay.

45

1  A. So you are doing catch-up work, I would say,
2 for the most part.
3  Q. When you say repairs, what are you referring
4 to? What are you referring to? Is it equipment, or is
5 it buildings? Is it grandstands or what?
6  A. It could be whatever needed it most at that
7 particular time.
8  Q. So it could be any of those things?
9  A. Yes, and others.
10  Q. Well, how do you know that the things needed
11 to be repaired?
12  A. We ride around and make lists of things that
13 we notice.
14  Q. Okay. And who is the we?
15  A. Myself, Mr. Peters, and hopefully, everyone
16 else.
17  Q. Okay.
18  A. Mr. Frank Outten did also make lists.
19  Q. Did Bob Morrison ever give you assignments?
20  A. Yes.
21  Q. Now, he was only your supervisor for about
22 five or six weeks; is that right?
23  A. I think less than that.
24  Q. Okay. Well, he testified he became a

46

1 supervisor on November 16th, and I think we understand
2 you were terminated on December 31st.
3  A. Yes.
4  Q. And that would be about six weeks, right?
5  A. Yes.
6  Q. Of course, you weren't there for one of the
7 weeks, because you were suspended?
8    MR. HOMER: If you accept Morrison's
9 testimony.
10   MR. ELLIS: If you accept Morrison's
11 testimony.
12   MR. HOMER: Yes.
13 BY MR. ELLIS:
14  Q. Do you believe Mr. Morrison's testimony was
15 incorrect?
16  A. No. That sounds like about the time he got
17 started.
18  Q. How did you get along with Mr. Morrison?
19  A. I didn't see him a whole lot. The first
20 assignment he gave me was to clean a large warehouse
21 that was very unkempt, extremely haphazard, materials
22 thrown everywhere, disorganized. You almost couldn't
23 walk through it. We called it the warehouse. It is
24 adjacent but in the same building as the maintenance

47

1 shop.
2  Q. So it was to the other end from where the
3 office and the break room were?
4  A. Right next to that; there's actually a door
5 that leads into what we call the warehouse.
6  Q. How big was the warehouse?
7  A. 60 by 40, I'm guessing.
8  Q. Feet?
9  A. Yes.
10  Q. And what did he tell you to do?
11  A. He told me to clean it up, and I
12 single-handedly did it. It took me maybe a week.
13  Q. Okay. What other assignments did
14 Mr. Morrison give you?
15  A. To help Mr. Frank Outten with what we called
16 the smoking pavilion. It was a temporary building for
17 smokers when the ban came on for smoking. It was
18 temporary, to be built outside the casino.
19  Q. A temporary for what came on?
20  A. For the smokers' ban.
21  Q. When you said ban, I thought you meant
22 B-A-N-D. Okay. Do you remember any other assignments
23 Mr. Morrison gave you?
24  A. When we finished with the smoking pavilion,

48

1 we were to continue on the command center, remodeling
2 it.
3  Q. How did you get along with Mr. Morrison?
4  A. I got along with him okay. I avoided him as
5 much as possible.
6  Q. Why?
7  A. I don't like the man.
8  Q. Why not?
9  A. Just a feeling.
10  Q. Did you know Mr. Morrison before he became
11 your boss?
12  A. No, I didn't. I only heard the name, and
13 that's all.
14  Q. He had worked at Dover Downs for a while,
15 right?
16  A. Yes. But we rarely went into the casino, if
17 ever.
18  Q. So you had never met him before he became
19 your boss?
20  A. No, sir.
21  Q. Okay. What was it about him that made you
22 think that you weren't going to get along with him or
23 that you were going to have a problem with him?
24  A. From the comments of people who had

**Page 49**

1 allegedly spoken to him and had allegedly heard him say
2 things about the maintenance, what he was going to do
3 when he came down there.
4    Q.  And who is it that told you things that
5 Mr. Morrison had said about what he was going to do when
6 he came down there?
7    A.  Mr. Tom Curtis, Mr. Rich Duncan, and
8 Mr. Nick Fedirko.
9    Q.  Anything else that made you think you
10 weren't going to like Mr. Morrison?
11    A.  Yes. That day or thereabouts, he made me
12 clean that large warehouse, which was unfair. But I
13 accepted it, because that is what I do.
14    Q.  Why did you think it was unfair?
15    A.  Because up to then, it was everyone's
16 responsibility to clean keep it clean when they brought
17 in materials to organize it. When they brought in
18 tarps, they should at least fold them up and put them on
19 the shelf. Everything was thrown in there haphazardly.
20    Q.  Who made it a mess?
21    A.  Except me; I'm sorry. That's the truth.
22    Q.  Everyone except you had made the mess?
23    A.  Yes.
24    Q.  Including Mr. Peters here? Was he part of

**Page 50**

1 the everybody that made the mess?
2    A.  I didn't see him personally make it a mess.
3 He wasn't up around the building as much as everyone
4 else was, such as the electrician, whose area was a
5 mess. The plumber had an area that was a mess. And
6 then they just used it as general storage, just people
7 coming in there not only from the maintenance, but from
8 building maintenance. They used that as storage and as
9 a catch-all for things that they didn't want around the
10 casino and the building.
11    Q.  So everybody made a mess except you and
12 Mr. Peters?
13       MR. HOMER:  He didn't say that. Objection.
14       MR. ELLIS:  He's getting close.
15       THE WITNESS:  Except me.
16 BY MR. ELLIS:
17    Q.  Okay. Why did you think it was not
18 appropriate for you to be assigned the job of cleaning
19 the warehouse?
20    A.  I didn't say not appropriate, I believe, but
21 unfair, a large area like that.
22    Q.  Well, do you mean it should have been
23 assigned to somebody other than you or it should have --
24    A.  A crew of people, I think.

**Page 51**

1    Q.  You think he should have assigned more
2 people to do the job?
3    A.  Yes.
4    Q.  Okay. Did you say that to Mr. Morrison?
5 That he ought to have more than one person on it?
6    A.  No, sir. I always accept assignments,
7 sometimes blindly.
8    Q.  Okay. Any other reason that you didn't
9 think you were going to get along with Mr. Morrison?
10       MR. HOMER:  Objection. I don't think he
11 testified that he didn't think he was going to get along
12 with him. He said he didn't like him.
13       THE WITNESS:  That's correct.
14 BY MR. ELLIS:
15    Q.  Any other reason that you didn't like him?
16    A.  No, nothing major that he did or said beyond
17 that.
18    Q.  Now, on December 1, 2003, you had a
19 conversation of some type with Mr. Morrison about sort
20 of supervising some work in the field; did you not?
21    A.  Yes.
22    Q.  Why don't you tell me how that conversation
23 came about, and describe it to me.
24    A.  Well, at the meeting, at the monthly staff

**Page 52**

1 meeting -- I'm sorry, the monthly maintenance meeting at
2 the chalet, when Mr. Morrison announced that he was the
3 new supervisor, he had said that he intended over the
4 next few weeks to speak one-on-one with each individual
5 employee, get a feel for what they did and get a better
6 idea of the goings-on of the maintenance department,
7 since he was so unfamiliar.
8       So I assumed when he called me in the
9 office, it was the one-on-one meeting. And we spoke in
10 general, what duties I did, who I worked with. And he
11 did, in fact, ask me if I would mind keeping an eye on
12 the other employees while Mr. Curtis was going to be out
13 for a few days.
14    Q.  Okay. And what did you say?
15    A.  I told Bob: I will do whatever you say, but
16 I would rather not supervise anyone, given the choice,
17 because I have had my belly full of it for 11 years. I
18 don't like it, and I don't get paid to do that.
19    Q.  Okay. And then what happened?
20    A.  He said: Well, I have to ask somebody else.
21 There was no indication that it was any kind of a
22 command, directive, threat. It was nothing like that.
23 It was quiet conversation. And I left his office
24 thinking: Great, I'm off the hook.

**Page 65**

1 a problem with the write-up itself?
2    A.   The write-up itself was my problem.
3    Q.   What did you feel was unfair about it?
4    A.   I honestly believed Mr. Morrison stretched
5 the truth to make me look like I was insubordinate,
6 which is not true.
7    Q.   Okay. So I take it that your problem with
8 it is that you didn't realize he was telling you you had
9 to do it?
10   A.   Absolutely. Had he said, Rich, this is a
11 direct order and you are going to get written up, I
12 would have been scared to death, to be quite honest with
13 you. It was nothing like that.
14   Q.   In the 25 years you were at Dover Downs, did
15 any supervisor or manager ever tell you: This is a
16 direct order. If you don't do it, I'm going to write
17 you up?
18   A.   I don't recall that.
19   Q.   Did you ever say that to any of the people
20 that were working under you?
21   A.   Yes, sometimes.
22   Q.   How many times?
23   A.   I don't remember.
24   Q.   Do you remember who you said it to?

**Page 66**

1    A.   Yes.
2    Q.   Who?
3    A.   Mr. Tom Curtis; it was a mandatory meeting
4 in the building of all employees, and he stated he was
5 not going to go, because it was BS. And I said: If you
6 don't do this -- It's is a requirement, you understand.
7 You are going to get written up. And he still didn't
8 attend, and I had to write him up. I didn't like doing
9 that.
10   Q.   And what other occasion?
11   A.   That's the one that stands out. There were
12 probably some minor, minor ones that people didn't
13 particular want to do.
14   Q.   That people, what? I am sorry?
15   A.   That people didn't particularly want to do
16 and I had to write them up, I had to threaten. I'm
17 sorry.
18   Q.   But the only person that you can remember
19 doing that to was Tom Curtis?
20   A.   Yes.
21   MR. HOMER: The only name he can remember.
22 I mean that is a very confusing question. He has
23 already said there were others. He just doesn't
24 remember who they were. Now you are saying --

**Page 67**

1    MR. ELLIS: Well, maybe there were others
2 and maybe there weren't.
3    MR. HOMER: The only name he can remember,
4 right?
5    MR. ELLIS: Right.
6    MR. HOMER: Okay.
7 BY MR. ELLIS:
8    Q.   I'm sorry if I asked you this already, but
9 how long after December 12th did you go in and see Robin
10 Roberts about the write-up?
11   A.   I don't recall the day.
12   Q.   All right. The 12th was a Friday, I think.
13 Did you go that day?
14   A.   I'm not sure.
15   Q.   Okay. Did you go talk to anybody other than
16 Mr. Dunning and Ms. Roberts about Morrison's write-up?
17   A.   No.
18   Q.   Anybody in management is what I am referring
19 to.
20   A.   I don't recall going to anyone else besides
21 those two.
22   Q.   Okay. After you had the cap on your hourly
23 compensation, the red line, did you go to complain to
24 anybody in management about that?

**Page 68**

1    A.   Yes.
2    Q.   Who?
3    A.   Mr. Jerry Dunning.
4    Q.   Anybody else?
5    A.   No.
6    Q.   And do you remember when you went to see
7 Jerry Dunning?
8    A.   I think Mr. Peters and myself went at the
9 same time, and I don't recall the day.
10   Q.   Do you remember what year?
11   A.   No, I don't.
12   Q.   Do you remember if it was in 2003?
13   MR. HOMER: Objection. He just said he
14 didn't remember what year.
15   THE WITNESS: I don't remember.
16   MR. ELLIS: Just trying to check his memory,
17 that is all.
18 BY MR. ELLIS:
19   Q.   Do you remember there being a Christmas
20 party scheduled for the maintenance department on
21 December 23rd?
22   A.   Yes, I do.
23   Q.   And you weren't going to go to the Christmas
24 party, right?

69

1  A. I had no intention of going, that is true.
2  Q. Why not?
3  A. I didn't think I would have a good time
4  there.
5  Q. Why not?
6  A. Because of Mr. Morrison.
7  Q. Okay. Just because you didn't like him?
8  A. That's correct.
9  Q. Okay. Was there anybody else there that you
10 didn't like?
11 A. No. I pretty much get along with everybody.
12 Q. Okay. It's just Mr. Morrison?
13 A. Yes.
14 Q. What was your work assignment that day?
15 A. Working on the command center; I remember it
16 well.
17 Q. And that was the remodeling of the command
18 center?
19 A. Yes.
20 Q. What particular task were you performing on
21 December 23rd? Do you remember?
22 A. I believe that was roofing.
23 Q. Okay. Who were you working with?
24 A. Frank Outten.

70

1  Q. Did you start on that job first thing in the
2  morning?
3  A. Yes.
4  Q. Did you talk to your son Brian that day?
5  A. Yes.
6  Q. When did you first talk to him?
7  A. It was a few minutes before 8:00 in the
8  morning, before starting time.
9  Q. Was it in the maintenance shop?
10 A. It was in the landscaping shop. That's
11 where his crew would have been. And as I was going to
12 my assignment, I saw him, and I had a brilliant idea.
13 Q. And what was that brilliant idea?
14 A. That I would buy pizza for everybody,
15 because there had been some talk that others besides
16 myself didn't want to go to the party. And it left a
17 hole in what everybody was going to do. I thought it
18 would be kind of neat to have a party with just us
19 there.
20 Q. So it was kind of like an anti-party?
21 A. Yes. You could call it that.
22 Q. And who did you expect was going to be at
23 the anti-party?
24 A. I believe Mr. Larnick and my son Brian. I'm

71

1  pretty sure it was going to be those two, because I gave
2  them $40 to buy pizza. They seemed to have more
3  flexibility in their time than I would have in getting
4  to the pizza shop and back in a reasonable time so we
5  could eat. Also, I have a key to the soda machine,
6  because it was my soda machine in the maintenance shop.
7  So I was to provide the sodas. I do that occasionally.
8  Q. What you do mean it's your soda machine?
9  A. It's my soda machine.
10 Q. Do you mean you own it like a concession?
11 A. Yes. That was one of the stipulations of
12 when I had a job. I said I want two things. I want my
13 soda machine, and I want my same company vehicle. And
14 Clifton agreed I could have both.
15 Q. This was when you walked away from the
16 manager's --
17 A. Yes.
18 Q. When you were a manager, was that your soda
19 machine?
20 A. Yes.
21 Q. Okay. Do you still have the soda machine?
22 A. I left it there. I wish I had taken it.
23 Q. Who fills it up now?
24 A. I have no idea. I don't even know if it's

72

1  still there. It is in the '70s, an antique, I guess.
2  Q. I am sorry. You mean it was built in the
3  '70s?
4  A. Yes, an old soda machine.
5  Q. And so you were going to provide the soda,
6  and you gave $40 for these guys to buy pizza?
7  A. Yes.
8  Q. And where were you going to eat the pizza?
9  A. In the maintenance shop -- I'm sorry, in the
10 landscaping shop.
11 Q. Now, $40 is a lot of pizza. That has to be
12 at least three pies.
13 A. I suppose. I don't know what the price for
14 it was at that time.
15 Q. Okay. How many people did you expect were
16 going to be there?
17 A. From the grumbling, I expected at least six
18 or eight.
19 Q. What do you mean from the grumbling?
20 A. There are some people who just don't go to
21 the Christmas party anyway in past years. And then
22 there are others who, because of Mr. Morrison, just
23 didn't care to go that particular day.
24 Q. So you expected that you were not the only

77

Q. To eat the pizza.
A. Yes, I did. I was very hungry.
Q. And did you ever make it to the landscape building?
A. No, I didn't.
Q. Why not?
A. Because I saw what I would consider unusual activity. I saw a white van that Mike Peters normally drives into the speedway. As I was leaving the command center, it is a straight shot. And you can see all the way down there. I thought this was sort of unusual, either maybe they changed the place of where we were going to eat pizza or something was going on. And that was still heavy. 9/11 was still heavy. And we were to report anything unusual. It know that's stretching it a little bit. But that is the way we were trained, seeing anything unusual.
  And I guess a couple of minutes later -- I don't know how long it takes to get from the command center, but I decided to go in. Mr. Frank Outten was right behind me in a blue van. I don't know what happened to him. Apparently, he went up to get his pizza.
  And then when I drove in to the speedway, I

78

drove in through gate one, looked to my left. And at that point, I was aware that there was a drag race going on. Even though I couldn't actually see the drivers, I knew who they were.
Q. Well, where were you when you saw Mr. Peters's van drive into the speedway?
A. I was en route from the command center, heading north, heading north.
Q. On Old Leipsic Road?
A. Yes.
Q. And how did you get into the speedway?
A. We have a little shortcut that we go through at the south end of the speedway. It goes to Tent Village.
Q. Okay. Now, what would be unusual about Mr. Peters's car driving into the speedway?
A. I know that at lunchtime, everyone has one thing on their mind, and that is to eat.
Q. In terms of Mr. Peters's job duties, is there anything unusual about him driving into the speedway?
A. Not really, because he does exchange equipment. He stores a lot of equipment there. But I thought it was unusual that particular day, because we

79

had all planned to have pizza. And I didn't know why he -- and I thought I had seen another vehicle in front of him go in first, but I'm not sure. But I know it was his van that went in there.
Q. So you pulled in yourself?
A. Yes.
Q. Did you drive straight there from the point at which you saw Mr. Peters's van drive into the gate one area?
A. Yes.
Q. And where is the cut over from Leipsic Road to the Dover Downs property?
A. It's almost across from the command center. You go down maybe a hundred feet, and then you can cut over through a gate that we had keys to. Mr. Morrison had changed a lot of locks on the main gates, the one that we would normally use as a convenient roadway through there. For some reason, Mr. Morrison or security had changed locks. We still had a key to the gate I'm talking about, by Tent Village.
Q. Okay. When you pulled up to gate one, what was Mr. Peters doing?
A. Sitting in his van by the gate.
Q. How long did it take you to get from where

80

you first saw Mr. Peters's car pull into gate one until when you actually pulled into gate one?
A. Probably no more than a minute or two.
Q. Okay. And when you got up to the top of gate one there, what did you see?
A. At first I went right past Mr. Peters. We got almost to Pit Road, realized there was something going on. I backed up, because we are trained to -- any activity on the speedway. At that moment, I knew it was going to be a drag race.
Q. How did you know that?
A. Well, there was a man dropping a hat, and there were two black cars lined up.
Q. Were they both black?
A. From what I recall.
Q. So --
A. So I repositioned my truck back to Mr. Peters, because we are trained that anytime activity is on the speedway, you don't want spectators, dogs, kids on bicycles, skateboarders coming down through there. It's too great a task to manually close those gates. You either need a crew of -- a group of men or you need a backhoe to push the gates made out of boiler plate steel. So the easiest thing is to park in front

**81**

1 of it to keep kids from coming through.
2    Q.  So you blocked the gate?
3    A.  Yes.
4    Q.  So you actually drove down onto the
5 speedway?
6    A.  Yes, I did.
7    Q.  From gate one?
8    A.  Uh-huh.
9    Q.  And how far did you get from the barrier
10 that you guys call the ad wall?
11    A.  Not very far, maybe about two-thirds of the
12 way across the speedway.
13    Q.  And then you backed up?
14    A.  I think I actually turned my vehicle around
15 and just kind of went back up.
16    Q.  Okay. What kind of vehicle did you have?
17    A.  A '71 Chevy.
18    Q.  Pickup?
19    A.  Pickup.
20    Q.  Is that your vehicle or the company's?
21    A.  Company.
22    Q.  Okay. So did you ever talk to Mr. Peters
23 that day?
24    A.  Not at that time.

**82**

1    Q.  Okay. So you are sitting there in your
2 pickup truck, watching the drag race?
3    A.  Yes.
4    Q.  What did you see?
5    A.  About the time I got out the gate, I saw the
6 two vehicles heading north.
7    Q.  Okay. Now, when you say about the time you
8 got to the gate --
9    A.  Yes.
10    Q.  -- as I understand it, you went through the
11 gate, almost down to Pit Road, and turned around and
12 came back up to Pit Road?
13    A.  By the time I got back up to the gate, I saw
14 the two vehicles.
15    Q.  Heading north?
16    A.  Yes.
17    Q.  Did you recognize one of them as your son?
18    A.  I recognized his vehicle, sure.
19    Q.  Did you recognize the other vehicle?
20    A.  Not really; I'm not into all the race cars
21 and things like that.
22    Q.  Did you recognize it as the vehicle of
23 another employee?
24    A.  Yes.

**83**

1    Q.  So did you recognize it as Ernie Carlisle's
2 vehicle?
3    A.  I would say yes.
4    Q.  So you must have realized fairly quickly
5 that this was your son drag racing against Ernie
6 Carlisle?
7    A.  Yes.
8    Q.  So what happened next?
9    A.  Okay. They raced to the north, and I'm not
10 sure who won. They went up the speedway, turned around,
11 repositioned, I think they may have briefly stopped.
12 They headed south, and I thought this is not going to
13 work, because at the south end, when they get to the
14 south end, the ad wall turns. It's going into a funnel.
15 Going north, it's great. You have a wide, open space.
16 You have plenty of time to slow down heading south. My
17 son was on the east side.
18    Q.  The side where the wall is?
19    A.  Where the wall was. And something told me
20 that he's not going to make it, just a gut feeling. I
21 said: He cannot turn, and he cannot hit his brakes. It
22 is gravel down there. About the time it's going through
23 my head, I saw the hood fly up.
24         And somehow, with all of those people there,

**84**

1 I was the first one there. I don't remember how I got
2 there that fast.
3    Q.  How did you get there? Did you drive your
4 pickup over?
5    A.  Yes.
6    Q.  And what did you do?
7    A.  I ran up to the window. The passenger
8 window was broken, smashed, gone. His head had broken
9 the side mirror when his body was thrown to the left as
10 the car went to the right. His head broke the whole
11 side window, and he was convulsing.
12         And it was the most horrible thing I have
13 ever seen in my whole life. I will never forget it, my
14 son convulsing, going like that, jerking sideways like
15 that. I was so afraid he had spine damage, head
16 damage. I was: How am I going to tell my wife?
17         So I was screaming: Call 911. Call nine
18 911. I didn't have a radio. I said: Call 911. About
19 that time, Monahan was running up the track, and he got
20 on his radio and he called somebody.
21         At about that same time, John Patterson, who
22 was a volunteer fireman, helped me -- he told me how to
23 stabilize Brian's head and lay him down in the front
24 seat until help got there. He was actually holding

85

1  Brian's head the whole time. I was trying to comfort
2  Brian. And I have no training in that at all, but I
3  kept telling him it was going to be okay.
4     Q.  Was he conscious?
5     A.  He was in and out. But I think by the time
6  the ambulance got there, he kind of knew. John was
7  asking, you know, do you know where you are, and things
8  like that.
9     Q.  I take it that the ambulance came and took
10 him away?
11    A.  Yes. It seemed like forever at the time.
12    Q.  Do you know of your son drag racing on Pit
13 Road before that day?
14    A.  I honestly don't know it. I can honestly
15 say I suspected it, because I hear conversations. That
16 was actually the first drag race that I witnessed with
17 my own eyes.
18    Q.  Okay. When you realized that there was
19 racing going on, did it concern you?
20    A.  As it would a father; other than that, I
21 don't really care. I mean it's a racetrack.
22    Q.  Well, you had never seen anybody racing on
23 it before, right?
24    A.  No employees, no; I have seen plenty

86

1  of races.
2     Q.  I understand. Did it occur to you that drag
3  racing on Pit Road might be dangerous?
4     A.  I wouldn't do it, personally. I wouldn't
5  dream of it.
6     Q.  Why wouldn't you do it?
7     A.  That's not my thing. I am a musician. I
8  don't care about race cars and all of that. Music is my
9  passion.
10    Q.  Is one of the reasons you wouldn't do it
11 because you might get hurt?
12    A.  I don't have a vehicle that would be capable
13 of racing.
14    Q.  Would you be concerned for your safety if
15 you were to try to drag race on Pit Road?
16    A.  It never crossed my mind.
17    Q.  So you don't know whether you would be
18 concerned or not?
19    A.  I just know that I'm a careful driver.
20    Q.  When you saw cars going southbound on Pit
21 Road fast, you immediately recognized that was a
22 problem, right?
23    A.  Yes, I did.
24    Q.  Because of the curvature of the wall?

87

1     A.  Yes. I only had a few seconds to think
2  about it, but it went through my mind, yes.
3     Q.  But it never went through your mind that
4  going northbound would be a problem?
5     A.  Not really.
6     Q.  You didn't feel that you had any obligation
7  to try to stop it?
8     A.  No, I didn't.
9     Q.  You were interviewed by Joe McNair
10 concerning what went on on December 23rd?
11    A.  Not a true interview, no; that occurred a
12 few days later when he asked me to write a statement of
13 everything that I can remember.
14    Q.  All right. Let me show you Exhibit 9.
15       (Exhibit Number D-9 was marked for
16 identification and attached to the record.)
17 BY MR. ELLIS:
18    Q.  Take a look at Exhibit D-9.
19       MR. HOMER: This is a two-page document,
20 isn't it?
21       THE WITNESS: Yes. It says over.
22       MR. HOMER: It says over at the bottom of
23 it.
24       MR. ELLIS: Yeah. We told you the other day

88

1  that we don't have the over.
2        MR. HOMER: I think we do have the over.
3  Let me take a look at the exhibit.
4        MR. ELLIS: Well, there is a separate
5  document, but it's not the over side of it.
6        MR. ELLIS: Off the record.
7        (Following a discussion off the record:)
8  BY MR. ELLIS:
9     Q.  Mr. Williams, did you have a chance to look
10 at D-9?
11    A.  Yes. What was here? I would never write
12 over without additional writing somewhere.
13    Q.  I understand that there is another side to
14 this that we don't have a copy of, because we can't find
15 the original. But insofar as what you can see here, is
16 this a statement that you wrote?
17    A.  Yes.
18    Q.  Where were you when you were preparing this
19 statement?
20    A.  It was in a conference room near the
21 security office, the first floor of the main building.
22    Q.  Who was present in the room, other than you?
23    A.  Joe McNair.
24    Q.  And do you remember where -- I'm sorry. Was

**89**

1  there anybody else in the room other than McNair?
2  A. I honestly can't recall.
3  Q. Okay. How did this document come to be?
4  A. I was told that everyone present had to
5  write a statement so they can gather information on what
6  happened.
7  Q. Okay. And did Mr. McNair ask you any
8  particular questions or anything? Did he --
9  A. He didn't really speak a lot. I
10 specifically remember he said: Rich, if you just tell
11 the truth, everything will be okay. And I did my best
12 to do that.
13 Q. So aside from Mr. McNair's signature on the
14 bottom, which is sort of obscured in this copy, is
15 everything on the page in your handwriting?
16 A. Yes.
17 Q. Now, this was a statement that you wrote up
18 the day after the accident, right?
19 A. Yes.
20 Q. Do you remember it being Christmas Eve?
21 A. Yes.
22 Q. Now, you say here in the first sentence of
23 this statement, that at approximately 12:05 on 12/23/03,
24 I left the command center to go to lunch. Upon passing

**90**

1  gate one, I saw some vehicles entering the track area.
2  In your testimony today, you said that you
3  saw the vehicles entering the track area back when you
4  were down by the command center, didn't you?
5  A. Yes, I did.
6  Q. Why did you write that you saw them upon
7  passing gate one in this statement that you gave on
8  December 24, 2003?
9  A. At that time I suspect it would have been
10 the same thing. In hindsight, apparently, I wouldn't
11 have written that. The important thing was that I
12 followed vehicles in.
13 Q. Okay. But in this statement, you said you
14 saw him upon passing gate one. Was it upon passing gate
15 one, or was it upon leaving the command center?
16 A. I don't remember exactly where I was. I was
17 en route. I was in a vehicle moving.
18 Q. How far would you estimate it is from the
19 command center to gate one? A quarter mile?
20 A. A quarter mile, yes.
21 Q. The next sentence you wrote here, starting
22 on the right side of the third line, it says: I decided
23 to follow them in, just on a hunch that something was
24 happening.

**91**

1  What do you mean by a hunch?
2  A. It just seemed unusual to me that Mike
3  Peters would be going inside the track at that
4  particular time.
5  Q. Okay. And you are sure you recognize that
6  it is Mike Peters's truck?
7  A. Yes.
8  Q. Would you agree with me that your statement
9  here, as you wrote it out, doesn't say anything about
10 having driven down onto the speedway track, as you have
11 just testified today when you arrived at gate one?
12 A. Can you repeat that? I'm sorry.
13 Q. Would you agree with me in this statement
14 that you didn't actually say that you drove down through
15 gate one down onto the speedway track and then turned
16 around and drove back up again?
17 A. Right. I didn't say that here.
18 Q. Any particular reason that you didn't?
19 A. It didn't seem that important at the time.
20 Q. It says here that you had no radio, and you
21 have said that your radio was not operable that day,
22 right?
23 A. Yes.
24 Q. Did Mr. Peters have a radio?

**92**

1  A. I assume he did.
2  Q. You didn't get out of the car and go over
3  and ask to use his radio, did you?
4  A. No, I didn't.
5  Q. Now, am I correct that the reason you didn't
6  try to get a radio and tell people to stop what they
7  were doing was you didn't think there was anything wrong
8  with it?
9  A. It never occurred to me that there would be
10 time to do anything had I even decided.
11 Q. Well, how many races did you think that they
12 were going to run?
13 A. I have no idea.
14 Q. Well, then, maybe they were going to run
15 eight or ten, as far as you know, right?
16 A. I don't know.
17 Q. If they were going to run eight or ten
18 races, you would have had time to stop them, wouldn't
19 you?
20 A. Had I decided to stop -- I don't know. I
21 don't know. That is speculative there. I don't know.
22 Q. Well, you chose not to stop them, right?
23 A. I didn't choose anything.
24 Q. Well, you could have gone over to

93

1 Mr. Peters's truck and said, Hey, let me use your
2 walkie-talkie, and then say on the walkie-talkie, you
3 guys can't do this. It's dangerous. Couldn't you?
4 There was nothing to stop you from doing that?
5   A.   Nothing to stop me, no.
6   Q.   But you chose to not pursue that action, did
7 you?
8   A.   It never entered my mind.
9   Q.   I understand that. Now, this is a statement
10 that you gave on the 24th?
11   A.   Yes.
12   Q.   Do you recall speaking to Joe McNair on the
13 23rd?
14   A.   Yes.
15   Q.   And where were you when Mr. McNair
16 approached you on the 23rd?
17   A.   I was going past what we call the track
18 shack. And Mr. McNair was right there, for some reason.
19   Q.   I'm going to show you the diagram that
20 Mr. Peters was good enough to draw for us.
21   A.   Right.
22   Q.   And that is marked as Exhibit D-1. And I
23 will ask you if you could tell me where the track shack
24 is. If it goes by another name that we've already got

94

1 on there, maybe you could just point it out to me.
2   A.   I would put it -- if this is the horse track
3 here, I would put it -- it's almost on the horse track,
4 just a little indentation of this area.
5   Q.   Okay. Is it near the first aid building,
6 which is where I have my glasses pointed?
7   A.   Yes. It's very close to that. This is out
8 of proportion.
9   Q.   I don't think Mr. Peters ever suggested he
10 was drawing it proportionately.
11   A.   Okay.
12   Q.   All right. So it is somewhere near the
13 first aid building?
14   A.   Yes. That is close.
15   Q.   What were you doing in the track shack?
16   A.   Brian had asked me to go and check on
17 something in his car, and I have been wracking my brain
18 ever since, keys or a wallet or something he may have
19 left in his car.
20   Q.   So this is after he had been taken to the
21 hospital?
22   A.   After I came back from the hospital and that
23 he was okay, he had asked me to go back and check on
24 something. And Mr. McNair was there, apparently, still

95

1 doing his investigation. And he stopped me and asked me
2 a few questions, I believe.
3   Q.   Okay. Did you go to the hospital with the
4 ambulance?
5   A.   I drove behind the ambulance.
6   Q.   And that was to Kent General Hospital?
7   A.   Yes.
8   Q.   How far away is Kent General Hospital from
9 the track?
10   A.   I'm terrible at guessing, but it is Downtown
11 Dover.
12   Q.   Within 10 or 15 minutes?
13   A.   Yes.
14   Q.   So you went to the hospital with your son.
15 And how long did you remain at the hospital?
16   A.   It was a few hours. By the time I got back,
17 actually, the work shift was over with.
18   Q.   Okay.
19   A.   So I didn't work the remainder of that day.
20   Q.   I take it you didn't get any pizza that day?
21   A.   I never saw a pizza, and I never saw any of
22 the $40. I have been accused of having a pizza
23 party/PEUS at the track shack, and I have never seen any
24 of it nor my $40.

96

1   Q.   Do you have any idea who went to get the
2 pizza that day?
3   A.   I have an idea. I can't prove it. I didn't
4 see them. But it was Brian and Bill Larnick, one or the
5 other.
6   Q.   How did they get time off from work to go
7 get pizza?
8   A.   As I said earlier, their schedule was more
9 flexible. By the nature of mowing grass and
10 landscaping, they were closer to the pizza place. They
11 could sneak over there, I guess, or be there and back
12 quicker.
13   Q.   Where is the pizza place?
14   A.   It almost borders with Dover Downs property.
15 It is Papa John's in Dover Commons.
16   Q.   Okay. So you saw Mr. McNair later in the
17 afternoon on the track, in what you called the track
18 shack?
19   A.   In that area, yes.
20   Q.   Okay. I'm going to ask you to take a look
21 at a document that Mr. McNair prepared.
22       MR. ELLIS: Could you, Jerry, please show
23 him Number 11, if you have the original of 11?
24       MR. HOMER: Yes.

## Page 97

1  MR. ELLIS: It is P-11, and I know this one
2 is a Sutor Exhibit.
3 BY MR. ELLIS:
4  Q. Could you flip through this package, please?
5  A. The whole thing?
6  Q. I don't want you to read the whole thing,
7 but go to the page that says D0350.
8  A. Okay.
9  Q. Take a look. Have you ever seen that
10 document before?
11  A. No, not before today.
12  Q. Okay. Take a minute to read that statement,
13 please.
14  A. Okay.
15  Q. I want to call your attention to the
16 beginning of the second paragraph. And it starts with
17 the phrase: I told Rich. Do you see that sentence?
18  A. Yes, I see it.
19  Q. The sentence after that says: He stated he
20 had just came up from the command center and he heard
21 cars running and he drove to gate one.
22  Did you say that to Mr. McNair on
23 December 23, 2003?
24  A. No. This is the first I have seen this.

## Page 98

1 I'm not really happy about his words at this point.
2  Q. Okay. Do you have any reason to believe he
3 would make them up?
4  A. No, I don't think he would. I would hope
5 not.
6  Q. Did you tell him that you heard the cars
7 running, as you were driving up from the command center?
8  A. No. The only reason I went in there was I
9 saw the white van.
10  Q. You did tell Mr. McNair that you helped to
11 block the gate, right?
12  A. Yes. That was supposed to be a good thing
13 at the time, by the way. I'll never do that again.
14  Q. Why is that a good thing?
15  A. To block children, skateboarders; patrons
16 stop by the rear gate all the time, you know. They are
17 out of town or visiting Dover, and they want to see the
18 great speedway they see on TV. And they just wander
19 down, people, skateboarders, bicycles, dogs.
20  Q. In the middle of the winter?
21  A. Pretty much, yes.
22  Q. Okay. On December 23, 2003, was there a
23 point that you learned you were going to be suspended?
24  A. Yes.

## Page 99

1  Q. And do you remember what time of day that
2 was?
3  A. It was the afternoon, I believe.
4  Q. Do you remember how you learned?
5  A. I was asked to go to the human resources
6 office.
7  Q. And where were you when you were asked to go
8 to the human resources office?
9  A. I don't recall exactly where I was.
10  Q. Were you out on a job site down at the
11 command center?
12  A. I don't recall.
13  Q. Do you remember who told you?
14  A. No, I don't remember.
15  Q. So you went to the human resources office?
16  A. Yes.
17  Q. And were you told who to see when you got
18 there?
19  A. Yes.
20  Q. Who?
21  A. Robin Roberts.
22  Q. And did you, in fact, see her?
23  A. Yes.
24  Q. And was she in her office?

## Page 100

1  A. Yes.
2  Q. Was anybody there with her?
3  A. I believe Mr. Wertz was there.
4  Q. Okay. Mr. Morrison wasn't there?
5  A. I don't remember. I should, but I don't.
6  Q. And did you have a meeting with Mr. Wertz
7 and Ms. Roberts?
8  A. Yes. I recall Ms. Roberts especially, yes.
9  Q. And do you recall what Ms. Roberts said to
10 you?
11  A. Yes. She said: Your department has decided
12 to terminate you for failing to report an illegal drag
13 race.
14  Q. Okay. You are describing now the meeting
15 where you were terminated, right?
16  A. Yes. I'm sorry.
17  Q. Okay. That is all right.
18  A. Suspended.
19  Q. I am referring first to the suspension
20 meeting. Do you remember how you got suspended? Who
21 told you you were going to be suspended?
22  A. I believe that was human resources again.
23  Q. Okay. So you went to the human resources
24 department?

**109**

1 occurred?
2   A.  He said a couple of things may have
3 happened. Obviously, there was more gravel at the end
4 of the road than he realized, and he thinks possibly
5 that Ernie could have crowded him a little bit toward
6 that wall. But it's all guessing.
7   Q.  Okay. Did you ever ask him why he did it?
8   A.  No, I never did.
9   Q.  Whatever became of the black Mustang?
10  A.  He sold all the good parts on it and bought
11 another Mustang.
12  Q.  It was totaled?
13  A.  Yes. He stripped it down and bought another
14 one. He sold some of the parts or reused some of the
15 parts from the other one.
16  Q.  Does he drive cars competitively now?
17  A.  During the season, which is spring through
18 fall, at Cecil County, he goes over there every chance
19 he gets, mostly Friday nights.
20  Q.  Okay. Prior to December 23, 2003, had you
21 known of him ever running on the Pit Road?
22  A.  Not specifically, other than just the
23 rumors; you overhear conversations of different guys
24 running.

**110**

1   Q.  When you were the manager of maintenance --
2 which is what? 11 years -- did anybody ever ask you for
3 permission to drag race on Pit Road?
4   A.  No.
5   Q.  What would you have said if they had asked
6 you for permission?
7   A.  I would have said: It's not my property,
8 ask Jerry Dunning. That is honestly what I would have
9 said, because that man watched me like a hawk.
10      MR. ELLIS: Just give us a minute or two.
11 We are pretty close to being done.
12      (Following a discussion off the record:)
13 BY MR. ELLIS:
14  Q.  Just a couple more questions, Mr. Williams.
15 Do you remember anything that Mr. Wertz said at the
16 termination meeting?
17  A.  Not at the termination meeting.
18  Q.  Okay. So everything that you have told us
19 about what happened in the termination meeting came from
20 Robin Roberts?
21  A.  To the best of my knowledge.
22  Q.  Okay. Do you recall her reading from a
23 document? I'm sorry?
24  A.  I don't specifically recall that.

**111**

1       MR. ELLIS: Could you show him Sutor 9,
2 please? Thanks, Jerry.
3 BY MR. ELLIS:
4   Q.  Mr. Williams, does that start with page
5 D0135?
6   A.  No.
7       MR. HOMER: It starts with 280.
8       MR. ELLIS: Okay. Our system has broken
9 down here.
10      THE WITNESS: This is from Mr. Peters, if
11 that is --
12      MR. ELLIS: I'm sorry. Has the termination
13 paperwork for Mr. Williams been identified --
14      MR. HOMER: I think that was eight. It was
15 Exhibit 8.
16      MR. ELLIS: Eight, I'm sorry. Let me have
17 it so I make sure I understand what you are looking at
18 here.
19 BY MR. ELLIS:
20  Q.  Okay. That is good. Page 135, is that what
21 you have in front of you of Exhibit 8?
22  A.  Yes, yes, yes.
23  Q.  Were you shown a copy of this document when
24 you were terminated?

**112**

1   A.  No.
2   Q.  Do you recall Ms. Roberts reading to you
3 from a document in her office?
4   A.  It is possible.
5   Q.  Do you recall the words that are under
6 nature of incident on the first page of Exhibit Sutor 8?
7   A.  I don't remember all of this.
8   Q.  Do you remember any of it?
9       MR. HOMER: Do you mean does he remember
10 this being read to him, or does he remember being read
11 the content of what is in here?
12 BY MR. ELLIS:
13  Q.  Do you remember any part of the content
14 being read to you?
15  A.  Yes. I remember several of the items in
16 here.
17  Q.  What parts do you remember?
18  A.  I remember Ms. Roberts mentioned that I had
19 a previous write-up, and that was one of the reasons
20 that I was being terminated.
21  Q.  Okay. Do you remember her telling you that
22 as a mechanic I, it is your responsibility to report any
23 suspicious, unsafe, or reckless behavior involving your
24 fellow coworkers?

**113**

1    A.   I believe she said something along the lines
2  that I should have stopped the race.
3    Q.   Okay. Do you remember her telling you that
4  according to Joe McNair, you admitted that you pulled
5  your work vehicle next to Michael Peters's work vehicle?
6    A.   Yes.
7    Q.   Let me show you another document. And I
8  guess we are up to 10.
9      (Exhibit Number D-10 was marked for
10  identification and attached to the record.)
11  BY MR. ELLIS:
12    Q.   Take a minute to look at that.
13    A.   Okay. Okay.
14    Q.   Do you recognize this document?
15    A.   Yes.
16    Q.   Can you tell us what it is, please?
17    A.   It's my handwriting. I believe it was in
18  response to the Department of Labor.
19    Q.   This is a document that you prepared or that
20  you received from the Department of Labor. You filled
21  in the blanks and gave it back to them?
22    A.   Yes.
23    Q.   Okay. Could you go to the fourth page in,
24  and it has on the top of it, discipline questionnaire,

**114**

1  underneath your name.
2    A.   Yes.
3    Q.   Do you have that?
4    A.   Yes.
5    Q.   Go down to question number three. And the
6  question is: What explanation was given to you as to
7  the reason(s) for your receiving this most recent
8  discipline? Do you see that?
9    A.   Yes.
10    Q.   Now, in your answer, you wrote -- and I will
11  quote -- I should have stopped a drag race, because I
12  was a number one mechanic and also because I was, quote,
13  older, end quote, and should have been more responsible.
14      Where did you get the information that you
15  put in in response to number three?
16    A.   From some conversations with Mr. Wertz,
17  Mr. Morrison, and Ms. Roberts, and I can't specifically
18  say which one.
19    Q.   Well, which among them told you that you
20  were terminated because you were older and should have
21  been more responsible?
22      MR. HOMER: He just said he couldn't
23  remember which of the three. That is exactly what he
24  said.

**115**

1      MR. ELLIS: I didn't say it with respect to
2  that particular phrase.
3      MR. HOMER: I thought he did, because you
4  just asked him about that phrase in the question before
5  that.
6      MR. ELLIS: I asked him about all four
7  lines. I just asked him about the last line and a half.
8  BY MR. ELLIS:
9    Q.   Are you saying that you don't remember who
10  told you that you were older and should have been more
11  responsible?
12    A.   Specifically, I was given four different
13  reasons for being suspended at the time.
14    Q.   You were given four different reasons for
15  being suspended?
16    A.   Yes.
17    Q.   You testified today that you were suspended
18  in a meeting with Robin Roberts in her office, along
19  with Wertz; did you not?
20    A.   Yes.
21    Q.   And you described that meeting to us, and I
22  don't remember there being four different reasons.
23      MR. HOMER: He didn't say he got four
24  different explanations from Ms. Roberts either.

**116**

1  BY MR. ELLIS:
2    Q.   Well, do you have anything to add to your
3  prior testimony about the conversation you had with
4  Ms. Roberts?
5    A.   No.
6      MR. HOMER: About the insubordination?
7      MR. ELLIS: No, about the suspension.
8      MR. HOMER: Okay. He had several
9  conversations with Ms. Roberts.
10  BY MR. ELLIS:
11    Q.   Did you have any conversations with Bob
12  Morrison about your termination?
13    A.   No, only the suspension.
14    Q.   When did you have a conversation with him
15  about the suspension?
16    A.   When I was called in his office and when he
17  and Tom Curtis were there.
18    Q.   Was that when you were suspended?
19    A.   Yes.
20    Q.   You previously testified that Robin Roberts
21  was the person who suspended you.
22    A.   Yes. But I had at that time -- at that time
23  I was also in Mr. Morrison's office.
24    Q.   So who was it that first told you you were

121

1  document? I want to ask you about your response to
2  number 20. And in order to understand that, you might
3  have to refer to the comment about Mr. Monahan up here
4  in response to question 18 and also in response to
5  number 19.
6      My question to you: If you look at
7  number 20 -- and you are referring to Mr. Peters here.
8  We're both over 50 years of age, and the others are
9  mostly under 40 years. Also, we both were at the high
10 end of the maintenance pay scale.
11     Do you believe that you and Mr. Peters were
12 terminated because you were at the high end of the
13 maintenance pay scale?
14     A.  No. I believe it's because we were
15 long-time employees, and Mr. Bob Morrison viewed us as a
16 threat to his job.
17     Q.  You think you were terminated because Bob
18 Morrison viewed you as a threat to his job?
19     A.  That's one of the reasons, yes.
20     Q.  What made you feel Mr. Morrison viewed you
21 as a threat to his job? He had just been picked for the
22 job over you, right?
23     A.  Yes.
24     Q.  So why do you think he thought you were a

122

1  threat to his job?
2      A.  Because he didn't seem to know anything
3  about the job, and Mr. Peters and I knew just about
4  everything there was to know.
5      Q.  Anything else?
6      A.  And I believe that what Mr. Curtis didn't
7  remember saying is that Bob Morrison was looking for any
8  excuse to get us back in his office.
9      Q.  Okay. Do you think that you were terminated
10 because of your age?
11     A.  Yes, I do.
12     Q.  Why? What makes you say that?
13     A.  Because we were -- Bob Peters and I were the
14 only two fired out of all the people that witnessed the
15 race. There were just as, if you want to say, guilty as
16 we were, and they all kept their jobs.
17     Q.  Well, you are not the oldest person who
18 witnessed the race, were you?
19     A.  All of us were long-time employees.
20     Q.  But you weren't the oldest person watching
21 the race, right?
22     A.  Yes.
23     Q.  Russell Hands was older than you, right?
24     A.  Yes.

123

1      Q.  By what? 12 or 15 years older than you?
2      A.  Approximately.
3      Q.  Do you think Ernie Carlisle was terminated
4  on account of his age?
5      MR. HOMER: I am going to object to the form
6  of the question. You can answer it.
7      THE WITNESS: I don't know why. I assume
8  it's because he was racing a car.
9  BY MR. ELLIS:
10     Q.  Why do you assume that?
11     A.  He never told me the exact reason he got
12 fired.
13     MR. ELLIS: Just give me a minute. I think
14 we are about done.
15     MR. ELLIS: Okay. I don't have any more
16 questions.
17     MR. HOMER: I have a few questions.
18 BY MR. HOMER:
19     Q.  Mr. Williams, you testified early on in the
20 deposition that you didn't apply for additional jobs
21 after your unemployment insurance ran out, because you
22 didn't need a job.
23     Do you recall telling me any other reasons
24 why you didn't apply for another job after your

124

1  unemployment insurance ran out?
2      MR. ELLIS: Is this a waiver of the
3  attorney-client privilege?
4      MR. HOMER: I guess it is.
5      MR. ELLIS: I just don't like to see that
6  unless everybody is aware that is what is going on.
7      MR. HOMER: That is what it is.
8      THE WITNESS: Can you repeat it?
9  BY MR. HOMER:
10     Q.  Can you recall telling me any other reason
11 you didn't apply for any other jobs after your
12 unemployment insurance ran out? Let me ask it more
13 directly. Were there any other reasons or any other
14 reason why you didn't apply for additional jobs after
15 unemployment insurance ran out, other than the fact that
16 you didn't need a job at that time to sustain a living?
17     A.  In June of that year, I had begun receiving
18 some advance payments on the sale of the land.
19     MR. ELLIS: Was that 2004?
20     THE WITNESS: Yes.
21 BY MR. HOMER:
22     Q.  Were you discouraged at all by the efforts
23 you made to find a job after you were terminated by
24 Dover Downs?

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

```
RICHARD L. WILLIAMS and      : C.A. No.: 06-0435 (GMS)
MICHAEL E. PETERS,           :
                             :
        Plaintiffs,          :
                             :
        v.                   :
                             :
DOVER DOWNS, INC., a         :
Delaware corporation,        :
                             :
        Defendant.           :
```

.. .. .. .. .. ..

Deposition of ERNEST CARLISLE, taken pursuant to notice, on Friday, March 10, 2006 at at 10:30 a.m. at 116 West Water Street, Dover, Delaware, reported by Lorena J. Hartnett, a Registered Professional Reporter and Notary Public.

.. .. .. .. .. ..

APPEARANCES:

    JEREMY HOMER, ESQUIRE
    Parkowski, Guerke & Swayze
    116 West Water Street
    Dover, DE  19901
      Attorney for the Plaintiffs

A0033

Page 50

1  track.
2    Q. Excuse me, before you get to that,
3  where was Brian's car that morning? Do you know?
4    A. I don't know whether he drove it down
5  there or what or whether it was already there. I
6  don't know.
7    Q. Okay.
8    A. I don't know where it was at.
9    Q. Do you know where Brian was working
10 that morning?
11   A. He was working for Dave Pelly.
12   Q. Do you know where he was working?
13   A. Up to his office, his building there
14 somewhere.
15   Q. And where is that building? Is that
16 the landscape building?
17   A. Landscape building, yeah, landscape
18 building.
19   Q. So do you remember whether he drove
20 his car down through gate one at about noon?
21   A. Yeah, yeah, he come down there about
22 noon.
23   Q. And how do you know that? Did you see
24 him?

Page 51

1    A. Yeah.
2    Q. Okay, so what happened next?
3    A. Well, we lined up and raced them.
4    Q. Okay. Which direction did you start
5  out in?
6    A. Well, we was on the south lane and
7  headed north.
8    Q. Why did you go north?
9    A. Well, it just seems like it was the
10 safest way to go.
11   Q. And when you say it's the safest, do
12 you mean it's safer than going south for reasons
13 you described earlier today?
14   A. Yeah, right, uh-huh.
15   Q. Okay, so who won the first race?
16   A. He won the first one, and I won the
17 next three.
18   Q. Okay. Was there one of the races that
19 was called off in the middle of the race?
20   A. Called off?
21   Q. Yeah, sort of aborted halfway down the
22 lane?
23   A. Yeah, well, he slowed down, yeah,
24 Brian did. I guess he couldn't keep up or

Page 52

1  something. He just, unless he missed a gear or
2  something. I don't know. I looked in the mirror
3  and didn't see no more of him.
4    Q. So was that -- Which trip was that?
5    A. Probably about the third one.
6    Q. Okay, so the first race you went
7  north; right?
8    A. The first three we went north.
9    Q. Okay, so you went north, then turned
10 around and drove back down?
11   A. Yeah.
12   Q. When you turn around and drive back
13 down, did you drive on Pit Road or did you drive
14 on the track?
15   A. Well, we raced down on the Pit Road.
16   Q. Right.
17   A. Going north, going south, and that was
18 the last run.
19   Q. I am not referring to the last one. I
20 am referring to the first three. When you end up
21 the race, you are at the north end; right?
22   A. Yeah.
23   Q. How do you get from the north end to
24 the south end?

Page 53

1    A. Oh, we just, we just drove straight
2  down Pit Lane down.
3    Q. Okay.
4    A. But we didn't race.
5    Q. You stayed on Pit Lane?
6    A. Yeah.
7    Q. Okay. So you had three trips north?
8    A. Uh-huh.
9    Q. And after each trip north you turned
10 around and drove back down Pit Lane?
11   A. Yeah, yeah.
12   Q. And how fast would you say you were
13 going at the highest speed that you were at
14 during the race?
15   A. I would probably say about 65, 70.
16   Q. And do you have any recollection of
17 looking at your speedometer and remembering that
18 that's how fast you were going?
19   A. I never looked at the speedometer.
20   Q. Okay.
21   A. I never looked.
22   Q. So you are just estimating based upon
23 your experience as a drag racer as to how fast
24 you got going in a quarter mile?

A0034

Page 54

1  A. Yeah, yeah, because Pit Lane is not a
2  quarter of a mile no way.
3  Q. Oh, it's not?
4  A. No, it's not a quarter mile. It's
5  shorter than a quarter mile.
6  Q. Oh, okay. How long is Pit Lane?
7  A. I don't know how long it is, but by
8  just looking at it and looking at the regular
9  tracks that you race on, I know it's not nearly
10 as long as those tracks, a quarter of a mile.
11 Q. Of course, the normal track you looked
12 at wouldn't have a banked turn at the end of it,
13 would it?
14 A. No, it wouldn't. (Laughter) That's
15 for sure.
16 Q. Does that make it harder or easier to
17 race on?
18 A. Well, it's more exciting.
19 Q. Why is it more exciting?
20 A. To get around that turn.
21 Q. You mean to get around the turn before
22 you --
23 A. Hit it.
24 Q. -- lose control?

Page 55

1  A. (Laughter) Uh-huh.
2  Q. After the third race northbound --
3  A. Uh-huh.
4  Q. -- why did you decide to race
5  southbound?
6  A. Well, we just wanted to race one more
7  time.
8  Q. So why didn't you drive back down to
9  the south and race north again?
10 A. Well, that was going to be our last
11 time, you know, that was going to be it, you
12 know.
13 Q. Well, I understand that, but my
14 question is why did you go -- You made three
15 trips north.
16 A. Yeah.
17 Q. Why didn't you go back and make a
18 fourth trip north instead of going south?
19 A. Well, we wasn't intending on racing.
20 That third race was going to be it until we got
21 to talking, setting there side by side talking.
22 Then we decided to race back to the other end,
23 southbound lane.
24 Q. Okay, let me -- Maybe I missed

Page 56

1  something. After you had done the first race,
2  you are at the north end; right? Did you then
3  talk to Brian?
4  A. After the first three?
5  Q. After the first race?
6  A. No, no.
7  Q. So you said absolutely nothing to him
8  after the first race?
9  A. No, we just turned around and lined up
10 back again.
11 Q. Okay, and then you made the second run
12 north?
13 A. Yes.
14 Q. Did you talk to him after the second
15 race?
16 A. No, nuh-uh.
17 Q. Now, you said in the second race he
18 started to drop back on you?
19 A. The third race.
20 Q. Third race, I'm sorry.
21 A. Yeah, the third race.
22 Q. So you had two full races north?
23 A. Yeah.
24 Q. And then on the third race north he

Page 57

1  drops off on you?
2  A. Yeah, yeah.
3  Q. And between the time you started and
4  that third race north, you hadn't spoken a word
5  to Brian Williams?
6  A. No, nuh-uh.
7  Q. Okay, so at the finish of the third
8  race north, at this point you won two and he has
9  won one; right?
10 A. Uh-huh.
11 Q. And when you get to that point north,
12 do you have a conversation with him?
13 A. Yeah.
14 Q. And where are you when you are having
15 that conversation?
16 A. We were sitting there side by side.
17 Q. In the cars with the windows down?
18 A. Yeah, with the windows down.
19 Q. Okay, and who said what to whom?
20 A. I guess we were just talking back and
21 forth, both of us, you know, and we said well, we
22 will just make our last run down here on the way
23 back.
24 Q. And whose idea was that?

Page 58

1  A. It was just as much one as it was the
2  other.
3  Q. I'm sorry?
4  A. It was just about as much one as it
5  was the other.
6  Q. Okay. Was there any reason why you
7  did it southbound instead of going back and
8  coming north?
9  A. Well, we were going to make that our
10 last trip down and we were going to stop. We
11 weren't going to race no more.
12 Q. Oh, I understand that, but my question
13 --
14 A. I know, but.
15 Q. Were you in a hurry?
16 A. No.
17 Q. So like why didn't you come down to
18 the south end and race north a fourth time?
19 A. Well, see, that's what we were -- We
20 was going to leave the cars down there on the
21 other end. That's where we left the cars at,
22 down there, after we got through racing them. We
23 was going to leave them down there anyway, so we
24 just figured while we was down at that end, when

Page 59

1  we got down to the other end we was going to
2  stop, you know, and that would have been it.
3  Q. Okay, so there wasn't any reason of --
4  A. No.
5  Q. You just decided to race south?
6  A. Yeah, uh-huh.
7  Q. Did you ever race south before?
8  A. Oh, yeah.
9  Q. You have?
10 A. Yeah, I have never had no problem with
11 it.
12 Q. Okay. So what happened going south?
13 A. Well, Brian hit the wall.
14 Q. Okay.
15 A. Yeah, Brian hit the wall and --
16 Q. Where was his car relative to your car
17 when Brian hit the wall?
18 A. He was in back of me.
19 Q. So you were ahead of him?
20 A. Yeah.
21 Q. Okay. You didn't see him hit the
22 wall, then?
23 A. No, I didn't see him. I heard the
24 bang, but I didn't see him.

Page 60

1  Q. Okay, did his car come into contact
2  with your car?
3  A. No, no, no.
4  Q. Was there room for two cars at the
5  south end?
6  A. Oh, yeah, yeah, two cars can get
7  through there.
8  Q. Do you have any idea why his didn't?
9  A. I don't know why. I don't have no
10 idea.
11 Q. Were you squeezing him to the left?
12 A. No.
13 Q. When you were running north, racing
14 north, who was on the right and who was on the
15 left?
16 A. Hmm. I was in the left lane. Brian
17 was in the right.
18 Q. All three times?
19 A. I think it was all three times.
20 Q. And so coming back down south you were
21 in the right lane?
22 A. Yeah, I was in the right lane, and he
23 was in the left.
24 Q. Okay. Did it occur to you that the

Page 61

1  right lane might be safer?
2  A. No, because when you got down there
3  you had to come out like this and then go around.
4  Q. I'm sorry?
5  A. Like this is the straight away going
6  like this.
7  Q. Right.
8  A. And then I had to cut him out like
9  this and go around, where his is like this, and
10 like the wall is right here, and the wall comes
11 in, where he would come down here like this, and
12 he would have had to come in like that.
13 Q. Okay, you are making a motion with
14 your fingers that I am going to try to describe
15 for the record, because the court reporter can't
16 take down what you are doing with your fingers.
17 A. Oh.
18 Q. You know what, let's do it this way:
19 I am going to take a yellow piece of paper and
20 ask you if you would be good enough to draw me a
21 picture of what you just described.
22 A. Like this is the track like this here,
23 and this is the wall like this here.
24 Q. Okay, why don't you write -- When you

A0036

## Page 1

IN THE UNITED STATES DISTRICT COURT
IN FOR THE DISTRICT OF DELAWARE

RICHARD L. WILLIAMS and )
MICHAEL E. PETERS, )
   Plaintiffs, )
      v. ) C.A. No.
       ) 05-0435 (GMS)
DOVER DOWNS, INC., )
a Delaware corporation, )
   Defendant. )

Deposition of **THOMAS CURTIS, JR.**, taken before Cheryl A. Anthony, Court Reporter, in the law offices of Parkowski, Guerke & Swayze, 116 West Water State Street, Dover, Delaware, on Thursday, February 9, 2006, beginning at 1:26 p.m.

APPEARANCES:

PARKOWSKI, GUERKE & SWAYZE
BY: JEREMY W. HOMER, ESQUIRE
116 West Water Street
Dover, Delaware 19901
Attorney for Plaintiffs.

MONTGOMERY, McCRACKEN, WALKER & RHOADS
BY: EDWARD T. ELLIS, ESQUIRE
123 South Broad Street
Philadelphia, Pennsylvania 19109
Attorney for Defendant.

ALSO PRESENT:

MR. RICHARD L. WILLIAMS

ORIGINAL RETAINED BY JEREMY W. HOMER, ESQUIRE

ANTHONY REPORTING
PO Box 234
Dover, Delaware 19903
(302)674-8884

## Page 2

1           THOMAS CURTIS, JR.,
2 the witness herein, having first been
3 duly sworn on oath, was examined and
4 testified as follows:
5 BY MR. HOMER:
6   Q. Mr. Curtis, could you state your address and
7 phone number, please?
8   A. 1015 Proctors Purchase Road, Hartly,
9 Delaware, and it's 302-492-0719.
10   Q. Okay. During the course of the questioning,
11 I may ask something that you don't really understand the
12 question very well. So if I do that, don't try to
13 answer it. Just make sure that I restate the question
14 so that you do understand it.
15   A. Okay.
16   Q. Is there any reason that your ability to
17 answer the questions today accurately would be impaired
18 in any way?
19   A. No.
20   Q. You are not on any medication?
21   A. No.
22   Q. Okay. What did you do to prepare for the
23 deposition today, if anything?
24   A. Nothing.

## Page 3

1   Q. Did you talk to Dover Downs' attorney at
2 all?
3   A. Yes.
4   Q. And when was that?
5   A. Oh, probably two weeks ago.
6   Q. And did you review any documents?
7   A. Yes.
8   Q. What were they?
9   A. The report, the incident report.
10   Q. Okay. I'm going to show you a document that
11 has been marked Sutor Exhibit Number 11. Is this the
12 report that you are talking about?
13   A. No.
14   Q. Okay. Can you tell me what about the
15 incident report it is that --
16   A. It is the one that I wrote, the statement
17 that I had to write.
18   Q. And that is about the car racing incident
19 that took place in the latter part of December of 2003?
20   A. Yes.
21   Q. Okay. Did you review any other documents
22 besides that one?
23   A. No.
24   Q. What is your educational background?

## Page 4

1   A. High school.
2   Q. High school graduate?
3   A. Yes.
4   Q. When did you graduate?
5   A. 1988.
6   Q. Could you just briefly describe to me your
7 work history, starting from the time you graduated from
8 high school until the present? And just identify each
9 job you had, who the employer was, how long you were
10 there, and what your job was.
11   A. I graduated high school. I worked for
12 Carey's Diesel, Leipsic, Delaware, as a diesel mechanic
13 for about five years. I left there and went to Parkview
14 RV Center in Smyrna as a mechanic for two years. I left
15 there and went to Fifer Orchards as a mechanic for two
16 years, and then I went to Dover Downs until now.
17   Q. When did you start at Dover Downs?
18   A. 1997.
19   Q. Okay. And what positions have you held with
20 Dover Downs?
21   A. I was a mechanic first for about five years.
22 And then I was a maintenance supervisor for about a year
23 and a half, two years, and then harness track
24 supervisor.

**Page 5**

Q. Okay. Do you recall what years you were the maintenance supervisor?
A. That would be 2003.
Q. You said you did it for a couple of years?
A. I would say a year and a half, two years.
Q. You don't remember the exact dates?
A. No, I don't.
Q. Okay. As maintenance supervisor, were you the immediate supervisor of Richard Williams and Michael Peters?
A. Yes.
Q. Okay. How long have you known Rich Williams, the Plaintiff in this case?
A. Since 1997.
Q. And Mr. Peters would be the same?
A. Yes.
Q. How many years have you worked with Mr. Williams?
A. Since 1997.
Q. Okay. I'm going to direct your attention to a conversation that we believe took place in 2003 at which Mr. Peters and Mr. Williams and you were present, and Mr. Frank Outten was up on a roof. I don't know if you remember this or not.

**Page 6**

But in the conversation you indicated to Mr. Williams and Mr. Peters that Mr. Morrison was looking for any excuse to get these gentlemen back in his office. Do you recall that conversation?
A. No.
Q. Do you recall any conversation at all in which you gave Mr. Williams or Mr. Peters a warning about Mr. Morrison's intentions --
A. No.
Q. -- regarding their employment?
A. No.
Q. Do you recall any conversation in which Mr. Morrison indicated that he would like to have all mechanics IIIs so that he could train them from the beginning?
    MR. ELLIS: I object to the form of the question.
BY MR. HOMER:
Q. Do you understand the question?
A. No, I don't.
Q. I'll rephrase it. Do you recall any conversation in which it was related that Mr. Morrison -- Let me back up. You know who Mr. Morrison is, right?

**Page 7**

A. Yes.
Q. Who is he?
A. He's the facility maintenance manager.
Q. Okay. Do you recall any conversation in which you learned that he was interested in having all maintenance mechanics IIIs so that he could train them, rather than having other levels of that position?
A. No, I don't.
Q. Okay. Do you ever recall any conversation in which he said something to the effect that some of the employees that were under him were set in their ways?
A. No.
Q. Do you have any reason to think that Mr. Morrison would have wanted to discipline Mr. Williams or Mr. Peters or get them out of their positions at Dover Downs?
A. No.
Q. Okay. Again, going back to the year 2003, in December, which was the month of the incident at the racetrack -- and by that, I mean the incident in which Brian Williams and Ernest Carlisle were involved in a race and there was a car accident. You know about that incident, what I'm talking about, right?

**Page 8**

A. Yes.
Q. Do you recall within a week or so before that incident that Mr. Williams gave to you his two-way radio because it didn't work?
A. Gave to me?
Q. Yes.
A. No.
Q. Do you have any knowledge that his two-way radio didn't work at that point in time?
A. No.
Q. During the course of your employment at Dover Downs, do you recall a time that you were in a truck with Ernest Carlisle and, while in that truck, you were involved in a race with Jerry Clifton? A car race?
A. No.
    MR. ELLIS: I'm sorry. In a truck with Carlisle and whom?
    MR. HOMER: The question was whether he recalls being in a truck with Carlisle and being involved in a race with Jerry Clifton.
    MR. ELLIS: So the question doesn't have anybody else in the truck with him other than Carlisle and this witness?
    MR. HOMER: Right.