## 1

IN THE UNITED STATES DISTRICT COURT
IN FOR THE DISTRICT OF DELAWARE

RICHARD L. WILLIAMS and    )
MICHAEL E. PETERS,         )
    Plaintiffs,            )
                           )
    v.                     ) C.A. No.
                           ) 05-0435 (GMS)
DOVER DOWNS, INC.,         )
a Delaware corporation,    )
    Defendant.             )

Deposition of JOE MICHAEL McNAIR, taken before Cheryl A. Anthony, Court Reporter, in the law offices of Parkowski, Guerke & Swayze, 116 West Water State Street, Dover, Delaware, on Thursday, February 9, 2006, beginning at 1:45 p.m.

APPEARANCES:

PARKOWSKI, GUERKE & SWAYZE
BY: JEREMY W. HOMER, ESQUIRE
116 West Water Street
Dover, Delaware 19901
Attorney for Plaintiffs.

MONTGOMERY, McCRACKEN, WALKER & RHOADS
BY: EDWARD T. ELLIS, ESQUIRE
123 South Broad Street
Philadelphia, Pennsylvania 19109
Attorney for Defendant.

ALSO PRESENT:

MR. RICHARD L. WILLIAMS

ORIGINAL RETAINED BY JEREMY W. HOMER, ESQUIRE

ANTHONY REPORTING
PO Box 234
Dover, Delaware 19903
(302)674-8884

## 2

1  JOE MICHAEL McNAIR,
2  the witness herein, having first been
3  duly sworn on oath, was examined and
4  testified as follows:
5  BY MR. HOMER:
6    Q.  Mr. McNair, what is your address and phone
7  number?
8    A.  Private address?
9    Q.  Yes.
10   A.  195 Newells Creek Drive.
11   Q.  Okay. And your phone number?
12   A.  302-698 --
13       MR. ELLIS: I'm sorry. You shouldn't be
14  looking at your documents. If there are documents that
15  are going to be shown to you, they will be marked with
16  the court reporter exhibits and that sort of thing. It
17  keeps the record clearer.
18       THE WITNESS: Okay. 302-698-4208.
19  BY MR. HOMER:
20   Q.  During the course of this deposition, I'm
21  going to be asking you a number of questions. If you
22  don't understand a question, don't try to answer it.
23  Instead, just tell me you don't understand it, and I
24  will try to rephrase it.

## 3

1    A.  Okay.
2    Q.  Is there any reason why your ability to
3  answer these questions would be impaired?
4    A.  No.
5    Q.  Okay. You are not on any medication that
6  would impair your ability to answer?
7    A.  No. I'm on medication, but nothing, I
8  think, that would interfere with it.
9    Q.  Okay. What did you do to prepare for
10 today's deposition?
11   A.  Reviewed my notes.
12   Q.  Okay. Your notes of what?
13   A.  Of the accident that occurred on 12/23/03.
14   Q.  Anything else?
15   A.  No, sir.
16   Q.  Okay. What is your educational background?
17   A.  I graduated from Newark High School and
18 probably have about a year's worth of credits at
19 Delaware Technical & Community College.
20   Q.  When did you graduate high school?
21   A.  I can't even begin to tell you. I can't
22 even guess.
23   Q.  Well, do you remember when you were born?
24   A.  1939.

## 4

1    Q.  Okay. Would you have graduated high school
2  approximately 16, 17 years later than that?
3    A.  Thereabouts.
4    Q.  Could you relate your work history? And
5  what I'm looking for is a relatively brief description,
6  starting from your first job out of high school through
7  the present. And if you could, just give me an
8  approximation of the years that you were at each job,
9  the years you were in each job, who your employer was,
10 and what your job was.
11   A.  I'll give you what I can remember of it.
12   Q.  That's all you can be asked for.
13   A.  I went to work for New Castle County as a
14 security officer, the Greater Wilmington Airport. That
15 was right after graduation. I was there for three or
16 four or five years, roughly.
17       The next thing I recall, I joined the
18 Wilmington Bureau of Police, maybe in '67, '66. I was
19 there for the '68 riots. I stayed there for about seven
20 and a half years and joined the New Castle County
21 Police. I retired out of there in 1984. I spent two
22 years with the Delaware Alcoholic Beverage Control
23 Commission.
24       And from there, I took a couple of years

**5**

1  off, came down and made application and flew as a
2  medi-vac pilot for Maryland State Police for eight and a
3  half years. I left there and started working for Dover
4  Downs Security as a security officer.
5      Q. Do you recall what year it was that you
6  started working for Dover Downs?
7      A. I think it was '98, late '98, '99. Shall I
8  continue?
9      Q. Yes, go ahead.
10     A. Then I took about six months off to take
11 care of my mother and get her property straightened
12 away. And then I came back and made application and was
13 rehired and have been there ever since.
14     Q. When was it that you came back?
15     A. I was there for about six or eight months,
16 from -- before I took my six-month leave -- '99, the end
17 of '99. I'm just guessing.
18     Q. Okay. What are your job responsibilities at
19 Dover Downs? First of all, have you held the same
20 position in the last six or seven years with Dover
21 Downs?
22     A. The last five, six years, yes, as an
23 investigator.
24     Q. What are your job responsibilities?

**6**

1      A. Investigate anything that is assigned to me
2  by my director, my manager now; the hard keys for Dover
3  Downs, that is where the hotel -- they have a time lock
4  system which applies to keys. They have the machine
5  keys, keys to different doors throughout the
6  administrative section of Dover Downs, various other
7  doors, and a lot of the outside gates.
8      Q. Okay. You mentioned your manager. Is that
9  Lee Ford?
10     A. Yes, sir. Well, right now it is Mitch Hill.
11 Lee Ford had been promoted to director.
12     Q. I was going to ask you -- First of all, do
13 you have a name for the department that you are in?
14     A. Security department.
15     Q. Okay. It is just called the security
16 department?
17     A. Yes, sir.
18     Q. How many employees does the security
19 department have?
20     A. Well, surveillance falls under them, also.
21 And I think they have -- this is a guesstimate, 14
22 people, 15 people, maybe in surveillance, two
23 surveillance technicians. I think right now at present,
24 we have 45 or 46 security officers. We have Mr. Ford,

**7**

1  his office secretary, Mitch Hill, who is now a manager
2  in security, myself, and Cheryl Messick is in the
3  administrative side.
4      Q. Okay. And how many people in that
5  department have a position comparable to yours?
6      A. None.
7      Q. You are the only investigator?
8      A. Yes, sir. I also investigate overages and
9  shortages from the casino vault and cashiers and in any
10 of the concession stands or anything that occurs that
11 needs investigating on the hotel side, also.
12     Q. Okay. Now, let's turn our attention to the
13 incident that you alluded to before, the December 23,
14 2003 incident, which involved a car accident.
15     A. Okay.
16     Q. Could you explain, first of all, what your
17 role was with respect to that incident?
18     A. Interviews.
19     Q. Could you elaborate a little bit?
20     A. Sure. Mr. Ford said there were witnesses to
21 be interviewed regarding the accident, and I should take
22 some statements from them.
23     Q. And when did he tell you to do that?
24     A. The afternoon of the accident, right after

**8**

1  it happened. I don't know exactly what time period.
2      Q. Did he tell you which witnesses you should
3  interview, or did he leave that up to you?
4      A. He left that up to me. He left that up to
5  me.
6      Q. Okay. Did he give you any other direction
7  or instruction as to what your investigation should
8  consist of, other than interviewing witnesses?
9      A. Non witnesses, also; there was witnesses and
10 non witnesses.
11     Q. Okay. Other than that, when you say
12 witnesses and non witnesses, you are referring to the
13 fact that there were people who actually saw the race
14 and there were people that didn't see the race?
15     A. Yes, sir.
16     Q. And other than that, did you have any
17 instruction from Mr. Ford as to what to do with the
18 investigation?
19     A. He advised me to, as soon as I got done with
20 the statement, inform Mr. Sutor. But I did not do that.
21 When I completed an interview, Mr. Ford would come in
22 and take the interview or this written statement. And I
23 assume -- I don't know where he took it, personally. I
24 just know he would come in and take it.

## 21

1  the witnesses' statements?
2  A. Yes, sir.
3  Q. Let me ask another question. Anything that
4  you know about, the prior knowledge of any of these
5  witnesses regarding the race, isn't it in the witness
6  statements?
7  A. No.
8  Q. So your conclusion, where you state, I feel
9  the witnesses had prior knowledge of the race, that
10 depends totally on the witness statements that are in
11 the report?
12 A. Yes, sir.
13 Q. Okay.
14 A. Unless it is stated in the witness statement
15 form itself.
16 Q. Okay. Do you know whether there are any
17 witness statements that says that Richard Williams had
18 prior knowledge of the race?
19 A. I would have to go through all of these and
20 see. I don't know off the top of my head, no.
21 Q. But unless there is a witness statement that
22 says that, then you don't have any other knowledge that
23 he would have known about the race before it took place?
24 A. The only evidence or information that I have

## 22

1  was from one of the drivers of the vehicle that placed
2  him there prior to the race.
3  Q. Prior to the race?
4  A. Yes, sir.
5  Q. And which driver was that?
6  A. That is Mr. Carlisle, 339.
7  Q. It says they were there at the start of the
8  race?
9  A. That's correct.
10 Q. It doesn't say they were there before the
11 race, does it?
12 A. No. That is what I based it on.
13 Q. Okay. If you will look at page 348 --
14 A. Yes, sir.
15 Q. -- this is your report about the written
16 statement that you took from Mr. Williams, correct?
17 A. Yes, sir.
18 Q. Doesn't this say there in the first three
19 lines that he saw some vehicles entering gate one and
20 decided to follow them, just on a hunch that something
21 is happening?
22 A. Yes, sir.
23 Q. Doesn't that indicate to you that according
24 to Mr. Williams, he wasn't aware of the race ahead of

## 23

1  time?
2  A. That's correct. That's correct.
3  Q. Okay. So this feeling that you had that he
4  had prior knowledge certainly wasn't based on his
5  witness statement?
6  A. No, sir. It was on Mr. Carlisle's.
7  Q. Mr. Carlisle didn't say he had prior
8  knowledge of the race, did he?
9  A. No.
10 Q. He just said he was there at the start of
11 the race?
12 A. Right.
13 Q. Did anyone have any knowledge of
14 Mr. Williams having prior knowledge of the race before
15 it started?
16 A. Other than that, no.
17 Q. And the same questions for Mr. Peters, was
18 there any statement made that he had prior knowledge of
19 the race, to your recollection?
20 A. I would have to go through here and see
21 again. The only thing I have reference to Mr. Peters is
22 on page 348, down at the bottom of Mr. Williams's
23 statement. I talked to Mr. Williams on the day of the
24 23rd, prior to him going to the hospital. I didn't want

## 24

1  to take a written statement from him that day, because
2  he had to get over there.
3  Q. And what is specific --
4  A. Down at the bottom, where it says:
5  Mr. Williams stated at that time he was coming from the
6  command center and heard cars running and he drove into
7  gate one. On entering the driveway to gate one, he
8  observed Mike Peters to be parked halfway across the
9  road as if to be blocking the road so no one could
10 enter.
11     That is where I associate that he was
12 already there, sitting like that.
13 Q. So you concluded that because his car was
14 parked there, that he had knowledge --
15 A. And sideways.
16 Q. Let me finish the question. Thanks. You
17 concluded that because his car was parked in front of
18 the gate, that he knew the race was going to take place
19 before he parked his car there?
20 A. That is what I based that knowledge on.
21 Q. And you don't have any other basis for that
22 conclusion. Is that a fair statement?
23 A. That's correct.
24 Q. Okay. Now, in some cases in the witness

**Page 1**

IN THE UNITED STATES DISTRICT COURT
IN FOR THE DISTRICT OF DELAWARE

RICHARD L. WILLIAMS and  )
MICHAEL E. PETERS,       )
    Plaintiffs,           )
                          )
    v.                    ) C.A. No.
                          ) 05-0435 (GMS)
DOVER DOWNS, INC.,        )
a Delaware corporation,   )
    Defendant.            )

Deposition of WILLIAM ROBERT MORRISON, taken before Cheryl A. Anthony, Court Reporter, in the law offices of Parkowski, Guerke & Swayze, 116 West Water State Street, Dover, Delaware, on Thursday, February 9, 2006, beginning at 11:05 a.m.

APPEARANCES:

PARKOWSKI, GUERKE & SWAYZE
BY: JEREMY W. HOMER, ESQUIRE
116 West Water Street
Dover, Delaware 19901
Attorney for Plaintiffs.

MONTGOMERY, McCRACKEN, WALKER & RHOADS
BY: EDWARD T. ELLIS, ESQUIRE
123 South Broad Street
Philadelphia, Pennsylvania 19109
Attorney for Defendant.

ALSO PRESENT:

MR. RICHARD L. WILLIAMS

ORIGINAL RETAINED BY JEREMY W. HOMER, ESQUIRE

ANTHONY REPORTING
PO Box 234
Dover, Delaware 19903
(302)674-8884

**Page 2**

1   WILLIAM ROBERT MORRISON,
2   the witness herein, having first been
3   duly sworn on oath, was examined and
4   testified as follows:
5   BY MR. HOMER:
6       Q.   Mr. Morrison, could you state your address
7   and phone number, please?
8       A.   My address is 1076 Brownsville Road. My
9   phone number is 302-398-0785.
10      Q.   Brownsville Road is --
11      A.   In Harrington.
12      Q.   Harrington. Okay. Mr. Morrison, during the
13  course of the questioning, I'm going to ask a series of
14  questions. If there is a question that I ask that is
15  not something you understand, don't try to answer it.
16  Tell me that you don't understand it, and I will try to
17  rephrase it. Do you understand that?
18      A.   Yes, sir.
19      Q.   Okay. Is there any reason your ability to
20  answer these questions today would be impaired?
21      A.   No.
22      Q.   Okay. You are not on any medication?
23      A.   High blood pressure.
24      Q.   That is not going to impair your ability to

**Page 3**

1   answer questions.
2       A.   No.
3       Q.   What did you do to prepare for the
4   deposition today?
5       A.   I talked to my lawyer or the company lawyer.
6       Q.   Okay. And when was that?
7       A.   That was last week.
8       Q.   Okay. Anything other than that?
9       A.   No.
10      Q.   Have you looked at any documents?
11      A.   No.
12      Q.   All right. What is your educational
13  background?
14      A.   I have a high school diploma. I also have
15  credits in criminal justice administration. And as in
16  military education, I retired with 21 years.
17      Q.   Okay. When did you graduate from high
18  school?
19      A.   1975.
20      Q.   Okay. Could you just briefly go back
21  chronologically, starting with your first job out of
22  high school, and identify the job you had, who the
23  employer was, how long you were there, and just briefly
24  what the job entailed?

**Page 4**

1       A.   My first job out of high school was working
2   for the state, state maintenance. I worked the summer
3   after graduation. In the fall after graduation, I went
4   into the United States Army. And again, I had 21 years
5   with them.
6       Q.   When did you get out of the army?
7       A.   April 1, 1996.
8       Q.   What did you do in the army?
9       A.   I was an infantryman.
10      Q.   Okay. Did you have any supervisory
11  responsibilities there?
12      A.   Yes, I did.
13      Q.   Okay. And what was your rank?
14      A.   When I retired?
15      Q.   Yes.
16      A.   I was a master sergeant, E-8.
17      Q.   Okay. How long were you a sergeant?
18      A.   Probably about 15 of those years, graduating
19  to different sergeant ranks.
20      Q.   And I take it that position entailed giving
21  soldiers under you directives, orders, and so forth?
22      A.   That's correct.
23      Q.   Let's go on. Was it 1996 that you say you
24  got out of the army?

## 5

1  A. Right.
2  Q. What did you do after that?
3  A. When I retired from the army, I went with
4  Met Life Insurance, sold insurance for a year. In 1997
5  I applied with Dover Downs for their security
6  department, which I was hired. I worked in the security
7  department until November of 1996 and then moved over to
8  their surveillance department.
9       MR. ELLIS: Not '96.
10      THE WITNESS: Excuse me, '97, rather.
11 BY MR. HOMER:
12 Q. You worked in surveillance from 1997 until
13 what date?
14 A. It was surveillance -- I had two jobs in
15 surveillance, initially as an operator. And then after
16 six months or so, I became their maintenance tech, where
17 basically I maintained all of their surveillance
18 equipment. And that was until 2001 March, at which time
19 I was -- I moved to the building maintenance department.
20 Q. Okay. What was your position there?
21 A. I was maintenance supervisor for the
22 building.
23 Q. And that started in 2001?
24 A. March.

## 6

1  Q. March of 2001. And how long did you have
2  that position?
3  A. Until November of 2003.
4  Q. And what position did you take at that
5  point?
6  A. The outside maintenance manager position.
7  Q. All right. And is that the last position?
8  Is that your position now?
9  A. That's correct.
10 Q. The first supervisory position you had, that
11 was at what point? I am talking now about your
12 employment with Dover Downs.
13 A. The first supervisory position was when I
14 became the building supervisor.
15 Q. Okay. And how many employees did you
16 supervise?
17 A. It varied, anywhere from two to five.
18 Q. Okay. And how many employees did you
19 supervise when you became the outside maintenance
20 manager?
21 A. When I came on board with the setup at the
22 time in 2003, it was around 14, 15 individuals.
23 Q. Okay. Have you had any training of any type
24 regarding handling personnel issues?

## 7

1  A. The basic military and civilian?
2  Q. Yes.
3  A. Yes.
4  Q. And can you relate what that consists of?
5  A. Well, basically in the military, I was also
6  instructor, also drill sergeant. Also, as you go
7  through the different ranks, you have different courses
8  you have to go through, from a basic non-commissioned
9  officers course to an advanced non-commissioned officers
10 course, where they engage you in personnel issues and
11 how to deal with personnel interface.
12      Also, when coming on board with Dover Downs
13 through the past years, we had various meetings on
14 employee relations.
15 Q. Okay. Did you have any seminars where they
16 taught you about matters relating to employees?
17 A. At Dover Downs?
18 Q. Yes.
19 A. Other than company training in-house, I
20 didn't go outside for any, as I recall, customer-related
21 issues.
22 Q. What were your responsibilities in your
23 current position? What have your responsibilities been
24 there?

## 8

1  A. Our responsibilities are basically the
2  outside areas of Dover Downs, excluding the hotel,
3  casino, grandstand areas. Our job entails taking care
4  of the physical structure of the paddocks, also the
5  motor sports structures.
6  Q. And what are your specific functions as a
7  supervisor?
8  A. As a manager of the individuals that do
9  those jobs, it is to, again, on a daily basis, make
10 observations throughout the complex of areas that need
11 maintenance, also be proactive on maintenance, whether
12 it is HVAC, roadways, and so forth. And then once those
13 observations are made, it is to prioritize orders of
14 work.
15      (Morrison Exhibit Number 12 was marked for
16 identification and attached to the record.)
17      (Following a discussion off the record:)
18      THE WITNESS: Yes, sir.
19 BY MR. HOMER:
20 Q. Can you identify this exhibit that has been
21 marked Exhibit 12?
22 A. Yes, sir. This is a disciplinary warning
23 notice that was issued to Mr. Williams in reference to
24 insubordination and also not following direction for

## 13

Q. Okay. Mr. Morrison, turning to the fourth page of the exhibit, which is the statement --

A. Yes.

Q. -- does this statement accurately reflect what happened when you met with Mr. Williams --

A. I would say yes.

Q. -- on the morning of December 1, 2003, correct?

A. Yes.

Q. Do you see where it says, about midway through that that: I was asking him to supervise, and I advised him that was part of the mechanic I job description?

A. In employee relations, when you are talking to individuals, just like maybe when you are talking to individuals, you don't want to put them on the defense. Basically, my comments to him was basically in an asking manner. But again, by that -- and I gave him an opportunity to come back. When he said, "well, if you pay me more money", I took that as him actually saying no to me.

Q. Okay. The next statement there -- and I will quote -- "Before leaving the office, I asked him if he was going to do what was asked, and he stated words

## 14

to the effect, if you get me more money. He did not change his response and was excused."

A. Yes. And that was taken as a no.

Q. Does that accurately report what happened exactly? Is that what happened?

A. I would say it was. Again, I asked the individual if he was going to do it. And again, his comment to me was: If you pay me more money. Being a capped individual, which he was, I have no authority to give him more money.

Q. On the first page of the exhibit, there is a block that states nature of incident. Do you see that?

A. Yes, sir.

Q. Did you fill this out?

A. Yes, sir.

Q. It says -- I will read again from it -- "On December 1, 2003, I requested that Richard Williams lead a work force." Do you see where it says that?

A. Yes, sir. Yes, sir.

Q. Does that accurately reflect what you did?

A. I did request -- if it is a play on words, asked or requested, the individual was brought into my office. And again, not sounding like a tyrant, I asked him if he would do that. And that was due to his

## 15

experience level from before. Again, I felt there would be no problem with him doing that, by his experience level. And then I received the comments I did from him.

Q. Okay. Did you ever state to Mr. Williams, during this conversation that you had with him on the morning of December 1, 2003, words to the effect that: This is an order. You have to do it. I'm telling you you have to do it. Did you ever tell him in any certain words --

A. I did not tell him it was an order, no.

Q. Did you say anything that would have made him believe that it was an order?

A. By virtue of the employee/supervisor relationship, by me calling him in there, I would feel that if my superior asked me or my supervisor asked me to do something, that would be something he wants me to did without actually coming out and having to order someone to do something.

Q. So is it fair to say that you didn't say in so many words: This is an order? What you did was you conveyed to him that you wanted him or you were requesting him to do something?

A. That's correct.

Q. Did you ever, during this conversation that

## 16

you had with him on the morning of December 1, 2003, tell him that if he didn't do the work, he would be considered insubordinate? Did you ever convey that thought to him?

A. I did come back and tell him that his job description did entail that he, again, lead a work force and also follow direction as given by management.

Q. Well, I understand that, that you told him that that was within his job scope to lead employees. I understand that. That is what your statement says.

A. Right.

Q. But did you ever tell him: If you don't go out there and lead this force, you are going to be considered insubordinate? Did you ever tell him words to that effect?

A. I did not tell him that, and that was due from the experience level that Mr. Williams had.

Q. What do you mean by that?

A. Mr. Williams has 18-plus years with the organization, and he's also been in a leadership position, even prior to me coming out there as chief of maintenance.

Q. So are you saying you assumed that he would have realized that he would be insubordinate?

## 37

1  You can answer.
2  THE WITNESS: The reasonings Mr. Williams
3 said basically the words to the effect that he didn't
4 want to do it basically was he wanted more money.
5 Mr. Peters just told me he didn't want to be in charge
6 of anybody. In fact, he made the statement to me: I'll
7 do anything else you ask me. I just don't want to be in
8 charge of anybody.
9  I then told him about the job description,
10 and that was part of his duties.
11 BY MR. HOMER:
12  Q. And that job description is a description
13 for a maintenance mechanic I; is that correct?
14  A. That's correct.
15  Q. And it was your understanding that he had,
16 as a maintenance mechanic I, job responsibilities that
17 required him to supervise people?
18  A. As per his job description, yes.
19  Q. Okay. And that is the basis of your
20 understanding that it is in the job description?
21  A. As a mechanic I, the next step for the
22 individual is to move up to supervisor and on occasions,
23 as supervisor of mech I or even higher, needs to be able
24 to observe that individual doing basic duties. If the

## 38

1 individual was to apply for a supervisory position, how
2 do you base your decisions?
3  So every so often a mechanic I is given an
4 opportunity to lead the work force, which again is in
5 his job description. It is better to give the
6 supervisor or if he is he's going to another position, I
7 mean when he's had some background in supervising a
8 crew --
9  Q. My question, though, was: Is it the job
10 description that makes you believe he had supervisory
11 responsibilities or is there some other -- Let me ask
12 this question, a little bit different question.
13  Is there any document that you are aware of
14 that reflects that a maintenance mechanic I has
15 supervisory responsibilities?
16  A. For me to tell the individual to keep an eye
17 on individuals, it is basically to lead a work force.
18 To be a true supervisor, you actually have charge or
19 responsibilities. This individual was to lead a work
20 force on a temporary basis there as per se a lead, being
21 a mech I.
22  Q. But you really didn't --
23  A. Is there another document out there that
24 would make me think that he would be it, you know,

## 39

1 solely from the different levels, III, II, I -- I being
2 the highest -- and then that mech I possibly moving to
3 supervisor and then also as noted in the job
4 description, that is where it was taken from, yes.
5  Q. Let's take a look at that job description.
6 It is Sutor Exhibit Number 1. Can you show me where in
7 there it indicates that he has a function that is
8 supervisory?
9  A. At the bottom there, where it says: Ability
10 to conduct analyses, generate reports to reflect
11 findings, lead a work force, provide support to staff
12 and assign job duties.
13  Q. Right. That is under the category
14 requirements/education. That deals with his
15 qualifications, correct?
16  A. That is true.
17  Q. Is there anything in the description of what
18 his functions --
19  A. Yes, perform any reasonable task as directed
20 by management.
21  Q. Well, that doesn't say anything about
22 supervising, does it?
23  A. It could be any task, as long as it is
24 reasonable.

## 40

1  Q. But that is what you believe is the basis
2 for saying he has supervisory responsibilities?
3  A. That's correct.
4  (Following a discussion off the record:)
5 BY MR. HOMER:
6  Q. Okay. Mr. Morrison, I'm going to hand you
7 Exhibit Number 10, which I'll represent to you is the
8 performance appraisal for Mr. Williams that was done
9 actually after his termination.
10  A. Who was that done by?
11  Q. It says on the document: Prepared by Jerry
12 Clifton.
13  A. Okay.
14  Q. I'm going to show you page 133 of the
15 document. Can you read the last sentence of the
16 document?
17  A. This section is not scored. Rich is not in
18 a supervisory/managerial role. I myself disagree with
19 this. But again, any evaluations I do does cover this
20 area.
21  Q. So what you are saying is that the form was
22 filled out. Is it your understanding Mr. Clifton
23 filled out the form improperly?
24  A. I can't speak for Mr. Clifton or why he

**49**

1 guys? Bad guys?
2        Basically, the only thing I believe I
3 possibly said at that time was that there was a written
4 incident on Mr. Williams and Mr. Peters, and that is
5 because I had just written it up a couple of weeks
6 prior.
7     Q.    Okay. Do you recall whether there was any
8 discussion at that meeting about what they were going to
9 do regarding the race incident?
10    A.    At that meeting my understanding was there
11 was going to be an investigation of what took place.
12    Q.    Okay. Did you have any other input into the
13 whole process, other than that meeting?
14    A.    No.
15    Q.    Okay. Mr. Morrison, do you recall ever
16 making a statement to the effect that either
17 Mr. Williams or Mr. Peters were set in their ways?
18    A.    I don't recall making that statement, no.
19    Q.    All right. Do you believe they were set in
20 their ways?
21    A.    Well, after you work in a certain position
22 for a period of time, it may be taken that you are, yes.
23 Even myself, sometimes we are set in our ways. But to
24 make the statement that they were set in their ways, I

**50**

1 don't recall making that statement.
2    Q.    Do you ever recall making the statement that
3 you would like to train someone new for the positions
4 they were performing?
5    A.    No, I don't.
6        MR. HOMER: I have no further questions.
7 BY MR. ELLIS:
8    Q.    I have a question. Mr. Morrison, could you
9 look at Exhibit P-12, which should be somewhere in front
10 of you?
11    A.    P-12?
12    Q.    Yes.
13    A.    I have Morrison 12.
14    Q.    Okay. Exhibit 12.
15    A.    Okay.
16    Q.    Could you turn to the second page? It has
17 on it D0144. Do you have that in front of you?
18    A.    Yes, sir.
19    Q.    Mr. Homer asked you questions earlier about
20 the section that is filled in under details of the
21 incident.
22    A.    Yes, sir.
23    Q.    Do you see that?
24    A.    Yes, sir.

**51**

1    Q.    It's around the middle of the page.
2    A.    Yes.
3    Q.    There is language in there following the
4 i.e. in the top line under the heading, details of the
5 incident. And it starts with the word failed. And it
6 goes as follows: Failed in the preparation of work
7 areas to include movement of furniture/obstructions,
8 ordering required materials, and direct tasks for
9 maintenance mechanic II and III.
10        Beginning with the word preparation and
11 ending with the words maintenance mechanic II and III,
12 do you know where that language comes from?
13    A.    It would be from the job description.
14    Q.    Take a look, please, at Exhibit 1 or
15 Sutor 1. Look at the part of the job description in P-1
16 that is under the heading essential functions. Do you
17 see that?
18    A.    Yes.
19    Q.    Go down to the next to the last bullet point
20 under essential functions. Do you see that?
21    A.    Yes.
22    Q.    Does that contain the same language as
23 appears in Exhibit P-12, the second page?
24    A.    That's correct.

**52**

1    Q.    Why does the language from the job
2 description appear on Exhibit P-12 on the second page
3 where it says details of the incident?
4    A.    Because that is what was failed.
5    Q.    Did Mr. Williams or Mr. Peters fail to move
6 any furniture?
7    A.    No.
8    Q.    Did they fail to move any obstructions?
9    A.    No.
10    Q.    Did they fail to order any required
11 materials?
12    A.    No.
13    Q.    Did they fail to direct tasks for
14 maintenance mechanic II and III?
15    A.    Yes.
16    Q.    What does it mean to direct tasks for
17 maintenance mechanic II and II?
18    A.    Well, mechanics II and IIIs have tasks in
19 their job function, also. And being the mechanic I and
20 also leading a work force, which we discussed earlier,
21 the mechanic I would direct them to accomplish such
22 tasks.
23    Q.    And is that what you were asking
24 Mr. Williams and Mr. Peters to do on the morning of

```
                    53
1   December 1, 2003?
2       A.   That's correct.
3           MR. ELLIS:  Okay.  I don't have any more
4   questions.
5           MR. HOMER:  Okay.  I don't have any more
6   either.
7           (The deposition adjourned at 12:12 p.m.)
```

```
                    54
1              INDEX TO TESTIMONY

2   DEPONENT                              PAGE
    WILLIAM ROBERT MORTIS
3       Examination by Mr. Homer           2
        Examination by Mr. Ellis          50
4

5              INDEX TO EXHIBITS


6   MORRISON EXHIBIT NO., FOR IDENTIFICATION   PAGE

7
    1   Disciplinary Warning Notice for Richard
8       Williams, dated 1 December 2003         8

9   2   Discipline File Report for Michael
        Peters, dated 12/31/03                 31
```

```
                    55




4       PLEASE REPLACE THIS PAGE

5       WITH THE ERRATA SHEET

6       AFTER IT HAS BEEN

7       COMPLETED AND SIGNED

8       BY THE WITNESS.
```

```
                    56
1   State of Delaware   )
                        )
2   Kent County         )

3
              CERTIFICATE OF REPORTER
4
        I, Cheryl A. Anthony, Delaware Certified Shorthand
5   Reporter and Notary Public, do hereby certify that there
    came before me on February 9, 2006, the deponent herein,
6   WILLIAM ROBERT MORRISON, who was duly sworn by me and
    thereafter examined by counsel for the respective
7   parties; that the questions asked of said deponent and
    the answers given were taken down by me in Stenotype
8   notes and thereafter transcribed by use of
    computer-aided transcription and computer printer under
9   my direction.

10      I further certify that the foregoing is a true and
    correct transcript of the testimony given at said
11  examination of said witness.

12      I further certify that I am not counsel, attorney,
    employee, or relative of either party, or otherwise
13  interested in the event of this suit.

14

15          _____
            Cheryl A. Anthony
16          Delaware CSR
            Certification No. 107-PS
17          (Permanent Certification)

18
    DATED: _____
```