IN THE UNITED STATES DISTRICT COURT
IN FOR THE DISTRICT OF DELAWARE

RICHARD L. WILLIAMS and )
MICHAEL E. PETERS, )
    Plaintiffs, )
                )
    v.          ) C.A. No.
                ) 05-0435 (GMS)
DOVER DOWNS, INC., )
a Delaware corporation, )
    Defendant. )

Deposition of **ROBIN ROBERTS**, taken
before Cheryl A. Anthony, Court Reporter, in the law
offices of Parkowski, Guerke & Swayze, 116 West Water
State Street, Dover, Delaware, on Monday, February 13,
2006, beginning at 10:30 a.m.

APPEARANCES:

PARKOWSKI, GUERKE & SWAYZE
BY: JEREMY W. HOMER, ESQUIRE
116 West Water Street
Dover, Delaware 19901
Attorney for Plaintiffs

MONTGOMERY, McCRACKEN, WALKER & RHOADS
BY: BETH A. FRIEL, ESQUIRE
123 South Broad Street
Philadelphia, Pennsylvania 19109
Attorney for Defendant.

ALSO PRESENT:

MR. RICHARD L. WILLIAMS

ORIGINAL RETAINED BY JEREMY W. HOMER, ESQUIRE

ANTHONY REPORTING
PO Box 234
Dover, Delaware 19903
(302)674-8884

---

2

1             ROBIN M. ROBERTS,
2  the witness herein, having first been
3  duly sworn on oath, was examined and
4  testified as follows:
5  BY MR. HOMER:
6     Q.  Ms. Roberts, could you state your address
7  and your phone number, please?
8     A.  Uh-huh.  It's 253 Labrador Lane, Townsend,
9  Delaware 19734, and the home phone number is
10  302-376-1712.
11     Q.  Okay.  During the course of the deposition
12  today, I'm going to ask a series of questions.  If I ask
13  any question that you don't understand, don't try to
14  answer it.  Just ask me to rephrase the question.  Do
15  you understand that?
16     A.  Yes.
17     Q.  Is there any reason that your ability to
18  answer any of the questions today is impaired?  For
19  example, have you been taking any medication?
20     A.  No.
21     Q.  Could you relate what you did to prepare for
22  today's deposition, if anything?
23     A.  I reviewed the investigation file of the
24  drag racing incident.

---

3

1     Q.  Okay.  Anything else?
2     A.  No.
3     Q.  Did you discuss the deposition at all with
4  your attorneys?
5     A.  Yes.
6     Q.  What is your educational background?
7     A.  My undergraduate degree is in training,
8  design, and development -- I'm sorry; it's in education
9  from the University of Delaware.  And my master's degree
10  is in training, design, and development from Penn State
11  University.  And I have a national PHR certification.
12     Q.  Could you explain what that is?
13     A.  It's a national certification that is
14  recognized within the human resources industry.  You
15  have to sit for a national test and, you know, it is a
16  broad body of knowledge that you are tested on relating
17  to human resource subjects.
18     Q.  Okay.  Would that body include issues such
19  as legal issues involving age discrimination?
20     A.  Yes.
21     Q.  Okay.  And have you had special training
22  about that issue?
23     A.  Yes.
24     Q.  Could you relate what that is?

---

4

1     A.  Well, besides to prepare for the PHR
2  certification, I actually took a 14-week long course at
3  Wilmington College, which included all areas of
4  discrimination and discrimination law.  And then, also,
5  I took a week-long course from the Institute for Applied
6  Management and Law that was on labor relations law and
7  again covered these issues.
8     Q.  Have you attended, for example, any seminars
9  that would have involved any training about age
10  discrimination?
11     A.  I can't recall any that were specifically
12  related to age, but definitely discrimination through
13  the Society for Human Resource Management.
14     Q.  Okay.  Could you describe for me your work
15  history?  And what I would like you to do, if you can,
16  is go back from the time you finished your education and
17  chronologically move forward in time to the present, and
18  name each of your employers, the approximate dates of
19  your employment, and what your job duties were.
20     A.  Wow.  Okay.  So starting from when I
21  graduated from college --
22     Q.  Yes.
23     A.  -- for my undergraduate degree?
24     Q.  Right.

17

1  Inc. also applied in the following year in December of
2  2003?
3       A.    No. I think it's because the maintenance
4  group of employees at one point moved over from being
5  motor sports employees to gaming employees. I don't
6  remember that exact date. But they were under the motor
7  sports company. And at some point they moved over to be
8  gaming employees. I'm thinking that this was signed at
9  the time they were motor sports employees.
10      Q.    Right. But what I'm trying to get at is by
11 December of 2003, were they still employees of motor
12 sports or were they employees of Dover Downs, Inc.?
13      A.    I'm not sure of the date that they
14 transitioned.
15      Q.    If the transition was before that, would
16 this statement still apply to them, or would they have a
17 totally different --
18      A.    No. It would still apply.
19      Q.    It would still apply?
20      A.    Yes.
21      Q.    Do you know whether there is any more
22 recent -- more recent than August 5, 2002 -- statement
23 signed by Mr. Williams and Mr. Peters acknowledging that
24 they received the code of conduct and were bound by it?

18

1       A.    Do I know if there is a subsequent signed
2  form?
3       Q.    Yes.
4       A.    I don't know.
5       Q.    Okay. Ms. Roberts, you are familiar with
6  the termination of the Plaintiffs in this case,
7  Mr. Williams and Mr. Peters, by Dover Downs in December
8  of 2003; is that correct?
9       A.    Yes.
10      Q.    Okay. Can you explain what involvement you
11 had in that termination or those terminations?
12      A.    Uh-huh. Can you tell me what you mean by
13 what involvement? I mean how --
14      Q.    How were you involved in the process by
15 which they were terminated, assuming that you were?
16      A.    I was involved, and I was involved in -- you
17 know, it was brought to our attention that there was a
18 drag race out on the track. And I was involved in a
19 couple of different meetings, subsequent meetings to
20 determine what types of discipline would be issued to
21 the various individuals who were involved.
22      Q.    Other than those meetings, did you have any
23 involvement? For example, were you asked to put
24 together information from their files or anything of

19

1  that nature, or was your department asked to do that?
2       A.    We weren't asked to do it, but I did it.
3       Q.    Okay. What did you do?
4       A.    I just basically -- all the folks that were
5  involved in the drag race incident looked back at their
6  prior discipline.
7       Q.    And you did that on your own, or did
8  somebody ask you to do that?
9       A.    I did that on my own. But that is just part
10 of our process.
11      Q.    And when would that have been done as to
12 when they would have been discharged?
13      A.    Prior to their being discharged.
14      Q.    Right before? Do you remember how soon it
15 was after that you learned about the problem?
16      A.    I don't.
17      Q.    Okay. Did you or anyone in the HR
18 department talk to either Mr. Williams or Mr. Peters
19 about what happened at the racetrack?
20      A.    I did not, and neither did anybody in my
21 department.
22      Q.    Okay. Before Mr. Williams' and Mr. Peters'
23 employment were terminated by Dover Downs, did you or
24 anybody in the HR department speak to any of the

20

1  witnesses that gave statements about the incident at the
2  racetrack on December 23, 2003?
3       A.    No.
4       Q.    Okay. Did you or anyone at HR review a
5  videotape of the scene at the racetrack after the
6  accident which took place there on December 23, 2003?
7       A.    No, I did not.
8       Q.    Have you ever seen that videotape?
9       A.    No.
10      Q.    Can you explain what the process was that
11 was followed to reach the decision to terminate the
12 employment of Mr. Williams and Mr. Peters?
13      A.    The process that I followed?
14      Q.    The entire process, the process that is
15 used -- I take it you would have known what the process
16 was that was used to do the termination. I'm wondering
17 if you could explain to me what the process was, not
18 just whoever had recent involvement, but anybody else
19 that was involved.
20      A.    Well, the first thing that happened right
21 after it was brought to our attention that there was a
22 drag race out on the track, the security department,
23 members of the security department had begun to take
24 statements and interview witnesses to the incident. And

**1**

IN THE UNITED STATES DISTRICT COURT
IN FOR THE DISTRICT OF DELAWARE

RICHARD L. WILLIAMS and    )
MICHAEL E. PETERS,    )
    Plaintiffs,    )
        )
    v.    ) C.A. No.
        ) 05-0435 (GMS)
DOVER DOWNS, INC.,    )
a Delaware corporation,    )
    Defendant.    )

Deposition of **EDWARD JAMES SUTOR**, taken
before Cheryl A. Anthony, Court Reporter, in the law
offices of Parkowski, Guerke & Swayze, 116 West Water
State Street, Dover, Delaware, on Thursday, February 9,
2006, beginning at 9:40 a.m.

APPEARANCES:

    PARKOWSKI, GUERKE & SWAYZE
    BY: JEREMY W. HOMER, ESQUIRE
    116 West Water Street
    Dover, Delaware 19901
    Attorney for Plaintiffs.

    MONTGOMERY, McCRACKEN, WALKER & RHOADS
    BY: EDWARD T. ELLIS, ESQUIRE
    123 South Broad Street
    Philadelphia, Pennsylvania 19109
    Attorney for Defendant.

ALSO PRESENT:

    MR. RICHARD L. WILLIAMS

ORIGINAL RETAINED BY JEREMY W. HOMER, ESQUIRE
—————————————

ANTHONY REPORTING
PO Box 234
Dover, Delaware 19903
(302)674-8884

**2**

1    EDWARD JAMES SUTOR,
2    the witness herein, having first been
3    duly sworn on oath, was examined and
4    testified as follows:
5    BY MR. HOMER:
6    Q.    Mr. Sutor, could you state your full name
7    for the record, please?
8    A.    Edward James Sutor.
9    Q.    Okay. And what is your address and phone
10    number?
11    A.    My address is 239 Charring Cross --
12    C-H-A-R-R-I-N-G C-R-O-S-S -- Dover, Delaware 19904.
13    Home or office?
14    Q.    Your home number. We are not going to call
15    you there. But just in case you leave employment there
16    or whatever, we would like to have it.
17    A.    Okay. It is 302-736-6305.
18    Q.    During the course of the deposition today, I
19    may ask questions that you don't fully understand. If
20    that happens, don't try to answer the question. Just
21    ask me to repeat it or rephrase it or whatever. Make
22    sure you understand the question. Do you understand
23    that?
24    A.    Yes.

**3**

1    Q.    Is there any reason that your ability to
2    answer accurately today would be impaired?
3    A.    No.
4    Q.    You are not on any medication or anything?
5    A.    I'm under medication prescribed by my doctor
6    for cholesterol and things like that.
7    Q.    I have the same issue. But that won't
8    affect your ability to answer today, will it?
9    A.    No, it will not.
10    Q.    Can you explain what you did to prepare for
11    today's deposition?
12    A.    Very little. I spoke with my attorney
13    yesterday, Mr. Ellis, and we had a very short meeting.
14    But I believe I have a recollection of the pertinent
15    facts involving this case.
16    Q.    Okay. Did you review any documents in
17    preparation for the deposition?
18    A.    No, I did not.
19    Q.    Okay. What is your educational background?
20    A.    I graduated from St. Peters College in
21    Jersey City, New Jersey, with a bachelor's degree in
22    accounting.
23    Q.    And when was that?
24    A.    1972.

**4**

1    Q.    Okay. Could you just briefly relate your
2    work history since that time? And what I would like you
3    to do, if you can, is just do this chronologically from
4    your first job out of college to the present. And if
5    you could, just name your employer, your time there, and
6    your responsibilities for each job.
7    A.    Upon graduation in 1972, I joined the public
8    accounting firm of Price Waterhouse in Philadelphia,
9    where I was a staff auditor. And I stayed there until
10    July of 1979, when I reached the capacity of audit
11    manager. I left and took a position with a company that
12    is now known as The Sands Atlantic City Hotel & Casino
13    in the position of accounting manager.
14    Over the next four years, I rose up to be
15    vice president and chief financial officer. And in
16    December of 1983 I was hired by Caesar's Atlantic City
17    as corporate controller and rose to the level of senior
18    vice president and chief financial officer.
19    The next 15 years I spent at Caesar's, until
20    March of 1999, when I left to join my current employer,
21    Dover Downs in Dover, Delaware, assuming the position of
22    executive vice president and chief operating officer,
23    the position which I currently hold.
24    Q.    Okay. In the course of your work

5

```
 1   experience, could you explain what involvement you have
 2   had with personnel issues?
 3           MR. ELLIS:  I would object to the form of
 4   the question.
 5           THE WITNESS:  In the hospitality business,
 6   one of the primary ingredients for success is people --
 7   there are literally thousands of people employed by the
 8   casino -- in order to successfully operate and compete.
 9   Anyone in the management of any casino at a senior level
10   would have to be innately familiar with human resources
11   and its necessity in order to be able to give proper
12   levels of customer service.
13           In my capacity at Caesar's Atlantic City,
14   for instance, not only did I have the traditional back-
15   of-house accounting, payroll, things you may think of
16   that way, but I literally had one-third of the company
17   reporting to me, over a thousand to 1,500.  Half of the
18   casino floor, believe it or not, is finance; cashiers,
19   cages, people walking around with money in their banks.
20   So being the CFO in a manufacturing facility is
21   different than being a CFO in the hospitality industry.
22      Q.   When you had this supervisory
23   responsibility, did you get involved in making decisions
24   regarding disciplining employees?
```

6

```
 1      A.   It depends.  If somebody reported directly
 2   to me, yes, I would get involved in disciplinary
 3   procedures.  If it involved a lower level staff person,
 4   we have a chain of command.
 5      Q.   And in your capacity with Dover Downs since
 6   March of '99, were you involved in making personnel
 7   decisions regarding discipline?
 8      A.   A few.
 9      Q.   A few?
10      A.   Yes.
11      Q.   Can you tell me under what circumstances you
12   get involved in making those kinds of decisions?
13      A.   Well, the vice president of human resources
14   is whose responsibility it is to make sure that company
15   policies and procedures are followed by all employees.
16   And you need disciplinary action as part of your
17   policies in order to make sure that people do what they
18   are supposed to do.  That vice president reported
19   directly to me.  And I was involved at the outset in the
20   incident that I know we are going to be talking about
21   later on.
22           Other things that I would be directly
23   involved with were those matters involving officers or
24   directors of the company.
```

7

```
 1      Q.   Were you involved in other disciplinary
 2   matters, other than the subject matter of this case,
 3   involving the termination of employees?
 4      A.   Yes.
 5      Q.   And were you involved in all of the
 6   termination of the employees, or were you involved in
 7   just select ones?
 8      A.   Only those of a significant nature; again,
 9   an officer of the company, a director of the company.  I
10   would not get involved, on a normal basis, with routine
11   disciplinary matters and terminations at the lowest
12   levels.  That is for other people to do.
13      Q.   Why were you involved in this case?
14      A.   Dover Downs is a publicly traded company on
15   the New York Stock Exchange.  We are also a very highly
16   regulated industry.  We operate under a license an
17   agency granted to us by the Delaware Lottery.
18           In order for us to protect our right as a
19   company to do business, I had clear instructions under
20   the policies within our company to let me know any time
21   anything of significance occurred on our property, which
22   I would need to tell my superiors of and in order to
23   determine what the company's position would be if it
24   were to hit the press.
```

8

```
 1           In particular, I have standard operating
 2   procedures for any time the Dover Police set foot on our
 3   facility, no matter what the reason, that I am to be
 4   notified.
 5           When this incident occurred, I immediately
 6   recognized it as a significant event which could
 7   possibly have led to the death or severe injury of one
 8   of our employees.  I also was very concerned that it was
 9   an illegal activity or crime that had occurred on our
10   property.  And the ramifications of that, we needed to
11   get our arms around that quickly to assess what had
12   happened and who had participated in the activity and
13   what were the consequences.
14           So this was not a normal incident.  This was
15   something that rose to the level of significance that
16   the chief operating officer of the company would get
17   involved with in order to determine its ramifications.
18      Q.   Okay.  Have you had any training regarding
19   personnel issues?  For example, have you attended
20   seminars where information has been provided to you
21   regarding personnel issues?
22      A.   Yes.  I have attended company-sponsored
23   seminars where we bring in labor attorneys for
24   discussions on progressive discipline, union attempts,
```

**9**

1  things of that nature.
2      Q.    Can you tell me approximately how many of
3  these seminars you have been to?
4      A.    At Dover Downs, I can say about three or
5  four.
6      Q.    And how about before Dover Downs? How many?
7      A.    Each of the companies that I was involved
8  with in the gaming industry we are also public
9  companies. And it is routine for companies of that
10  nature to give its officers regular yearly briefings on
11  the rights of employees, the rights of companies, things
12  of that nature. But by no means do I hold myself out to
13  be as expert in HR as some of the people on my staff.
14  However, I do have a working knowledge of the HR
15  responsibilities.
16      Q.    You mentioned that you have had, during the
17  course of this training or these instructional seminars,
18  information given to you about the rights of employees.
19  Would those rights include rights arising under
20  discrimination laws?
21      A.    Yes.
22      Q.    Okay. Would they also include within that
23  category rights under the age discrimination laws?
24      A.    Yes.

**10**

1      Q.    Would you have had seminars about age
2  discrimination or a seminar about age discrimination law
3  prior to your decision in this case or prior to the
4  termination of Mr. Williams and Mr. Peters in this case?
5      A.    Not specifically age discrimination; age
6  discrimination and a whole bucket of other types of
7  discrimination, including sexual discrimination.
8      Q.    But you would have received information in
9  these training seminars about age discrimination law
10  before Mr. Williams and Mr. Peters were discharged. Is
11  that a fair statement?
12      A.    Yes.
13      Q.    Mr. Sutor, it was your decision to terminate
14  both the Plaintiffs in this case; that is, Mr. Williams
15  and Mr. Peters? Is that correct?
16      A.    Ultimately, yes; however, it was a group
17  decision.
18      Q.    Okay. Can you explain what you mean by
19  that?
20      A.    I remember the incident we are talking about
21  and its significance. That is why it is etched in my
22  mind. But this was a pervasive type of situation that
23  when it first occurred, my immediate concern was for the
24  safety and the health of the individual who was hurt.

**11**

1      Q.    Excuse me. I don't mean to cut you off. It
2  sounds to me like you are getting to what the reason
3  was. What I'm really getting to was the process of why
4  you made the decision.
5          Maybe we could change the question a little
6  bit. Could you explain to me what the process was that
7  led you to the decision to terminate?
8      A.    The process was there was an investigation
9  that was directed by me to our security department.
10  They had to find out exactly what had happened. So our
11  process was our security and HR oversaw the
12  investigation to determine who was involved and what
13  degree of participation they had in the incident, the
14  department heads, our legal counsel, and me. I directed
15  that the information be pulled together as quickly as
16  possible and that we deal with it as quickly as
17  possible.
18      Q.    Do you recall specifically who it was that
19  gave you input into the matter that led to the discharge
20  of the Plaintiffs?
21      A.    I have a general recollection of the major
22  players. I may not know everybody involved in the
23  process.
24      Q.    If you could, just name the ones that you

**12**

1  can recall.
2      A.    Sure. The person that I was talking to and
3  heading up the investigation was Lee Ford, who is our
4  director of security, who had a prior history of many
5  years with the Dover Police Department. I also remember
6  from the HR standpoint, that it was of such a matter of
7  significance that Robin Roberts, vice president of human
8  resources, was also very much involved in the situation.
9          The department heads that I was involved
10  with, as far as the maintenance area, were Jerry
11  Dunning, who was a VP and who had 30 years of experience
12  at Dover Downs; Richard Wertz, who was a director of
13  maintenance; and our attorney, Klaus Belohoubek.
14      Q.    Can you give the court reporter some clues,
15  at least, about how to spell his name?
16      A.    Klaus, K-L-A-U-S, last name,
17  B-E-L-O-H-O-U-B-I-C-K.
18          MR. ELLIS: Do you want me to correct that?
19          MR. HOMER: Yes, if you could; that would be
20  helpful.
21          MR. ELLIS: B-E-L-O-H-O-U-B-E-K.
22  BY MR. HOMER:
23      Q.    Is that an in-house counselor, or is that a
24  firm outside your company?

## 13

1   A.   He is an in-house counselor. Don't let him
2   see this deposition, please. I messed up that name
3   again.
4   Q.   Anybody else besides those individuals that
5   you can recall that would give input?
6   A.   Those were the main people that I dealt with
7   in this issue.
8   Q.   And you got that input from all of these
9   individuals before you made your decision. Is that a
10  fair statement?
11  A.   Yes, sure.
12  Q.   Okay. Did you make any notes regarding the
13  investigation or your decision to terminate the
14  employees?
15  A.   Not that I recall.
16  Q.   When you discussed the case with the people
17  you just mentioned, was there any discussion about the
18  age discrimination laws, if you can recall?
19  A.   If there was, it wasn't a significant amount
20  of discussion. This was a serious breach of company
21  policy, and it was not the highlight of our discussions.
22  Q.   But there was some discussion about the
23  possibility that there might be an age discrimination
24  claim, if you recall?

## 14

1   A.   No.
2   Q.   There wasn't?
3   A.   No. There was no discussion about that. It
4   had nothing to do with age.
5   Q.   Did you have any discussion about a possible
6   age discrimination claim that might be brought?
7   A.   Not clearly.
8   Q.   When you say not clearly, do you think there
9   might have been some, or there wasn't?
10  A.   There might have been, but it was not
11  significant to the issue taking place. There was an
12  illegal crime that occurred on our facility, and we
13  would have taken this action regardless of someone's
14  age.
15  Q.   Okay. The interrogatory responses that your
16  attorneys have provided to us indicate that Robert
17  Morrison was also involved in discussions with you. Do
18  you recall that?
19  A.   Yes, yes, I remember. Bob Morrison is the
20  manager of the outside maintenance department from which
21  most of the participants in this incident reported to.
22  Q.   Okay. The interrogatory response -- and
23  this is interrogatory number one -- also says that you
24  made the decision and it was approved by Robin Roberts.

## 15

1   Is that correct? She approved the decision?
2   A.   She doesn't approve my decisions. What I
3   remember was that it took quite a while, more time than
4   I had expected, for all of the information to be
5   gathered. And we evaluated it, and we separated the
6   groups of employees into different groups, based upon
7   our understanding of their degree of participation in
8   the event. And then we decided what was the fair type
9   of disciplinary action that we would need to take based
10  upon each person's level of involvement.
11  Q.   Could you explain what your reasoning was in
12  terminating the employment of the Plaintiffs in this
13  case?
14  A.   Sure. First and foremost, we needed to get
15  the facts straight, what had occurred, who was involved,
16  and what was their degree of participation. For
17  instance, the two individuals who were actually doing
18  the illegal drag racing, in my mind, were of the highest
19  culpability. Some of the others were in the area,
20  perhaps as part of their normal work assignment, and
21  happened to be looking at an activity that they had
22  little or no control over.
23       So we had to separate who was there, how
24  many participated, what did they do to help promote this

## 16

1   illegal activity, and what did they do to help prevent
2   this illegal activity. So I think it took -- it was
3   around Christmas, but it took over a week or so to get
4   through all of the interviews and sorting out who all
5   were involved, how many of our employees, and what they
6   did.
7        After we sorted through it and got the
8   stories lined up where we could corroborate the
9   attendees and what they were doing, we basically placed
10  them into two groups; ones who actually participated,
11  and those included the two drivers of the vehicles, as
12  well as the two supervisory personnel that blocked the
13  entrance to the facility in order to keep anyone from
14  entering, and then another group of people who were in
15  the area or were viewing the illegal drag race but who
16  may have not had as much ability or culpability as those
17  who participated in the event.
18       We discussed as a group what each person's
19  involvement was, what was expected of those people based
20  upon our company policies and procedures, what was
21  expected of our supervisory personnel, and how they
22  should perform if they become aware of such an activity.
23       And based upon several hours of discussion,
24  we placed these groups of people into two different

**17**

1  categories and meted out what we thought was the
2  appropriate disciplinary action.
3       The group that we called participants were
4  immediately terminated.  The people who were observers,
5  if I can use that term, already were under suspension
6  and had been so for at least a week and, therefore,
7  without pay.  So we determined that their disciplinary
8  action would be loss of pay for that time period, as
9  well as what we call a final warning or probation, if
10  you will, that if any incident occurred after that that
11  they would be subject to termination.
12      Q.   Okay.  You say there were two categories.
13  The participants are the drivers, correct?
14      A.   We considered the two drivers as
15  participants, yes.
16      Q.   And the remaining ones that were on
17  suspension, you considered those to be observers?
18      A.   Well, we also considered the two supervisory
19  people who used their vehicles to block the entrance to
20  the facility to be participants, because common sense
21  would lead you to believe they knew what was going on.
22  Otherwise, they wouldn't have used their vehicles to
23  block the entrance.
24      Q.   So the reason they were ultimately

**18**

1  discharged was that you viewed them as participants,
2  whereas you observed the other four that only received
3  suspensions not to be participants; is that right?
4       MR. ELLIS:  I object to the form of the
5  question.
6       THE WITNESS:  In our minds, there were four
7  very guilty people in this activity, the two people in
8  the car and the two supervisory people who were using
9  their vehicles to prevent entrance and blocking anyone
10  from coming in to find out about it, who did not
11  exercise their responsibilities as supervisors, not only
12  to prevent it, but to report it.
13       So now we considered -- I know I did in my
14  mind -- considered that the two supervisory personnel
15  were participants because of what they did with their
16  vehicles to block the public or anyone else and find out
17  what was going on in that facility.
18  BY MR. HOMER:
19      Q.   So are you telling me that you deemed the
20  Plaintiffs and the drivers to be the most culpable
21  individuals involved in the race and more culpable than
22  the four that didn't get terminated that were observing
23  the race?
24      A.   Exactly.

**19**

1       Q.   What about the individual who started the
2  race by dropping his hat?  Are you aware that one
3  individual did that?
4       A.   I heard about it.  But to be absolutely
5  honest with you, it was very difficult trying to find
6  out exactly who was there and who did what.  There was a
7  backtracking of not only the participants, the
8  supervisory personnel, but even the people who were
9  involved.  They were all very mum.  I don't know who it
10  was that dropped the hat or dropped the flag or
11  whatever.  But it clearly wasn't supervisory personnel,
12  no.
13      Q.   Did you know Mr. Richards before you made
14  the decision to terminate his employment?  Did you know
15  him personally?
16      A.   Mr. Richards?
17      Q.   I am sorry, Mr. Williams.
18      A.   Did I know Rich Williams?  Yes, I knew Rich
19  Williams.
20      Q.   And Mr. Peters, did you know him, as well?
21      A.   Yes.
22      Q.   Before you made the decision to terminate
23  their employment, were you aware of how long they had
24  worked for the company?

**20**

1       A.   Yes.
2       Q.   Were you aware of their work history and
3  evaluations and that sort of thing before you made the
4  decision to terminate them?
5       A.   Not extensively, no.
6       Q.   Did you understand that their performance
7  history was good before you terminated them?
8       A.   I knew they were long-term employees.  If
9  they were bad, they wouldn't have been there for that
10  long.
11      Q.   Before you made the decision to terminate
12  them, did you look into their performance history at
13  all?
14      A.   No.  It didn't matter.
15      Q.   What documents did you review before
16  you made the decision to terminate Mr. Williams and
17  Mr. Peters?
18      A.   I'm not sure there were a lot of documents
19  to look at.  I rely on my staff to inform me verbally of
20  the decisions that have happened and things that have
21  occurred.  I don't go through a lot of -- I know that
22  there were documented investigations done by our
23  security person, interviews with the personnel.
24       I don't remember probably -- well, I

**25**

1    A.   Vaguely, yes.
2    Q.   Can you tell me what you know about that
3    incident or those incidents?
4    A.   I remember I was surprised that the two
5    people involved, Williams and Peters, were insubordinate
6    in not carrying out the direction of their manager to
7    lead some men in the performance of some work.
8    Q.   And when did you learn that they had refused
9    to do that?
10   A.   I'm not exactly sure of the time point.  I
11   may or may not have learned it immediately at the time
12   that it occurred or shortly thereafter.  I can't pin
13   down the time.
14   Q.   Were you involved in investigating that
15   matter?
16   A.   No.  I wasn't involved in any fashion.
17   Q.   You were not involved in the decision to
18   discipline them for that?
19   A.   No.  That wouldn't rise to my level.
20   Q.   Were you aware of the fact of this incident
21   before the termination decision was made for each of the
22   employees?  And by that, I mean Mr. Williams and
23   Mr. Peters.
24   A.   Yes.

**26**

1    Q.   Okay.  Was that discussed during the
2    discussions you had which resulted in the termination of
3    the Plaintiffs?
4    A.   Yes.
5    Q.   And who brought that up?  Do you recall who
6    brought that up in the discussions?
7    A.   Robin Roberts.
8    Q.   What was the relevance of that, regarding
9    the decision to terminate their employment, if at all?
10   A.   Very little.  The incident itself was of
11   such an egregious nature that the insubordination
12   warnings were just piling on for what I consider -- I
13   would have made that decision regardless of the prior
14   incident.  But it did come up during the discussion that
15   it occurred within a short time frame of when this
16   activity occurred.
17   Q.   Mr. Sutor, your company's Answer to
18   Interrogatory Number 6 indicates that between the year
19   2000 and the present, four different individuals have
20   filed charges of age discrimination against the
21   Defendant; a Mr. Robert Faircloth, Mr. Robert Lewis, a
22   Frederick McDowell, and a Brance Thompson.  Are you
23   familiar with the facts in any of those matters --
24   A.   No, I'm not.

**27**

1    Q.   -- leading up to the charge of
2    discrimination?
3    A.   No, I'm not.
4    Q.   Were you involved in any way in any of those
5    matters?
6    A.   No.
7    Q.   So as the chief operating officer, you are
8    not apprised of charges of discrimination that are
9    brought against Dover Downs?
10   A.   They wouldn't rise to the same level of this
11   incident.  This incident again involved, in my mind,
12   illegal activity, a scandalous type of activity that
13   could embarrass the company and jeopardize its license
14   to operate in the company.  So clearly, it rose to a
15   level far greater than normal HR type of activities that
16   were handled by that department.
17   Q.   So the fact that four different individuals
18   have filed age discrimination claims against Dover Downs
19   would not be a matter that would particularly concern
20   you in your capacity as chief operating officer?
21   A.   I would be concerned if my attorneys warned
22   me that a pattern had developed that showed that we
23   needed to address it.  But having been in the business
24   for over ten years at Dover Downs and the many thousands

**28**

1    of employees who had gone through, four complaints
2    doesn't seem -- and I'm not sure if any of them were
3    upheld or rejected.  I'm not even sure.  But it doesn't
4    sound to me to be a considerable number.  And last, but
5    not least, my intimate knowledge of how the company
6    works and our policies and procedures give me comfort
7    that our company doesn't use age discrimination.
8    Q.   You said ten years experience.  Didn't you
9    tell me that you started at Dover Downs in 1999?
10   A.   I started at Dover Downs in March of 1999.
11   However, I have to back up a little bit.  When gaming
12   was passed back in 1994 in the State of Delaware, Dover
13   Downs retained the services under a management agreement
14   from Caesar's.  I was responsible as a Caesar's
15   representative for coming to Delaware and setting up
16   their entire operation, including the selection of key
17   personnel, policies, procedures, drawing the facility.
18   I had visited Dover Downs at least on a monthly basis
19   every month since 1994.  So I have been involved with
20   the gaming operations of Dover Downs from its inception.
21   Q.   Okay.  Are you familiar at all with the
22   litigation brought by Brance Thompson?
23   A.   No.
24   Q.   And you haven't been kept apprised of that

**33**

1  know in essence what is in here. And I will stake my
2  reputation on it that something in here says that you
3  should not participate in anything that is illegal. So
4  if I had a few moments, I could probably find the place
5  where it states that.
6      Q.   Okay. Could you take a look at that? I
7  would be interested in knowing exactly where it states
8  that.
9      A.   Sure. It's on page 15.
10     Q.   Can you tell me where it says that?
11     A.   It is the third paragraph: Don't improperly
12  use company resources or assets.
13     Q.   Okay. So it is your testimony that this
14  policy has bearing on the termination of the employees,
15  Mr. Williams and Mr. Peters?
16     A.   If you are trying to suggest that this is
17  the only reason in the entire incident that was used or
18  we referred to, no. It comes into play that they
19  improperly used company facilities.
20     Q.   And how did the Plaintiffs do that?
21     A.   The racetrack is a facility that is owned by
22  a public company and cannot be used for personal gain,
23  much like the hotel. If one of our employees improperly
24  took a hotel room and didn't pay rent for it, that is an

**34**

1  improper use of our facility. If an employee, even
2  doing an illegal activity, chose to use something of the
3  company's facility in order to entertain themselves
4  without proper approval and permission from the company,
5  it is an inappropriate use of company assets.
6      Q.   Is there anything else in this code of
7  conduct that you see that might be relevant to the
8  termination of the employees?
9      A.   I would have to look some more.
10     Q.   Okay. Go ahead.
11     A.   On page 17, the second paragraph, protect
12  assets from loss or harm.
13     Q.   Okay.
14     A.   That obviously occurred when the crash
15  happened.
16     Q.   So are you saying that every employee has a
17  responsibility, and it would be a violation of the code
18  if they failed to report this type of activity that took
19  place at the racetrack between the two individuals who
20  got terminated for racing on the racetrack?
21     A.   This paragraph refers to all company assets.
22  You can easily see that if an employee saw someone
23  defacing our facility, of course, they have a
24  responsibility to report it. We don't want them to sit

**35**

1  there and do nothing. In this particular case, using
2  the company facility in the aftermath of what occurred,
3  did cause physical damage to the property.
4      Q.   Okay. Is there any other statement in here
5  that you think might be relevant to the discharge of the
6  employees, Mr. Williams and Mr. Peters?
7      A.   I'm still on the same page. I mean I can
8  almost attach this incident to a number of paragraphs.
9  The paragraph, follow all security regulations, the last
10  sentence, do not neglect fire and other safety
11  precautions. This was a very unsafe event that
12  occurred.
13          First of all, the facility wasn't designed
14  for drag racing. Secondly, there wasn't any emergency
15  personnel there to handle that sort of activity. So
16  again, I'm not trying to stretch things here. But there
17  are a lot of things within this code of ethics that
18  could apply into what these people should have -- but
19  the essence of it is it was an illegal activity.
20          And this whole code of conduct document is
21  clearly telling our employees, because we are a public
22  company and a highly regulated business, we cannot get
23  ourselves involved in any illegal activity. Anyone who
24  was involved or participated in this activity clearly

**36**

1  should have known it violated this code of conduct.
2      Q.   But again, as you indicated before, this
3  wasn't something that you reviewed in making your
4  decision to terminate the employees, correct? This was
5  a document that was not looked at; is that a fair
6  statement?
7      A.   Correct.
8          MR. HOMER: Okay. Exhibit 4.
9          (Sutor Exhibit Number 4 was marked for
10  identification and attached to the record.)
11  BY MR. HOMER:
12     Q.   Would you take a moment to look at
13  Exhibit 4, please?
14     A.   Sure.
15          MR. ELLIS: There are two Michael Peterses.
16          MR. HOMER: Yes. There are two different
17  forms there. I'm not sure why.
18          MR. ELLIS: They look like the same
19  signature.
20          THE WITNESS: They aren't the same signature
21  either.
22  BY MR. HOMER:
23     Q.   Mr. Sutor, looking at page one, are you
24  familiar with this form that is in Exhibit 4?

## 45

1  break?

2  MR. HOMER: The witness is reminded not to
3  discuss the deposition during the break.

4  (A recess was taken from 10:20 a.m. until
5  10:18 a.m.)

6  MR. HOMER: Can we have that marked, please?

7  (Sutor Exhibit Number 7 was marked for
8  identification and attached to the record.)

9  BY MR. HOMER:

10  Q.  Mr. Sutor, can you identify the exhibit that
11  has been marked as Exhibit 7?

12  A.  I'm not quite sure what it is. It is a
13  handwritten note.

14  Q.  These are not your notes?

15  A.  No.

16  Q.  Have you ever seen them before?

17  A.  No.

18  MR. ELLIS: Did we not identify them for
19  you?

20  MR. HOMER: I don't think so.

21  MR. ELLIS: I guess we should have. They
22  are Robin Roberts's notes, whom you will be deposing
23  next week.

24  MR. HOMER: Okay.

## 46

1  MR. ELLIS: I won't try to decipher her
2  handwriting.

3  MR. HOMER: No. I'm going to need some help
4  with that. Let's get these marked as 8 and 9.

5  (Sutor Exhibits Number 8 and 9 were
6  marked for identification and attached to the record.)

7  BY MR. HOMER:

8  Q.  Let's go to the next exhibit.

9  MR. ELLIS: Which is eight, and which is
10  nine?

11  MR. HOMER: Williams is eight, and Peters is
12  nine.

13  BY MR. HOMER:

14  Q.  Mr. Sutor, can you identify Exhibits 8
15  and 9?

16  A.  They appear to be a disciplinary warning
17  notice to Michael Peters and Richard Williams, followed
18  by a form called an Employee Action Form, what we call
19  an EAF.

20  Q.  Okay. Have you ever seen either of these
21  forms, eight or nine, before today?

22  A.  No.

23  Q.  And did you have any involvement in the
24  preparation of the forms?

## 47

1  A.  No.

2  Q.  Referring to Exhibit 8, there is a paragraph
3  description under a block that says: Nature of
4  incident. Do you see where I'm talking about?

5  A.  Yes.

6  Q.  The next to the last sentence, I will read
7  it to you. It says: As a mechanic I, it is your
8  responsibility to report any suspicious, unsafe, or
9  reckless behavior of any type, involving your fellow
10  coworkers.

11  A.  Yes.

12  Q.  Do you agree with that statement?

13  A.  Yes.

14  Q.  Is there something in the job
15  responsibilities of a mechanic I that requires this, or
16  is it every employee at Dover Downs that has this same
17  obligation of reporting any suspicious, unsafe, or
18  reckless behavior involving fellow coworkers?

19  A.  In my personal opinion, everyone.

20  Q.  Weren't you telling me before that the code
21  of conduct requires --

22  A.  Everyone in the whole company, regardless of
23  their position.

24  Q.  Okay. So is it a fair statement that part

## 48

1  of the reason that Mr. Williams was terminated by you
2  was you believed he should have reported the race that
3  resulted in the accident, the race between Mr. Brian
4  Williams and Mr. Ernie Carlisle that resulted in an
5  accident?

6  A.  Yes. I believe they should have been
7  reported. I believe that they had a greater degree of
8  responsibility for reporting things because of their
9  supervisory capacity, because of their age and
10  experience. And in one particular case, there was a
11  gentleman's son that was actually involved in the
12  illegal activity. I thought they should have stopped it
13  and reported it.

14  Q.  You say that they had supervisory
15  responsibilities?

16  A.  Yes.

17  Q.  What makes you believe they had supervisory
18  responsibilities?

19  A.  I believe in the job description of the
20  mechanic I, it requires them to have the ability to lead
21  a group of workers. In my mind, that means supervisory
22  responsibilities.

23  Q.  Let me show you Exhibit 1 again. See if
24  there is anything in Exhibit 1, which is the job

49

1  responsibilities for a mechanic I, about supervisory
2  responsibilities.
3      A.   Exhibit 1, the second bullet from the
4  bottom: The ability to conduct analyses and generate
5  reports to reflect findings; lead a work force, provide
6  support to staff and assign job duties.
7          That, to me is leadership. That is
8  supervisory-type activities.
9      Q.   Well, that is a requirement of the job --
10     A.   Yes.
11     Q.   -- in terms of the qualification. But is
12  there any function that talks about supervision?
13     A.   I would say the third bullet in the
14  functions is applicable: Responsibility for compliance
15  with applicable codes and then inspection and reporting
16  of deficiencies throughout the facilities and systems.
17     Q.   Well, wouldn't any mechanic, whether he was
18  a mechanic I or a mechanic II or a mechanic III, have
19  that responsibility?
20     A.   Yes.
21     Q.   That is not a supervisory responsibility?
22     A.   No.
23     Q.   Okay. Do you see on the second page of the
24  description, where it says accountable to and

50

1  accountable for?
2      A.   Yes.
3      Q.   What does that mean, accountable for?
4      A.   People under their responsibility who they
5  would do the hiring, firing, raises, performance
6  reviews, things of that nature.
7      Q.   It doesn't mean people who report to them
8  are responsible --
9      A.   Yes.
10     Q.   And there it says N/A. Does that mean in
11  the mechanic I position, there is no one accountable?
12     A.   Not in the mechanic I position, there aren't
13  any people they are responsible for.
14         MR. HOMER: Can we have this marked as
15  Exhibit 10?
16         (Sutor Exhibit Number 10 was marked for
17  identification and attached to the record.)
18  BY MR. HOMER:
19     Q.   Mr. Sutor, have you had a chance to look at
20  Exhibit 10?
21     A.   Yes, I have.
22     Q.   Can you turn to the page that is
23  Bates-stamped D0133 --
24     A.   Yes.

51

1      Q.   -- and just read the bottom line here?
2      A.   This section is not scored. Rich is not a
3  supervisor/managerial role.
4      Q.   It says: Rich is not in a supervisory/
5  managerial role, correct?
6      A.   Uh-huh.
7      Q.   Can you explain why this Exhibit 10 says
8  that?
9      A.   No, I can't.
10     Q.   Isn't this the performance appraisal that is
11  filled out and scores on each one of the job functions?
12     A.   Yes.
13     Q.   Would you agree with me that this appraisal
14  indicates that Mr. Williams didn't have any supervisory
15  responsibilities?
16     A.   That is what it would indicate.
17     Q.   Can you explain why you have testified that
18  he does have supervisory responsibilities or why he did
19  have supervisory responsibilities?
20     A.   Why?
21     Q.   Yes.
22     A.   Because the job description of a mechanic I
23  requires that they have the ability to lead a group of
24  people in accomplishing a task. It is several grade

52

1  levels and pay levels above other mechanics and is
2  looked upon by the company as a more experienced
3  supervisory or leadership type position.
4      Q.   Okay. You also said that based on
5  Mr. Williams' and Mr. Peters' age, they should have done
6  something to stop the race; is that correct?
7      A.   Can you repeat that, please?
8      Q.   Maybe you can tell me. Did you indicate in
9  your prior testimony that you believed one of the
10  reasons Mr. Williams should have stopped the race was
11  because of his age?
12     A.   His experience, I think, was the term I
13  used.
14     Q.   You used the word age.
15     A.   Okay. Well, sometimes they go hand in hand,
16  age and experience.
17     Q.   Do you have a higher standard for employees
18  who are older than you do for ones that are younger --
19     A.   No.
20     Q.   -- in terms of a situation such as this,
21  where somebody should intervene?
22     A.   No.
23     Q.   Then why did you say age was a factor?
24     A.   I think you are zeroing in on age for some

## 53

1  reason that escapes me. I am more experienced. Someone
2  who has 25 years of experience in this type of business
3  should understand that that illegal activity is not only
4  forbidden by the company, but unsafe.
5      In this particular instance, on a personal
6  note, I was appalled that a father would allow their son
7  to engage in that sort of reckless activity.
8      Q.  What information did you have then or have
9  now that Mr. Williams was aware before the race that it
10 was going to take place, before he got to the scene?
11     A.  I have no evidence that he was aware of it
12 before. The only thing I know is the reports coming
13 back initially were that he used his vehicle to block
14 the entrance to prohibit other people from getting in
15 and witnessing the illegal activity. I do not know
16 whether he had prior knowledge of what was going to take
17 place.
18     Q.  And how do you know that he had an
19 opportunity to stop the race?
20     A.  I believe that by parking his vehicle at the
21 entrance and blocking it, that gave him little ability
22 to get down on the track. He should have kept going
23 with his vehicle and gotten down there and stopped it
24 immediately.

## 54

1      Q.  And do you know that if he had done that,
2  that he could have stopped the race? That he had time
3  physically to get down there before the race started?
4      A.  I don't know what time his vehicle started,
5  no.
6      Q.  Do you know that he had any means of
7  communicating to anybody that the race was taking place
8  before it took place?
9      A.  Yes, I do.
10     Q.  And what means did he have?
11     A.  All of our maintenance people have
12 walkie-talkies.
13     Q.  Do you have knowledge that Mr. Williams's
14 walkie-talkie was functional at the time this incident
15 took place? And by that, I mean the accident.
16     A.  No, I do not.
17     Q.  Did you look into that before you made your
18 decision?
19     A.  No.
20     Q.  Was it a relevant factor whether or not he
21 had the ability to communicate to somebody that the race
22 was taking place?
23     A.  That subject did not come up at all.
24     Q.  It didn't come up in your discussions

## 55

1  regarding the termination of the employees?
2      A.  The functionality of his equipment, no.
3      Q.  Or whether he had the means to communicate
4  to anyone that the race was taking place?
5      A.  No.
6      Q.  Wouldn't that have been a relevant factor in
7  terms of fixing his culpability?
8      A.  No.
9      Q.  Why not?
10     A.  The mere parking of his vehicle in such a
11 manner as to block other management personnel, citizens
12 from seeing what was going on, to me, was a severe
13 breach of responsibility by a person at that level,
14 meaning that they were trying to protect that knowledge
15 from getting to the proper personnel.
16     Q.  Do you even know how long Mr. Williams was
17 at the scene? Do you know if he got there before the
18 race started even?
19     A.  I do not.
20     Q.  You don't know?
21     A.  I do not know.
22     Q.  And you didn't know at the time you made the
23 decision?
24     A.  That is true.

## 56

1      Q.  Wouldn't that have been a relevant question
2  to ask?
3      A.  Perhaps.
4      Q.  Do you know whether Mr. Williams was on duty
5  at the time of the incident? That is, was he being paid
6  during the time that the race incident took place?
7      A.  The father or the son?
8      Q.  I'm talking about the Plaintiff,
9  Mr. Williams.
10     A.  No. I assumed he was at work, getting paid.
11     Q.  And when you made your decision, you didn't
12 inquire as to what his status was at the time, whether
13 he was on lunch break or anything else?
14     A.  No.
15     Q.  What information do you have that
16 Mr. Williams blocked the entrance to the racetrack?
17     A.  I was informed by my security department
18 virtually immediately, when I first became aware of the
19 crash. Because his son was involved, I just, as a
20 father, became incensed.
21     (Sutor Exhibit Number 11 was marked for
22 identification and attached to the record.)
23 BY MR. HOMER:
24     Q.  Mr. Sutor, can you identify Exhibit

**1**

IN THE UNITED STATES DISTRICT COURT
IN FOR THE DISTRICT OF DELAWARE

RICHARD L. WILLIAMS and )
MICHAEL E. PETERS, )
    Plaintiffs, )
      v. ) C.A. No.
        ) 05-0435 (GMS)
DOVER DOWNS, INC., )
a Delaware corporation, )
    Defendant. )

Deposition of BRIAN DAVID WILLIAMS, taken
before Cheryl A. Anthony, Court Reporter, in the law
offices of Parkowski, Guerke & Swayze, 116 West Water
State Street, Dover, Delaware, on Monday, February 13,
2006, beginning at 2:12 p.m.

APPEARANCES:

PARKOWSKI, GUERKE & SWAYZE
BY: JEREMY W. HOMER, ESQUIRE
116 West Water Street
Dover, Delaware 19901
Attorney for Plaintiffs.

MONTGOMERY, McCRACKEN, WALKER & RHOADS
BY: EDWARD T. ELLIS, ESQUIRE
123 South Broad Street
Philadelphia, Pennsylvania 19109
Attorney for Defendant.

ALSO PRESENT:

MR. RICHARD L. WILLIAMS

ORIGINAL RETAINED BY BETH A. FRIEL, ESQUIRE

ANTHONY REPORTING
PO Box 234
Dover, Delaware 19903
(302)674-8884

**2**

1          BRIAN DAVID WILLIAMS,
2  the witness herein, having first been
3  duly sworn on oath, was examined and
4  testified as follows:
5  BY MS. FRIEL:
6    Q.  Good afternoon, Mr. Williams. My name is
7  Beth Friel, and I am here to represent Dover Downs in
8  the matter of Richard Williams and Michael Peters versus
9  Dover Downs. Have you ever been deposed before?
10    A.  No.
11    Q.  Okay. Do you understand that I am going to
12  ask you questions and that the court reporter is going
13  to take down my questions and that the court reporter is
14  also going to take down your answers to my questions?
15    A.  Yes.
16    Q.  Okay. So don't nod your head. You need to
17  express your answers verbally so she can understand
18  them.
19    A.  Okay.
20    Q.  Do you understand you are under oath today?
21    A.  Yes.
22    Q.  Do you understand that means you are sworn
23  to tell the truth and give full and complete answers to
24  the best of your ability?

**3**

1    A.  Of course.
2    Q.  If at any time you don't understand my
3  question, will you let me know and I will try to
4  rephrase it for you?
5    A.  Okay.
6    Q.  If you need to take a break, will you let me
7  know and we can take a break?
8    A.  Yes.
9    Q.  Are you on any medication or on any drugs
10  that would affect your ability to understand my
11  questions?
12    A.  No.
13    Q.  Also, is there any reason you would not be
14  able to tell the truth today?
15    A.  No.
16    Q.  Where do you live, Mr. Williams?
17    A.  898 Rosedale Lane, Dover, Delaware 19904.
18    Q.  Who do you live there with?
19    A.  My wife and daughter and son.
20    Q.  How old is your daughter?
21    A.  She's nine years old. She's actually my
22  stepdaughter.
23    Q.  How old is your son?
24    A.  He's a year and a half.

**4**

1    Q.  Where do you work, Mr. Williams?
2    A.  Crossley Enterprises.
3    Q.  Can spell that?
4    A.  C-R-O-S-S-L-E-Y.
5    Q.  What is your position there?
6    A.  Landscaper.
7    Q.  How long have you worked there?
8    A.  Two and a half years.
9    Q.  Did you go to Crossley after you left Dover
10  Downs?
11    A.  Yes.
12    Q.  Have you always been a landscaper with
13  Crossley?
14    A.  Yes.
15    Q.  Prior to working at Crossley, you say you
16  worked at Dover Downs?
17    A.  Yes.
18    Q.  How long did you work at Dover Downs? Give
19  me the years you were there.
20    A.  Roughly '95, pretty much.
21    Q.  So '95 to the end of 2003; is that right?
22    A.  Yes.
23    Q.  And what was your job at Dover Downs? What
24  was your position?

**9**

1 car at Dover Downs?

2     A. I think when I raced Ernie, when I crashed.

3     Q. The December 23, 2003 drag race?

4     A. Yes.

5     Q. Let's go back one question. The 2003 race,

6 what kind of a car were you driving at that time?

7     A. A white Mustang.

8     Q. What year?

9     A. '91.

10     Q. '91. And what kind of car was James

11 driving?

12     A. It was a red Integra.

13     Q. Okay. So the next race you remember is the

14 race of December 23, 2003?

15     A. Yes.

16     Q. Okay. What car were you driving then?

17     A. A black Mustang.

18     Q. What year?

19     A. It was a 1988.

20     Q. And was this a race against Ernie Carlisle?

21     A. Yes.

22     Q. And where did this race take place?

23     A. Pit Road.

24     Q. Can you tell me how this race came about?

**10**

1     A. I can't remember exactly. Ernie and I had

2 talked about racing. He had a Camaro, and I had a

3 Mustang. We just talked about racing. Several days

4 prior to, we had talked about racing. We were supposed

5 to race before, but nothing ever happened. I took my

6 car down to Pit Road and parked on Pit Road and parked

7 it there all day. And Ernie never brought his car. So

8 then the same thing happened on December 23rd. We just

9 kind of talked about it. And I had my car, and we were

10 going to race.

11     Q. Did you talk to anyone else about your race

12 with Ernie?

13     A. Not really, no.

14     Q. Not really?

15     A. No.

16     Q. Can you think of anyone you talked to about

17 it?

18     A. Well, there were some people who knew about

19 it right before.

20     Q. Okay. Tell me who knew about it.

21     A. Bill Larnick knew about it. How far are you

22 talking about prior to the race? Right before --

23     Q. Tell me everyone you knew that had prior

24 knowledge of the race.

**11**

1     A. Right before the race, Bill Larnick, Russell

2 Hands knew, John Patterson knew, and Mike Monohan knew.

3     Q. Okay. Let's start about Bill Larnick. How

4 do you know Bill Larnick knew about the race?

5     A. Because I had my car down in the garage

6 area, next to Pit Lane. And Bill and I were

7 landscapers. We worked together. We were supposed to

8 pick up some lunch, so we picked up lunch. And right

9 before that, I saw Ernie and we talked about racing. So

10 after we got the lunch, we went down to Pit Road where

11 my car was. So that is how Bill knew, because he was

12 with me. He drove me down there to get my car.

13     Q. So Bill knew on December 23rd?

14     A. Yes.

15     Q. Russell Hands, how do you know Russell Hands

16 knew about the race?

17     A. Because he started the race.

18     Q. When did Russell Hands learn about the race?

19     A. I don't know; probably -- I don't know. I

20 just know he was there.

21     Q. Did you tell Russell Hands about the race?

22     A. No.

23     Q. What do you mean he started the race?

24     A. He held his hat out, and he said go.

**12**

1     Q. And John Patterson, how do you know John

2 Patterson knew about the race?

3     A. He was right in the truck with Russell Hands

4 as a racer. He parked just to the left of Pit Road.

5     Q. Do you know how John Patterson found out

6 about the race?

7     A. No.

8     Q. Did you ever talk to John Patterson about

9 the race?

10     A. No.

11     Q. Okay. Next you said Mike Monohan.

12     A. Yes.

13     Q. How do you know Mr. Monohan knew about the

14 race?

15     A. Because he was in the vehicle with Bill

16 Larnick, and they were parked right in Victory Lane,

17 which is right next to Pit Road, probably four or five

18 feet from the actual Pit Road.

19     Q. Did you ever talk to Mr. Monohan about the

20 race?

21     A. No.

22     Q. Besides Bill Larnick, Russell Hands, John

23 Patterson, and Mike Monohan, do you know of anyone else

24 who knew about the race before it happened?

---

**13**

1   A.   No.
2   Q.   Did you talk to anyone besides who you
3 mentioned about the race prior to it happening?
4   A.   Not that I can recall.
5   Q.   Did you ever talk to your father about the
6 race?
7   A.   No.
8   Q.   Prior to it happening, you never talked to
9 him about the race?
10   A.   No.
11   Q.   Do you know if your father knew about the
12 race?
13   A.   No.
14   Q.   Do you remember your father being at the
15 race?
16   A.   No.
17   Q.   Did you and your father ever talk about the
18 race after it happened?
19   A.   No.  Or after it happened?  I don't know.
20 After it happened, I went to the hospital.  We have
21 talked since.
22   Q.   Okay.  So you go to the hospital after it
23 happens?
24   A.   Yes.

---

**14**

1   Q.   Is your father with you when you go to the
2 hospital?
3   A.   I don't remember.  I was in an ambulance.  I
4 don't remember.
5   Q.   Okay.
6   A.   I just remember him -- I just know that
7 after the accident, it was kind of a blur.
8   Q.   When you get your memory back, do you have
9 any recollection of talking to your father about the
10 accident or about the race?
11   A.   I can't remember specifics two and a half
12 years later.
13   Q.   Okay.  Do you remember if your father was
14 angry at you for racing?
15   A.   No.  My dad's not angry at me for that.
16   Q.   You woke up at the hospital, I take it; is
17 that right?
18   A.   I remember fuzzily coming around in the
19 ambulance, but that's about it.
20   Q.   Okay.  Do you remember?  The first time you
21 talked to your father when you woke up, what was the
22 nature of your conversation?
23   A.   Dad was just worried about me, if I was all
24 right, if I was hurt or anything.

---

**15**

1   Q.   Did your father ask any questions about the
2 race?
3   A.   No.  Well, he wanted to know how it was and
4 everything.
5   Q.   Do you know if Mike Peters knew about the
6 race?
7   A.   No, I don't know.
8   Q.   Did you ever talk to Mike Peters about the
9 race before it happened?
10   A.   No.
11   Q.   What about after it happened?  Did you ever
12 talk to Mike Peters about the race?
13   A.   No, because I didn't go back to work.
14   Q.   Did you ever talk to Ernie Carlisle after
15 the race?
16   A.   Just some, a little bit, I guess.
17   Q.   What were the conversations you had with
18 Ernie Carlisle?
19   A.   He just stopped over at the house and wanted
20 to know how I was, how I was doing.
21   Q.   Did Ernie Carlisle ever say to you:  This
22 was stupid, we shouldn't have done that?  We shouldn't
23 have raced?
24   A.   No, no.

---

**16**

1   Q.   What time of the day was this race on
2 December 23rd?
3   A.   Lunchtime.
4   Q.   What is lunchtime?
5   A.   12:00 or so, somewhere around 12, quarter
6 after, something like that.
7   Q.   Was this the same day as the holiday work
8 party?  Was there a holiday party at work?
9   A.   I think in the maintenance; I'm not sure.
10   Q.   It wasn't a party for you?
11   A.   No.  It wasn't landscaping per se.
12   Q.   What department was Ernie Carlisle in?
13   A.   Landscaping.
14   Q.   Did you know anything about a holiday party
15 that day?
16   A.   Yeah.
17   Q.   What do you know about the holiday party?
18   A.   I just knew that Bob Morrison was having
19 some kind of a get-together or something.
20   Q.   Who was the get-together for?  Do you know?
21   A.   I don't know.  I guess the maintenance
22 department.  I'm not sure.
23   Q.   Do you know if your father, Richard
24 Williams, went to the party?

---

21

1    Q.    Who picked up the pizza?
2    A.    Bill and I.
3    Q.    And where do you get the pizza?
4    A.    Papa John's.
5    Q.    I am sorry.  You pick up the pizza, and
6    where do you put the pizza?
7    A.    It was in the vehicle.
8    Q.    The vehicle that is --
9    A.    The work vehicle.
10   Q.    Okay.  Then the pizza is in the vehicle.
11   And while the pizza is in the vehicle, you are racing
12   with Ernie Carlisle?
13   A.    Not in my vehicle.  Bill took me to get the
14   pizza in the work vehicle.  And then we went from there
15   down to the garage area, and I got out of that and I got
16   in my personal vehicle.
17   Q.    Okay.  Do you remember seeing your father at
18   any time during the race?
19   A.    No.
20   Q.    Do you remember seeing your father prior to
21   the race on December 23rd?
22   A.    Earlier in the day.
23   Q.    But you never talked to him about the race?
24   A.    No.

22

1    Q.    Okay.  Do you remember talking to him about
2    seeing Mike Peters at the race?
3    A.    No.
4    Q.    Do you remember seeing Mike Peters earlier
5    that day on December 23rd?
6    A.    Yes.
7    Q.    You saw him earlier that day?
8    A.    Yes.
9    Q.    But you never talked to him about the race
10   that day?
11   A.    No.
12   Q.    I'm just trying to understand.  It seems
13   like people are talking about this race; is that right?
14   A.    I don't know.
15   Q.    I mean you have four people, at least, that
16   you named that are talking about the race or are at the
17   race; is that right?
18   MR. HOMER:  Objection.  He has not said all
19   four of those people were talking about the race.  He
20   said they were aware of it.  They were at the racetrack.
21   But he hasn't said that at all.
22   THE WITNESS:  Yes.
23   BY MS. FRIEL:
24   Q.    So you listed four people that were at the

23

1    race?
2    A.    They were at the race.
3    Q.    Okay.  Tell me what you remember about the
4    race.
5    A.    Ernie and I raced.  Just -- I got out from
6    the garage, and I got my car.  And Ernie started the
7    race -- or Russell started the race, and we raced a
8    couple of times and turned around and came back.  And I
9    crashed.
10   Q.    How many times did you race?
11   A.    I think four.
12   Q.    Is that four?  So you go up once --
13   A.    We go up three times and then back once.
14   Q.    Okay.  I got you.  And how long does this
15   race last?
16   A.    I don't know; a few minutes.  I'm not sure.
17   Q.    How fast were you going?
18   A.    I don't know, 80 or 90, maybe.  I don't
19   know.
20   Q.    During the fourth time, is that when you got
21   into the accident?
22   A.    Yes.
23   Q.    Did you sustain any injuries?
24   A.    No.

24

1    Q.    But you were taken to the hospital; is that
2    right?
3    A.    Yes.
4    Q.    Were you unconscious at the time you were
5    taken from the hospital?
6    A.    I guess so.
7    Q.    Do you remember how you got out of the car?
8    A.    No.
9    Q.    Do you remember how you got into the
10   ambulance?
11   A.    No.
12   Q.    Do you remember what they told you when you
13   were at the hospital about any injuries you sustained?
14   A.    No.
15   Q.    Did the hospital give you any medication?
16   A.    No.  I'm sorry, no.
17   Q.    Did you receive a traffic citation as a
18   result of the drag race on December 23rd?
19   A.    Yes.
20   Q.    And was that for reckless driving?  Do you
21   remember?
22   A.    Yes.
23   Q.    Do you still have a copy of that ticket?
24   A.    No.

**Dover Downs, Inc.**

**JOB TITLE:**        **Maintenance Mechanic-I**

**SALARY GRADE:**        13
**PAY STATUS:**        Non-Exempt
**DIVISION:**        Maintenance-
**NO. OF POSITIONS:**        15
**DATE:**        October 10, 2002 Last Revision

---

**MAJOR FOCUS:**

- Responsible for maintenance and repair of facilities and systems.

**ESSENTIAL FUNCTIONS:**

- Performs maintenance and repair duties on reported deficiencies and compliance with assigned functions of Preventative Maintenance Program.
- Knowledge of most current methods of repair.
- Responsible for compliance with applicable codes and inspection and reporting of deficiencies throughout the facilities and systems.
- A Maintenance Mechanic I is expected to have a level of expertise in at least one of the following areas: Air Conditioning/heating, electrical, kitchen, plumbing, machine service, carpentry, upholstery, painting, plastering, heavy equipment operation, landscaping, Harness Track preparation, auto track maintenance, welding and general maintenance.
- Performs maintenance service and repairs in the areas of air conditioning/heating, electrical, kitchen, plumbing, machine service, fireboard, carpentry, upholstery, painting, plastering, landscaping, Harness Track preparation, auto track, welding, and general maintenance.
- Must be able to read and evaluate blueprints.
- Lifting and moving of tools and parts.
- Preparation of work area to include movement of furniture/obstructions, ordering required materials and direct tasks for Maintenance Mechanic II & III.
- Perform any reasonable tasks as directed by management.

**REQUIREMENTS/EDUCATIONS:**

- High School diploma or equivalent required.
- Ability to obtain Dover Downs certification to operate fork lifts, man lifts, tractors and other related job equipment.
- Requires a minimum of 6 – 10 years experience as an Electrician, Plumber, H.V.A.C., Mechanic, casino maintenance and/or machinist.
- Certification of skills or ability to demonstrate skills through testing and/or demonstrating is required.
- Valid drivers license with a clean driving record and insurability required.
- Ability to diagnose and troubleshoot malfunctioning equipment and make a determination for the corrective action to take place.
- Ability to perform math calculations.
- Ability to operate diagnostic equipment.
- Ability to understand basic building comfort operation.
- Ability to communicate clearly and effectively both orally and in writing; ability to logically and independently plan, organize, and complete work; initiative; well developed inter-personal skills; ability to set and achieve high standards of performance. Ability to make progress on multiple assignments under time constraint; ability to travel to various locations on business.

- Ability to conduct analyses and generate reports to reflect findings; lead a work force, provide support to staff and assign job duties.
- Ability to express ideas or make recommendations concerning job related issues; learn specific job duties and complete detailed work assignments; maintain knowledge of basic concepts and techniques.

**D 0145**

A0064

- Ability to perceive quality of work; read material and review documents; receive instructions.
- Ability to lift, carry, push and pull heavy objects.
- Ability to stand for extended periods of time – four (4) hours.
- Ability to reach for specific objects at short distances in local working area.
- Ability to use tools and equipment
- Ability to bend, stoop or kneel; climb, ascend and descend stairs/ladders and travel to other locations within the facility.
- Ability to perceive sizes, shapes, temperatures, textures; perceive depth and distance.
- Ability to perceive emergency or distress signals, inspect or secure proper use of equipment.
- Ability to perform job tasks and remain vigilant in the event of an emergency.

**ORGANIZATIONAL RELATIONSHIPS:**

| | |
|---|---|
| Accountable to: | Supervisor-Building Maintenance |
| | Supervisor-Grounds Maintenance |
| | Supervisor-Landscaping |
| Accountable for: | N/A |

**The above description denotes some of the specific characteristics which are necessary to perform the principal functions of the job and are not intended to be a description of all the work requirements that may be inherent in the position.**

**Dover Downs, Inc. is an equal opportunity employer. Women, minorities, and individuals with disabilities are encouraged to apply.**



# *EMPLOYEE HANDBOOK*

### *For Employees of*
### *Dover Downs Gaming & Entertainment, Inc.*
### *and Its Subsidiaries*

**D 0388**

EMPLOYEE HANDBOOK FOR DOVER DOWNS GAMING & ENTERTAINMENT, INC. and its SUBSIDIARIES
© 2002 DOVER DOWNS GAMING & ENTERTAINMENT, INC.
ALL RIGHTS RESERVED

A0066

# *TABLE OF CONTENTS*

**SECTION**                                                                 **PAGE**

1. **INTRODUCTION** ........................................................................... 4
   1.01   Welcome to Dover Downs Gaming & Entertainment ........... 4
   1.02   Mission Statement .................................................................. 4
   1.03   Customer Service .................................................................. 5
   1.04   Employment At Will ............................................................. 5

2. **EMPLOYMENT POLICIES** ...................................................... 6
   2.01   Equal Employment Opportunity .......................................... 6
   2.02   Employee Harassment / Sexual Harassment ..................... 6
   2.03   Complaint Procedure For Discrimination or Harassment ... 7
   2.04   Employment of Family Members (Nepotism) ..................... 7
   2.05   New Employee Orientation ................................................. 8
   2.06   Job Posting ............................................................................ 8
   2.07   Employment Records ........................................................... 8
   2.08   Use of Company Information Systems ............................... 9
   2.09   AIDS ...................................................................................... 10
   2.10   Accommodation of Qualified Individuals with Disabilities ... 10
   2.11   Union Free Philosophy ......................................................... 10

3. **COMPENSATION POLICIES** .................................................. 12
   3.01   Classifications of Employment ........................................... 12
   3.02   Work Hours ........................................................................... 12
   3.03   Regular Pay Procedures ...................................................... 13
   3.04   Overtime ................................................................................ 13
   3.05   Compensatory Time .............................................................. 13
   3.06   Tipping .................................................................................... 14
   3.07   Wage Garnishments and Support Orders ......................... 14
   3.08   Salary Administration Program and Performance Evaluations ... 14

4. **TIME-OFF BENEFITS** ............................................................. 15
   4.01   Family & Medical Leave of Absence .................................. 15
   4.02   Military Leave of Absence ................................................... 17
   4.03   Bereavement Leave ............................................................. 17
   4.04   Jury Duty ................................................................................ 17
   4.05   Vacations ............................................................................... 18
   4.06   Holidays ................................................................................. 19
   4.07   Sick Time ............................................................................... 21

5. **GROUP HEALTH AND RELATED BENEFITS** ..................... 22
   5.01   Our Employee Benefits Programs ...................................... 22
   5.02   Health Care Plan .................................................................. 22
   5.03   Dental, Vision and Prescription Plans ............................... 22
   5.04   Disability Plan ....................................................................... 23
   5.05   Life Insurance ....................................................................... 23
   5.06   401(k) Savings Plan ............................................................. 23
   5.07   Pension Plan ......................................................................... 23
   5.08   Tuition Assistance Program ................................................ 24

A0067

**D 0389**

EMPLOYEE HANDBOOK FOR DOVER DOWNS GAMING & ENTERTAINMENT, INC. and its SUBSIDIARIES
© 2002 DOVER DOWNS GAMING & ENTERTAINMENT, INC.
ALL RIGHTS RESERVED

2

## TABLE OF CONTENTS
### (continued)

SECTION

PAGE

6.   **EMPLOYEE CONDUCT** ................................................................................. 25
    6.01   Compliance With Laws.............................................................................. 25
    6.02   Guidelines for Appropriate Conduct....................................................... 25
    6.03   Code of Business Conduct ....................................................................... 27
    6.04   Attendance Standards (Absenteeism and Lateness).............................. 27
    6.05   Personal Appearance and Demeanor ...................................................... 29
    6.06   Uniforms ................................................................................................... 30
    6.07   Controlled Substances and Alcohol........................................................ 31
    6.08   Safety and Health .................................................................................... 32
    6.09   Company Confidential Information ......................................................... 32
    6.10   Confidentiality Regarding Customers .................................................... 33
    6.11   Gambling by Employees........................................................................... 33
    6.12   Workplace Violence.................................................................................. 34
    6.13   Workplace Searches.................................................................................. 34
    6.14   Entering or Leaving Our Property While on Duty ................................. 35
    6.15   Positions Involving Direct Customer Contact ........................................ 35
    6.16   Moonlighting / Second Job ...................................................................... 35
    6.17   Solicitation / Distribution........................................................................ 36
    6.18   Lockers ...................................................................................................... 36
    6.19   Parking ...................................................................................................... 36
    6.20   Badges........................................................................................................ 36
    6.21   Break Room ............................................................................................... 37
    6.22   Complimentaries ...................................................................................... 37
    6.23   Lost and Found ......................................................................................... 37
    6.24   Suggestions ............................................................................................... 37
    6.25   Emergency Closings and Delayed Openings ........................................... 37
    6.26   National Labor Relations Act .................................................................. 38
    6.27   Termination of Employment.................................................................... 38

**RECEIPTS**.......................................................................................................... 40
Acknowledgement of Employment and Employee Handbook (Employee's - Remains in Handbook) .......... 40
Acknowledgement of Employment and Employee Handbook (Company's - Please Read, Sign & Return) .. 41

EMPLOYEE HANDBOOK FOR DOVER DOWNS GAMING & ENTERTAINMENT, INC. and its SUBSIDIARIES
© 2002 DOVER DOWNS GAMING & ENTERTAINMENT, INC.
ALL RIGHTS RESERVED

D 0390

A0068

3