IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| RICHARD L. WILLIAMS and<br>MICHAEL E. PETERS,<br><br>      Plaintiffs,<br><br>v.<br><br>DOVER DOWNS GAMING &<br>ENTERTAINMENT, INC., a Delaware<br>Corporation; and DOVER DOWNS, INC.,<br>a Delaware Corporation,<br><br>      Defendants. | ) Civil Action No.: 05-0435 (GMS)<br>)<br>) TRIAL BY JURY OF<br>) TWELVE DEMANDED<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**PLAINTIFFS' ANSWERING BRIEF**
**IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**




PARKOWSKI, GUERKE & SWAYZE, P.A.

By:   JEREMY W. HOMER, ESQUIRE
        (Delaware Bar ID#0413)
        116 W. Water Street
        P.O. Box 598
        Dover, DE 19903
        (302) 678-3262

DATED: June 8, 2006         Attorneys for Plaintiffs

**TABLE OF CONTENTS**

**PAGE**

TABLE OF CITATIONS ................................................................................................ ii

I. NATURE AND STAGE OF PROCEEDINGS ..................................................... 1

II. STATEMENT OF FACTS ................................................................................... 2

III. SUMMARY OF ARGUMENT ........................................................................... 10

IV. ARGUMENT ...................................................................................................... 11

    A. On a motion for summary judgment, the moving party must demonstrate a clear right to judgment and the opposing party is given the benefit of all favorable inferences that can be drawn from the evidence ................................................................................................ 11

    B. Plaintiffs have produced direct evidence of age discrimination which precludes application of the McDonnell Douglas test and summary judgment ................................................................................................ 11

    C. Assuming McDonnell Douglas applies, numerous material fact issues preclude summary judgment ........................................................... 14

    D. Any state law claim should not be dismissed because the court does have jurisdiction over federal claims ........................................... 16

V. CONCLUSION ................................................................................................... 17

## TABLE OF CITATIONS

**PAGE**

**Cases**

Connor v. Chrysler Fin. Corp., 160 F.3d 971 (3d. Cir. 1998) .......................................... 13

Ely v. Hall's Motor Transit Co., 590 F.2d 62 (3d. Cir. 1978) .......................................... 11

Fakete v. Aetna, Inc., 308 F.3d 335 (3d. Cir. 2002) ................................................... 12, 13

Fuentes v. Perskie, 32 F.3d 759 (3d. Cir. 1994) ........................................................ 12, 14

Glanzman v. Metropolitan Corporation, 391 F.3d 506 (3d. Cir. 2004) ........................... 12

Hazen Paper Co. v. Biggins, 507 U.S. 604 (1993) ........................................................... 12

Keller v. Orvix Credit Alliance, 13 F.3d 1101 (3d. Cir 1997) ......................................... 11

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) ....................................... passim

Price Waterhouse v. Hopkins, 490 U.S. 228 (1989) ........................................................ 13

Reeves v. Sanderson Plumbing Prods., Inc., 53 U.S. 133 (2000) .................................... 12

Rose v. N.Y. City Bd. of Educ., 257 F.3d 156 (2d. Cir. 2001) ......................................... 13

Trans World Airlines, Inc. v. Thurston, 469 U.S. 111 (1985) ......................................... 12

**Other Authority**

Wright, Miller & Kane, Federal Practice and Procedure:
   Civil 3d §2725, Vol. 10A, pp. 426-427; 455 ............................................................. 11

Advisory Committee Note to Rule 56 1963 Amendments .............................................. 11

I.   **NATURE AND STAGE OF PROCEEDING**

Plaintiffs were fired by their employer, the defendant. Each filed a Charge of Discrimination with the Delaware Department of Labor (DOL) and the Equal Employment Opportunity Commission (EEOC). DOL investigated the charges, and in each case determined "there is reasonable cause to believe that an unlawful employment practice has occurred." Subsequently plaintiffs filed this action. Discovery has been completed. Defendant has moved for summary judgment. The motion should be denied for the reasons stated herein.

## II. STATEMENT OF FACTS

### A. Introduction.

The opening brief (OB) argues plaintiffs must pass the McDonnell Douglas test and cannot do so because defendant "had a legitimate, nondiscriminatory reason for terminating their [the plaintiffs] employment – which Plaintiffs cannot rebut."[1] (OB, 9). Although plaintiffs easily satisfy the McDonnell Douglas test (in part because defendant has provided totally inconsistent reasons for the terminations), the McDonnell Douglas test is inapplicable. McDonnell Douglas applies when plaintiffs rely only on indirect evidence of age discrimination; ADEA plaintiffs who present direct evidence of age discrimination need only show their ages more likely than not were a substantial factor in the discriminatory decision. See argument below. Although the opening brief asserts "the disciplinary actions taken against the eight employees involved in the drag race had no correlation with their ages" (OB, 11), the decision-maker, Edward Sutor, testified:

> "I believe that they [the plaintiffs] had a greater degree of responsibility for reporting things because of their supervisory capacity, because of their age and experience." (emphasis supplied) (B-164).

The "failure" to report the race was critical to the termination decisions. According to the termination notices supplied by defendant, plaintiffs were fired for the following reason:

> "In view of the fact that you had recently been issued a written warning for insubordination, and the fact you did not report this very serious incident, you are hereby being terminated." (B-25, 29).

Moreover, apparently "failure" to report the incident was far more important than the other reason given in the termination notice – prior discipline - because Sutor testified

---

[1] The full citation is McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

2

plaintiffs' prior disciplinary record had "very little" relevance to the termination decisions. (B-162). He even testified he would have fired them regardless of the prior disciplinary action. (B-163).

Sutor's testimony completely undermines defendant's position statement filed with DOL, which claims plaintiffs were fired, whereas the other spectators were merely suspended, because only plaintiffs had a prior record of discipline. (B-3). The opening brief argument that defendant had a legitimate nondiscriminatory reason for the terminations is rebutted by Sutor's testimony.

In any event, Mr. Sutor's admission that plaintiffs' ages were a factor in finding plaintiffs more culpable than the employees who were not discharged precludes summary judgment.

B.   Plaintiffs' Employment History.

The plaintiff Richard L. Williams (Williams) worked at Dover Downs for 25 years before his employment was terminated. (See OB, p. 2). During the last year he worked for defendant, his supervisor, Jerry Clifton, asked Williams whether he wanted to take early retirement. (Clifton deposition, B-139A-140). The plaintiff Michael M. Peters (Peters) worked for Dover Downs for 19 years before he was fired. (See OB, p. 2). Both plaintiffs were excellent employees. Their last performance evaluations, completed by Jerry Clifton, appear at B-39 and B-45. Clifton testified that both plaintiffs were more

3

qualified to perform their position (Maintenance Mechanic I) than Larry Barner. (B-140). Defendant claims Barner replaced Williams after he was fired.[2]

    C.    The Prior Disciplinary Actions.

A few weeks before plaintiffs were fired, Robert Morrison replaced Jerry Clifton as plaintiffs' supervisor. (See OB, 3). On December 1, 2003, Morrison asked Williams if he would supervise employees while Mr. Curtis was on vacation. (Williams Deposition, B-168). Williams didn't understand the request to be a directive and indicated, "given the choice," he didn't want to do it. (Id.). Morrison admitted it was a request – "And again, not sounding like a tyrant, I asked him if he would do that." (Morrison Deposition, B-149). Further, Morrison admitted he didn't tell Williams the request was an order or that he'd be considered insubordinate if he didn't do it. (Id.).

On the same day, December 1, 2003, and after his meeting with Williams, Morrison asked Peters to supervise; Peters, not understanding Morrison was directing him to do it, declined the request. (Peters Deposition, B-154). Morrison testified he didn't order Peters to do the job or tell him he would be considered insubordinate if he didn't do it. (Morrison Deposition, B-152). It wasn't until almost two weeks later that Morrison took disciplinary action, claiming Williams and Peters were insubordinate.

---

[2] Defendant's attorney letter, B-129. The letter contends Barner and Frank Outten replaced Williams and Peters, respectively. It also claims Jeffrey Shockley replaced Barner and Kelvin Arnold replaced Outten. (Id.). The ages of those employees when the plaintiffs were fired were: Williams – 55; Peters – 52; Barner – 42; Outten – 47; Shockley – 41; and Arnold – 47. (B-33, the margin of the exhibit was cut-off in the copy produced by defendant). Because Williams and Peters held the same position and were fired at the same time, there is a factual issue regarding whether Barner replaced Williams or Peters, etc. Defendant may be claiming Outten replaced Peters so it can argue their age difference is less significant than would be the case if Barner replaced Peters. In any event, it doesn't matter because plaintiffs aren't required to show there was a significant age difference under the "direct evidence" standard discussed below.

4

(Id.). A memorandum (on which Clifton is copied), with the subject title "Refusing to Comply," indicates the proper process for dealing with an insubordinate employee is to send the employee home at the time of the insubordination. (B-111).[3] Morrison admitted he didn't say anything to Williams about going home or there being an investigation of his refusal to abide by the request. (B-151). Finally, Morrison acknowledged Williams never showed him any disrespect on any other occasion, and that Williams' performance evaluation (completed by Clifton after December 1, 2003) states Mr. Williams "has always shown respect to other employees and management." (B-151; B-40). Tom Curtis, who supervised both plaintiffs for 1.5 years (including time in the year 2003) testified that neither was ever insubordinate regarding any order given by Curtis. (B-144, 145).

Williams and Peters were understandably upset to learn on December 12, 2003, that they were being disciplined for alleged insubordination. Peters tried to address the problem with defendant's Human Resources Department, but was told "only supervisors tell the truth." (Peters Deposition, B-154, 155). Williams complained to Mr. Dunning, an upper management employee, and Robin Roberts, the head of the Human Resources Department (Williams Deposition, B-169).

D.   The accident and the termination decisions.

On December 23, 2003, two Dover Downs employees raced their motor vehicles during the lunch hour. Williams and Peters watched the race, along with four other employees. There is no evidence that Williams or Peters knew about the race in

---

[3] The memo is dated 7/18/02 but is referenced in a 12-17-03 Dover Downs memorandum (B-110).

advance.[4] There is evidence that at least two other employees had enough advance notice of the race to report it in time to prevent it. Stephen Maher signed a statement saying he learned of the race at 10:30 A.M. (B-80).[5] John Patterson knew at 11:00 A.M. (Patterson Statement, B-78). Ed Sutor, who made the decision to fire the plaintiffs (Interrogatory response, B-113), testified be had no knowledge that Williams had had advance notice of the race (B-165), but that any employee with advance notice of the race who hadn't reported it -- even ones who hadn't attended the race - - should have been disciplined. (B-166). Maher received no discipline. (See OB, 6-7).

The opening brief contends Peters blocked the gate to the racetrack, thereby making him a participant. (OB, 5). However the evidence reflects Peters arrived at the gate first (before Williams) and parked his vehicle in a direction that didn't block the gate (Peters Deposition, B-156). Williams parked his vehicle across the gate because he saw there was going to be a race and had been trained, under such circumstances, to block access of children and others to the speedway. (Williams Deposition, B-170, 171).

It is doubtful that Williams or Peters did anything to warrant disciplinary action of any kind, let alone the discriminatory termination of their employment. First, although defendant contends plaintiffs possessed supervisory capacity and, therefore, more culpability than the other spectators, such contention rests lamely on vague language (e.g., "Heading a workforce when necessary") contained in a Job Description evidently

---

[4] A report prepared by Joe McNair states he "feels" all the observers had advance knowledge of the race (B-56), but McNair testified his only knowledge of whether Williams or Peters had advance knowledge of the race was through their statements, which do not reflect such knowledge. (McNair Testimony, B-147; plaintiffs' statements are at B-64 and B-66).

[5] Maher was 24 years old on the date of the race. (B-33).

dusted off for purposes of the litigation. It is unclear when anyone looked at the Job Description prior to the litigation, but it is undisputed that Williams' job performance evaluation, completed after the race accident, under the heading "Leadership," states: "This section is not scored. Rich is not in a supervisory/managerial role." (B-44). Moreover, the race took place during the lunch hour and the evidence doesn't reflect any of the employees, including plaintiffs, were on duty.

The second reason to question whether plaintiffs did anything wrong is management tolerated and even participated in race activities at the track. Ernest Carlisle, one of the drivers in the December 23, 2003 race, testified that a supervisor, Clifton, engaged in racing (B-136), and that Dunning once gave him permission to race. (B-137). Clifton candidly admitted that he used the track for speeding in excess of the legal limit and that he did it after he became a manager. (B-141). He also indicated other employees did it:

> A. ..."It's a racetrack. You know, it's like you can't go onto the racetrack and not get that feel of just a little faster, just a little faster."
>
> Q. So what you are saying is you assume other employees used the racetrack from time to time to run motor vehicles up and down it at high speeds?
>
> A. Sure." (B-141, 142).

Plaintiffs didn't even use the track themselves, they merely watched someone else use it during their lunch hour. Roberts, defendant's vice president of human resources (B-158), testified she was unaware of any document which advises the defendant's employees it's a violation of company policy to watch a race at defendant's facility on the employee's own time. (B-159). She also testified she didn't have any knowledge of

7

how an employee in December 2003 would have known it was improper to watch a race on his own time if it were not stated in a document. (Id.). Likewise, she testified she had no knowledge of any document advising an employee of a duty to report or stop a race. (B-159, 160). Finally, she answered "No" to the question – "If they [the employees] know that a race is going to take place, do they have any duty to stop and report that?" (B-160).

Although the above facts present insurmountable problems to defendant's effort to obtain summary judgment, they pale in comparison to the hurdles presented by defendant's rationale for firing the plaintiffs while only suspending the other spectators (and not disciplining Maher at all). Initially, defendant contended plaintiffs were fired because they had a prior disciplinary action (the unsubstantiated insubordination of December 1, 2003), whereas the suspended employees did not.[6] (April 5, 2004 Defendant position statement filed with DOL, B-3). That position was reiterated in December 23, 2004 and January 28, 2004 follow-up letters (B-14, 34), through counsel, to DOL (e.g., "Due to his December 2003 discipline, Charging Party was not similarly situated with the other employees who were suspended rather than terminated for participating in the drag race." (B-16).[7]

---

[6] DOL found reasonable cause to find discrimination based on subsequently provided (by defendant's counsel) information that one of the other employees had been disciplined previously. (B-38). Plaintiffs understand that the subsequent information may have been incorrect because the discipline allegedly was imposed after the race incident.

[7] The letter also points out that Russell Hands, age 68, was only suspended. Hands, however, was not a full-time employee. A DOL letter to defendant's counsel requests a response, among other things, to Williams' assertion that Hands was part-time (B-35). The response doesn't dispute the assertion (B-36).

Despite the three letters to DOL and the termination notices (B-25, 29) which assert defendant's rationale for firing plaintiffs was the record of prior discipline, Sutor testified plaintiffs' prior disciplinary record had "very little...relevance" to the termination decision and that he "would have made that decision regardless of the prior incident." (B-162).

Sutor's rationale for the termination decision was that plaintiffs were more culpable than the other spectators -- a "fact" which is never mentioned in defendant's three written positions filed with DOL. Specifically, Sutor testified:

> "I believe that they [the plaintiffs] had a greater degree of responsibility for reporting things because of their supervisory capacity, <u>because of their age</u> and experience. And in one particular case, there was a gentleman's son that was actually involved in the illegal activity. I thought they should have stopped it and reported it." (emphasis supplied) (B-164).[8]

As indicated above, there is considerable doubt that plaintiffs had any supervisory responsibility as it related to the race accident. In any event, Sutor's testimony leaves no doubt that plaintiffs' ages were a factor in his decision to fire plaintiffs. A clearer "direct evidence" case of discrimination is difficult to postulate than one where, as here, the decision-maker acknowledges the adverse employment decision was based, at least in part, on the plaintiffs' ages. It is for a jury to decide whether age was substantial enough a factor to find unlawful discrimination.

---

[8] The testimony alludes to Williams' son being involved in the race. Peters is no relation to either driver, but was fired anyway.

9

III. **SUMMARY OF THE ARGUMENT**

    A.    On a motion for summary judgment, the moving party must demonstrate a clear right to judgment and the opposing party is given the benefit of all favorable inferences that can be drawn from the evidence.

    B.    Plaintiffs have produced direct evidence of age discrimination which precludes application of the McDonnell Douglas test and summary judgment.

    C.    Assuming McDonnell Douglas applies, numerous material fact issues preclude summary judgment.

    D.    Any state law claim should not be dismissed because the court does have jurisdiction over federal claims.

IV. **ARGUMENT**

    A. <u>On a motion for summary judgment, the moving party must demonstrate a clear right to judgment and the opposing party is given the benefit of all favorable inferences that can be drawn from the evidence.</u>

On a motion for summary judgment, the moving party has the burden of proving the truth of what it asserts is clear; it must "[demonstrate] a right to judgment with such clarity as to leave no room for controversy and [show] affirmatively that the opposing party cannot prevail under any circumstances." <u>Wright, Miller & Kane</u>, Federal Practice and Procedure: Civil 3d §2725, Vol. 10A, pp. 426-427; 455, citing, inter alia, <u>Ely v. Hall's Motor Transit Co.</u>, 590 F.2d 62 (3d. Cir. 1978). The opposing party is given the benefit of all favorable inferences that can be drawn from the evidence. Id. at 459. Facts asserted by the opposing party are regarded as true if supported by evidentiary material. (Id. at 461-462). Moreover, "Where an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate." (Id. at 443, citing <u>Advisory Committee Note to Rule 56 1963 amendments</u>).

    B. <u>Plaintiffs have produced direct evidence of age discrimination which precludes application of the McDonnell Douglas test and summary judgment.</u>

The opening brief argues the <u>McDonnell Douglas</u> test is applicable (OB, 8-9).[9] The opening brief goes on to argue that under <u>McDonnell Douglas</u>, once a prima facie

---

[9] According to the opening brief, a prima facie case under <u>McDonnell Douglas</u> requires proof that plaintiff: (1) is a member of the protected class, i.e., at least 40 years old; (2) qualified for the position; (3) suffered an adverse employment action; and (4) replaced by a sufficiently younger person to create an inference of age discrimination. (Id. at 9, citing <u>Keller v. Orvix Credit Alliance</u>, 13 F.3d 1101, 1108 (3d. Cir 1997)).

11

case is established, the burden of production shifts to the employer to articulate a legitimate non-discriminatory reason for his decision; then the plaintiff has an opportunity to provide evidence showing defendant's articulated reason is a pretext for discrimination. (Id. at 9, citing Fuentes v. Perskie, 32 F.3d 759, 763 (3d. Cir. 1994)).

> McDonnell Douglas is not applicable. As the Supreme Court puts it:
>
> "[T]he McDonnell Douglas is inapplicable where the plaintiff presents direct evidence of discrimination...The shifting burdens of proof set forth in McDonnell Douglas are designed to assure that the plaintiff [has] his day in court despite the unavailability of direct evidence." Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 121 (1985).

In Fakete v. Aetna, Inc., 308 F.3d 335, 337-338 (3d. Cir. 2002), the Third Circuit Court of Appeals held (1) a plaintiff must show his or her age "actually motivated" and "had a determinative influence on" the employer's decision to fire him or her (citing Reeves v. Sanderson Plumbing Prods., Inc., 53 U.S. 133, 141 (2000) and Hazen Paper Co. v. Biggins, 507 U.S. 604, 610 (1993)), and (2) plaintiff can meet that burden by direct evidence, thereby avoiding the indirect evidence test "that satisfies the familiar three-step framework of McDonnell Douglas." Fakete also formulates the issue as follows: "Thus the only matter requiring discussion is whether a reasonable jury could find...Fakete's age was more likely than not a substantial factor in...[the employer's] decision to fire him." 308 F.3d at 339. The Third Circuit Court of Appeals also has stated the employer's burden of proof in a direct evidence case in even stronger terms:

> "This is a high burden [under Fakete] on a motion for summary judgment because...[the employer] must leave no doubt that a rational jury would find that...[the employer] would have fired...[plaintiff] even if it had not been for the discriminatory statement." (emphasis supplied). Glanzman v. Metropolitan Corporation, 391 F.3d 506, 514 (3d. Cir. 2004).

12

"'Direct evidence' means evidence sufficient to allow the jury to find 'the decision makers placed substantial negative reliance on [the plaintiff's age] in reaching their decision' to fire him." (Fakete, supra, 308 F.3d at 338, citing Connor v. Chrysler Fin. Corp., 160 F.3d 971, 976 (3d. Cir. 1998) and Price Waterhouse v. Hopkins, 490 U.S. 228, 277 (1989)). Fakete also points out that "direct evidence" may be "statements of a person involved in the decision making process that reflect a discriminatory or retaliatory animus of the type complained of in the suit" (Id at 339), and "even if the statements are not made at the same time as the adverse employment decision," the evidence may satisfy the "direct evidence" test (Id., citing Rose v. N.Y. City Bd. of Educ., 257 F.3d 156, 158, 162 (2d. Cir. 2001) ("holding that supervisor's statements, several months before he demoted employee, that he might replace her with someone 'younger and cheaper' were sufficient to shift the burden of persuasion under Price Waterhouse").

Here, Sutor was the decision-maker and he admitted the adverse employment decision itself was based, in part, on plaintiffs' ages. Under the aforementioned standard of review for summary judgment motions, plaintiffs must be given all favorable inferences of Sutor's testimony, and defendant certainly hasn't demonstrated a right to judgment "with such clarity as to leave to room for controversy."

Finally, although Sutor's admission that his decision was based on plaintiffs' ages by itself precludes summary judgment, his other testimony to the effect that plaintiffs' prior disciplinary records had "very little relevance" to the termination decisions, casts another large layer of doubt on defendant's reason for the terminations. Sutor's testimony flatly contradicts all three defendant statements to DOL which contended prior

discipline was the "nondiscriminatory reason" for terminating the plaintiffs. The next argument addresses this circumstance in more detail.

    C.    Assuming McDonnell Douglas applies, numerous material fact issues preclude summary judgment.

The opening brief argument is: "Plaintiffs' claim cannot pass the requisite [McDonnell Douglas] test to survive summary judgment, as Dover Downs had a legitimate, nondiscriminatory reason for terminating their employment -- which Plaintiffs cannot rebut." (OB, 9).[10]

The argument fails altogether to discuss the uncomfortable fact that the "nondiscriminatory reason" has completely changed. Initially, in the termination notices and three letters to DOL, the "nondiscriminatory reason" allegedly was plaintiffs' record of prior discipline. Then Sutor testified that reason had "very little relevance." The new reason was plaintiffs allegedly were more culpable than the other spectators (partly because of their age), even though one of the other spectators (Patterson) had advance notice of the race and plaintiffs didn't.

It doesn't much matter now which reason defendant contends was the nondiscriminatory reason, defendant's flip-flop by itself creates questions of fact regarding whether all the reasons are a pretext for discriminatory treatment. Inconsistencies in an employer's proffered reasons for its action preclude summary judgment. Fuentes, supra, 32 F.3d at 765.

---

[10] The opening brief makes no argument that plaintiffs do not have a prima facie case of discrimination under McDonnell Douglas; instead it argues defendant has satisfied the second step of McDonnell Douglas (demonstration of a nondiscriminatory reason for the termination) and plaintiffs allegedly can't meet their burden of the third step (rebutting the proffered reason).

Moreover, Sutor testified one reason (age and experience were the others; see B-164) plaintiffs were deemed more culpable than the others was their alleged supervisory capacity. Both plaintiffs held the same position, and Williams' performance evaluation expressly states he had no supervisory responsibility. In addition, neither plaintiff was working at the time of the race, and neither were the employees they allegedly should have been supervising. All those facts preclude any showing by the clear evidence standard required for summary judgment that defendant's decision was based on a nondiscriminatory reason.

There are also genuine issues of material fact regarding whether plaintiffs did anything wrong by merely watching a race at defendant's premises during their lunch hour. A manager level employee, Clifton, testified he and others used the defendant's facility for driving their cars at illegal speeds. Carlisle's testimony that Dunning gave him permission to race at the track offered additional evidence along the same line.

To the extent defendant relies on its original justification for firing plaintiffs and not the other race spectators, namely the alleged insubordination, there are genuine issues of fact regarding whether there was any such insubordination. Morrison's admissions that he didn't give a directive, didn't warn plaintiffs they were being insubordinate, and didn't apply the process of sending them home immediately, all support plaintiffs' testimony that there was no insubordination. A reasonable inference from the evidence is that defendant used the non-insubordination incident to set plaintiffs up for the termination that followed approximately two weeks later.

      D.    <u>Any state law claim should not be dismissed because the court does have jurisdiction over federal claims</u>.

The opening brief argues "The Court should dismiss any alleged State law claim because the Court lacks jurisdiction - - in the absence of Plaintiffs' federal claim." (OB, 12). However, the court does have jurisdiction over federal claims for the reasons set forth above.

## V.  CONCLUSION

For the above stated reasons, plaintiffs respectfully request the court deny defendant's motion for summary judgment.

                              Respectfully submitted,

                              PARKOWSKI, GUERKE & SWAYZE, P.A.

By: _/s/ Jeremy W. Homer_____
JEREMY W. HOMER, ESQUIRE
(Delaware Bar ID#0413)
116 W. Water Street
P.O. Box 598
Dover, DE  19903
(302) 678-3262

DATED:  June 8, 2006                Attorneys for Plaintiffs

17