**Interrogatory No. 18**

Identify the names, addresses, phone numbers, ages, salaries and dates of employment with Defendant of any employee in Defendant's maintenance department the day before Robert Morrison became manager.

**Response to Interrogatory No. 18**

Objection. Interrogatory No. 18 seeks information that is not relevant to the subject matter involved in the pending action, will not be admissible at trial, and is not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiver or limitation of its objections, Defendant answers Interrogatory No. 18 as follows:

Defendant is in the process of gathering the requested information and will supplement its Response to Interrogatory No. 18.

**Interrogatory No. 19**

Identify the names, addresses, phone numbers, ages, salaries and dates of employment of any employee in Defendant's maintenance department since Robert Morrison became manager of the maintenance department.

**Response to Interrogatory No. 19**

Objection. Interrogatory No. 19 seeks information that is not relevant to the subject matter involved in the pending action, will not be admissible at trial, and is not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiver or limitation of its objections, Defendant answers Interrogatory No. 18 as follows:

Defendant is in the process of gathering the requested information and will supplement its Response to Interrogatory No. 19.

**Interrogatory No. 20**

Identify any document which contains information related to disciplinary action of any kind taken by Defendant against Michael Monahan, Williams Lamick, John Patterson or Russell Hand.

**Response to Interrogatory No. 20**

See the written warnings concerning Michael Monahan, William Larnick, John Patterson, and Russell Hand, which are attached at Exhibit H.

By: Edward T. Ellis /bof
Noel C. Burnham (DE Bar No. 3483)
Richard M. Donaldson (DE Bar No. 4367)
Montgomery, McCracken, Walker & Rhoads, LLP
300 Delaware Avenue, Suite 750
Wilmington, DE 19801
Telephone: (302) 504-7840
Facsimile: (302) 504-7820

Edward T. Ellis
Montgomery, McCracken, Walker & Rhoads, LLP
123 S. Broad Street
Philadelphia, PA 19109

Date: December 27, 2005

Attorneys for Defendant Dover Downs, Inc.

**CERTIFICATE OF SERVICE**

I, Beth A. Friel, hereby certify that, on December 27, 2005, I caused two copies of the foregoing **Defendant's Response to Interrogatories of Plaintiffs Richard L. Williams and Michael E. Peters** to be served by First Class U.S. Mail as follows:

Jeremy W. Homer, Esquire
Parkowski, Guerke & Swayze, P.A.
116 West Water Street
P.O. Box 598
Dover, DE 19806

Attorney for Plaintiff

Beth A. Friel

**CORPORATE CERTIFICATION**

I, Robin M. Roberts, am the Vice President of Human Resources for Defendant Dover Downs, Inc. I am authorized to answer these interrogatories on behalf of said corporate defendant, and I certify that the foregoing statements are true and correct to the best of my knowledge and belief. I am aware that I am subject to punishment if any of the foregoing statements are willfully false.

DOVER DOWNS, INC.

By: Robin M. Roberts

Dated:

MONTGOMERY, MCCRACKEN, WALKER & RHOADS, LLP
ATTORNEYS AT LAW

BETH A. FRIEL
ADMITTED IN PENNSYLVANIA & NEW JERSEY

DIRECT DIAL
215-772-7622

bfriel@mmwr.com

123 SOUTH BROAD STREET
AVENUE OF THE ARTS
PHILADELPHIA, PA 19109
215-772-1500
FAX 215-772-7620

LIBERTYVIEW
457 HADDONFIELD ROAD, SUITE 600
CHERRY HILL, NJ 08002
856-488-7700
FAX 856-488-7720

300 DELAWARE AVENUE, SUITE 750
WILMINGTON, DE 19801
302-504-7800
FAX 302-504-7820

1235 WESTLAKES DRIVE, SUITE 200
BERWYN, PA 19312
610-889-2210
FAX 610-889-2220

January 30, 2006

FEB - 9 2006

**By Regular Mail**
Jeremy W. Homer, Esquire
Parkowski, Guerke & Swayze, P.A.
116 West Water Street
P.O. Box 598
Dover, DE 19806

**Re: Williams v. Dover Downs, Inc. (Civ. No. 05-435)**

Dear Mr. Homer:

This letter and the accompanying materials (D 0590 – D 0591) supplement Defendant's Responses to Plaintiffs' Interrogatories and Document Requests, which were served on December 27, 2005.

**Interrogatory No. 18**

Identify the names, addresses, phone numbers, ages, salaries and dates of employment with Defendant of any employee in Defendant's maintenance department the day before Robert Morrison became manager.

**Response to Interrogatory No. 18**

Objection. Interrogatory No. 18 seeks information that is not relevant to the subject matter involved in the pending action, will not be admissible at trial, and is not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiver or limitation of its objections, Defendant answers Interrogatory No. 18 as follows:

A LIMITED LIABILITY PARTNERSHIP FORMED IN PENNSYLVANIA
LOUIS A. PETRONI - NEW JERSEY RESPONSIBLE PARTNER

The following is a list of employees in Outside Maintenance as of November 1, 2003:

| Last Name | First Name | Date of Birth |
|---|---|---|
| Barner | Larry | 3/31/1961 |
| Carlisle | Ernest | 4/13/1932 |
| Clifton | Jerry | 8/9/1958 |
| Copeland | Leroy | 2/5/1940 |
| Curtis | Tom | 1/20/1970 |
| Ginter | John | 7/1/1954 |
| Hands | Russell | 2/7/1935 |
| Larnick | William | 12/19/1958 |
| Maher | Stephen | 9/21/1979 |
| Maher | David | 7/30/1982 |
| Monahan | Michael | 8/15/1965 |
| Outten | Frank | 9/9/1956 |
| Patterson | John | 1/21/1979 |
| Pelly | David | 3/23/1965 |
| Peters | Michael | 11/30/1951 |
| Ruddy | Diana | 3/6/1955 |
| Sylvester | Don | 3/12/1965 |
| Williams | Brian | 11/24/1974 |
| Williams | Richard | 2/20/1948 |

**Interrogatory No. 19**

Identify the names, addresses, phone numbers, ages, salaries and dates of employment of any employee in Defendant's maintenance department since Robert Morrison became manager of the maintenance department.

**Response to Interrogatory No. 19**

Objection. Interrogatory No. 19 seeks information that is not relevant to the subject matter involved in the pending action, will not be admissible at trial, and is not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiver or limitation of its objections, Defendant answers Interrogatory No. 19 as follows:

The following is a list of employees in Outside Maintenance as of November 1, 2005:

| Last Name | First Name | Date of Birth |
|---|---|---|
| Armstrong | Richard | 3/4/1947 |
| Auchterlone | Alexander | 5/26/1939 |
| Barner | Larry | 3/31/1961 |
| Cahall | Karen | 2/22/1966 |
| Callahan | Christopher | 6/27/1983 |
| Clay | Jeffrey | 10/30/1962 |
| Dawson | Patrick | 12/9/1981 |
| Frazier | Thomas | 7/18/1939 |
| Hands | Russell | 2/7/1935 |
| Knotts | Robert | 6/11/1961 |
| Maher | Stephen | 9/21/1979 |
| McCarty | John | 7/22/1956 |
| Monahan | Michael | 8/15/1965 |
| Morrison | William | 5/11/1957 |
| Patterson | John | 1/21/1979 |
| Pelly | David | 3/23/1965 |
| Schaffer | Roger | 10/16/1946 |
| Shockley | Jeffrey | 8/10/1962 |

Sincerely,

Beth A. Friel

Enclosures

01-16-04A11:14 RCVD

Jan. 7, 2004

Denis McGlynn
Dover Downs
1131 N. DuPont Highway
Dover, DE 19901

Dear Denis,

I am writing to you because I feel there is no other way in my life to begin to heal the hurt I feel inside because of the injustice that has been done to me. Also, it is important to me that you don't think I am a bad guy or a trouble-maker in any way. I have always admired you and respected you, not for the positions that you hold, but simply as a good man who is never too busy or important to speak to the little guy.

As you probably know, I was suspended on Christmas Eve and then fired on New Year's Eve. Talk about putting a damper on the holidays! (It was especially hard to face my wife.) I can't sleep at night and I can't eat because this taste of injustice won't leave my mouth. I can't come to grips with how quickly a freak set of circumstances made me look so bad. I swear to you that I had no prior knowledge of the drag race that took place on the 23rd and was simply at the wrong place at the wrong time. I was accused of a "criminal act" for not stopping the race (already in progress) as I drove through gate 1 on my lunch break. I had no radio (mine was turned in to Tom Curtis on the 19th for repair). The "thorough" investigation didn't bother to confirm this. If you know anything about fast cars, you can determine that the two speeding vehicles could make it down pit road in approximately 12-15 seconds--an impossible amount of time for me to summon anyone who could have halted the activity!

I can't understand why the four persons who did have prior knowledge (one of whom actually "started" the race) still have their jobs in spite of the fact that they all had their radios on their belts at the time.

You lost the best maintenance man that Dover Downs has ever had when you fired Mike Peters. It is inconceivable that the two longest term employees with impeccable records were let go while others were welcomed back.

What do I want? I am not begging for my job back. I do not want to work for a company that is too quick to condemn good people on such thin circumstances. I am, however, asking you to conduct an independent, unbiased review of this case in which all the facts are brought to light so that I may clear my good name. Thanks for your time.

Sincerely,

Richard Gilliam

MONTGOMERY, MCCRACKEN, WALKER & RHOADS, LLP
ATTORNEYS AT LAW

BETH A. FRIEL
ADMITTED IN PENNSYLVANIA & NEW JERSEY

DIRECT DIAL
215-772-7622

bfriel@mmwr.com

123 SOUTH BROAD STREET
AVENUE OF THE ARTS
PHILADELPHIA, PA 19109
215-772-1500
FAX 215-772-7620

LIBERTYVIEW
457 HADDONFIELD ROAD, SUITE 600
CHERRY HILL, NJ 08002
856-488-7700
FAX 856-488-7720

300 DELAWARE AVENUE, SUITE 750
WILMINGTON, DE 19801
302-504-7800
FAX 302-504-7820

1235 WESTLAKES DRIVE, SUITE 200
BERWYN, PA 19312
610-889-2210
FAX 610-889-2220

March 9, 2006

**By Facsimile (302) 678-9415**
**And Regular Mail**
Jeremy W. Homer, Esquire
Parkowski, Guerke & Swayze, P.A.
116 West Water Street
P.O. Box 598
Dover, DE 19806

**Re: Williams v. Dover Downs, Inc. (Civ. No. 05-435)**

Dear Jeremy:

In response to your letter dated February 23, 3006, I am enclosing the Charges of Discrimination regarding Robert Faircloth, Robert Lewis, Frederick McDowell, and Brance Thompson. These documents are bates labeled D 0594 - D 0597.

You also requested information regarding the plaintiffs' last benefits statement. Dover Downs used an outside firm, Benefits Report, to handle its benefits statements. Benefits Report last distributed statements in approximately March or April of 2004 for the preceding year, 2003. Because the plaintiffs had left Dover Downs by that time, they did not receive this distribution. Benefits Report maintains only the most recent benefits statements on file, and therefore, Benefits Report does not have any benefits statements regarding the plaintiffs. The telephone number for Benefits Report is 1-800-346-5054.

In your letter, you also requested the names of the employees who replaced the plaintiffs. Larry Barner replaced Richard Williams as a Maintenance Mechanic I and Frank Outten as a Maintenance Mechanic I. Because Barner and Outten were promotions from Maintenance Mechanic II, they had to be replaced within the department. Jeffrey Shockley replaced Barner; Kelvin Arnold replaced Outten.

You requested information as to which employees the David Pelly memorandum referred. The employee is Michael Peters, and the incident occurred in 2002.

A LIMITED LIABILITY PARTNERSHIP FORMED IN PENNSYLVANIA
LOUIS A. PETRONI - NEW JERSEY RESPONSIBLE PARTNER

Jeremy W. Homer, Esquire
March 9, 2006
Page 2

Lastly, you requested the second page of the statement from Richard Williams to Joe McNair. We have been not yet able to locate this page.

Sincerely,

Beth A. Friel

Enclosures

B-130

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974

ENTER CHARGE NUMBER

☐ FEPA
☐ EEOC

Delaware Department of Labor and EEOC

(State, or local Agency, if any)

| NAME (Indicate Mr., Mrs., Ms) | | HOME TELEPHONE NO. (Include Area Code) |
|---|---|---|
| Mr. Robert Faircloth | | (302) 335-3959 |
| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
| P.O. Box 34, 25 West Walnut Street | Magnolia DE 19962 | Kent |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one, list below.)*

| NAME | NO. OF EMPLOYEES OR MEMBERS | TELEPHONE NUMBER (Incl. Area Code) |
|---|---|---|
| Dover Downs Entertainment, Inc. | | (302) 335-3959 |
| STREET ADDRESS | CITY, STATE AND ZIP CODE | |
| P.O. Box 843, Dover, DE 19903 | | |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|
| N/A | |
| STREET ADDRESS | CITY, STATE AND ZIP CODE |

☒ RACE ☐ COLOR ☒ SEX ☐ RELIGION ☐ NATIONAL ORIGIN ☒ AGE

☒ RETALIATION ☐ DISABILITY ☐ OTHER (Specify)

DATE DISCRIMINATION TOOK PLACE
EARLIEST 10/12/1999
LATEST 2/11/2003
☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional space is needed, attached extra sheet(s)):

I am a male individual over the age of forty (Date of Birth is August 14, 1937), and my race is white. I began my employment with Respondent on October 12, 1998, and I was discharged from my position as a Motor Coach Marketing Supervisor on February 11, 2003.

I was told by Respondent's Human Resources Representative, Robin Roberts (white, female, significantly younger than me), that Respondent was eliminating my position, and that it was effective immediately.

I believe that Respondent violated Title VII of the Civil Rights Act of 1964, as amended, and the Delaware Discrimination in Employment Act, as amended, because I was not treated the same way that Debra Jacobs (black, female, significantly younger than me) was treated when her position was eliminated. For example, Ms. Jacobs' continued working for another three months after her position was eliminated, and then Respondent created another position for her with duties very similar to my position. Two months following Ms. Jacobs new position, my position was eliminated. I believe that eliminating my position was in furtherance of Respondent's pattern of discrimination against individuals of my age group because it also eliminated the position of William Witt (white, male, over forty). Mr. Witt was also replaced by significantly younger individuals.

☒ I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

SIGNATURE OF COMPLAINANT

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

5-6-03 Robert R. Faircloth

Date Charging Party (Signature)

NOTARY - (When necessary to meet State and Local Requirements)

Subscribed and sworn to before me this date (Day, month, and year)

EEOC FORM 5
REV 5/92

PREVIOUS EDITIONS OF THIS FORM ARE OBSOLETE AND MUST NOT BE USED

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974

ENTER CHARGE NUMBER

☐ FEPA 05020058M
☐ EEOC 17C4500249

Delaware Department of Labor and EEOC (if applicable)

| NAME (Indicate Mr., Mrs., Ms) | HOME TELEPHONE NO. (Include Area Code) |
|---|---|
| Mr. Robert Grant ~~Ms.~~ Lewis Grant | (302) 734-9090 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 341 Norway Drive | Dover, DE 19901 | Kent |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one, list below.)

| NAME | NO. OF EMPLOYEES OR MEMBERS | TELEPHONE NUMBER (incl. Area Code) |
|---|---|---|
| Dover Downs Entertainment | 25+ | (302) 674-4600 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE |
|---|---|
| 1131 N. Dupont Highway, Dover, DE 19901 | |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|
| | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE |
|---|---|
| | |

☒ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☐ NATIONAL ORIGIN ☒ AGE

☐ RETALIATION ☐ DISABILITY ☐ OTHER (Specify)

DATE DISCRIMINATION TOOK PLACE
EARLIEST 4/2004
LATEST 2/4/2005
☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional space is needed, attached extra sheet(s):

Jurisdiction: Charging Party was employed by Respondent as a Pantry Cook in its Dover, DE location.

Charging Party's protected class: White, Age (D.O.B. 09/23/1953)

Adverse employment action: Hostile Work Environment, Assignment, Constructive Discharge

Brief statement of allegations: Charging Party was employed by Respondent in as a Pantry Cook. However, Respondent required Charging Party to work as a Dishwasher/Bus Person. Another employee, Xiomara (last name unknown, Hispanic, Age 19) was hired as a Bus Person but was to work as Pantry Cook. She was promoted to a Pantry Cook and assigned Charging Party to Bus Person/Dishwasher details. Charging Party was subjected to a hostile work environment by Chef Rickey Pitts ( Black, 40's). Charging Party was followed around Chef Rickey Pitts constantly followed Charging Party around. Charging Party was hit by another employee, Chef Aaron Gibbs (Black, 28).

Respondent's explanation: None Given

Applicable law(s): Title VII of the Civil Rights Act of 1964, as amended, Age Discrimination in Employment Act, as amended, and state of Delaware's Discrimination in Employment Act, as amended,

Comparator(s) or other specific reason(s) for alleging discrimination: None

Additional information and verification of these facts are provided by the attached Affidavit.

☒ I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

SIGNATURE OF COMPLAINANT [signature] 02/23/05

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

DL FORM 8-05
REV 11/04

PREVIOUS EDITIONS OF THIS FORM ARE OBSOLETE AND MUST NOT BE USED

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974

ENTER CHARGE NUMBER
++
++ FEPA 0204350
++
++ EEOC 17CA200374

Delaware Department of Labor and EEOC
(State, or local Agency, if any)

NAME (Indicate Mr., Mrs., Ms): Mr. Frederick R. McDowell

HOME TELEPHONE NO. (Include Area Code): (302) 424-1557

STREET ADDRESS / CITY, STATE AND ZIP CODE / COUNTY: 812 Parson Throne Apts., Milford, DE 19963 Kent

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (*If more than one, list below.*)

NAME: Dover Downs Entertainment, Inc.

NO. OF EMPLOYEES OR MEMBERS: 100+

TELEPHONE NUMBER (Incl. Area Code): (302) 674-4600

STREET ADDRESS / CITY, STATE AND ZIP CODE: 1131 N. Dupont Highway, Dover, DE 19901

NAME:

TELEPHONE NUMBER (Include Area Code):

STREET ADDRESS / CITY, STATE AND ZIP CODE:

[] RACE [ ] COLOR [] SEX [] RELIGION [] NATIONAL ORIGIN [x] AGE

[] RETALIATION [] DISABILITY [] OTHER (Specify)

DATE DISCRIMINATION TOOK PLACE
EARLIEST 1999
LATEST 4/19/02
[x] CONTINUING ACTION

THE PARTICULARS ARE (If additional space is needed, attached extra sheet(s)):

I. I am an individual who is over the age of forty (May 30, 1935). I am a seasonal employee with Respondent and began my employment with Respondent in 1995. I am a Starting Judge in the Harness Racing Department. I have been disparately treated in regard to pay increases during my employment with Respondent. I have only received one pay increase during my employment history. This action is ongoing and continuing up to and including today's date, April 19, 2002.

II. Charles Lockhart, Vice President of the Horse Racing Department, refuses to speak with me about my concerns and will not provide me with an explanation as to why I am not being paid a comparable salary to that of my similarly situated younger co-workers.

III. I believe that Respondent has violated the Age Discrimination in Employment Act, as amended, and the state of Delaware's Discrimination in Employment Act, as amended, because Respondent has not given me annual or even reasonable pay increases as compared to the other similarly situated employees who are all considerably younger than me (Don Harmon, Allen Cook, Jr., Dale Milby, Sam Tapman). These individuals receive performance evaluations and receive pay increases, however, I do not.

[x] I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the foregoing is true and correct.

4/19/02 Charging Party (Signature) [signature]

NOTARY - (When necessary to meet State and Local Requirements)

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year)

EEOC FORM 5 PREVIOUS EDITIONS OF THIS FORM ARE OBSOLETE AND MUST NOT BE USED REV 6/92

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974

ENTER CHARGE NUMBER

☐ FEPA 05010025[illegible]

☐ EEOC 17CA500189

Delaware Department of Labor and EEOC (if applicable)

NAME (indicate Mr., Mrs., Ms): Mr. Brance F. Thompson Sr.

HOME TELEPHONE NO. (Include Area Code): (302) 677-1871

STREET ADDRESS: 1679 South State St. Lot #72

CITY, STATE AND ZIP CODE: Dover, DE 19901

COUNTY: Kent

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one, list below.)*

NAME: Dover Downs Entertainment

NO. OF EMPLOYEES OR MEMBERS: 50+

TELEPHONE NUMBER (Incl. Area Code): (302) 674-4600

STREET ADDRESS: 1131 N. Dupont Highway

CITY, STATE AND ZIP CODE: Dover, DE 19901

NAME:

TELEPHONE NUMBER (Include Area Code):

STREET ADDRESS:

CITY, STATE AND ZIP CODE:

☐ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☐ NATIONAL ORIGIN ☒ AGE

☒ RETALIATION ☐ DISABILITY ☐ OTHER (Specify)

DATE DISCRIMINATION TOOK PLACE

EARLIEST 11/17/2004

LATEST 1/20/05

☒ CONTINUING ACTION

THE PARTICULARS ARE (If additional space is needed, attached extra sheet(s)):

Jurisdiction: Charging Party is employed by Respondent as a Mechanic I in their Dover, DE facility

Charging Party's protected class: Age

Adverse employment action: Retaliation and Discipline

Brief statement of allegations: Charging Party in currently employed and has a pending charge of age discrimination against Respondent. Since Charging Party has filed his charge, he has been written up approximately seven (7) times. Charging Party made internal complaints prior to his original allegations of discrimination and was written up five (5) times afterwards. Charging Party has received an approximately twelve (12) write since complaining of age discrimination. Charging Party last write- up was January 17, 2005 and he was told that it would be his last written warning.

Respondent's explanation: Respondent asserts that Charging Party has not provide doctors' excuses for absences.

Applicable law(s): Age Discrimination in Employment Act, as amended, and state of Delaware's Discrimination in Employment Act, as amended.

Comparator(s) or other specific reason(s) for alleging discrimination: Charging Party asserts that he has presented doctors' excuses. Respondent also has denied Charging Party the right to utilizing vacation time for medical purposes. However, Charging Party and others were informed by Respondent's Building Manger Richard Dunkin (50s) they were allowed to utilize vacation time for sick or medical leave.

Additional information and verification of these facts are provided by the attached Affidavit.

☒ I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

SIGNATURE OF COMPLAINANT: Brance Thompson Sr.

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

FORM 6-05 REV 11/04

PREVIOUS EDITIONS OF THIS FORM ARE OBSOLETE AND MUST NOT BE USED

D 0597

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

RICHARD L. WILLIAMS and MICHAEL E. PETERS,

Plaintiffs,

v.

DOVER DOWNS, INC., a Delaware corporation,

Defendant.

: C.A. No.: 06-0435 (GMS)

.. .. .. .. .. ..

Deposition of ERNEST CARLISLE, taken pursuant to notice, on Friday, March 10, 2006 at at 10:30 a.m. at 116 West Water Street, Dover, Delaware, reported by Lorena J. Hartnett, a Registered Professional Reporter and Notary Public.

.. .. .. .. .. ..

APPEARANCES:

JEREMY HOMER, ESQUIRE
Parkowski, Guerke & Swayze
116 West Water Street
Dover, DE 19901
Attorney for the Plaintiffs

B-135

Page 22

time. It was in the -- That was in the early nineties.
Q. Okay. Anybody else that you raced that you can remember?
A. No, no, that's about it.
Q. Where at Dover Downs did you race these people?
A. On Pit Lane there on the track, race car track, Pit Lane.
Q. Why did you use Pit Lane?
A. Long, straight, straight road there, lane there.
Q. Why not race them on the track, itself?
A. Well, you had the horse track on one end that crosses the track there, you know.
Q. Okay.
A. You had a road built across the car track to the harness track, and you couldn't race around there.
Q. But that road is only there during the winter; right?
A. Yeah, yeah.
Q. Did all the races that you are

Page 23

describing here with the other employees --
A. It was mostly when they was racing. When the harness racing was going on is mostly when it happened most of the time.
Q. Why did it happen then and not in the summer?
A. Well, I was out on, out in the fields working and mowing grass and stuff then and never got to see nobody.
Q. (Laughter) Okay. When you raced on the Pit Road, how fast would the cars be going by the time you got to the end?
A. Oh, them street vehicles, I would say probably about 70, 65 or 70.
Q. Was it always street vehicles that you raced, or did you race cars that were set up for drag racing?
A. No, they was all street, street vehicles.
Q. Did you ever ask anybody for permission to do that?
A. No, because the ones, the bosses did it.
Q. The bosses did it?

Page 24

A. Yeah.
Q. Okay, who is the bosses?
A. My boss, Jerry Clifton, he did it.
Q. Okay.
A. Tom Curtis, they did it. They both rode -- I rode with Tom Curtis when he was racing Jerry Clifton.
Q. So you saw Jerry Clifton and Tom Curtis racing each other?
A. Uh-huh, yeah.
Q. When was that?
A. Oh, I don't know, I don't know. I can't tell you what dates or what month or nothing like that or what year, but I know they did it.
Q. Well --
A. It was sometime in the nineties is all I know.
Q. Well, Curtis wasn't working there when you started working there, was he?
A. No, he wasn't, no, no.
Q. What was Curtis's job when he did it?
A. He was the mechanic.
Q. So he wasn't the boss?

Page 25

A. No, he wasn't, no, but Jerry Clifton was. He was my boss.
Q. Okay, and you don't remember what year this was?
A. No, I don't know what year it was.
Q. And the other bosses that you say raced each other?
A. Well, about the only one I know, Jerry Clifton.
Q. Okay.
A. Tom, he come to be a boss later on.
Q. Did you ever tell any of the bosses that you were going to race?
A. No, they would ask me.
Q. They would ask you what?
A. Let's take them out and try them. We would talk about the cars, you know.
Q. You are talking about Clifton now?
A. Yeah.
Q. Anybody other than Clifton --
A. No.
Q. -- who was a boss?
A. He was a boss.
Q. Right, but anybody other than Clifton

B-136

A. Hmm, probably about a month ago.
Q. What was that occasion when you saw him?
A. I just, I stopped in to his place. I work at a job, and when I go -- I had a delivery right through where he lives at, and I stopped in to his place.
Q. Just to say hello?
A. Just to say hello, yes.
Q. Have you talked to him about your testimony here today?
A. No.
Q. Have you talked to Mr. Homer?
A. Who?
Q. Mr. Homer. That's the guy on your left.
A. Oh, no, no.
Q. Prior to that time when you stopped by to see Mr. Williams, when was the last time you saw him?
A. That was the last time.
Q. I'm sorry, before that, when was the last time you saw him?
A. Oh, I can't remember. It's been a

long time.
Q. Okay.
A. It's been a long time.
Q. Okay. Do you know a guy named Jerry Dunning?
A. Yeah.
Q. Did you ever talk to him about drag racing on Dover Downs Pit Road?
A. Yeah, he give me permission to race the '68 Camaro down there.
Q. When?
A. It was in the nineties.
Q. You say he gave you permission. What did he give you permission to do?
A. Well, it was just like a race car, you know, and I wanted to take it down there and get it, just to see how it felt, you know, I never raced it, never done nothing with it before, but I had taken it down there on Pit Lane.
Q. And were you racing against somebody?
A. No, just by myself.
Q. And this was the car that you used to drag race?
A. I drag raced it one time, this one

here. I took it down Cecil County one time right after I got it.
Q. And this was sometime in the nineties?
A. Yeah, uh-huh.
Q. Did you ever ask Dunning for permission to race against somebody else on Pit Road?
A. No.
Q. Why did you ask him for permission to run the '68 Camaro on Pit Road?
A. Well, this car, it's a regular race car, you know, and you can't drive it nowhere, so just to test it out before I took it down to Cecil County, I just wanted to see how the car felt before I took it down there.
Q. Well, I realize why you wanted to do it, but why did you ask Dunning for permission?
A. Well, it's a pretty high-powered car, you know, it's got a lot of horsepower, and if anything happened, I wanted him to know, you know, before I took it over there.
Q. Okay.
A. Without asking, I didn't want to do it.

Q. And he said it was okay?
A. Yeah, uh-huh.
Q. Well, why didn't you ask him for permission to drag race?
A. Well, these are just regular street cars, I mean they wouldn't go that fast, you know, and I never thought it would be -- And everybody else had done it anyway, regular street cars, did it all the time. Ever since I have been there they did it, and I didn't see no difference why I couldn't do it.
Q. Okay, well, when you say everybody did it since you have been there, is there anybody who did it that you actually saw do it other than the people you have identified, Antalor, Neese, Knight, Clifton and Curtis?
A. Does it have Larry Barner on it.
Q. I'm sorry, Larry Barner also?
A. That's about it, about the ones there, you know, since I worked there.
Q. Okay. Aside from that time when you asked Mr. Dunning for permission to run your '68 Camaro, had you had any other conversations with him about racing on Pit Road?

COPY

IN THE UNITED STATES DISTRICT COURT
IN FOR THE DISTRICT OF DELAWARE

RICHARD L. WILLIAMS and MICHAEL E. PETERS, Plaintiffs,

v.

DOVER DOWNS, INC., a Delaware corporation, Defendant.

C.A. No. 05-0435 (GMS)

Deposition of **JERRY CLIFTON,** taken before Cheryl A. Anthony, Court Reporter, in the law offices of Parkowski, Guerke & Swayze, 116 West Water State Street, Dover, Delaware, on Monday, February 13, 2006, beginning at 3:10 p.m.

APPEARANCES:

PARKOWSKI, GUERKE & SWAYZE
BY: JEREMY W. HOMER, ESQUIRE
116 West Water Street
Dover, Delaware 19901
Attorney for Plaintiffs.

MONTGOMERY, McCRACKEN, WALKER & RHOADS
BY: EDWARD T. ELLIS, ESQUIRE
123 South Broad Street
Philadelphia, Pennsylvania 19109
Attorney for Defendant.

ALSO PRESENT:

MR. RICHARD L. WILLIAMS

**ORIGINAL RETAINED BY JEREMY W. HOMER, ESQUIRE**

**ANTHONY REPORTING**
**PO Box 234**
**Dover, Delaware 19903**
**(302)674-8884**

Force. I was stationed at New Mexico for three years as a jet engine mechanic. I left there and went to Little Rock, Arkansas, Little Rock Air Force Base, for two years as a heavy equipment operator. I separated from active duty and went to reserves for four years. Also, at the same time I worked for a company called Koss Construction Company out of Des Moines, Iowa as a grader.

I reentered active duty in February of '86. I stayed active duty until May of '95. I was an independent contractor from May of '95 until '96. And then I came to work at Dover Downs in January of '96, and I have been there since.

Q. Okay. And what have your jobs been at Dover Downs?

A. Well, I worked part-time for Dover Downs from about '87, '88 -- I don't remember exactly -- until '94 in building maintenance at night when we raced horses. Since I have been full-time I have worked on construction projects. I have been harness track supervisor. I have been outside maintenance manager.

Q. And for what dates were you the outside maintenance manager? What time period?

A. April of -- Can you help me? I don't

remember the date. April --

MR. WILLIAMS: I don't think I am allowed.

THE WITNESS: April of '99, I think, until November of 2003, I think.

BY MR. HOMER:

Q. Would it have --

A. I was in there before Bob Morrison took over. So whatever his start date, that was my quit date.

Q. We will get to this in a minute. But you did a performance evaluation for Mr. Williams in January of '04. Do you remember that?

A. Uh-huh.

Q. And at that point in time, you weren't the maintenance manager anymore, but you were doing the performance evaluations, right?

A. Right, right.

Q. Why did you do it instead of Mr. Morrison?

A. It was due in December, and I didn't do it because of the termination at the end of the month. And I didn't think it was due, but human resources said to go ahead and do it, because it was due and monies are owed. I did it because Bob Morrison was new to the position, and Rich Williams worked for me longer than he

had Bob Morrison.

Q. And what job have you had for Dover Downs since November of '03?

A. Harness track superintendent.

Q. Is that the only position you have had --

A. Yes.

Q. -- since November of '03?

A. Yes.

Q. Mr. Clifton, if you could, take a look at the exhibit that has been marked as Exhibit 10. It says Sutor Exhibit Number 10 on it.

A. All right.

Q. And take a moment to review that.

A. All right.

Q. Mr. Clifton, first, can you identify what this Exhibit 10 is?

A. This is Rich's performance appraisal for December 22, 2002 through 2003.

Q. And through December 21st of 2003, correct?

A. Yes.

Q. I see on it that Mr. Wertz approved the appraisal; is that right?

A. Yes.

Q. And you prepared it?

A. Yes.

Q. Can you tell me what process was used for Mr. Wertz to approve it? Did you just deliver it to him and he looked at it and you talked about it? What process was followed before he approved it?

A. No. It was never discussed, as I can recall. It was forwarded to him, and he looked at it. Had he wanted any changes, he would have notified me, and I would have made the corrections.

Q. Okay. Would it be correct to say that when you did this performance evaluation, that you attempted to be fair and accurate?

A. Yes.

Q. On the first page of the exhibit, in the bottom right-hand corner of the page there, there is a score that says overall score. And the score is 79.7. Do you see where that is?

A. Yes.

Q. Does that refer to the numbers that are in the second column up above in terms of figuring out what the overall evaluation is?

A. Yes.

Q. So where it says on the form, 78 to 85 good, that relates to the 79.7 overall score?

Q. So that is a criticism in the comment where you say: Did not take any Dover Downs classes in the past year except those scheduled for him? You were criticizing?
A. Yes.
Q. Now, with respect to the sentence, Mike does not believe that some rules should apply to him, you have explained this issue we just talked about, which is that he didn't take classes that weren't scheduled for him. Was there any thing that you were referring to here in terms of rules that apply to him?
A. Not that I can recall, not now.
Q. Okay. Going to the next page and the last page of the exhibit, in the box that says evaluator's comments --
A. Yes.
Q. -- you say in the fifth line, he, referring to Mr. Peters, reluctantly adapts to policy change. Do you see where it says that?
A. Yes.
Q. What were you referring to when he said that?
A. The answer right now, I would have to say it was probably along the lines of the same sentence that I

put in the Rich Williams' evaluation, because he was one of the original employees. He had been around when the company was 50 people. And the people skills and the customer service were not some of his strong suits.
Q. What policy change is it you are referring to there when you say he reluctantly adopts to it?
A. I can't recall now.
Q. You can't recall what the policy change was?
A. No.
Q. Did you believe that Mr. Peters was set in his ways and didn't want to change the way he did things?
A. No, no. It wasn't the same that I used for Rich Williams, no. He would change. It was reluctant and it was slow to come about, but he would change.
Q. It goes on to say: I get the impression that he feels all rules do not apply to him, given the fact that he has over 18 years with the company.
Can you tell me what you are referring to there?
A. No, no, not right now. I can't recall.
Q. It is your testimony, though, you didn't have any concern that Mr. Peters was fixed in the ways he did things and didn't want to change?

A. Say that again?
MR. HOMER: Could you read back?
(The following was read:
"Question: It is your testimony, though, you didn't have any concern that Mr. Peters was fixed in the ways he did things and didn't want to change?")
THE WITNESS: No, no.
BY MR. HOMER:
Q. So you don't think Mr. Peters had any problem with making changes?
A. Like I say, he was slow to change, but he would change. Others would embrace change quickly. With him, it took just a little longer.
Q. Okay. When you say others, you don't mean Mr. Williams, though?
A. No.
Q. Who do you mean?
A. Some of the younger employees within the company, I think, with less experience.
Q. Do you know who it was that replaced Mr. Peters when his employment was terminated?
A. No, no, I don't.
Q. Do you know who replaced Mr. Williams?
A. No, I don't.

Q. Okay. Do you know whether anybody that came to work for Dover Downs in the maintenance department was more qualified than either Mr. Williams or Mr. Peters after they left? Did they hire anybody that had as good in qualifications as Mr. Peters or Mr. Williams?
MS. FRIEL: Objection. He already said he didn't know who replaced them.
MR. HOMER: Pardon?
MS. FRIEL: He already said he didn't know who replaced them.
MR. HOMER: This is a different question.
BY MR. HOMER:
Q. Do you know whether anybody came to work for the Dover Downs maintenance department after Mr. Williams and Mr. Peters were terminated that were as well qualified to do the work as Mr. Peters and Mr. Williams?
A. No.
Q. Do you know who did come into the maintenance department after Mr. Williams and Mr. Peters left?
A. No, I don't.
Q. Okay. Do you recall asking Mr. Williams

B-139A

29

whether he wanted to take early retirement?
A. Yes.
Q. When was that?
A. That would have been -- I will probably get the year wrong. That would have been along about May of '03. I don't remember the exact year.
Q. Okay. Do you recall what you asked him exactly? Do you remember what the words were or what the gist of what you said was to him?
A. I had asked him -- and I don't believe I told him the reason why. But I had asked him if he had considered retirement.
Q. And that is all you recall about the question you asked him?
A. Probably along the line that the company had wanted certain departments to reduce their staffing by one full-time individual because of budget tightness for that year. And I had asked him, knowing that he was -- he had mentioned retirement before in conversation. And I thought: Well, you know, this might be a time for him to consider it, if that is what he wants to do.
Q. And when did he mention that to you before? When did he mention to you --
A. The specific times, I don't remember. It

30

was just in casual conversation.
Q. Okay. Did you ask anyone else whether they were interested in taking early retirement?
A. Yes.
Q. Who was that?
A. Ernie Carlisle.
Q. And how old was he?
A. 70, maybe; I don't know.
Q. Anybody else?
A. No.
Q. Do you know who Mr. Barner is? Larry Barner?
A. Yes.
Q. Yes?
A. Yes.
Q. Are you familiar with his work?
A. Yes.
Q. Do you know what grade he was? He worked in the outside maintenance department; did he not?
A. Yes.
Q. Do you know at what grade he was -- Back up a little bit. The positions in the outside maintenance department include mechanic I, mechanic II, and mechanic III, correct?

31

A. Yes.
Q. Do you know which of those grades Mr. Barner was at?
A. Mechanic II.
Q. And do you know what grades Mr. Peters and Mr. Williams were at?
A. They were both mechanic Is.
Q. Okay. Is it fair to say that Mr. Barner was not as qualified as Mr. Peters or Mr. Williams when it came to performing the job for the maintenance department?
A. No.
Q. And why is that?
A. Are you asking why he wasn't a mechanic I?
Q. No. Mechanic II is a lower grade than mechanic I, correct?
A. Correct.
Q. But you are saying that Mr. Barner -- Let me ask the question this way. Was Mr. Barner as qualified as either Mr. Williams or Mr. Peters or both of them to perform the mechanic maintenance job?
A. As a mechanic I?
Q. Yes.
A. He could have been promoted to a mechanic I.

32

Q. Okay. Well, were his qualifications as good as the qualifications that Mr. Williams and Mr. Peters had to perform that job?
A. No.
Q. And why is that?
A. Well, in the case of Mike Peters, Larry Barner was not as efficient with equipment, which sometimes had to do with completing the job.
Q. And what about compared to Mr. Williams?
A. Company knowledge, Larry Barner was not as efficient on certain pieces of equipment. Some he was better at; most, he was not.
Q. Okay. What else?
A. I can't think of anything else right now.
Q. Mr. Clifton, I hope you will forgive me for asking this. You have never been convicted of a crime, have you?
A. No.
Q. Were you ever involved in racing any motor vehicles at the Dover Downs facility?
A. Racing, as in individually?
Q. Either racing against another car or just going out on the racetrack and going as fast as you could down the racetrack.

A. I have taken my car on occasion down the racetrack.
Q. When was that?
A. I can't give you specific dates. I don't know, just --
Q. Okay. More than one time, though, I guess?
A. Probably a couple of times, two or three times.
Q. Okay. Do you know who Jerry Dunning is?
A. Yes.
Q. Was he aware that you did that?
A. Probably not, no.
Q. Who was aware of it?
A. No one.
Q. Nobody ever saw you do it?
A. Not that I'm aware of.
Q. When did you do it?
A. I can't give you specific dates. I don't --
Q. Was it while you were a manager at Dover Downs?
A. I can't -- I don't know.
Q. Well, how long --
A. Have I driven fast? Yes, I probably have. I have a '68 Camaro. And when I bring it to work, I

tend to go a little fast with it, yes.
Q. You have been on the racetrack going up and down --
A. Pit Road?
Q. Yes.
A. Yes.
Q. In your Camaro?
A. Yes.
Q. And speeding in excess of the speed limit, I take it? And by speed limit, I am talking about the speed limit out on the highway.
A. I was going to say, the speed limit on Pit Road is going 40 miles per hour, so yes.
Q. Okay. Do you know who might have been aware of you doing that?
A. I'm not aware that anybody knew it. It is not something that you would advertise.
Q. Okay. And let's go back, because I don't recall your answer to these questions. But how long have you been a manager at Dover Downs, either an outside maintenance manager or as harness track manager, going back to April of '99 or earlier?
A. Six years, seven years.
Q. And before April of '99, were you in a

management capacity at that time?
A. No.
Q. Okay. When did you get the '68 Camaro? When did you buy it?
A. '92, '93.
Q. Okay. And do you know whether you have been out on Pit Road with your Camaro and driven at speeds in excess of the highway speed limit at any time after April of 1999?
A. Probably.
Q. Do you know who Tom Curtis is?
A. Yes.
Q. Who is he?
A. Right now he's the harness track supervisor.
Q. Okay. Did you ever have a motor vehicle race with Mr. Curtis at the Dover Downs facility?
A. No.
Q. Sorry. I just need a second here. Have you ever been involved in any speeding with a motor vehicle with Ernie Carlisle present?
A. Not that I recall, unless he, in one of those instances, saw me on Pit Road.
Q. Okay. Were you ever aware of any employee of Dover Downs, other than yourself, who did any driving

of motor vehicles on Pit Road or Perimeter Road around the facility at speeds in excess of the highway limit?
A. Am I aware of it?
Q. Yes.
A. I don't recall it.
Q. You are aware that Mr. Carlisle and Mr. Brian Williams were involved in a race which resulted in an accident, correct?
A. Yes.
Q. Other than that race and what you have described to me as what you did, are you aware of anybody else in the whole history of the time you have been with Dover Downs of ever being on or ever using either Pit Road or Perimeter Road for driving motor vehicles in excess of the highway speed?
A. No. I don't recall, no.
Q. Before December of '03, to your knowledge, you were the only employee who ever used Pit Road to drive cars at an excessive of rate of speed, correct?
A. No. I'm sure it has been done before.
Q. Why are you sure of that?
A. 100 percent, actually, I don't know. It's a racetrack. You know, it's like you can't go onto the racetrack and not get that feel of just a little faster,



just a little faster.

Q. So what you are saying is you assume other employees used the racetrack from time to time to run motor vehicles up and down it at high speeds?

A. Sure.

Q. Okay. Do you ever recall anybody at Dover Downs, prior to December of 2003, indicating that that was an improper thing to do, to use the racetrack for driving motor vehicles at a high rate of speed?

MS. FRIEL: Objection to form. It wasn't driving at high rates of speed. It was racing in December.

MR. HOMER: I don't know. Could you read it back?

(The last question was read.)

THE WITNESS: Do I recall anyone ever saying it was okay?

BY MR. HOMER:

Q. No, anyone ever saying it was improper to do that?

A. I don't recall.

Q. So you don't recall anyone at Dover Downs indicating to the employees that there was something improper about using Pit Road to drive motor vehicles at

a high rate of speed?

A. I don't recall it ever coming up.

MR. HOMER: I don't have any other questions.

MS. FRIEL: I don't have any questions.

(The deposition adjourned at 3:50 p.m.)

PLEASE REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE WITNESS.

State of Delaware )
)
Kent County )

CERTIFICATE OF REPORTER

I, Cheryl A. Anthony, Delaware Certified Shorthand Reporter and Notary Public, do hereby certify that there came before me on February 13, 2006, the deponent herein, JERRY CLIFTON, who was duly sworn by me and thereafter examined by counsel for the respective parties; that the questions asked of said deponent and the answers given were taken down by me in Stenotype notes and thereafter transcribed by use of computer-aided transcription and computer printer under my direction.

I further certify that the foregoing is a true and correct transcript of the testimony given at said examination of said witness.

I further certify that I am not counsel, attorney, employee, or relative of either party, or otherwise interested in the event of this suit.



IN THE UNITED STATES DISTRICT COURT
IN FOR THE DISTRICT OF DELAWARE

RICHARD L. WILLIAMS and MICHAEL E. PETERS, Plaintiffs,

v.

DOVER DOWNS, INC., a Delaware corporation, Defendant.

C.A. No. 05-0435 (GMS)

Deposition of **THOMAS CURTIS, JR.**, taken before Cheryl A. Anthony, Court Reporter, in the law offices of Parkowski, Guerke & Swayze, 116 West Water State Street, Dover, Delaware, on Thursday, February 9, 2006, beginning at 1:26 p.m.

APPEARANCES:

PARKOWSKI, GUERKE & SWAYZE
BY: JEREMY W. HOMER, ESQUIRE
116 West Water Street
Dover, Delaware 19901
Attorney for Plaintiffs.

MONTGOMERY, McCRACKEN, WALKER & RHOADS
BY: EDWARD T. ELLIS, ESQUIRE
123 South Broad Street
Philadelphia, Pennsylvania 19109
Attorney for Defendant.

ALSO PRESENT:

MR. RICHARD L. WILLIAMS

**ORIGINAL RETAINED BY JEREMY W. HOMER, ESQUIRE**

---

**ANTHONY REPORTING**
**PO Box 234**
**Dover, Delaware 19903**
**(302)674-8884**

Q. Okay. Do you recall what years you were the maintenance supervisor?

A. That would be 2003.

Q. You said you did it for a couple of years?

A. I would say a year and a half, two years.

Q. You don't remember the exact dates?

A. No, I don't.

Q. Okay. As maintenance supervisor, were you the immediate supervisor of Richard Williams and Michael Peters?

A. Yes.

Q. Okay. How long have you known Rich Williams, the Plaintiff in this case?

A. Since 1997.

Q. And Mr. Peters would be the same?

A. Yes.

Q. How many years have you worked with Mr. Williams?

A. Since 1997.

Q. Okay. I'm going to direct your attention to a conversation that we believe took place in 2003 at which Mr. Peters and Mr. Williams and you were present, and Mr. Frank Outten was up on a roof. I don't know if you remember this or not.

A. No.

Q. Other than that knowledge or information that you heard from someone that you can't recall who it was, do you have any other knowledge of there being any drag racing by employees at the Dover Downs facility?

A. No.

Q. During the time that you supervised Mr. Williams and Mr. Peters, was either one of them ever insubordinate with respect to any order that you gave to them?

A. No.

MR. HOMER: That's all I have.

MR. ELLIS: I have no questions.

(The deposition adjourned at 1:37 p.m.)



IN THE UNITED STATES DISTRICT COURT
IN FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| RICHARD L. WILLIAMS and MICHAEL E. PETERS, Plaintiffs, | ) |
| v. | ) C.A. No. 05-0435 (GMS) |
| DOVER DOWNS, INC., a Delaware corporation, Defendant. | ) |

Deposition of **JOE MICHAEL McNAIR,** taken before Cheryl A. Anthony, Court Reporter, in the law offices of Parkowski, Guerke & Swayze, 116 West Water State Street, Dover, Delaware, on Thursday, February 9, 2006, beginning at 1:45 p.m.

APPEARANCES:

PARKOWSKI, GUERKE & SWAYZE
BY: JEREMY W. HOMER, ESQUIRE
116 West Water Street
Dover, Delaware 19901
Attorney for Plaintiffs.

MONTGOMERY, McCRACKEN, WALKER & RHOADS
BY: EDWARD T. ELLIS, ESQUIRE
123 South Broad Street
Philadelphia, Pennsylvania 19109
Attorney for Defendant.

ALSO PRESENT:

MR. RICHARD L. WILLIAMS

**ORIGINAL RETAINED BY JEREMY W. HOMER, ESQUIRE**

**ANTHONY REPORTING**
**PO Box 234**
**Dover, Delaware 19903**
**(302)674-8884**

the witnesses' statements?
A. Yes, sir.
Q. Let me ask another question. Anything that you know about, the prior knowledge of any of these witnesses regarding the race, isn't it in the witness statements?
A. No.
Q. So your conclusion, where you state, I feel the witnesses had prior knowledge of the race, that depends totally on the witness statements that are in the report?
A. Yes, sir.
Q. Okay.
A. Unless it is stated in the witness statement form itself.
Q. Okay. Do you know whether there are any witness statements that says that Richard Williams had prior knowledge of the race?
A. I would have to go through all of these and see. I don't know off the top of my head, no.
Q. But unless there is a witness statement that says that, then you don't have any other knowledge that he would have known about the race before it took place?
A. The only evidence or information that I have

was from one of the drivers of the vehicle that placed him there prior to the race.
Q. Prior to the race?
A. Yes, sir.
Q. And which driver was that?
A. That is Mr. Carlisle, 339.
Q. It says they were there at the start of the race?
A. That's correct.
Q. It doesn't say they were there before the race, does it?
A. No. That is what I based it on.
Q. Okay. If you will look at page 348 --
A. Yes, sir.
Q. -- this is your report about the written statement that you took from Mr. Williams, correct?
A. Yes, sir.
Q. Doesn't this say there in the first three lines that he saw some vehicles entering gate one and decided to follow them, just on a hunch that something is happening?
A. Yes, sir.
Q. Doesn't that indicate to you that according to Mr. Williams, he wasn't aware of the race ahead of

time?
A. That's correct. That's correct.
Q. Okay. So this feeling that you had that he had prior knowledge certainly wasn't based on his witness statement?
A. No, sir. It was on Mr. Carlisle's.
Q. Mr. Carlisle didn't say he had prior knowledge of the race, did he?
A. No.
Q. He just said he was there at the start of the race?
A. Right.
Q. Did anyone have any knowledge of Mr. Williams having prior knowledge of the race before it started?
A. Other than that, no.
Q. And the same questions for Mr. Peters, was there any statement made that he had prior knowledge of the race, to your recollection?
A. I would have to go through here and see again. The only thing I have reference to Mr. Peters is on page 348, down at the bottom of Mr. Williams's statement. I talked to Mr. Williams on the day of the 23rd, prior to him going to the hospital. I didn't want

to take a written statement from him that day, because he had to get over there.
Q. And what is specific --
A. Down at the bottom, where it says: Mr. Williams stated at that time he was coming from the command center and heard cars running and he drove into gate one. On entering the driveway to gate one, he observed Mike Peters to be parked halfway across the road as if to be blocking the road so no one could enter.
That is where I associate that he was already there, sitting like that.
Q. So you concluded that because his car was parked there, that he had knowledge --
A. And sideways.
Q. Let me finish the question. Thanks. You concluded that because his car was parked in front of the gate, that he knew the race was going to take place before he parked his car there?
A. That is what I based that knowledge on.
Q. And you don't have any other basis for that conclusion. Is that a fair statement?
A. That's correct.
Q. Okay. Now, in some cases in the witness

COPY

IN THE UNITED STATES DISTRICT COURT
IN FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| RICHARD L. WILLIAMS and MICHAEL E. PETERS, Plaintiffs, | ) | |
| v. | ) | C.A. No. 05-0435 (GMS) |
| DOVER DOWNS, INC., a Delaware corporation, Defendant. | ) | |

Deposition of **WILLIAM ROBERT MORRISON**, taken before Cheryl A. Anthony, Court Reporter, in the law offices of Parkowski, Guerke & Swayze, 116 West Water State Street, Dover, Delaware, on Thursday, February 9, 2006, beginning at 11:05 a.m.

APPEARANCES:

PARKOWSKI, GUERKE & SWAYZE
BY: JEREMY W. HOMER, ESQUIRE
116 West Water Street
Dover, Delaware 19901
Attorney for Plaintiffs.

MONTGOMERY, McCRACKEN, WALKER & RHOADS
BY: EDWARD T. ELLIS, ESQUIRE
123 South Broad Street
Philadelphia, Pennsylvania 19109
Attorney for Defendant.

ALSO PRESENT:

MR. RICHARD L. WILLIAMS

**ORIGINAL RETAINED BY JEREMY W. HOMER, ESQUIRE**

---

**ANTHONY REPORTING**
**PO Box 234**
**Dover, Delaware 19903**
**(302)674-8884**

Q. Okay. Mr. Morrison, turning to the fourth page of the exhibit, which is the statement --

A. Yes.

Q. -- does this statement accurately reflect what happened when you met with Mr. Williams --

A. I would say yes.

Q. -- on the morning of December 1, 2003, correct?

A. Yes.

Q. Do you see where it says, about midway through that that: I was asking him to supervise, and I advised him that was part of the mechanic I job description?

A. In employee relations, when you are talking to individuals, just like maybe when you are talking to individuals, you don't want to put them on the defense. Basically, my comments to him was basically in an asking manner. But again, by that -- and I gave him an opportunity to come back. When he said, "well, if you pay me more money", I took that as him actually saying no to me.

Q. Okay. The next statement there -- and I will quote -- "Before leaving the office, I asked him if he was going to do what was asked, and he stated words

to the effect, if you get me more money. He did not change his response and was excused."

A. Yes. And that was taken as a no.

Q. Does that accurately report what happened exactly? Is that what happened?

A. I would say it was. Again, I asked the individual if he was going to do it. And again, his comment to me was: If you pay me more money. Being a capped individual, which he was, I have no authority to give him more money.

Q. On the first page of the exhibit, there is a block that states nature of incident. Do you see that?

A. Yes, sir.

Q. Did you fill this out?

A. Yes, sir.

Q. It says -- I will read again from it -- "On December 1, 2003, I requested that Richard Williams lead a work force." Do you see where it says that?

A. Yes, sir. Yes, sir.

Q. Does that accurately reflect what you did?

A. I did request -- if it is a play on words, asked or requested, the individual was brought into my office. And again, not sounding like a tyrant, I asked him if he would do that. And that was due to his

experience level from before. Again, I felt there would be no problem with him doing that, by his experience level. And then I received the comments I did from him.

Q. Okay. Did you ever state to Mr. Williams, during this conversation that you had with him on the morning of December 1, 2003, words to the effect that: This is an order. You have to do it. I'm telling you you have to do it. Did you ever tell him in any certain words --

A. I did not tell him it was an order, no.

Q. Did you say anything that would have made him believe that it was an order?

A. By virtue of the employee/supervisor relationship, by me calling him in there, I would feel that if my superior asked me or my supervisor asked me to do something, that would be something he wants me to did without actually coming out and having to order someone to do something.

Q. So is it fair to say that you didn't say in so many words: This is an order? What you did was you conveyed to him that you wanted him or you were requesting him to do something?

A. That's correct.

Q. Did you ever, during this conversation that

you had with him on the morning of December 1, 2003, tell him that if he didn't do the work, he would be considered insubordinate? Did you ever convey that thought to him?

A. I did come back and tell him that his job description did entail that he, again, lead a work force and also follow direction as given by management.

Q. Well, I understand that, that you told him that that was within his job scope to lead employees. I understand that. That is what your statement says.

A. Right.

Q. But did you ever tell him: If you don't go out there and lead this force, you are going to be considered insubordinate? Did you ever tell him words to that effect?

A. I did not tell him that, and that was due from the experience level that Mr. Williams had.

Q. What do you mean by that?

A. Mr. Williams has 18-plus years with the organization, and he's also been in a leadership position, even prior to me coming out there as chief of maintenance.

Q. So are you saying you assumed that he would have realized that he would be insubordinate?

17

A. I would say yes, that is what I did.
Q. You just assumed it?
A. Well, from the experience level, learned experiences, and also from him probably being in the same situations, I'm sure he didn't -- well, I can't speak for Mr. Williams. But in conversations with his employees, he didn't come off in such a rash manner to order people around. Basically, he kind of came off as a human being and asked people. And with the amount of time he had in those positions, I would have expected he would have known that, yes.
Q. If he would have been a younger, less experienced employee, would you have made it clear to him that you considered him to be insubordinate for not carrying out the work order or what you claimed was an order? I guess you have admitted it was a request.
A. I would say in any situation, in an employee/supervisor position -- and this is probably learned early in school or as you graduate into the different job positions -- that you would know if your boss or your supervisor asked you to do something, that if you didn't do it, it would be something that -- to answer your question, probably not.
Q. You would not have told a younger employee

18

that it would have been insubordinate not to do the work?
A. Each of the individuals that worked for Dover Downs is issued a policy book. They are required to read the policy book. Inside the policy book it is basically laid out, you know, and it is not all inclusive of what you can do and can't do. In there, it also talks about insubordination. So no, I don't believe I would.
Q. Did you ever explain to Mr. Williams, during this conversation of December 1, 2003, that if he didn't perform this supervisory responsibility that you were asking him to do, that he would receive discipline? There would be disciplinary action?
A. On that day?
Q. Yes.
A. No.
Q. When did you explain it to him?
A. After I talked to my supervisor, who was Richard Wertz, of the situation, it was decided that a disciplinary warning notice be written up. And again, as the policy book reads, you can go certain levels of discipline with individuals, depending on the severity of it. Since this was basically a flat-out

19

insubordination matter, it was agreed upon that a disciplinary warning notice be issued.
Q. Well, isn't it possible, Mr. Morrison, that Mr. Williams left that room thinking that you were only asking him to do something, that he indicated that he didn't want to do it, and that you didn't tell him that it was an order? You didn't tell him that it was considered insubordinate. You didn't tell him there was going to be disciplinary action. Isn't it possible that he left that room thinking that you only asked him to do something that he wasn't required to do?
MR. ELLIS: Objection to the form of the question.
THE WITNESS: Can you rephrase that?
MR. HOMER: Well, I will have the reporter read it back.
(The following was read:
"Question: Well, isn't it possible, Mr. Morrison, that Mr. Williams left that room thinking that you were only asking him to do something, that he indicated that he didn't want to do it, and that you didn't tell him that it was an order? You didn't tell him that it was considered insubordinate. You didn't tell him there was going to be disciplinary action.

20

Isn't it possible that he left that room only thinking that you asked him to do something that he wasn't required to do?")
MR. ELLIS: Am I allowed to object again?
MR. HOMER: Go ahead.
THE WITNESS: Am I to answer that?
MR. ELLIS: Yes, you can answer the question.
THE WITNESS: Okay. Again, by virtue of me having the individual in my office and, again, in the form I used asking him, if I didn't want him to do it, I wouldn't have called him in there. Why have the individual in my office if I didn't want him to do it? If I'm just going in there to get a feel for things, why would I do that?
BY MR. HOMER:
Q. Well, I'm asking the questions. If you can make your answer responsive to the question --
A. Okay.
Q. Basically, what I'm trying to get at is isn't it possible that the witness didn't realize you made an order that he had to do it? In other words, he left the room, not realizing that you found him to be defiant of an order?

MR. ELLIS: I am going to object to the form of the question. Again, it really is not a question he can answer. You are asking him to say what is going on in somebody else's head.

THE WITNESS: That's correct. I didn't know what Mr. Williams thought. When he left out of there, the impression I got was he was not going to follow the request.

BY MR. HOMER:

Q. When you started supervising Mr. Williams, were you aware of his performance record with Dover Downs?

A. No. I knew his longevity with Dover Downs, from him being chief of maintenance, and welcomed that as a real asset to me, coming out there with the experience level that I thought he had.

Q. I would like to refer you to the exhibit that has been marked as Exhibit 10, which is in this pile. This is his last performance evaluation, Mr. Williams's last performance evaluation. Could you turn to the second page of the exhibit?

A. Is that 129?

Q. Yes.

A. Yes, sir.

Q. Do you see where it says in the second sentence, he, referring to Mr. Williams, has always shown respect to other employees and management?

A. I see that.

Q. Did he ever, other than this one incident, show you any disrespect as his supervisor?

A. No.

Q. Okay. And how long had you been supervising him at the time of this incident that took place on December 1, 2003?

A. Probably about 14 days.

Q. Were there any witnesses to this conversation that you had with Mr. Williams?

A. No. It was in my office, and it was closed door.

Q. Did you make any notes of the conversation?

A. After the fact, I wrote that statement that day.

Q. That is a typed statement. Did you make any notes while you were having the conversation with him?

A. No.

Q. Did you make any notes afterwards? Handwritten notes?

A. No. After we were done, basically I got on

the computer and typed it up.

Q. Okay.

A. After the second individual I talked to, which we haven't talked about, that is when I wrote the statement up.

Q. Okay. You didn't think, while you had this meeting with him, to ask him to sign a statement indicating he refused to do the job that you asked him to do? Is that a correct statement?

A. I did not.

Q. And when he left the room, was it your understanding that he was going back to work?

A. To do his regular duties, yes.

Q. And you didn't tell him that he had to go home or that he was under suspension or that this was going to get investigated or anything like that?

A. I did not.

Q. Even though you viewed him to be insubordinate and viewed it as him refusing to do an order?

A. If it was a serious situation of sending him home or something like that, I didn't believe it was to that point of doing it. He was nonviolent. There was no reason to send him home, other than he needed or we

required disciplinary intervention.

Q. During your employment with Dover Downs as a supervisory manager, were you given any guidance by HR or any of your superiors in the chain of command about what to do when an employee was insubordinate?

A. Yes.

Q. And could you relate what that was?

A. Basically, if the individual, again, broke company policy, I was to either do a statement and/or follow up with a disciplinary warning notice, depending on the severity, whether it escalated as a verbal or written.

Q. Well, let's suppose you are on the outside and you tell a maintenance guy he needs to paint something and he says: I'm not going to do it. Did you get any training in that situation?

A. Well, in that situation – Well, do you mean formal training from Dover Downs?

Q. Not formal, but any kind of guidance from either HR or your superiors as to what to do when an employee refuses to carry out an order.

A. I refer them back to the policy manual and also the previous statement that I made, as far as writing a statement and also following up with a

B-151

Q. But Mr. Morrison, the second page of the exhibit is a statement, correct?
A. Yes, sir.
Q. Well, let me do it this way. On the morning of December 1, 2003, after you had your meeting with Mr. Williams, you then had a meeting with Mr. Peters, correct?
A. That's correct.
Q. Okay. And does the statement that is on page two of Exhibit 13 accurately reflect what happened at that meeting with Mr. Peters?
A. That is 283?
Q. Right.
A. Yes.
Q. And when did you prepare this statement?
A. The same day.
Q. Would it have been after your meeting with Mr. Peters that morning?
A. Yes.
Q. Okay. And again, you didn't keep any notes of your meeting with Mr. Peters or you just went to the computer and typed this up; is that right?
A. Both meetings were back to back.
Q. Did you make any notes of your meeting with

Mr. Peters?
A. No.
Q. Were there any witnesses to the meeting with Mr. Peters?
A. No.
Q. And again, in this statement -- and this is the fourth to the bottom line of the statement. It says: I asked him again before he left to reconsider his answer to me.
Is it fair to say that when you had your meeting with Mr. Peters, it was very similar to what happened with Mr. Williams? You made this request of Mr. Peters. He told you he didn't want to do it. And based on that, you considered him insubordinate. Is that a fair statement?
A. After asking him a second time and to again reconsider what he said to me, yes.
Q. Okay. And I'll go through the same questions I asked regarding Mr. Williams. Did you ever state to Mr. Peters, during this meeting of December 1, 2003, that what you were asking him to do was, in effect, an order and that he had to do it?
A. I did not order him to do nothing, no.
Q. And you didn't use words to that effect?

A. That's correct.
Q. And did you give him any kind of warning that if he didn't do it, that he would be considered insubordinate?
A. I did restate the job description. That was part of his job to do, you know, to follow that request. I did not state to him at that time that he was going to be written up, no.
Q. Or that he would be viewed as insubordinate?
A. No.
Q. Did you explain to him that as a result of his refusal to do this job or his unwillingness to do the job, that he would be disciplined?
A. I did not at that time.
Q. And when did you inform him of that?
A. When we finalized the disciplinary warning notice, he was called back in for the disciplinary warning.
Q. And would that have been on December 12, 03?
A. Yes.
Q. Why did it take so long to follow up on this and give him the disciplinary action? The same question of Mr. Williams. Why, with respect to his case, did it take 12 days to get back to him and indicate that he was

being disciplined?
A. At that time Ms. Isenberg requested to see all disciplinary warning notices. When the documents were prepared, it was taken to HR. And again, due to her scheduling, being able to see stuff, and by the time it came back to me and any changes that was to be written up on there, as far as being detailed on it -- which was again making sure it was right out of the book, which she has stated to me many times, if it is in the procedure book, then as an individual or as a supervisor or manager, the questioning of the validity of the situation is basically taken out of the book there.
So due to the times of sending it up to her for review, to come back down to me for review, the finalization of it, and also the weekend, that is the reasoning that you see a 12/12 there.
Q. Was there any difference between what happened with Mr. Williams and what happened with Mr. Peters in terms of this incident that resulted in them being disciplined for insubordination? Was it basically the same thing back to back?
MR. ELLIS: I object to the form of the question.

COPY

IN THE UNITED STATES DISTRICT COURT
IN FOR THE DISTRICT OF DELAWARE

RICHARD L. WILLIAMS and MICHAEL E. PETERS, Plaintiffs,

v.

DOVER DOWNS, INC., a Delaware corporation, Defendant.

C.A. No. 05-0435 (GMS)

Deposition of **MICHAEL PETERS**, taken before Cheryl A. Anthony, Court Reporter, in the law offices of Parkowski, Guerke & Swayze, 116 West Water Street, Dover, Delaware, on Tuesday, February 14, 2006, beginning at 9:00 a.m.

APPEARANCES:

PARKOWSKI, GUERKE & SWAYZE
BY: JEREMY W. HOMER, ESQUIRE
116 West Water Street
Dover, Delaware 19901
Attorney for Plaintiffs.

MONTGOMERY, McCRACKEN, WALKER & RHOADS
BY: EDWARD T. ELLIS, ESQUIRE
123 South Broad Street
Philadelphia, Pennsylvania 19109
Attorney for Defendant.

ALSO PRESENT:

MR. RICHARD L. WILLIAMS
MS. ROBIN M. ROBERTS

**ORIGINAL RETAINED BY EDWARD T. ELLIS, ESQUIRE**

**ANTHONY REPORTING**
**PO Box 234**
**Dover, Delaware 19903**
**(302)674-8884**

69

didn't really read through all of this.
Q. Did it have like essential functions and job bullet points under the job functions?
A. I don't remember.
Q. Okay. Have you ever seen that document again?
MR. HOMER: Again, from when?
MR. ELLIS: Since then.
THE WITNESS: No.
BY MR. ELLIS:
Q. Did you ever see it before that day?
A. No.
Q. What makes you say that Exhibit P-1 is not the document that Mr. Morrison gave you?
A. It just doesn't look familiar to me, and it does actually have some of the same statements in it. But I don't believe that was the document that I got.
Q. When you say that it doesn't look familiar to you, are you talking about the format or the typed --
A. The format is different, it seems to me.
Q. Okay. What did the format look like of the document Mr. Morrison gave you?
A. It seems to me it was more long. I don't know. It was boxed-in stuff like this.

70

Q. Okay. If we were to draw boxes around some of the bullet points on Exhibit P-1, would that look more like the document that --
A. Perhaps.
Q. Okay. Go back to Exhibit 13, Morrison 13, to the statement of Mr. Morrison, which appears on page two of that document. I'm going down to the middle of the statement. And it says: He again informed me that he did not want to be in charge of anyone.
Is that something that you --
A. Yes.
Q. Pardon me? Is that something that you said to Mr. Morrison?
A. I told him I didn't want to do that, and I gave him reasons.
Q. Okay. One of which is the salary cap?
A. Yes.
Q. And the other of which you don't remember, right?
A. Yes.
Q. And then you say -- and the next line in the statement says: He did say he would do anything that I asked except be in charge of someone.
Did you say that to Mr. Morrison?

71

A. I don't remember.
Q. It says next: I asked him again, before he left the office, to reconsider his answer to me.
Did Mr. Morrison say that to you?
A. I don't remember.
Q. The next sentence is: He did not change his response and did not accomplish the task directed. That would be correct, right?
A. Yes. I was not directed. I was asked.
Q. What is the difference?
A. There is a difference between telling somebody to do something and asking them to do something.
Q. And when your boss asks you to do something, you don't think that is being told?
A. No, sir.
Q. Okay.
A. If --
Q. Go ahead.
A. No, go ahead.
Q. You said that you had a discussion with Marie Isenberg over the discipline that you got --
A. Yes.
Q. -- for the December 1st evaluation?

72

A. Yes.
Q. Do you remember when that occurred?
A. The write-up was on a Friday. And I talked to her not the following Monday, but the Monday and a week. So I don't know what that date was.
Q. The write-up on the next to the last page of Exhibit 13, it says 0291 at the bottom right.
A. Yes.
Q. It says it is December 12, 2003. Is that the date you were given the document?
A. It was a Friday. Whether it was that date or not, I couldn't swear to it.
Q. So if that is a Friday, that means Monday would be December 15th, and the discussion you had with Mr. Marie Isenberg must have been December 22nd?
A. Yes.
Q. Where did that discussion take place?
A. In Marie Isenberg's --
Q. Office?
A. I can't say that. I don't know whose office it was. It was in an office with Marie Isenberg. Whether that was her office or not, I don't know.
Q. Was it in the human resources department?
A. Yes, I'm sorry, yes.

Q. Was anybody in the room other than you and Marie?
A. No.
Q. And what was the substance of the discussion?
A. Trying to find out what I can do about the write-up.
Q. Okay. Well, what did you say to her?
A. I don't remember the whole conversation. But I do remember asking her what I could do about it.
Q. Did you say to her that this was bullshit?
A. I probably didn't use that word.
Q. But a word that conveyed the same intent?
A. Yes.
Q. Were you angry when you went into Marie Isenberg's office or into the room where she was?
A. Yes.
Q. Why did it take you a whole week to get in to see her?
A. I went to the First Flight Centennial in Kill Devil Hills.
Q. You took a week off?
A. Yes.
Q. So you were out the week between --

A. This was a pre-planned thing with my father.
Q. I understand. So you were out from that week of the 15th, I guess?
A. Yes.
Q. So December 22nd was the first time --
A. I was back.
Q. Okay. How long were you in Marie's office or the office that Marie was occupying at the time that you spoke to her?
A. 10 or 12 minutes, I suppose.
Q. Do you remember any of the discussion? Anything she said or anything you said?
A. Yes, I do. I remember what she said.
Q. What did she say?
A. I asked her what I could do to refute this write-up. And she said I could write a letter, and it would go on my file, but that only supervisors, managers, and above told the truth. And I quote that. I'll never forget that until the day I die.
Q. I'm not quite --
A. Managers, supervisors and above tell the truth.
Q. How did this come up in the conversation?
A. Because I asked her what I could do about

refuting this. She said I could write a letter, and it would go on my file. And she turned around and called me a liar is what it amounted to.
Q. Well, what is it that she called you a liar about? I don't understand.
A. About the letter I was going to write to refute the insubordination.
Q. When you say refute, your position was that you hadn't refused, but you had just declined --
A. Right.
Q. -- a request?
A. Yes.
Q. And that you had not refused to do what Mr. Morrison wanted you to do?
A. Yes.
Q. Okay. And so she was telling you to write a letter that said that?
A. Yes.
Q. Okay. What was it you said that provoked her to say whatever she said about managers and supervisors?
A. I asked her what I could do, and she said you could write a letter that goes in your file, but only supervisors, managers, and above tell the truth.

And that was basically the end of the conversation.
Q. Okay. Were you angry about that?
A. Certainly. She just called me a liar.
Q. Okay. What time of day was that?
A. In the morning, but not first thing; I went to human resources first thing in the morning. And I don't remember if we made a time then, but she told me that I would have to come back. And I think it was ten or 10:30, or something before she was ready.
Q. Okay. Did you talk to anybody else in the human resources about this disciplinary warning notice?
A. No, I don't believe so.
Q. Okay. Do you believe that you were capable of supervising the crew on December 1st in whatever activities they were doing?
A. Yes.
Q. Now, on December 23, 2003, there was supposed to be a Christmas party, right?
A. There was a maintenance Christmas party planned. I don't know what the date was. But if you say it was the 23rd, we will go along with that.
Q. It is the date of the drag race?
A. Yes. It was that day.
Q. Okay. How long before the 23rd did you know

A. No.
Q. Okay. Did you expect that management might think it was unsafe to watch cars run down Pit Road?
A. Never thought about it.
Q. You never thought about it. When did Rich Williams arrive at gate one?
A. After I had parked my van.
Q. How long after you had parked your van?
A. Within a minute or two, I suppose.
Q. All right. When Rich Williams got there, was he driving a vehicle?
A. Yes.
Q. A company vehicle?
A. Yes.
Q. What kind of a vehicle?
A. A pickup truck.
Q. And where did he park?
A. He parked at the gate.
Q. The same as you?
A. He was facing -- I believe he was facing south.
Q. And you were facing west?
A. Yes.
Q. So he was across the gate?

A. Yes.
Q. Did you have a conversation with him?
A. No, sir.
Q. Did you remain in your car the whole time?
A. Yes.
Q. And he remained in his, I guess, until the accident occurred?
A. I don't remember him getting out of the truck.
Q. Okay. So you had no conversation with him?
A. No.
Q. Okay. Could you tell what he was doing?
A. Yes.
Q. What was he doing?
A. Watching the race.
Q. Did you have a radio?
A. Yes.
Q. Is that like a walkie-talkie?
A. Yes.
Q. Who did it connect to?
A. The whole maintenance department was on the same frequency.
Q. So, for example, Monahan, who is in Victory Lane or whatever you call it, would he have the

walkie-talkie, too?
A. I don't know if he had it on his person, but he should have a radio.
Q. And you could, for example, have talked to him from your car during the race?
A. Yes.
Q. And how about Ernie Carlisle and the younger Williams? Would they have walkie-talkies, also?
A. I don't think Ernie carried a radio, and I don't know about Brian.
Q. Okay. How about Russell Hands? Would he have a radio?
A. I don't think so.
Q. Did the landscape people have radios?
A. Some did, some didn't, and I don't know who.
Q. Okay. But all the maintenance people would have radios?
A. Yes.
Q. How about the harness people? Do you know?
A. I don't think they all had radios.
Q. Okay. You are not sure?
A. No.
Q. Okay. Describe the accident.
A. Brian failed to negotiate the curve at the

end of Pit Road and hit the inside of the ad wall with the left front of his car.
Q. The inside of the what wall?
A. The ad wall, and that is the wall you are talking about that separates the road from Pit Road.
Q. Why is it called the ad wall?
A. Because it has advertising on it on the spectators' side.
Q. Okay. Now I got you. I understand. So what happened next? Where did the two cars end up?
A. Brian's ended up on the auto track, and I don't remember where Ernie ended up. But he --
Q. Did you --
A. Go ahead.
Q. Go ahead. What were you saying?
A. I remember him driving away.
Q. Did you know that Ernie had a flat?
A. Not at that time.
Q. Okay. After Brian's car spun onto the speedway, what happened next?
A. Everybody ran that way.
Q. Including you?
A. No.
Q. Who was the everybody then?

COPY

IN THE UNITED STATES DISTRICT COURT
IN FOR THE DISTRICT OF DELAWARE

RICHARD L. WILLIAMS and MICHAEL E. PETERS, Plaintiffs,

v.

DOVER DOWNS, INC., a Delaware corporation, Defendant.

C.A. No. 05-0435 (GMS)

Deposition of **ROBIN ROBERTS**, taken before Cheryl A. Anthony, Court Reporter, in the law offices of Parkowski, Guerke & Swayze, 116 West Water State Street, Dover, Delaware, on Monday, February 13, 2006, beginning at 10:30 a.m.

APPEARANCES:

PARKOWSKI, GUERKE & SWAYZE
BY: JEREMY W. HOMER, ESQUIRE
116 West Water Street
Dover, Delaware 19901
Attorney for Plaintiffs.

MONTGOMERY, McCRACKEN, WALKER & RHOADS
BY: BETH A. FRIEL, ESQUIRE
123 South Broad Street
Philadelphia, Pennsylvania 19109
Attorney for Defendant.

ALSO PRESENT:

MR. RICHARD L. WILLIAMS

**ORIGINAL RETAINED BY JEREMY W. HOMER, ESQUIRE**

---

**ANTHONY REPORTING**
**PO Box 234**
**Dover, Delaware 19903**
**(302)674-8884**

5

A. Okay. Let's see. That would have been -- I graduated from college maybe in '81 or '82. I'm going to be a little bit fuzzy on these.
Q. That is okay. Do your best.
A. I graduated in '81 or '82 from the University of Delaware. And from there, I took a job -- And this is just professional level positions you are talking about, right?
Q. Unless there is some big period of time where you didn't have a professional job.
A. No. I worked two jobs for a lot of my career. That is why I'm asking you. Should I include those jobs, too?
Q. Why don't you? Yes, go ahead.
A. I graduated from college, and the first job out of college I took was as a first grade teacher. And I also worked at a restaurant and bar at that time, during that period of time. I worked there for two years, I believe. I left there and went to public school and taught in public school for a year.
I left there and went and worked for the State of Delaware with the Division of Child Protective Services. I was a case worker in the child abuse area, if that is what you want to call it. I was there for

6

ten months. I left there, and I went to work for Goldey Beacom. It was actually called the Business Training Center. It was one of the branches of their college in Downtown Wilmington.
Q. You were a teacher at that point?
A. Well, I was actually -- my actual job title was director of counseling. So I was working with a program for women who were on FDC and who were trying to get training so they could get back in the work force. So I was doing some counseling and also some classroom instruction with that group and then teaching at the same time a college course through Goldey Beacom, as well. I was there until -- and again, all of this whole time, I was working the second job, as well.
And then in 1993 I went to work for First Chicago MBD or FCC National Bank. That was in Wilmington, the credit card division of First Chicago MBD. And I worked there -- I started out there in their training unit, but then broadened, basically, my responsibilities as the years went on there. I worked there for six years. My last position when I worked there was as the human resources officer.
So I left there in June of '99, and then I came to work at Dover Downs and Dover Motor Sports in

7

August of 1999. I was hired there as a human resources manager, the head of the human resources department.
And then I want to say maybe a year after I was there, I was promoted to the director of human resources. And then -- and again, I'm a little fuzzy on these dates. But I think it was 2002 that I was promoted to vice president of human resources for Dover Downs and Dover Motor Sports.
Q. That is your present position?
A. Correct.
Q. When did you get your master's degree?
A. Let's see. That was during the time that I was at Goldey Beacom. So I actually -- it took me longer than usual. But I think I actually received it in '93, I believe.
Q. And when did you get the human resources certificate that you mentioned earlier?
A. 2000, early 2000.
Q. Okay. After that, after early 2000, did you receive any additional training regarding discrimination claims of employees?
A. Yeah. The course that I had mentioned to you earlier through the Institute for Applied Management and Law was a course that I took after I went to work at

8

Dover Downs. And I don't remember the year.
Q. How many hours was that course?
A. It was a week-long course, where you were in classes from morning until, you know, like four or five. It was a week-long course, maybe four days, I think.
Q. Do you recall how much time was spent on discrimination claims?
A. I don't.
Q. Would it have been a substantial amount of time spent on that, if you can say?
A. I would say that it was probably -- Because it was a broad base of the law and it wasn't just discrimination --
Q. Right.
A. -- there were areas covered on a lot of different topics, and I don't remember exactly how much time. But I know that we talked about discrimination. And they also wanted to make sure that you had, you know, the latest cases, you know, that you were aware of the latest information.
Q. And when did you take that course?
A. I think that was -- let's see. 2000, I got the PHR, so maybe 2001.
Q. In any event, it was before the events

B-158

Case 1:05-cv-00435-GMS Document 41-4 Filed 06/08/2006 Page 40 of 41

the termination, the reason for the termination, if you recall?

A. Oh, I do. I would have read exactly from their termination paperwork.

Q. Okay. Would you have provided any other explanation? Or would you have simply read that, and that is all you would have told them?

A. If they had asked any questions, I would do my best to answer them. I just don't recall if there were questions or if there was any other discussion after I read the termination paperwork.

Q. You have referred to termination paperwork. I would like you to take a look at Sutor Exhibit Number 8 and ask you if that is at least part of the paperwork you are talking about.

A. That is what I am talking about when I refer to termination paperwork.

Q. And that refers to Mr. Williams, correct?

A. Uh-huh.

Q. And now I would like to show you Exhibit Number 9. That is the termination paperwork for Mr. Peters, correct?

A. Yes.

Q. And it is from these two statements,

Exhibit 8 and Exhibit 9, these two documents, that you would have read to Mr. Williams and Mr. Peters the reasoning for the termination, correct?

A. Yes.

Q. And specifically, there is a block on these documents that says nature of incident. Is it within that block that you would have read to them the reason for the termination?

A. Yes.

Q. Ms. Roberts, are you aware that this race incident that led to the termination of the Plaintiffs took place during their lunch hour?

A. I'm not aware, because I don't know -- I know that it took place around the noon time, but I don't know when everybody takes their lunch.

Q. Do you know whether they were, so to speak, on the clock? That is, being paid for their time?

A. I don't know.

Q. Do you know whether they were being paid for their time at the time of the race?

A. I don't know.

Q. Does anybody at Dover Downs know that?

A. I don't know if anybody at Dover Downs knows that.

Q. Are you aware of any document by which Dover Downs advises its employees that it's a violation of the company policy to watch a race at the facility on their own time? Is there any policy that specifically states that anywhere?

A. States -- if you could repeat --

(The following was read:

"Question: Are you aware of any document by which Dover Downs advises its employees that it's a violation of the company policy to watch a race at the facility on their own time? Is there any policy that specifically states that anywhere?")

THE WITNESS: Not that I know of.

BY MR. HOMER:

Q. Do you have any knowledge of how an employee at Dover Downs, back in December of 2003, would be aware that it was improper to watch a race at the facility when they are not working?

A. Can you repeat that?

(The last question was read.)

BY MR. HOMER:

Q. By that, I mean on their time; that is, they are not being paid for their time when they are watching the race?

A. No. We don't have anything in writing. There is no policy on that that I'm aware of.

Q. I am not asking if there is something in writing here. I am asking if you have any knowledge of or whether there is any basis for an employee to know that they shouldn't be watching a race during their own time? Do you have any knowledge of a reason why an employee would know they shouldn't be doing that?

Let me back up a little bit. You said there wasn't any written document that you are aware of that advises the employees that they shouldn't be doing that. Do you have any knowledge, independent of any written document, that employees would know that it would be improper in December of 2003 to be watching a race at the facility on their own time?

A. No.

Q. Are you aware of any Dover Downs document that, as of December of 2003, would have advised an employee specifically that they have a duty to report anyone who is using the track if they are fellow employees?

A. No, nothing specific, nothing as specific that, no.

Q. Likewise, are you aware of any document that

37

would specifically state -- and again, going back to December of 2003, documents as of that time -- that an employee must stop a race if fellow employees are involved at a facility?

A. No.

Q. If they hear that a race is going to take place, do they have any duty to stop and report that?

A. No.

Q. Do you have any knowledge of how an employee, back in December of 2003, would be aware that they had an obligation to report a race that took place or to stop a race that they are watching or to report that a race is going to take place in the future that they are aware of?

A. You ask such long questions. By the time you get to the end of them, I forget what is --

Q. We can break it down into three separate questions.

A. Sorry. My mind doesn't work that way.

Q. I'm sorry. That was a complex question. Let me try it again.

A. Okay.

Q. Do you have any knowledge of how an employee would be aware, back in December of 2003, that if they

38

were aware of a race that was going to take place at the facility, that they should report that? And by that, I mean a race between the employees, that they should report that to their employer before the race takes place?

A. No document that I'm aware of.

Q. I am not asking about a document. You already said you weren't aware of a document. But I am asking: Do you have any knowledge of how an employee would know they are not supposed to be racing at the facility?

A. I don't mean to sound flip about that, but other than common sense, no. To me, it would be just plain old common sense and good safety -- you know, just being aware of, you know, potential safety problems.

Q. And the same question, would you have any knowledge of how an employee would be aware, back in December of 2003, that if they saw some employees racing at the racetrack, that they have an obligation to report that?

A. Other than, again, it is an unsafe -- It is something unsafe that you would see.

Q. It is just something that they should report because it is unsafe?

39

A. That is what I would say. I mean you would hope they would.

Q. And finally, do you have any knowledge of how an employee, back in December of 2003, would be aware that he or she was required to try to stop a race of fellow employees at the racetrack?

A. Again, it would just be common sense to me.

Q. Okay. Do you know whether any conversations between Mr. Williams or Mr. Peters and anybody else at Dover Downs were recorded by tape-recording?

A. Am I aware of any conversations being recorded?

Q. Yes.

A. No.

Q. Ms. Roberts, could you please look at Exhibit Number 5? This is Sutor Exhibit Number 5. Take a moment or two to look through it, and then tell me if you can identify it.

A. It's the position statement that was submitted from our attorney in response to the charge of discrimination that was filed.

Q. Okay. Could you explain to me what the procedure is or, let's say, was in December of 2003 for responding to a charge of discrimination, assuming there

40

was a procedure?

A. I don't necessarily know there was a written procedure. But I can tell you what was common practice.

Q. If you could do that.

A. When a charge of discrimination is filed at the Department of Labor, typically, we will receive that charge of discrimination. Typically, it comes to me. And I will fax it or send it to inside counsel and then also to Montgomery, McCracken, Walker & Rhoads, who responds to the position statement on our behalf.

Q. Okay. Is it fair to understand, given your knowledge of discrimination law and so forth, that Dover Downs would have understood in December of 2003 that they had a duty to provide accurate information in response to the charge of discrimination?

A. Oh, yes.

Q. Okay. Did you have any responsibility for overseeing the accuracy of the information?

A. Typically, when a position statement is submitted, we review it -- I review it, any of my HR managers who are involved in the situation review it -- for accuracy. And then also, our inside counsel reviews it for accuracy.

Q. And that is before it is sent to the agency;

B-160