COPY

IN THE UNITED STATES DISTRICT COURT
IN FOR THE DISTRICT OF DELAWARE

RICHARD L. WILLIAMS and            )
MICHAEL E. PETERS,                 )
    Plaintiffs,                    )
                                   )
         v.                         ) C.A. No.
                                   ) 05-0435 (GMS)
DOVER DOWNS, INC.,                 )
a Delaware corporation,            )
    Defendant.                     )

        Deposition of **EDWARD JAMES SUTOR**, taken before Cheryl A. Anthony, Court Reporter, in the law offices of Parkowski, Guerke & Swayze, 116 West Water State Street, Dover, Delaware, on Thursday, February 9, 2006, beginning at 9:40 a.m.

APPEARANCES:

    PARKOWSKI, GUERKE & SWAYZE
    BY:   JEREMY W. HOMER, ESQUIRE
    116 West Water Street
    Dover, Delaware  19901
    Attorney for Plaintiffs.

    MONTGOMERY, McCRACKEN, WALKER & RHOADS
    BY:   EDWARD T. ELLIS, ESQUIRE
    123 South Broad Street
    Philadelphia, Pennsylvania  19109
    Attorney for Defendant.

ALSO PRESENT:

    MR. RICHARD L. WILLIAMS

**ORIGINAL RETAINED BY JEREMY W. HOMER, ESQUIRE**

---

**ANTHONY REPORTING
PO Box 234
Dover, Delaware  19903
(302) 674-8884**


**25**

A. Vaguely, yes.

Q. Can you tell me what you know about that incident or those incidents?

A. I remember I was surprised that the two people involved, Williams and Peters, were insubordinate in not carrying out the direction of their manager to lead some men in the performance of some work.

Q. And when did you learn that they had refused to do that?

A. I'm not exactly sure of the time point. I may or may not have learned it immediately at the time that it occurred or shortly thereafter. I can't pin down the time.

Q. Were you involved in investigating that matter?

A. No. I wasn't involved in any fashion.

Q. You were not involved in the decision to discipline them for that?

A. No. That wouldn't rise to my level.

Q. Were you aware of the fact of this incident before the termination decision was made for each of the employees? And by that, I mean Mr. Williams and Mr. Peters.

A. Yes.

**26**

Q. Okay. Was that discussed during the discussions you had which resulted in the termination of the Plaintiffs?

A. Yes.

Q. And who brought that up? Do you recall who brought that up in the discussions?

A. Robin Roberts.

Q. What was the relevance of that, regarding the decision to terminate their employment, if at all?

A. Very little. The incident itself was of such an egregious nature that the insubordination warnings were just piling on for what I consider -- I would have made that decision regardless of the prior incident. But it did come up during the discussion that it occurred within a short time frame of when this activity occurred.

Q. Mr. Sutor, your company's Answer to Interrogatory Number 6 indicates that between the year 2000 and the present, four different individuals have filed charges of age discrimination against the Defendant; a Mr. Robert Faircloth, Mr. Robert Lewis, a Frederick McDowell, and a Brance Thompson. Are you familiar with the facts in any of those matters --

A. No, I'm not.

**27**

Q. -- leading up to the charge of discrimination?

A. No, I'm not.

Q. Were you involved in any way in any of those matters?

A. No.

Q. So as the chief operating officer, you are not apprised of charges of discrimination that are brought against Dover Downs?

A. They wouldn't rise to the same level of this incident. This incident again involved, in my mind, illegal activity, a scandalous type of activity that could embarrass the company and jeopardize its license to operate in the company. So clearly, it rose to a level far greater than normal HR type of activities that were handled by that department.

Q. So the fact that four different individuals have filed age discrimination claims against Dover Downs would not be a matter that would particularly concern you in your capacity as chief operating officer?

A. I would be concerned if my attorneys warned me that a pattern had developed that showed that we needed to address it. But having been in the business for over ten years at Dover Downs and the many thousands

**28**

of employees who had gone through, four complaints doesn't seem -- and I'm not sure if any of them were upheld or rejected. I'm not even sure. But it doesn't sound to me to be a considerable number. And last, but not least, my intimate knowledge of how the company works and our policies and procedures give me comfort that our company doesn't use age discrimination.

Q. You said ten years experience. Didn't you tell me that you started at Dover Downs in 1999?

A. I started at Dover Downs in March of 1999. However, I have to back up a little bit. When gaming was passed back in 1994 in the State of Delaware, Dover Downs retained the services under a management agreement from Caesar's. I was responsible as a Caesar's representative for coming to Delaware and setting up their entire operation, including the selection of key personnel, policies, procedures, drawing the facility. I had visited Dover Downs at least on a monthly basis every month since 1994. So I have been involved with the gaming operations of Dover Downs from its inception.

Q. Okay. Are you familiar at all with the litigation brought by Brance Thompson?

A. No.

Q. And you haven't been kept apprised of that

**37**

1  A. Yes.
2  Q. Could you explain what this form is?
3  A. Yes. What this is is an acknowledgment that
4  is distributed to our employees, along with the code of
5  conduct. And we ask that the employee return this to
6  the company side as an acknowledgment that they
7  received, read, and understood the company code of
8  conduct. This is kept in the personnel file of each and
9  every employee that works for our company.
10  Q. Is it fair to say that even though this
11  refers to the Dover Motor Sports Inc. Code of Business
12  Conduct, this code of conduct or this acknowledgment
13  would apply to Dover Downs, Inc. employees?
14  A. Yes.
15  Q. And the Dover Downs, Inc. employees would be
16  bound by both the employee handbook and the code of
17  conduct?
18  A. Yes.
19  Q. And that would have been true in December of
20  2003?
21  A. Yes.
22  Q. For what time period would that have been
23  true?
24  A. From the time period to the first -- I don't

**38**

1  know when we first came out with that. We would have to
2  go back to Enron and when that occurred.
3  Q. But at least back to August of '02, right?
4  That is when these were signed.
5  A. Yes.
6  Q. But again, this isn't a document that you
7  looked at in determining whether to discharge these
8  employees; is that correct?
9  A. No.
10  Q. That statement is correct?
11  A. That statement is correct.
12    (Sutor Exhibit Number 5 was marked for
13  identification and attached to the record.)
14  BY MR. HOMER:
15  Q. Mr. Sutor, can you identify Exhibit
16  Number 5?
17  A. It appears to be a letter to the Delaware
18  Department of Labor from a law firm in Philadelphia.
19  Q. Is this the position statement that was
20  prepared and filed with the Department of Labor on
21  behalf of Dover Downs regarding the Williams charge of
22  discrimination?
23  A. I'm not sure I ever saw this document
24  before.

**39**

1  Q. You are not familiar with it at all?
2  A. I'm not familiar with it at all.
3  Q. Would you know who helped put this together
4  on the part of the Defendant?
5  A. Robin Roberts.
6  Q. Anybody else that you know of that may have
7  been involved in that?
8  A. Some of her staff.
9  Q. Do you know who would have reviewed it on
10  behalf of Dover Downs before it was filed with the
11  Department of Labor, if anybody?
12  A. No.
13  Q. Do you recall discussing this case at all
14  with any attorney or Ms. Roberts or anybody else at
15  about the time that the position statement was being
16  prepared?
17  A. I don't remember talking to anybody about
18  this.
19  Q. Could you look at the bottom of the page?
20  It is paginated by a Bates stamp number, which is D0170,
21  and it is also page two of the letter. Could you read
22  the last two paragraphs? You don't need to read it out
23  loud.
24  A. Is that where: Charging party alleges?

**40**

1  Q. Right.
2  A. This is our attorney. I am still getting
3  used to who is who on this. This is our attorney
4  writing to the --
5  Q. Do you see where, in the position statement,
6  your attorney is arguing that the reason the Plaintiffs
7  were discharged is that they had a prior disciplinary
8  action?
9  A. As I stated earlier, this didn't play -- the
10  prior warning didn't play a major role in my decision.
11  Q. Well, you said it didn't play any role. You
12  said regardless of that, you would have discharged them?
13  A. Exactly.
14  Q. So this statement isn't correct that is in
15  the letter?
16  A. I can't overrule the statement that this
17  attorney is writing. I didn't participate in the
18  gathering of this. I told you what went through my
19  mind, was that the prior incidences were piling on
20  additional reasons to terminate. As far as I was
21  concerned, I would have made the decision to terminate
22  whether this existed or didn't exist.
23  Q. Okay. Could you look at the paragraph that
24  is sort of in the middle of page two, which starts with

B-163

### 45

1  break?
2  MR. HOMER: The witness is reminded not to
3  discuss the deposition during the break.
4  (A recess was taken from 10:20 a.m. until
5  10:18 a.m.)
6  MR. HOMER: Can we have that marked, please?
7  (Sutor Exhibit Number 7 was marked for
8  identification and attached to the record.)
9  BY MR. HOMER:
10  Q. Mr. Sutor, can you identify the exhibit that
11  has been marked as Exhibit 7?
12  A. I'm not quite sure what it is. It is a
13  handwritten note.
14  Q. These are not your notes?
15  A. No.
16  Q. Have you ever seen them before?
17  A. No.
18  MR. ELLIS: Did we not identify them for
19  you?
20  MR. HOMER: I don't think so.
21  MR. ELLIS: I guess we should have. They
22  are Robin Roberts's notes, whom you will be deposing
23  next week.
24  MR. HOMER: Okay.

### 46

1  MR. ELLIS: I won't try to decipher her
2  handwriting.
3  MR. HOMER: No. I'm going to need some help
4  with that. Let's get these marked as 8 and 9.
5  (Sutor Exhibits Number 8 and 9 were was
6  marked for identification and attached to the record.)
7  BY MR. HOMER:
8  Q. Let's go to the next exhibit.
9  MR. ELLIS: Which is eight, and which is
10  nine?
11  MR. HOMER: Williams is eight, and Peters is
12  nine.
13  BY MR. HOMER:
14  Q. Mr. Sutor, can you identify Exhibits 8
15  and 9?
16  A. They appear to be a disciplinary warning
17  notice to Michael Peters and Richard Williams, followed
18  by a form called an Employee Action Form, what we call
19  an EAF.
20  Q. Okay. Have you ever seen either of these
21  forms, eight or nine, before today?
22  A. No.
23  Q. And did you have any involvement in the
24  preparation of the forms?

### 47

1  A. No.
2  Q. Referring to Exhibit 8, there is a paragraph
3  description under a block that says: Nature of
4  incident. Do you see where I'm talking about?
5  A. Yes.
6  Q. The next to the last sentence, I will read
7  it to you. It says: As a mechanic I, it is your
8  responsibility to report any suspicious, unsafe, or
9  reckless behavior of any type, involving your fellow
10  coworkers.
11  A. Yes.
12  Q. Do you agree with that statement?
13  A. Yes.
14  Q. Is there something in the job
15  responsibilities of a mechanic I that requires this, or
16  is it every employee at Dover Downs that has this same
17  obligation of reporting any suspicious, unsafe, or
18  reckless behavior involving fellow coworkers?
19  A. In my personal opinion, everyone.
20  Q. Weren't you telling me before that the code
21  of conduct requires --
22  A. Everyone in the whole company, regardless of
23  their position.
24  Q. Okay. So is it a fair statement that part

### 48

1  of the reason that Mr. Williams was terminated by you
2  was you believed he should have reported the race that
3  resulted in the accident, the race between Mr. Brian
4  Williams and Mr. Ernie Carlisle that resulted in an
5  accident?
6  A. Yes. I believe they should have been
7  reported. I believe that they had a greater degree of
8  responsibility for reporting things because of their
9  supervisory capacity, because of their age and
10  experience. And in one particular case, there was a
11  gentleman's son that was actually involved in the
12  illegal activity. I thought they should have stopped it
13  and reported it.
14  Q. You say that they had supervisory
15  responsibilities?
16  A. Yes.
17  Q. What makes you believe they had supervisory
18  responsibilities?
19  A. I believe in the job description of the
20  mechanic I, it requires them to have the ability to lead
21  a group of workers. In my mind, that means supervisory
22  responsibilities.
23  Q. Let me show you Exhibit 1 again. See if
24  there is anything in Exhibit 1, which is the job

B-164

**Page 53**

1 reason that escapes me. I am more experienced. Someone
2 who has 25 years of experience in this type of business
3 should understand that that illegal activity is not only
4 forbidden by the company, but unsafe.
5     In this particular instance, on a personal
6 note, I was appalled that a father would allow their son
7 to engage in that sort of reckless activity.
8     Q. What information did you have then or have
9 now that Mr. Williams was aware before the race that it
10 was going to take place, before he got to the scene?
11    A. I have no evidence that he was aware of it
12 before. The only thing I know is the reports coming
13 back initially were that he used his vehicle to block
14 the entrance to prohibit other people from getting in
15 and witnessing the illegal activity. I do not know
16 whether he had prior knowledge of what was going to take
17 place.
18    Q. And how do you know that he had an
19 opportunity to stop the race?
20    A. I believe that by parking his vehicle at the
21 entrance and blocking it, that gave him little ability
22 to get down on the track. He should have kept going
23 with his vehicle and gotten down there and stopped it
24 immediately.

**Page 54**

1    Q. And do you know that if he had done that,
2 that he could have stopped the race? That he had time
3 physically to get down there before the race started?
4    A. I don't know what time his vehicle started,
5 no.
6    Q. Do you know that he had any means of
7 communicating to anybody that the race was taking place
8 before it took place?
9    A. Yes, I do.
10    Q. And what means did he have?
11    A. All of our maintenance people have
12 walkie-talkies.
13    Q. Do you have knowledge that Mr. Williams's
14 walkie-talkie was functional at the time this incident
15 took place? And by that, I mean the accident.
16    A. No, I do not.
17    Q. Did you look into that before you made your
18 decision?
19    A. No.
20    Q. Was it a relevant factor whether or not he
21 had the ability to communicate to somebody that the race
22 was taking place?
23    A. That subject did not come up at all.
24    Q. It didn't come up in your discussions

**Page 55**

1 regarding the termination of the employees?
2    A. The functionality of his equipment, no.
3    Q. Or whether he had the means to communicate
4 to anyone that the race was taking place?
5    A. No.
6    Q. Wouldn't that have been a relevant factor in
7 terms of fixing his culpability?
8    A. No.
9    Q. Why not?
10    A. The mere parking of his vehicle in such a
11 manner as to block other management personnel, citizens
12 from seeing what was going on, to me, was a severe
13 breach of responsibility by a person at that level,
14 meaning that they were trying to protect that knowledge
15 from getting to the proper personnel.
16    Q. Do you even know how long Mr. Williams was
17 at the scene? Do you know if he got there before the
18 race started even?
19    A. I do not.
20    Q. You don't know?
21    A. I do not know.
22    Q. And you didn't know at the time you made the
23 decision?
24    A. That is true.

**Page 56**

1    Q. Wouldn't that have been a relevant question
2 to ask?
3    A. Perhaps.
4    Q. Do you know whether Mr. Williams was on duty
5 at the time of the incident? That is, was he being paid
6 during the time that the race incident took place?
7    A. The father or the son?
8    Q. I'm talking about the Plaintiff,
9 Mr. Williams.
10    A. No. I assumed he was at work, getting paid.
11    Q. And when you made your decision, you didn't
12 inquire as to what his status was at the time, whether
13 he was on lunch break or anything else?
14    A. No.
15    Q. What information do you have that
16 Mr. Williams blocked the entrance to the racetrack?
17    A. I was informed by my security department
18 virtually immediately, when I first became aware of the
19 crash. Because his son was involved, I just, as a
20 father, became incensed.
21    (Sutor Exhibit Number 11 was marked for
22 identification and attached to the record.)
23 BY MR. HOMER:
24    Q. Mr. Sutor, can you identify Exhibit

B-165

**Page 57**

Number 11?

A. Exhibit 11 is a very thick packet of numerous documents, the first being an incident report, and pictures, diagrams, employee statements.

Q. Was this a document that you -- and I'm talking about the whole Exhibit 11. Did you see this document before your decision to terminate the Plaintiffs?

A. Not in this consolidated form, but I remember our security department briefing me on the results of their interviews. And I may have seen some of the individual pages in here. I can't say whether I saw everything in this entire document. But I know I was briefed by our security department, the results of their investigation.

Q. But your testimony is you didn't necessarily rely on the report to make your decision? Is that a fair statement?

A. I relied on the presentation of the reports to me by our security department, by the management of our security department, and our HR department and then our legal counsel.

Q. Mr. Sutor, I will represent to you that in this document there are various witness statements by

**Page 58**

1 individuals. Some of them indicate that the employees
2 knew ahead of time about the race, and some of the
3 statements indicate that they didn't know ahead of time
4 or they don't say anything about knowing ahead of time.
5     Is it your position that an employee who
6 knew ahead of time about the race had an obligation to
7 report it?
8     A. Yes.
9     Q. And the failure to report it was a serious
10 matter?
11    A. Yes.
12    Q. And a matter that should result in
13 discipline, I take it?
14    A. If they did not report it, yes.
15    Q. Would that be true of any employee at the
16 facility who learned about the race ahead of time, even
17 the ones that didn't go to the race?
18    A. Yes.
19    Q. Turning to page 338, Bates stamp 338 of the
20 document, there is a statement on this page, about
21 halfway down, that says W-9 -- I think that refers to
22 witness nine, Stephen Maher -- had prior knowledge of
23 race per his statement. Do you see where it says that?
24    A. Yes.

**Page 59**

Q. Do you know if Mr. Maher received any discipline for his role in this?

A. I don't know who he is.

Q. Okay. So you don't know whether he was disciplined or not?

A. No.

Q. As the person who initiated the investigation --

A. Yes.

Q. -- as the person who doled out the discipline and decided what the discipline was going to be, wouldn't it have been within your function to have disciplined Mr. Maher for his involvement in this?

A. At this point in time, I'm not familiar with what his involvement was. I don't have a recollection at all.

Q. I'm not asking you that. But assuming that he is an employee who did know about the race ahead of time and assuming that the investigation discovered that -- in fact, there is a written statement he made saying that he did know about it ahead of time, and I can show that to you. Let's take a minute and look at that. Let's look at 362. That is within Exhibit 11. Do you see that? Lines nine through 11 there?

**Page 60**

1     A. Yes, I see it.
2     Q. Doesn't it say here that Mr. Maher
3 acknowledged that he knew about the race at 10:30 a.m.
4 that day?
5     A. That is what it says, yes.
6     Q. The race happened around noon, didn't it, or
7 around the lunch hour?
8     A. I believe so.
9     Q. And you received a report -- you already
10 looked at that page -- indicating that Mr. Maher had
11 prior knowledge of the race?
12    A. I'm not sure if I ever saw this thing. I'm
13 trying to become familiar. It's been so long, I don't
14 remember. I don't have a lot of recollection -- I'm
15 sorry -- about what sort of discussion occurred with
16 Mr. Maher and whether he may or may not have been
17 disciplined. I'm sorry.
18    Q. But you do agree that it would have been up
19 to you to decide whether Mr. Maher or anyone who, it
20 turned out from the investigative report, had prior
21 knowledge of the race and didn't report it? It would
22 have been up to you to decide --
23    A. I would have been --
24    Q. Let me finish. It would have been up to you

COPY

IN THE UNITED STATES DISTRICT COURT
IN FOR THE DISTRICT OF DELAWARE

RICHARD L. WILLIAMS and )
MICHAEL E. PETERS, )
    Plaintiffs, )
)
)
v. ) C.A. No.
) 05-0435 (GMS)
)
DOVER DOWNS, INC., )
a Delaware corporation, )
    Defendant. )

        Deposition of **RICHARD L. WILLIAM**, taken before Cheryl A. Anthony, Court Reporter, in the law offices of Parkowski, Guerke & Swayze, 116 West Water Street, Dover, Delaware, on Friday, February 14, 2006, beginning at 1:30 p.m.

APPEARANCES:

    PARKOWSKI, GUERKE & SWAYZE
    BY: JEREMY W. HOMER, ESQUIRE
    116 West Water Street
    Dover, Delaware 19901
    Attorney for Plaintiffs.

    MONTGOMERY, McCRACKEN, WALKER & RHOADS
    BY: EDWARD T. ELLIS, ESQUIRE
    123 South Broad Street
    Philadelphia, Pennsylvania 19109
    Attorney for Defendant.

ALSO PRESENT:

    MR. MICHAEL PETERS
    MS. ROBIN M. ROBERTS

**ORIGINAL RETAINED BY EDWARD T. ELLIS, ESQUIRE**

---

**ANTHONY REPORTING**
PO Box 234
Dover, Delaware 19903
(302) 674-8884

### 49

1 allegedly spoken to him and had allegedly heard him say
2 things about the maintenance, what he was going to do
3 when he came down there.
4    Q.  And who is it that told you things that
5 Mr. Morrison had said about what he was going to do when
6 he came down there?
7    A.  Mr. Tom Curtis, Mr. Rich Duncan, and
8 Mr. Nick Fedirko.
9    Q.  Anything else that made you think you
10 weren't going to like Mr. Morrison?
11    A.  Yes. That day or thereabouts, he made me
12 clean that large warehouse, which was unfair. But I
13 accepted it, because that is what I do.
14    Q.  Why did you think it was unfair?
15    A.  Because up to then, it was everyone's
16 responsibility to clean keep it clean when they brought
17 in materials to organize it. When they brought in
18 tarps, they should at least fold them up and put them on
19 the shelf. Everything was thrown in there haphazardly.
20    Q.  Who made it a mess?
21    A.  Except me; I'm sorry. That's the truth.
22    Q.  Everyone except you had made the mess?
23    A.  Yes.
24    Q.  Including Mr. Peters here? Was he part of

### 50

1 the everybody that made the mess?
2    A.  I didn't see him personally make it a mess.
3 He wasn't up around the building as much as everyone
4 else was, such as the electrician, whose area was a
5 mess. The plumber had an area that was a mess. And
6 then they just used it as general storage, just people
7 coming in there not only from the maintenance, but from
8 building maintenance. They used that as storage and as
9 a catch-all for things that they didn't want around the
10 casino and the building.
11    Q.  So everybody made a mess except you and
12 Mr. Peters?
13        MR. HOMER: He didn't say that. Objection.
14        MR. ELLIS: He's getting close.
15        THE WITNESS: Except me.
16 BY MR. ELLIS:
17    Q.  Okay. Why did you think it was not
18 appropriate for you to be assigned the job of cleaning
19 the warehouse?
20    A.  I didn't say not appropriate, I believe, but
21 unfair, a large area like that.
22    Q.  Well, do you mean it should have been
23 assigned to somebody other than you or it should have --
24    A.  A crew of people, I think.

### 51

1    Q.  You think he should have assigned more
2 people to do the job?
3    A.  Yes.
4    Q.  Okay. Did you say that to Mr. Morrison?
5 That he ought to have more than one person on it?
6    A.  No, sir. I always accept assignments,
7 sometimes blindly.
8    Q.  Okay. Any other reason that you didn't
9 think you were going to get along with Mr. Morrison?
10        MR. HOMER: Objection. I don't think he
11 testified that he didn't think he was going to get along
12 with him. He said he didn't like him.
13        THE WITNESS: That's correct.
14 BY MR. ELLIS:
15    Q.  Any other reason that you didn't like him?
16    A.  No, nothing major that he did or said beyond
17 that.
18    Q.  Now, on December 1, 2003, you had a
19 conversation of some type with Mr. Morrison about sort
20 of supervising some work in the field; did you not?
21    A.  Yes.
22    Q.  Why don't you tell me how that conversation
23 came about, and describe it to me.
24    A.  Well, at the meeting, at the monthly staff

### 52

1 meeting -- I'm sorry, the monthly maintenance meeting at
2 the chalet, when Mr. Morrison announced that he was the
3 new supervisor, he had said that he intended over the
4 next few weeks to speak one-on-one with each individual
5 employee, get a feel for what they did and get a better
6 idea of the goings-on of the maintenance department,
7 since he was so unfamiliar.
8        So I assumed when he called me in the
9 office, it was the one-on-one meeting. And we spoke in
10 general, what duties I did, who I worked with. And he
11 did, in fact, ask me if I would mind keeping an eye on
12 the other employees while Mr. Curtis was going to be out
13 for a few days.
14    Q.  Okay. And what did you say?
15    A.  I told Bob: I will do whatever you say, but
16 I would rather not supervise anyone, given the choice,
17 because I have had my belly full of it for 11 years. I
18 don't like it, and I don't get paid to do that.
19    Q.  Okay. And then what happened?
20    A.  He said: Well, I have to ask somebody else.
21 There was no indication that it was any kind of a
22 command, directive, threat. It was nothing like that.
23 It was quiet conversation. And I left his office
24 thinking: Great, I'm off the hook.

**61**

1    A.   No.
2    Q.   Okay. He didn't show you a copy of it?
3    A.   No.
4    Q.   He just said he was writing you up?
5    A.   I honestly believe it was sitting on his
6  desk, but I did not read it. It was upside down. He
7  did not show it to me on December 12th.
8    Q.   Okay. So how did the meeting end between
9  you and Mr. Morrison on the 12th?
10   A.   On the 12th?
11   Q.   Yes.
12   A.   I don't recall exactly.
13   Q.   Did you walk out mad?
14   A.   Absolutely.
15   Q.   Okay. Did you raise your voice to him?
16   A.   I may have.
17   Q.   Did you use profanity?
18   A.   No, sir.
19   Q.   Did he use profanity to you?
20   A.   No, he didn't.
21   Q.   So what did you do after you left his
22 office?
23   A.   I think the first time I did was went to
24 Mr. Jerry Dunning's office, because I had respected that

**62**

1  man for 25 years. He was my hero.
2    Q.   Okay.
3    A.   And I went to him --
4    Q.   Was Dunning Morrison's boss?
5    A.   He was over top of Mr. Morrison, but not
6  necessarily his immediate supervisor.
7    Q.   Okay. So did you have a conversation with
8  Jerry Dunning?
9    A.   Yes, I did. I wanted to know what was going
10 on. I had never been written up in all of those years.
11 And I honestly, honestly, to this day, believe I didn't
12 do anything wrong. And I said to Mr. Dunning: What is
13 going on with this?
14   Q.   And what did he say?
15   A.   He said -- and this is word for word. He
16 said: Every manager has their own way of managing. I
17 will never forget that, as long as I live.
18   Q.   Okay. Did he say anything else?
19   A.   Basically, tough luck, that's the way it is.
20 Our managers are always right.
21   Q.   Did he say anything --
22   A.   He said we have to rely on all our managers.
23   Q.   Anything other than that?
24   A.   No.

**63**

1    Q.   Okay. So did you complain to somebody else
2  about the discipline?
3    A.   Yes. I went to Ms. Roberts.
4    Q.   Okay. And that is the woman that is sitting
5  next to me today?
6    A.   Yes.
7    Q.   And did you have a conversation with her?
8    A.   Yes. I was very upset.
9    Q.   Do you remember what day? Was it the same
10 day that you got the discipline?
11   A.   I don't remember the exact day. It was
12 shortly after, within a day or two, probably.
13   Q.   Did you meet with her in her office?
14   A.   Yes.
15   Q.   And how long did that meeting last?
16   A.   First of all, I believe there were two other
17 people in the room at the time when I walked in.
18   Q.   And do you remember who it was that was in
19 the room?
20   A.   Yes, Marie Isenberg and Richard Wertz. I
21 said: Oh, no, you're not going to gang up on me on
22 this. Do you remember that? And I said: I don't want
23 them in here. And Ms. Roberts excused those two. And
24 then after that, it was just the two of us.

**64**

1    Q.   How long were you in there?
2    A.   I don't remember exactly.
3    Q.   Do you remember who said what to whom in the
4  conversation?
5    A.   I tried to explain to Ms. Roberts: No
6  matter how this looks, this is wrong. This is the wrong
7  thing to be written up. It's just wrong.
8    Q.   Did you tell her why you thought it was
9  wrong?
10   A.   I tried to explain, yes, I did.
11   Q.   What did you say?
12   A.   I tried to explain that I didn't do anything
13 wrong and I can't understand why, if you are
14 insubordinate on the 1st, why are you getting written up
15 on the 12th. I could not understand that, and I still
16 don't.
17   Q.   I don't understand what you mean. Because
18 there was a delay?
19   A.   Yes, an 11-day or so delay in writing up.
20   Q.   Okay. Was that the only thing you
21 complained of?
22   A.   That was my main issue, yes.
23   Q.   I'm sorry. But was the main issue that
24 there was a delay? Or was the main issue that there was

B-169

## Page 77

1  Q. To eat the pizza.
2  A. Yes, I did. I was very hungry.
3  Q. And did you ever make it to the landscape
4  building?
5  A. No, I didn't.
6  Q. Why not?
7  A. Because I saw what I would consider unusual
8  activity. I saw a white van that Mike Peters normally
9  drives into the speedway. As I was leaving the command
10 center, it is a straight shot. And you can see all the
11 way down there. I thought this was sort of unusual,
12 either maybe they changed the place of where we were
13 going to eat pizza or something was going on. And that
14 was still heavy. 9/11 was still heavy. And we were to
15 report anything unusual. It know that's stretching it a
16 little bit. But that is the way we were trained, seeing
17 anything unusual.
18     And I guess a couple of minutes later -- I
19 don't know how long it takes to get from the command
20 center, but I decided to go in. Mr. Frank Outten was
21 right behind me in a blue van. I don't know what
22 happened to him. Apparently, he went up to get his
23 pizza.
24     And then when I drove in to the speedway, I

## Page 78

1  drove in through gate one, looked to my left. And at
2  that point, I was aware that there was a drag race going
3  on. Even though I couldn't actually see the drivers, I
4  knew who they were.
5  Q. Well, where were you when you saw
6  Mr. Peters's van drive into the speedway?
7  A. I was en route from the command center,
8  heading north, heading north.
9  Q. On Old Leipsic Road?
10 A. Yes.
11 Q. And how did you get into the speedway?
12 A. We have a little shortcut that we go through
13 at the south end of the speedway. It goes to Tent
14 Village.
15 Q. Okay. Now, what would be unusual about
16 Mr. Peters's car driving into the speedway?
17 A. I know that at lunchtime, everyone has one
18 thing on their mind, and that is to eat.
19 Q. In terms of Mr. Peters's job duties, is
20 there anything unusual about him driving into the
21 speedway?
22 A. Not really, because he does exchange
23 equipment. He stores a lot of equipment there. But I
24 thought it was unusual that particular day, because we

## Page 79

1  had all planned to have pizza. And I didn't know why
2  he -- and I thought I had seen another vehicle in front
3  of him go in first, but I'm not sure. But I know it was
4  his van that went in there.
5  Q. So you pulled in yourself?
6  A. Yes.
7  Q. Did you drive straight there from the point
8  at which you saw Mr. Peters's van drive into the gate
9  one area?
10 A. Yes.
11 Q. And where is the cut over from Leipsic Road
12 to the Dover Downs property?
13 A. It's almost across from the command center.
14 You go down maybe a hundred feet, and then you can cut
15 over through a gate that we had keys to. Mr. Morrison
16 had changed a lot of locks on the main gates, the one
17 that we would normally use as a convenient roadway
18 through there. For some reason, Mr. Morrison or
19 security had changed locks. We still had a key to the
20 gate I'm talking about, by Tent Village.
21 Q. Okay. When you pulled up to gate one, what
22 was Mr. Peters doing?
23 A. Sitting in his van by the gate.
24 Q. How long did it take you to get from where

## Page 80

1  you first saw Mr. Peters's car pull into gate one until
2  when you actually pulled into gate one?
3  A. Probably no more than a minute or two.
4  Q. Okay. And when you got up to the top of
5  gate one there, what did you see?
6  A. At first I went right past Mr. Peters. We
7  got almost to Pit Road, realized there was something
8  going on. I backed up, because we are trained to -- any
9  activity on the speedway. At that moment, I knew it was
10 going to be a drag race.
11 Q. How did you know that?
12 A. Well, there was a man dropping a hat, and
13 there were two black cars lined up.
14 Q. Were they both black?
15 A. From what I recall.
16 Q. So --
17 A. So I repositioned my truck back to
18 Mr. Peters, because we are trained that anytime activity
19 is on the speedway, you don't want spectators, dogs,
20 kids on bicycles, skateboarders coming down through
21 there. It's too great a task to manually close those
22 gates. You either need a crew of -- a group of men or
23 you need a backhoe to push the gates made out of boiler
24 plate steel. So the easiest thing is to park in front

B-170

**Page 81**

1  of it to keep kids from coming through.
2  Q. So you blocked the gate?
3  A. Yes.
4  Q. So you actually drove down onto the
5  speedway?
6  A. Yes, I did.
7  Q. From gate one?
8  A. Uh-huh.
9  Q. And how far did you get from the barrier
10 that you guys call the ad wall?
11 A. Not very far, maybe about two-thirds of the
12 way across the speedway.
13 Q. And then you backed up?
14 A. I think I actually turned my vehicle around
15 and just kind of went back up.
16 Q. Okay. What kind of vehicle did you have?
17 A. A '71 Chevy.
18 Q. Pickup?
19 A. Pickup.
20 Q. Is that your vehicle or the company's?
21 A. Company.
22 Q. Okay. So did you ever talk to Mr. Peters
23 that day?
24 A. Not at that time.

**Page 82**

1  Q. Okay. So you are sitting there in your
2  pickup truck, watching the drag race?
3  A. Yes.
4  Q. What did you see?
5  A. About the time I got out the gate, I saw the
6  two vehicles heading north.
7  Q. Okay. Now, when you say about the time you
8  got to the gate --
9  A. Yes.
10 Q. -- as I understand it, you went through the
11 gate, almost down to Pit Road, and turned around and
12 came back up to Pit Road?
13 A. By the time I got back up to the gate, I saw
14 the two vehicles.
15 Q. Heading north?
16 A. Yes.
17 Q. Did you recognize one of them as your son?
18 A. I recognized his vehicle, sure.
19 Q. Did you recognize the other vehicle?
20 A. Not really; I'm not into all the race cars
21 and things like that.
22 Q. Did you recognize it as the vehicle of
23 another employee?
24 A. Yes.

**Page 83**

1  Q. So did you recognize it as Ernie Carlisle's
2  vehicle?
3  A. I would say yes.
4  Q. So you must have realized fairly quickly
5  that this was your son drag racing against Ernie
6  Carlisle?
7  A. Yes.
8  Q. So what happened next?
9  A. Okay. They raced to the north, and I'm not
10 sure who won. They went up the speedway, turned around,
11 repositioned, I think they may have briefly stopped.
12 They headed south, and I thought this is not going to
13 work, because at the south end, when they get to the
14 south end, the ad wall turns. It's going into a funnel.
15 Going north, it's great. You have a wide, open space.
16 You have plenty of time to slow down heading south. My
17 son was on the east side.
18 Q. The side where the wall is?
19 A. Where the wall was. And something told me
20 that he's not going to make it, just a gut feeling. I
21 said: He cannot turn, and he cannot hit his brakes. It
22 is gravel down there. About the time it's going through
23 my head, I saw the hood fly up.
24 And somehow, with all of those people there,

**Page 84**

1  I was the first one there. I don't remember how I got
2  there that fast.
3  Q. How did you get there? Did you drive your
4  pickup over?
5  A. Yes.
6  Q. And what did you do?
7  A. I ran up to the window. The passenger
8  window was broken, smashed, gone. His head had broken
9  the side mirror when his body was thrown to the left as
10 the car went to the right. His head broke the whole
11 side window, and he was convulsing.
12 And it was the most horrible thing I have
13 ever seen in my whole life. I will never forget it, my
14 son convulsing, going like that, jerking sideways like
15 that. I was so afraid he had spine damage, head
16 damage. I was: How am I going to tell my wife?
17 So I was screaming: Call 911. Call nine
18 911. I didn't have a radio. I said: Call 911. About
19 that time, Monahan was running up the track, and he got
20 on his radio and he called somebody.
21 At about that same time, John Patterson, who
22 was a volunteer fireman, helped me -- he told me how to
23 stabilize Brian's head and lay him down in the front
24 seat until help got there. He was actually holding