# EXHIBIT A

Case 1:05-cv-00435-GMS  Document 49-2  Filed 03/30/2007  Page 1 of 17

## Page 45

1　A.　Well, sometime after she received the charge
2　and before the position statement was filed, but I don't
3　know the time frame.
4　Q.　Do you know who put the records together
5　that would have been sent to Ms. Hankinson about this
6　issue of prior disciplinary action?
7　A.　It would have come from our department. As
8　to whether it was me specifically or not, I'm not sure.
9　Q.　Okay.
10　A.　But the request would have come to us,
11　obviously. It would have been information that we would
12　have provided back to Kymberly.
13　Q.　Okay. I need to get a new exhibit out.
14　A.　Do you want this one back?
15　MS. FRIEL: Are you marking these Exhibits P
16　or by deponent?
17　MR. HOMER: No. They are marked by the
18　deponent.
19　MS. FRIEL: Okay.
20　MR. HOMER: Could we have this exhibit
21　marked as Roberts Exhibit Number 14?
22　(Roberts Exhibit Number 14 was marked for
23　identification and attached to the record.)
24　THE WITNESS: Do you want me to read this?

## Page 46

1　BY MR. HOMER:
2　Q.　I would like you to take a look at it, and
3　then tell me if you can identify it.
4　Have you had a chance to read the entire
5　letter now?
6　A.　Uh-huh.
7　Q.　What is this letter, if you can identify it?
8　A.　It is a letter from the labor law
9　enforcement officer from the Department of Labor to
10　Kymberly Hankinson, asking for more information in the
11　Williams charge.
12　Q.　Okay. Can I have that back?
13　A.　Sure.
14　Q.　Now, can you identify what has already been
15　marked as Sutor Exhibit Number 6?
16　A.　It looks like this is Kymberly's response to
17　the questions that the investigator was asking.
18　Q.　Okay. And again, would you have
19　followed the same process with respect to this letter?
20　Ms. Hankinson, did she obtain the information from you
21　and did you see this letter and review it before it went
22　out to the Department of Labor?
23　A.　I don't remember seeing this or that.
24　Q.　Okay. Do you know how Ms. Hankinson would

## Page 47

1　have gotten the answers to these questions or the
2　information that is being supplied in this Exhibit 6?
3　A.　Well, any questions about disciplines, who
4　was disciplined, when, and what level of discipline
5　would have come -- I'm fairly certain the request for
6　that information would have come to our department, and
7　we would have responded.
8　Q.　So is it fair to say that you would have
9　been aware that Ms. Hankinson was putting together more
10　information to give to the Delaware Department of Labor
11　regarding the charge of discrimination?
12　A.　I honestly don't remember that, and I don't
13　remember seeing these.
14　Q.　I am not asking you to remember. I'm asking
15　whether that is a fair assumption to make, if the
16　attorney would come back for more information, that the
17　human resources department would have been aware that
18　another response was going to be going to the Department
19　of Labor. Is that a fair assumption?
20　A.　That is a fair assumption.
21　Q.　Okay. Now, that being the case, is it also
22　a fair assumption that somebody at HR -- maybe yourself
23　or maybe someone else with Dover Downs -- would have
24　again reviewed whatever information the attorney was

## Page 48

1　providing on behalf of Dover Downs to the Department of
2　Labor?
3　A.　We normally do review information, but I do
4　not remember reviewing this particular document.
5　Q.　I'm not asking you to. That would have been
6　the process. Somebody would have taken a look at it
7　probably?
8　MS. FRIEL: Objection to form. Are you
9　asking about this document?
10　MR. HOMER: I'm asking about this document.
11　BY MR. HOMER:
12　Q.　Before this document, which is Exhibit 6,
13　was submitted to the Department of Labor, would it have
14　been Dover Downs' practice to have reviewed the letter
15　before it went to the Department of Labor?
16　MS. FRIEL: I think she has already answered
17　that.
18　THE WITNESS: I don't remember reviewing
19　this particular document.
20　BY MR. HOMER:
21　Q.　I understand that.
22　A.　It is our practice, typically. When we are
23　responding to a charge of discrimination, we typically
24　will look at the documents. But I don't recall

# EXHIBIT B

**Page 37**

1 would specifically state -- and again, going back to
2 December of 2003, documents as of that time -- that an
3 employee must stop a race if fellow employees are
4 involved at a facility?
5     A. No.
6     Q. If they hear that a race is going to take
7 place, do they have any duty to stop and report that?
8     A. No.
9     Q. Do you have any knowledge of how an
10 employee, back in December of 2003, would be aware that
11 they had an obligation to report a race that took place
12 or to stop a race that they are watching or to report
13 that a race is going to take place in the future that
14 they are aware of?
15     A. You ask such long questions. By the time
16 you get to the end of them, I forget what is --
17     Q. We can break it down into three separate
18 questions.
19     A. Sorry. My mind doesn't work that way.
20     Q. I'm sorry. That was a complex question.
21 Let me try it again.
22     A. Okay.
23     Q. Do you have any knowledge of how an employee
24 would be aware, back in December of 2003, that if they

**Page 38**

1 were aware of a race that was going to take place at the
2 facility, that they should report that? And by that, I
3 mean a race between the employees, that they should
4 report that to their employer before the race takes
5 place?
6     A. No document that I'm aware of.
7     Q. I am not asking about a document. You
8 already said you weren't aware of a document. But I am
9 asking: Do you have any knowledge of how an employee
10 would know they are not supposed to be racing at the
11 facility?
12     A. I don't mean to sound flip about that, but
13 other than common sense, no. To me, it would be just
14 plain old common sense and good safety -- you know, just
15 being aware of, you know, potential safety problems.
16     Q. And the same question, would you have any
17 knowledge of how an employee would be aware, back in
18 December of 2003, that if they saw some employees racing
19 at the racetrack, that they have an obligation to report
20 that?
21     A. Other than, again, it is an unsafe -- It is
22 something unsafe that you would see.
23     Q. It is just something that they should report
24 because it is unsafe?

**Page 39**

1     A. That is what I would say. I mean you would
2 hope they would.
3     Q. And finally, do you have any knowledge of
4 how an employee, back in December of 2003, would be
5 aware that he or she was required to try to stop a race
6 of fellow employees at the racetrack?
7     A. Again, it would just be common sense to me.
8     Q. Okay. Do you know whether any conversations
9 between Mr. Williams or Mr. Peters and anybody else at
10 Dover Downs were recorded by tape-recording?
11     A. Am I aware of any conversations being
12 recorded?
13     Q. Yes.
14     A. No.
15     Q. Ms. Roberts, could you please look at
16 Exhibit Number 5? This is Sutor Exhibit Number 5. Take
17 a moment or two to look through it, and then tell me if
18 you can identify it.
19     A. It's the position statement that was
20 submitted from our attorney in response to the charge of
21 discrimination that was filed.
22     Q. Okay. Could you explain to me what the
23 procedure is or, let's say, was in December of 2003 for
24 responding to a charge of discrimination, assuming there

**Page 40**

1 was a procedure?
2     A. I don't necessarily know there was a written
3 procedure. But I can tell you what was common practice.
4     Q. If you could do that.
5     A. When a charge of discrimination is filed at
6 the Department of Labor, typically, we will receive that
7 charge of discrimination. Typically, it comes to me.
8 And I will fax it or send it to inside counsel and then
9 also to Montgomery, McCracken, Walker & Rhoads, who
10 responds to the position statement on our behalf.
11     Q. Okay. Is it fair to understand, given your
12 knowledge of discrimination law and so forth, that Dover
13 Downs would have understood in December of 2003 that
14 they had a duty to provide accurate information in
15 response to the charge of discrimination?
16     A. Oh, yes.
17     Q. Okay. Did you have any responsibility for
18 overseeing the accuracy of the information?
19     A. Typically, when a position statement is
20 submitted, we review it -- I review it, any of my HR
21 managers who are involved in the situation review it --
22 for accuracy. And then also, our inside counsel reviews
23 it for accuracy.
24     Q. And that is before it is sent to the agency;

### 41

1　is that a fair statement?
2　　A.　Yes.
3　　Q.　Did that happen in this case? Do you know?
4　　A.　Yes.
5　　Q.　Would it be fair to say, also, that the HR
6　department would have supplied to outside counsel the
7　various pieces of information that are set out in the
8　position statement?
9　　　　MS. FRIEL: Objection; calls for privileged
10　information.
11　　　　MR. HOMER: Again, I'm not asking for any
12　conversation. I am just asking whether they applied the
13　information that is in the letter. That is all I am
14　asking.
15　BY MR. HOMER:
16　　Q.　In other words, in this letter there is a
17　story told about the reason for the termination,
18　correct?
19　　A.　Typically, that is -- I haven't reread this
20　one.
21　　Q.　Go ahead and take a look at it.
22　　A.　Do you want me to go ahead and reread the
23　whole thing?
24　　Q.　Yes, if you feel you need to.

### 42

1　　A.　If you are going to be asking me questions
2　about it, yes.
3　　Q.　Then go ahead and read it.
4　　A.　Okay.
5　　Q.　Okay. Ms. Roberts, you have had a chance
6　now and have, in fact, read the entire letter, which is
7　the position statement, Exhibit 5, correct?
8　　A.　Yes.
9　　Q.　In that letter there are various pieces of
10　information; for example, the ages of the participants
11　in the race and the spectators of the race, and there is
12　a discussion about prior discipline of various people
13　and so forth. Did the HR department provide this
14　information to the attorney who wrote the letter?
15　　A.　I don't remember myself specifically
16　providing it, but I'm going to say that they would have
17　probably had to have gotten it from us.
18　　Q.　And are the statements in here accurate, to
19　the best of your knowledge, in terms of, first of all,
20　the ages of the participants, including the spectators
21　of the race?
22　　A.　I really don't know all of their ages.
23　　Q.　Okay.
24　　A.　So I'd like to look at this and say is

### 43

1　William Larnick 45? I don't know.
2　　Q.　But is it fair to say that the ages that are
3　put in here are based on the documents that HR gave to
4　the attorney who wrote the letter? The attorney who
5　wrote the letter wouldn't have known how old these
6　people were, would he?
7　　A.　Correct. We would have provided this
8　information.
9　　Q.　You wouldn't have any reason to disagree
10　with the ages that are in the letter at the time of the
11　incident? Is that a fair statement?
12　　A.　None jump out at me, but I don't know. I
13　really don't know their ages.
14　　Q.　Do you know whether Mr. Hands, who is
15　mentioned in this letter, was a full-time or a part-time
16　employee at the time of the incident that led to the
17　discharge of the Plaintiffs in this case?
18　　A.　I don't know.
19　　Q.　I'm not going to mark this as an exhibit,
20　but I would like to refer to it. This is a document
21　that was produced to us, and it is Bates-stamped D226.
22　I would like to show that to you.
23　　A.　Okay.
24　　Q.　Do you see there that Mr. Hands is listed as

### 44

1　a seasonal employee?
2　　A.　Uh-huh.
3　　Q.　That memo was dated January of '03. Again,
4　do you have any reason to believe that Mr. Hands became
5　a full-time employee after that memorandum was prepared?
6　　A.　I don't know.
7　　Q.　Okay. Ms. Roberts, this position statement
8　states or makes the argument at the end of the page,
9　D170, and it says -- and I will read this to you -- of
10　the four employees issued suspensions for their
11　involvement in the drag race, not one had a record of
12　disciplinary action, let alone a disciplinary action
13　that occurred within a month of the unauthorized drag
14　race, end quote.
15　　　　Would the attorney have obtained information
16　about that from the HR department?
17　　A.　Yes.
18　　Q.　Okay. And do you know when the attorney
19　obtained that information relative to the decision to
20　terminate the employees? Would it have been afterward?
21　　A.　Now, when you say the attorney, you are
22　talking about Kymberly Hankinson?
23　　Q.　Oh, yes, the author of this statement,
24　Kymberly Hankinson.

# EXHIBIT C

## 17

1   Inc. also applied in the following year in December of
2   2003?
3       A.   No. I think it's because the maintenance
4   group of employees at one point moved over from being
5   motor sports employees to gaming employees. I don't
6   remember that exact date. But they were under the motor
7   sports company. And at some point they moved over to be
8   gaming employees. I'm thinking that this was signed at
9   the time they were motor sports employees.
10      Q.   Right. But what I'm trying to get at is by
11  December of 2003, were they still employees of motor
12  sports or were they employees of Dover Downs, Inc.?
13      A.   I'm not sure of the date that they
14  transitioned.
15      Q.   If the transition was before that, would
16  this statement still apply to them, or would they have a
17  totally different --
18      A.   No. It would still apply.
19      Q.   It would still apply?
20      A.   Yes.
21      Q.   Do you know whether there is any more
22  recent -- more recent than August 5, 2002 -- statement
23  signed by Mr. Williams and Mr. Peters acknowledging that
24  they received the code of conduct and were bound by it?

## 18

1       A.   Do I know if there is a subsequent signed
2   form?
3       Q.   Yes.
4       A.   I don't know.
5       Q.   Okay. Ms. Roberts, you are familiar with
6   the termination of the Plaintiffs in this case,
7   Mr. Williams and Mr. Peters, by Dover Downs in December
8   of 2003; is that correct?
9       A.   Yes.
10      Q.   Okay. Can you explain what involvement you
11  had in that termination or those terminations?
12      A.   Uh-huh. Can you tell me what you mean by
13  what involvement? I mean how --
14      Q.   How were you involved in the process by
15  which they were terminated, assuming that you were?
16      A.   I was involved, and I was involved in -- you
17  know, it was brought to our attention that there was a
18  drag race out on the track. And I was involved in a
19  couple of different meetings, subsequent meetings to
20  determine what types of discipline would be issued to
21  the various individuals who were involved.
22      Q.   Other than those meetings, did you have any
23  involvement? For example, were you asked to put
24  together information from their files or anything of

## 19

1   that nature, or was your department asked to do that?
2       A.   We weren't asked to do it, but I did it.
3       Q.   Okay. What did you do?
4       A.   I just basically -- all the folks that were
5   involved in the drag race incident looked back at their
6   prior discipline.
7       Q.   And you did that on your own, or did
8   somebody ask you to do that?
9       A.   I did that on my own. But that is just part
10  of our process.
11      Q.   And when would that have been done as to
12  when they would have been discharged?
13      A.   Prior to their being discharged.
14      Q.   Right before? Do you remember how soon it
15  was after that you learned about the problem?
16      A.   I don't.
17      Q.   Okay. Did you or anyone in the HR
18  department talk to either Mr. Williams or Mr. Peters
19  about what happened at the racetrack?
20      A.   I did not, and neither did anybody in my
21  department.
22      Q.   Okay. Before Mr. Williams' and Mr. Peters'
23  employment were terminated by Dover Downs, did you or
24  anybody in the HR department speak to any of the

## 20

1   witnesses that gave statements about the incident at the
2   racetrack on December 23, 2003?
3       A.   No.
4       Q.   Okay. Did you or anyone at HR review a
5   videotape of the scene at the racetrack after the
6   accident which took place there on December 23, 2003?
7       A.   No, I did not.
8       Q.   Have you ever seen that videotape?
9       A.   No.
10      Q.   Can you explain what the process was that
11  was followed to reach the decision to terminate the
12  employment of Mr. Williams and Mr. Peters?
13      A.   The process that I followed?
14      Q.   The entire process, the process that is
15  used -- I take it you would have known what the process
16  was that was used to do the termination. I'm wondering
17  if you could explain to me what the process was, not
18  just whoever had recent involvement, but anybody else
19  that was involved.
20      A.   Well, the first thing that happened right
21  after it was brought to our attention that there was a
22  drag race out on the track, the security department,
23  members of the security department had begun to take
24  statements and interview witnesses to the incident. And

# EXHIBIT D

## Page 25

1　　A.　Vaguely, yes.
2　　Q.　Can you tell me what you know about that
3　incident or those incidents?
4　　A.　I remember I was surprised that the two
5　people involved, Williams and Peters, were insubordinate
6　in not carrying out the direction of their manager to
7　lead some men in the performance of some work.
8　　Q.　And when did you learn that they had refused
9　to do that?
10　　A.　I'm not exactly sure of the time point. I
11　may or may not have learned it immediately at the time
12　that it occurred or shortly thereafter. I can't pin
13　down the time.
14　　Q.　Were you involved in investigating that
15　matter?
16　　A.　No. I wasn't involved in any fashion.
17　　Q.　You were not involved in the decision to
18　discipline them for that?
19　　A.　No. That wouldn't rise to my level.
20　　Q.　Were you aware of the fact of this incident
21　before the termination decision was made for each of the
22　employees? And by that, I mean Mr. Williams and
23　Mr. Peters.
24　　A.　Yes.

## Page 26

1　　Q.　Okay. Was that discussed during the
2　discussions you had which resulted in the termination of
3　the Plaintiffs?
4　　A.　Yes.
5　　Q.　And who brought that up? Do you recall who
6　brought that up in the discussions?
7　　A.　Robin Roberts.
8　　Q.　What was the relevance of that, regarding
9　the decision to terminate their employment, if at all?
10　　A.　Very little. The incident itself was of
11　such an egregious nature that the insubordination
12　warnings were just piling on for what I consider -- I
13　would have made that decision regardless of the prior
14　incident. But it did come up during the discussion that
15　it occurred within a short time frame of when this
16　activity occurred.
17　　Q.　Mr. Sutor, your company's Answer to
18　Interrogatory Number 6 indicates that between the year
19　2000 and the present, four different individuals have
20　filed charges of age discrimination against the
21　Defendant; a Mr. Robert Faircloth, Mr. Robert Lewis, a
22　Frederick McDowell, and a Brance Thompson. Are you
23　familiar with the facts in any of those matters --
24　　A.　No, I'm not.

## Page 27

1　　Q.　-- leading up to the charge of
2　discrimination?
3　　A.　No, I'm not.
4　　Q.　Were you involved in any way in any of those
5　matters?
6　　A.　No.
7　　Q.　So as the chief operating officer, you are
8　not apprised of charges of discrimination that are
9　brought against Dover Downs?
10　　A.　They wouldn't rise to the same level of this
11　incident. This incident again involved, in my mind,
12　illegal activity, a scandalous type of activity that
13　could embarrass the company and jeopardize its license
14　to operate in the company. So clearly, it rose to a
15　level far greater than normal HR type of activities that
16　were handled by that department.
17　　Q.　So the fact that four different individuals
18　have filed age discrimination claims against Dover Downs
19　would not be a matter that would particularly concern
20　you in your capacity as chief operating officer?
21　　A.　I would be concerned if my attorneys warned
22　me that a pattern had developed that showed that we
23　needed to address it. But having been in the business
24　for over ten years at Dover Downs and the many thousands

## Page 28

1　of employees who had gone through, four complaints
2　doesn't seem -- and I'm not sure if any of them were
3　upheld or rejected. I'm not even sure. But it doesn't
4　sound to me to be a considerable number. And last, but
5　not least, my intimate knowledge of how the company
6　works and our policies and procedures give me comfort
7　that our company doesn't use age discrimination.
8　　Q.　You said ten years experience. Didn't you
9　tell me that you started at Dover Downs in 1999?
10　　A.　I started at Dover Downs in March of 1999.
11　However, I have to back up a little bit. When gaming
12　was passed back in 1994 in the State of Delaware, Dover
13　Downs retained the services under a management agreement
14　from Caesar's. I was responsible as a Caesar's
15　representative for coming to Delaware and setting up
16　their entire operation, including the selection of key
17　personnel, policies, procedures, drawing the facility.
18　I had visited Dover Downs at least on a monthly basis
19　every month since 1994. So I have been involved with
20　the gaming operations of Dover Downs from its inception.
21　　Q.　Okay. Are you familiar at all with the
22　litigation brought by Brance Thompson?
23　　A.　No.
24　　Q.　And you haven't been kept apprised of that

# EXHIBIT E

77

1 the drag race incident but was not terminated.
2      Did you come to learn that the DOL decision
3 was based on the notion that one of the people who
4 merely got suspended had been previously disciplined?
5    A.   I really don't remember.
6    Q.   Okay. Well, did anybody at Dover Downs
7 raise the point with the attorney that: Hey, the only
8 ones that got disciplined before the race incident were
9 the ones we fired? Did anybody ever raise that point at
10 Dover Downs with any of their attorneys?
11    A.   Can you ask that again? I am sorry.
12    Q.   I am asking: You don't recall this, but do
13 you know if anybody at Dover Downs ever raised this
14 point? Namely, that the only two individuals who had
15 been disciplined prior to the race were the Plaintiffs,
16 and nobody else had been? Did anybody ever raise that
17 point?
18      Let me back up a little bit. My
19 understanding of this is that the defense that was
20 raised -- and we can go back through the letters, if you
21 want -- the defense that was raised by Dover Downs was
22 that only the Plaintiffs were fired as spectators,
23 because they had been previously disciplined and nobody
24 else had been previously disciplined.

78

1      Wasn't that the rationale given to the
2 Department of Labor?
3    A.   I do believe that was a part of the final
4 decision, yes.
5    Q.   And then the decision comes out, and they
6 say one of the people that got suspended had prior
7 discipline. Therefore, your defense doesn't hold water.
8 Wasn't that what the determination of the Department of
9 Labor was?
10    A.   I honestly don't remember that.
11    Q.   I am not asking you to remember. I'm just
12 asking --
13    A.   I do now, having read it. And I am going to
14 assume that they are referring to Monohan, I guess.
15    Q.   Okay.
16    A.   I don't even --
17    Q.   Did anybody, after they got the decision at
18 Dover Downs, say: Hey, they've got this wrong. There
19 wasn't prior discipline of anybody but the two
20 Plaintiffs. Did anybody say that? Did anybody at HR
21 say that a mistake was made?
22    A.   I'm just understanding this now for the
23 first time.
24    Q.   Okay.

79

1    A.   So no.
2    Q.   So even though this defense was premised on
3 the notion that there was no prior discipline of anybody
4 else except for the people that got terminated, when
5 Dover Downs got the decision that somebody had been
6 disciplined previously and had only been suspended,
7 nobody thought to go to the Department of Labor and say:
8 Hey, the facts aren't right here?
9    A.   Like I said, I'm just understanding this for
10 the first time right now.
11    Q.   Who at HR would be responsible for looking
12 at the decision and understanding what happened? Who
13 has that responsibility? I'm talking about the
14 Department of Labor decision.
15    A.   Do you mean looking at the final decision
16 that the Department of Labor makes?
17    Q.   Right.
18    A.   It is us, in conjunction with our attorneys.
19    Q.   When you say us --
20    A.   Inside attorneys and Montgomery.
21    Q.   Do you personally have any role in that or
22 is it -- when you say us, who are you referring to at
23 HR?
24    A.   Do you mean do I have any role in

80

1 understanding the decision that is made that comes from
2 the Department of Labor?
3    Q.   Yes.
4    A.   Yes.
5    Q.   Okay. What is that role?
6    A.   It's understanding and hopefully learning
7 from whatever it is that, you know, has been decided,
8 whatever decision is made.
9    Q.   You testified that when this race incident
10 first happened, you personally checked the disciplinary
11 history of the people that were involved --
12    A.   I don't -- excuse me.
13    Q.   Let me finish. You testified that you
14 informed both the Plaintiffs that they were being fired
15 and you read them a statement that points out that they
16 were the only ones that were disciplined. Then you get
17 a decision from the Department of Labor that says: That
18 isn't true.
19      Do you have any role at that point in
20 saying: Wait a minute. We checked this, and they were
21 the only ones that were disciplined? Do you have any
22 function along that line?
23    A.   Yes. And had I known that and been made
24 aware of that, I may have taken some steps. But what I

**Page 81**

1 am saying is this is the first time I am understanding
2 this.
3    Q.   Are you saying that when the decision came,
4 you never saw the decision the Department of Labor made?
5    A.   I don't recall. I honestly don't recall,
6 because this is from a year ago.
7    Q.   What is the process that is used at Dover
8 Downs in the HR department? You are the head of the
9 department, right?
10   A.   Yes.
11   Q.   Isn't this a serious matter, when somebody
12 files a charge of discrimination?
13   A.   Yes.
14   Q.   Haven't you received training about the
15 importance of these types of claims?
16   A.   Yes.
17   Q.   And when a charge of discrimination is
18 filed, aren't you keenly interested in the defense of
19 that?
20   A.   Yes.
21   Q.   So why is it that when the decision comes
22 against you, that you are not aware of it?
23   A.   I didn't say I wasn't aware that the
24 decision came in against us. I was made aware of that.

**Page 82**

1 I just didn't know about the specifics. I didn't
2 know -- I didn't realize that it was based on -- I am
3 looking at this now, and I'm going to assume that it is
4 based on the fact that Monohan had a discipline that was
5 not factored into the final decision. And I don't know
6 that now. I don't have his file in front of me.
7    Q.   So your testimony is although you are aware
8 there was an adverse decision, you didn't try to
9 ascertain the rationale for the decision?
10   A.   I don't remember if I knew exactly what the
11 discussions were with Kymberly or our inside counsel. I
12 truly don't remember that.
13   Q.   Well, then are you saying that you might
14 have known what the rationale was after you got the
15 decision, before today?
16   A.   I'm going to say probably not, because I am
17 surprised.
18   Q.   Okay. To your knowledge, has Dover Downs
19 ever contended that the Plaintiffs in this case were
20 terminated from their positions solely because they were
21 judged to be more culpable regarding the race incident
22 than the other four individuals who were merely
23 suspended?
24   A.   Not solely, but it was a part -- you know,

**Page 83**

1 it was a factor in the final decision.
2    Q.   No. That is not what I am asking. I am
3 asking whether Dover Downs ever contended to the
4 Department of Labor that the Plaintiffs were more
5 culpable than the other four spectators of the race who
6 were not fired?
7        MS. FRIEL: Objection. I am assuming just
8 her knowledge, because conversations with the
9 department --
10       MR. HOMER: I am asking about her knowledge.
11       THE WITNESS: And you are asking me whether
12 Kymberly Hankinson talked to the department?
13       MR. HOMER: Can you read it back?
14       (The following was read:
15       "Question: No. That is not what I am
16 asking. I am asking whether Dover Downs ever contended
17 to the Department of Labor that the Plaintiffs were more
18 culpable than the other four spectators of the race who
19 were not fired?")
20 BY MR. HOMER:
21   Q.   And I will add to that, simply because of
22 what they did regarding the race?
23   A.   I'm sorry, but I'm not sure what you are
24 asking. Are you asking about a discussion that I might

**Page 84**

1 have had with the Department of Labor?
2    Q.   No, I'm not.
3    A.   Or just knowledge of --
4    Q.   No. I'm asking you whether you have any
5 understanding or any knowledge that Dover Downs, in
6 defending this charge of discrimination, ever contended
7 that the Plaintiffs were more culpable than the four
8 spectators as it related to the race itself? In other
9 words, let's assume there hadn't been any prior
10 disciplinary error. They still would have --
11   A.   For the two, Williams and Peters?
12   Q.   They still would have been fired because
13 they were more culpable than were the other four
14 spectators?
15   A.   I'm not exactly sure if that is what was
16 presented to the Department of Labor.
17   Q.   I am not asking about that. I am asking if
18 you were ever aware of Dover Downs ever making that
19 contention to the Department of Labor, that these two
20 Plaintiffs were more culpable than the other four
21 spectators for their involvement in the race?
22   A.   I don't know.
23   Q.   Did Dover Downs contest unemployment
24 benefits to Mr. Peters or Mr. Richards? Do you know

# EXHIBIT F

## Page 109

1  indicates that between 2000 and the present -- and the
2  present at that time was December 27, 2005 -- that there
3  had been four other charges of age discrimination filed
4  against the Defendant; namely, by Robert Faircloth,
5  Robert Lewis, Frederick McDowell, and Brance Thompson.
6  Are you aware of the facts underlying those
7  charges of discrimination?
8  A.  I am aware of all of them. I don't know all
9  of the specifics. I could not tell you all of the
10 specifics of all of them, no.
11 Q.  Let's take Robert Faircloth. Do you know
12 about when he filed his charge?
13 A.  No.
14 Q.  Do you know approximately?
15 A.  It's since 2001. It's one of the older
16 ones. That's all I know.
17 Q.  What do you remember about that charge?
18 What was his claim?
19 A.  I don't remember.
20 Q.  You don't have any recollection of it at
21 all?
22 A.  I know he goes by Bud Faircloth.
23 Q.  But you don't recall why he filed the charge
24 of discrimination?

## Page 110

1  A.  No.
2  Q.  Okay. How about Robert Lewis?
3  A.  I think he was -- no, I'm going to say no,
4  because I don't want to say things that I think -- no.
5  Q.  How about Frederick McDowell? You don't
6  remember that one either?
7  A.  I remember all of these. It's not to say I
8  am seeing these names and saying: Who the heck are
9  these people?
10 Q.  You only recognize these names. Is there
11 anything else you can tell me about their charge of
12 discrimination?
13 A.  No.
14 Q.  Would you have been involved in -- I think
15 you told me before that you were normally involved in --
16 A.  Absolutely.
17 Q.  And so after the year 2000, between the year
18 2000 and the present, you don't recall any details
19 whatsoever of any of these charges of discrimination?
20 All you can do is recognize their names; is that a fair
21 statement?
22 A.  I can tell you like where they worked, I
23 think, most of them.
24 Q.  Do you remember anything about what they

## Page 111

1  alleged, any of them?
2  A.  Again, I would be -- it would be fuzzy.
3  Q.  Well, I will take fuzzy. If you have fuzzy,
4  I will take it. What do you remember, if anything,
5  about any of the charges that were brought by any of
6  these four individuals?
7  A.  Robert Lewis was a cook. And I believe -- I
8  would rather not guess at these. I don't think -- I
9  would rather not guess.
10 Q.  So your testimony is you recall nothing
11 about the charges of discrimination, other than the
12 individuals' names that are listed here in the
13 interrogatory number 16 response?
14 A.  I could probably tell you what department
15 they worked in.
16 Q.  But other than that, though --
17 A.  Other than having a clear recollection and
18 being able to give that to you, no.
19 Q.  I am not asking for a clear recollection. I
20 am asking whether you can recall any of the allegations
21 by any of these four individuals that are named in the
22 response to interrogatory number 16?
23 A.  Do I recall any of the individuals?
24 Q.  Any of the allegations that any of them

## Page 112

1  made.
2  A.  Specifics, no.
3  Q.  So as head of the HR department, you have no
4  recollection of any specific allegations that any of the
5  four individuals made since the year 2000 regarding any
6  of these charges of discrimination?
7  A.  Again, it's fuzzy, because some of these
8  date back to six years. So do I have a good
9  recollection of exactly what happened with them? No, I
10 don't. Again, I can tell you what departments they work
11 in, I think.
12 Q.  But that is all you can tell me? Maybe you
13 can tell me that.
14 A.  And I can guess at what I think they are
15 about.
16 Q.  I am not asking you to guess. It strikes me
17 that as head of the HR department, you might have some
18 concern that four charges of age discrimination have
19 been brought against the company, and you might have
20 some recollection of some detail of an allegation that
21 somebody made about age discrimination out of the four.
22 MS. FRIEL: Is this a question?
23 MR. HOMER: I am leading up to a question.

### Page 113

1 BY MR. HOMER:
2     Q. But what you are telling me is you can't
3 recall a single detail about any of the allegations
4 made?
5     A. I would say I would prefer not to rely on a
6 fuzzy memory in some cases of things that happened over
7 six years ago.
8     Q. I don't mean to be overbearing about this,
9 but it is really not up to you that you would prefer not
10 to answer something where you have a clear recollection.
11     What I am asking is do you have any
12 recollection of any of the allegations of any of the
13 four that are listed in the interrogatory number 16
14 response? I think you said you don't. Is that right?
15     A. What I know about them, what I think I could
16 recall about them is what the departments -- what
17 departments they worked in and, in some cases, maybe
18 what their job was, but the circumstances surrounding
19 the charge, no.
20     Q. But at one time you would have seen the
21 charges of each one of these four individuals, right?
22     A. Yes. I know I did.
23     Q. And you would have been involved in
24 reviewing the responses that were sent to the Department

### Page 114

1 of Labor or the position statements that were sent to
2 the Department of Labor?
3     A. Yes.
4     Q. Okay. Let's turn to interrogatory number
5 17. Do you know what the status of the litigation with
6 Brance Thompson is?
7     A. I believe it is pending at this point.
8     Q. Do you have any other knowledge of where the
9 action sits?
10     A. No.
11     Q. All right. Let's go back to interrogatory
12 number 15. The question was: Identify the individual
13 who is most familiar with the benefits to which the
14 Plaintiffs would have been entitled if his employment
15 with Defendant had not been terminated. And then the
16 answer is Robin Roberts has knowledge of the benefits to
17 which the Defendants would have been entitled had they
18 remained employed by the Defendant.
19     Is that true, that you would have been the
20 one that was most familiar with the benefits?
21     MS. FRIEL: Objection. That is not what the
22 response states.
23     MR. HOMER: Well, the question is: Who is
24 most familiar? If that answer isn't responsive to that

### Page 115

1 question, I'm not too happy.
2     MS. FRIEL: Ms. Roberts will tell you about
3 her knowledge, but I'm not saying it is the knowledge.
4     MR. HOMER: Are you saying that this answer
5 is evasive, and it is not responsive to the question?
6     MS. FRIEL: I think it says that Ms. Roberts
7 has knowledge of the benefits.
8     MR. HOMER: Then you have given me the
9 answer Robin Roberts, and she is not the most familiar?
10     MS. FRIEL: You are asking the question that
11 someone else may be more knowledgeable. Ms. Robert may
12 know the answer. Why don't you ask the question?
13     MR. HOMER: I am telling you that I would be
14 upset at giving me an answer like that if you are not
15 responding to the question and telling me that. You
16 could have said she is not the most familiar, but she is
17 familiar. But in any event, let's move on.
18 BY MR. HOMER:
19     Q. Have you done any analysis to determine what
20 benefits the Plaintiffs would have been entitled to had
21 they not been terminated?
22     A. No.
23     Q. I would like to hand you again Exhibit 2,
24 which is the employee handbook. If you could, turn to

### Page 116

1 page 22 of the handbook, which is Bates-stamped D0409.
2     A. Uh-huh.
3     Q. It says at the top of that page: All
4 full-time regular employees are eligible to participate
5 in most of our benefits programs upon completing 30 days
6 of employment. Correct?
7     A. Well, it is actually 90 days now.
8     Q. Well, what about December of 2003?
9     A. That would have been correct at that point
10 in time.
11     Q. In any event, both Mr. Williams and
12 Mr. Peters were full-time regular employees who
13 qualified for the benefits program, correct?
14     A. Correct.
15     Q. Okay. The next few pages of this handbook
16 describe the various benefit programs, correct?
17     A. Yes.
18     Q. Are there any benefits that Mr. Williams and
19 Mr. Peters would have been entitled to had their
20 employment not been terminated that are not listed in
21 the employee handbook?
22     A. I can't think of any.
23     Q. Okay. Does Dover Downs know the average
24 value of their benefits package to hourly employees?

# EXHIBIT G

## Page 1

IN THE UNITED STATES DISTRICT COURT
IN FOR THE DISTRICT OF DELAWARE

RICHARD L. WILLIAMS and )
MICHAEL E. PETERS, )
   Plaintiffs, )
                   )
   v. ) C.A. No.
          ) 05-0435 (GMS)
DOVER DOWNS, INC., )
a Delaware corporation, )
   Defendant. )

Deposition of ROBIN ROBERTS, taken before Cheryl A. Anthony, Court Reporter, in the law offices of Parkowski, Guerke & Swayze, 116 West Water Street, Dover, Delaware, on Monday, February 13, 2006, beginning at 10:30 a.m.

APPEARANCES:

PARKOWSKI, GUERKE & SWAYZE
BY: JEREMY W. HOMER, ESQUIRE
116 West Water Street
Dover, Delaware 19901
Attorney for Plaintiffs.

MONTGOMERY, McCRACKEN, WALKER & RHOADS
BY: BETH A. FRIEL, ESQUIRE
123 South Broad Street
Philadelphia, Pennsylvania 19109
Attorney for Defendant.

ALSO PRESENT:

MR. RICHARD L. WILLIAMS

ORIGINAL RETAINED BY JEREMY W. HOMER, ESQUIRE

ANTHONY REPORTING
PO Box 234
Dover, Delaware 19903
(302)674-8884

## Page 2

1      ROBIN M. ROBERTS,
2  the witness herein, having first been
3  duly sworn on oath, was examined and
4  testified as follows:
5  BY MR. HOMER:
6      Q.  Ms. Roberts, could you state your address
7  and your phone number, please?
8      A.  Uh-huh. It's 253 Labrador Lane, Townsend,
9  Delaware 19734, and the home phone number is
10  302-376-1712.
11     Q.  Okay. During the course of the deposition
12  today, I'm going to ask a series of questions. If I ask
13  any question that you don't understand, don't try to
14  answer it. Just ask me to rephrase the question. Do
15  you understand that?
16     A.  Yes.
17     Q.  Is there any reason that your ability to
18  answer any of the questions today is impaired? For
19  example, have you been taking any medication?
20     A.  No.
21     Q.  Could you relate what you did to prepare for
22  today's deposition, if anything?
23     A.  I reviewed the investigation file of the
24  drag racing incident.

## Page 3

1     Q.  Okay. Anything else?
2     A.  No.
3     Q.  Did you discuss the deposition at all with
4  your attorneys?
5     A.  Yes.
6     Q.  What is your educational background?
7     A.  My undergraduate degree is in training,
8  design, and development -- I'm sorry; it's in education
9  from the University of Delaware. And my master's degree
10  is in training, design, and development from Penn State
11  University. And I have a national PHR certification.
12     Q.  Could you explain what that is?
13     A.  It's a national certification that is
14  recognized within the human resources industry. You
15  have to sit for a national test and, you know, it is a
16  broad body of knowledge that you are tested on relating
17  to human resource subjects.
18     Q.  Okay. Would that body include issues such
19  as legal issues involving age discrimination?
20     A.  Yes.
21     Q.  Okay. And have you had special training
22  about that issue?
23     A.  Yes.
24     Q.  Could you relate what that is?

## Page 4

1     A.  Well, besides to prepare for the PHR
2  certification, I actually took a 14-week long course at
3  Wilmington College, which included all areas of
4  discrimination and discrimination law. And then, also,
5  I took a week-long course from the Institute for Applied
6  Management and Law that was on labor relations law and
7  again covered these issues.
8     Q.  Have you attended, for example, any seminars
9  that would have involved any training about age
10  discrimination?
11     A.  I can't recall any that were specifically
12  related to age, but definitely discrimination through
13  the Society for Human Resource Management.
14     Q.  Okay. Could you describe for me your work
15  history? And what I would like you to do, if you can,
16  is go back from the time you finished your education and
17  chronologically move forward in time to the present, and
18  name each of your employers, the approximate dates of
19  your employment, and what your job duties were.
20     A.  Wow. Okay. So starting from when I
21  graduated from college --
22     Q.  Yes.
23     A.  -- for my undergraduate degree?
24     Q.  Right.